**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ASSOCIATED BANK, NATIONAL ASSOCIATION,<br><br>       Plaintiff,<br>  v.<br><br>JT LOGISTICS HOLDING COMPANY, LLC; JT LOGISTICS SOLUTIONS, LLC; JT TRANSPORTATION, LLC; JT FREIGHT, LLC; LIVIT STAFFING, LLC; JT REAL ESTATE HOLDINGS, LLC; JT PROPERTY SOLUTIONS, LLC; JT TRANSPORTATION LEASING SOLUTIONS, LLC; WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC; JT ECOMMERCE SOLUTIONS, LLC; JT PACKAGING SOLUTIONS, LLC; JT BINDING SOLUTIONS, LLC; JT INDUSTRIAL SERVICES, LLC; JT EXPEDITED SOLUTIONS, LLC; 700 BLAKELY, LLC; ANDRE J. EKIS; TROY J. STRAWHECKER; JAMES M. MYERS; JAMES R. CORD; JT LOGISTICS 4120 PARCEL A, LLC; and DIXON PROPERTIES – 3811, LLC,<br><br>       Defendants. | Case No. _____ |

**VERIFIED COMPLAINT FOR REPLEVIN, DETINUE,
<u>BREACH OF CONTRACTS, APPOINTMENT OF RECEIVER AND OTHER RELIEF</u>**

Plaintiff ASSOCIATED BANK, NATIONAL ASSOCIATION ("<u>Plaintiff</u>"), by and

through its undersigned counsel, states as follows for its Verified Complaint for Replevin, Detinue,

Breach of Contracts, Appointment of Receiver and Other Relief against Defendants (i) JT

LOGISTICS HOLDING COMPANY, LLC ("<u>Holding</u>"), (ii) JT LOGISTICS SOLUTIONS, LLC

("<u>JT Logistics</u>"), (iii) JT TRANSPORTATION, LLC ("<u>JT Transportation</u>"), (iv) JT FREIGHT,

LLC ("<u>JT Freight</u>"), (v) LIVIT STAFFING, LLC ("<u>LIVIT Staffing</u>"), (vi) JT REAL ESTATE

HOLDINGS, LLC ("JT Real Estate"), (vii) JT PROPERTY SOLUTIONS, LLC ("JT Property"), (viii) JT TRANSPORTATION LEASING SOLUTIONS, LLC ("JT Leasing"), (ix) WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC ("JT Warehouse"), (x) JT ECOMMERCE SOLUTIONS, LLC ("JT eCommerce"), (xi) JT PACKAGING SOLUTIONS, LLC ("JT Packaging"), (xii) JT BINDING SOLUTIONS, LLC ("JT Binding"), (xiii) JT INDUSTRIAL SERVICES, LLC ("JT Industrial"), (xiv) JT EXPEDITED SOLUTIONS, LLC ("JT Expedited"), (xv) 700 BLAKELY, LLC ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial and JT Expedited, each a "Borrower" and collectively, the "Borrowers"), (xvi) ANDRE J. EKIS ("Ekis"), (xvii) TROY J. STRAWHECKER ("Strawhecker"), (xviii) JAMES M. MYERS ("Myers"), (xix) JAMES R. CORD ("Cord"; and together with Holding, Ekis, Strawhecker and Myers, each a "Guarantor" and collectively, the "Guarantors"), (xx) JT LOGISTICS 4120 PARCEL A, LLC ("4120 Mortgagor"), and (xxi) DIXON PROPERTIES – 3811, LLC ("3811 Mortgagor"; and together with 4120 Mortgagor, Cord and JT Real Estate, each a "Mortgagor" and collectively, the "Mortgagors"):

## NATURE OF ACTION

1. As set forth below, the individual Guarantors own Holding, which in turn, owns all of the Borrowers. The Mortgagors—each of which are affiliates of the Borrowers—own certain real estate upon which the Borrowers operate. Collectively, the Borrowers and Mortgagors provide third-party logistics services, including warehousing, fulfillment, transportation, freight brokerage, industrial staffing, and warehouse technology services from approximately 13 facilities across Iowa, Nevada, Texas and Oklahoma.

2. Since December 27, 2024, Plaintiff provided loans and made other financial accommodations to, or for the benefit of, the defendants in a series of Loan Documents (defined herein).[1]

3. Notwithstanding the clear and express terms of the Loan Documents, Holding and the Borrowers failed to comply with many of their terms, thus causing various "Events of Default" thereunder. As a result of such Events of Default, on each of August 29, 2024, November 24, 2025 and March 31, 2026, Plaintiff notified the Borrowers and others of, *inter alia*, various then-existing Events of Default.

4. Holding, the Borrowers and Plaintiff entered into that certain Forbearance Agreement and Second Amendment to Credit and Security Agreement dated as of November 24, 2025 (the "Forbearance Agreement"), whereby Plaintiff agreed to forbear from exercising certain of its default-related rights and remedies against the Loan Parties and Collateral.

5. Despite additional accommodations from Plaintiff, the problems facing Holding and the Borrowers persisted. Plaintiff advised the Loan Parties of certain additional Events of Default in its Notice of Events of Default and Reservation of Rights letter dated March 31, 2026.

6. Rather than addressing such Events of Default, or attending to the myriad operational issues which caused the Events of Default, the Borrowers, through actions taken by Cord (the Borrowers' President and CEO), instead chose to borrow more money from third-party lenders in a series of undisclosed transactions.

7. As expected, the veritable house of cards ultimately collapsed. The Borrowers recently advised Plaintiff that their total funded debt is ~ $81 million. In addition, the Borrowers have ~$2.8 million of past-due trade payables, the majority of which are due to landlords and have

---

[1] Capitalized terms used and not otherwise defined herein shall have the same meanings assigned to them in the applicable Loan Documents.

exceeded the amounts available to them under the Loan Documents by ~$6.5 million. Under either recognized test—measured by their balance sheet(s) or their ability to pay their obligations as they become due—the Borrowers and Mortgagors are hopelessly insolvent. The totality of these events have caused Plaintiff to question (i) the Borrowers' ability to operate their businesses in conformance with the Loan Documents, (ii) the veracity of the Borrowers' actual and projected financial reporting and (iii) the lengths the Borrowers will go to save their struggling businesses.

## PARTIES

8. Plaintiff is a national banking association which maintains its principal place of business in Green Bay, Wisconsin and lawfully operates several bank branches throughout Cook County, Illinois.

9. Ekis is an individual who resides in Iowa.

10. Strawhecker is an individual who resides in Iowa and is the Chief Strategy Officer of JT Logistics

11. Myers is an individual who resides in Iowa.

12. Cord is an individual who resides in Iowa and is the President and CEO of JT Logistics.

13. Holding is an Iowa limited liability company which does business in Illinois and is wholly owned by Ekis, Myers, Strawhecker and Cord.

14. JT Logistics is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

15. JT Transportation is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

16. JT Freight is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

17. LIVIT Staffing is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

18. JT Real Estate is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

19. JT Property is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

20. JT Leasing is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

21. JT Warehouse is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

22. JT eCommerce is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

23. JT Packaging is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

24. JT Binding is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

25. JT Industrial is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

26. JT Expedited is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

27.     700 Blakely is an Iowa limited liability company which does business in Illinois and is wholly owned by Holding.

28.     4120 Mortgagor is an Iowa limited liability company which does business in Illinois and is wholly owned by 4120 E 13th Street, LLC, an Iowa limited liability company, which is owned by JT Real Estate.

29.     3811 Mortgagor is an Iowa limited liability company that is wholly directly/indirectly owned by members who reside in Iowa.

30.     The Borrowers, Guarantors and Mortgagors are collectively referred to herein as the "Defendants."

**JURISDICTION AND VENUE**

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

32.     At all times relevant hereto, Plaintiff has been and remains a national banking association with its main/principal office located in Green Bay, Wisconsin. *See, e.g., Guarantee Co. of N. Am. USA v. Associated Bank, N.A.*, No. 17-CV-4268 (JNE/LIB), 2019 WL 4897171, at *1 (D. Minn. Aug. 27, 2019) ("Associated is a nationally chartered bank with its principal office in Wisconsin"). Accordingly, for purposes of diversity jurisdiction, Plaintiff is a citizen of Wisconsin. *See, e.g., Wells Fargo Bank, N.A. v. iServe Residential Lending, LLC*, No. 23-CV-1445 (JRT/DLM), 2023 WL 5277012, at *1 n.2 (D. Minn. May 25, 2023) (noting that a national banking association is a citizen of the state where its main office is located).

33.     For purposes of diversity jurisdiction, limited liability companies are citizens of the states where their members, sub-members and sub-sub-members are citizens. *See Wells Fargo*

*Bank*, 2023 WL 5277012, at \*2 (internal quotations omitted). As detailed above, the members of the Borrowers, Holding and corporate Mortgagors—each a limited liability company—are exclusively Iowa citizens. The Borrowers, Holding and corporate Mortgagors are therefore Iowa citizens for diversity purposes. Further, the individual Guarantors are domiciled in Iowa and therefore Iowa citizens. Accordingly, all of the Defendants are Iowa citizens, and none of the Defendants are Wisconsin citizens. Thus, complete diversity exists between the parties.

34. This Court has personal jurisdiction over the Defendants because they (i) conduct business in this jurisdiction, (ii) entered into and breached contracts substantially connected to this jurisdiction and (iii) agreed to personal jurisdiction in this jurisdiction through the express forum selection clauses contained in the subject Loan Documents.

35. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because: (i) the Defendants conduct business in this judicial district; (ii) a substantial part of the events giving rise to Plaintiff's causes of action set forth herein occurred in this judicial district; and (iii) the express forum selection clauses contained in the subject Loan Documents provide that any action arising out of or relating thereto may be brought in this Court.

## FACTS COMMON TO ALL COUNTS

36. Beginning around December 27, 2024 and continuing from time to time thereafter, Plaintiff made certain loans, advances, extensions of credit and other financial accommodations to the Borrowers, in an aggregate original principal amount of approximately $28,430.000.00, pursuant to the terms and conditions set forth in that certain Credit and Security Agreement, originally dated as of December 27, 2024, by and between Holding, the Borrowers and Plaintiff (collectively, the "Credit Parties"), as thereafter modified, amended and otherwise supplemented by (i) that certain First Amendment to Credit and Security Agreement, dated as of November 7,

2025, by and between the Credit Parties and (ii) the Forbearance Agreement (collectively with all related schedules, riders, exhibits and similar items, and as modified, amended and otherwise supplemented from time to time, the "Credit Agreement"). A true and correct copy of the Credit Agreement is attached hereto and incorporated herein as **Exhibit 1**.

**I.      The Notes.**

37.      As evidence of the Revolving Loans contemplated in the Credit Agreement, and the Borrowers' promises to repay the corresponding borrowed funds plus interest and other fees, costs, charges and expenses, on or around December 27, 2024, the Borrowers executed and delivered to Plaintiff that certain Revolving Note, dated December 27, 2024, in the original principal amount of $20,000,000.00 (as modified, amended or otherwise supplemented from time to time, the "Revolving Note"). A true and correct copy of the Revolving Note is attached hereto and incorporated herein as **Exhibit 2**.

38.      As evidence of the Term Loan contemplated in the Credit Agreement, and the Borrowers' promises to repay the corresponding borrowed funds plus interest and other fees, costs, charges and expenses, on or around December 27, 2024, the Borrowers executed and delivered to Plaintiff that certain Term Note, dated December 27, 2024, in the original principal amount of $2,530,000.00 (as modified, amended or otherwise supplemented from time to time, the "Term Note"). A true and correct copy of the Term Note is attached hereto and incorporated herein as **Exhibit 3**.

39.      As evidence of the Capex Loan(s) contemplated in the Credit Agreement, and the Borrowers' promises to repay the corresponding borrowed funds plus interest and other fees, costs, charges and expenses, on or around December 27, 2024, the Borrowers executed and delivered to Plaintiff that certain Capex Note, dated December 27, 2024, in the original principal amount of

$3,000,000.00 (as modified, amended or otherwise supplemented from time to time, the "Capex Note"). A true and correct copy of the Capex Note is attached hereto and incorporated herein as **Exhibit 4**.

40. As evidence of the HVAC Equipment Loan contemplated in the Credit Agreement, and the Borrowers' promises to repay the corresponding borrowed funds plus interest and other fees, costs, charges and expenses, on or around December 27, 2024, the Borrowers executed and delivered to Plaintiff that certain HVAC Equipment Loan Note, dated December 27, 2024, in the original principal amount of $2,900,000.00 (as modified, amended or otherwise supplemented from time to time, the "HVAC Equipment Loan Note"). A true and correct copy of the HVAC Equipment Loan Note is attached hereto and incorporated herein as **Exhibit 5**.

41. The Revolving Note, Term Note, Capex Note and HVAC Equipment Loan Note are collectively referred to herein as the "Notes."

**II.     The Guarantees.**

42. To induce Plaintiff to make the Loans to the Borrowers, on or around December 27, 2024, Holding executed and delivered to Plaintiff that certain Guaranty and Security Agreement, dated December 27, 2024 (together with all related schedules, riders, exhibits and similar items (if any), as modified, amended or otherwise supplemented from time to time, the "Holding Guaranty and Security Agreement"), whereby Holding, among other things, unconditionally and irrevocably guaranteed, *inter alia*, all of the Borrowers' Obligations to Plaintiff. A true and correct copy of the Holding Guaranty and Security Agreement is attached hereto as **Exhibit 6** and is incorporated herein by reference.

43. To induce Plaintiff to make additional Loans to the Borrowers, on or around October 24, 2025, Cord executed and delivered to Plaintiff that certain Guaranty and Security

-9-

Agreement, dated October 24, 2025 (as modified, amended or otherwise supplemented from time to time, the "Cord Guaranty"), whereby Cord unconditionally and irrevocably guaranteed, *inter alia*, all of the Borrowers' Obligations to Plaintiff. A true and correct copy of the Cord Guaranty is attached hereto as **Exhibit 7** and is incorporated herein by reference.

44. To induce Plaintiff to make additional Loans to the Borrowers, on or around October 27, 2025, Strawhecker executed and delivered to Plaintiff that certain Guaranty and Security Agreement, dated October 27, 2025 (as modified, amended or otherwise supplemented from time to time, the "Strawhecker Guaranty"), whereby Strawhecker unconditionally and irrevocably guaranteed, *inter alia*, all of the Borrowers' Obligations to Plaintiff. A true and correct copy of the Strawhecker Guaranty is attached hereto as **Exhibit 8** and is incorporated herein by reference.

45. To induce Plaintiff to, *inter alia*, make certain Loans and enter into the Forbearance Agreement, on or around November 24, 2025, Myers executed and delivered to Plaintiff that certain Guaranty and Suretyship Agreement, dated as of November 26, 2025, (as modified, amended or otherwise supplemented from time to time, the "Myers Guaranty"), whereby Myers unconditionally and irrevocably guaranteed, *inter alia*, certain of the Borrowers' Obligations to Plaintiff. A true and correct copy of the Myers Guaranty is attached hereto as **Exhibit 9** and is incorporated herein by reference.

46. To induce Plaintiff to, *inter alia*, make certain Loans and enter into the Forbearance Agreement, on or around November 26, 2025, Ekis executed and delivered to Plaintiff that certain Guaranty and Suretyship Agreement, dated as of November 26, 2025 (as modified, amended or otherwise supplemented from time to time, the "Ekis Guaranty"), whereby Ekis unconditionally and irrevocably guaranteed, *inter alia*, certain of the Borrowers' Obligations to Plaintiff. A true

and correct copy of the Ekis Guaranty is attached hereto as **Exhibit 10** and is incorporated herein by reference.

47. The Holding Guaranty and Security Agreement, Cord Guaranty, Strawhecker Guaranty, Myers Guaranty and Ekis Guaranty are collectively referred to as the "Guarantees."

**III. The Collateral, Security Agreements, Mortgages, Perfection Documents and Related Items.**

48. Pursuant to, *inter alia*, Article IV of the Credit Agreement, the Defendants granted Plaintiff security interests in substantially all of their assets as security for the Obligations to Plaintiff. *See* Credit Agreement (**Ex. 1**), § 4.1.

49. Additionally, pursuant to the Holding Guaranty and Security Agreement, Holding granted Plaintiff a security interest in substantially all of Holding's assets as collateral for the Secured Obligations to Plaintiff. *See* Holding Guaranty and Security Agreement (**Ex. 6**), §§ 1-3.

50. To induce Plaintiff to make the Loans, on or around December 27, 2024, JT Logistics and JT eCommerce executed and delivered to Plaintiff that certain Trademark Security Agreement, dated as of December 27, 2024 (together with all related schedules, riders, exhibits and similar items (if any), as modified, amended or otherwise supplemented from time to time, the "Trademark Security Agreement"), pursuant to which JT Logistics and JT eCommerce granted Plaintiff security interests in, *inter alia*, the Trademark Collateral (as such term is defined in the Trademark Security Agreement) as security for the Obligations to Plaintiff. A true and correct copy of the Trademark Security Agreement is attached hereto as **Exhibit 11** and is incorporated herein by reference.

51. To induce Plaintiff to make additional Loans, on or around January 9, 2026, Cord executed and delivered to Plaintiff that certain Motor Vehicle/Equipment Security Agreement dated effective as of January 9, 2026 (the "Motor Vehicle/Equipment Security Agreement"),

pursuant to which Cord granted Plaintiff security interests in, *inter alia*, the Titled Collateral (as such term is defined in the Motor Vehicle/Equipment Security Agreement) including two Bentley / Continental GT Speed models and an Aston Martin / Vanquish, as security for the Obligations to Plaintiff. A true and correct copy of the Motor Vehicle/Equipment Security Agreement is attached hereto as **Exhibit 12** and is incorporated herein by reference.

52.     The Credit Agreement, Holding Guaranty and Security Agreement, Trademark Security Agreement and Motor Vehicle/Equipment Security Agreement are collectively referred to herein as the "Security Agreements."

53.     To induce Plaintiff to make further Loans to the Borrowers, on or around March 9, 2026, Cord executed and delivered to Plaintiff that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of March 9, 2026 and recorded with the Polk County, Iowa Recorder's Office as Document No. 202600012485 (the "Urbandale Mortgage"), pursuant to which, *inter alia*, Cord granted Plaintiff a security interest in the real property commonly known as 12951 Oak Brook Drive, Urbandale, Iowa 50323 (the "Urbandale Real Estate") as collateral for the Obligations to Plaintiff. A true and correct copy of the Urbandale Mortgage is attached hereto and incorporated herein as **Exhibit 13**.

54.     To induce Plaintiff to make further Loans to the Borrowers, on or around March 9, 2026, JT Real Estate executed and delivered to Plaintiff that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of March 9, 2026 and recorded with the Poweshiek County, Iowa Recorder's Office as File No. 2026-00647 (the "Grinnell Mortgage"), pursuant to which, *inter alia*, JT Real Estate granted Plaintiff a security interest in the real property commonly known as 700 Blakely Circle, Grinnell, Iowa 50112 (the "Grinnell Real

Estate") as collateral for the Obligations to Plaintiff. A true and correct copy of the Grinnell Mortgage is attached hereto and incorporated herein as **Exhibit 14**.

55. To induce Plaintiff to make further Loans to the Borrowers, on or around March 9, 2026, 4120 Mortgagor executed and delivered to Plaintiff that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of March 9, 2026 and recorded with the Story County, Iowa Recorder's Office as Instrument No. 2026-01831 (the "Ames Mortgage"), pursuant to which, *inter alia*, 4120 Mortgagor granted Plaintiff a security interest in the real property commonly known as 4120 E. 13th Street, Ames, Iowa 50010 (the "Ames Real Estate") as collateral for the Obligations to Plaintiff. A true and correct copy of the Ames Mortgage is attached hereto and incorporated herein as **Exhibit 15**.

56. To induce Plaintiff to make further Loans to the Borrowers, on or around March 9, 2026, 3811 Mortgagor executed and delivered to Plaintiff that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of March 9, 2026 and recorded with the Polk County, Iowa Recorder's Office as Document No. 202600012486 (the "Des Moines Mortgage"), pursuant to which, *inter alia*, 3811 Mortgagor granted Plaintiff a security interest in the real property commonly known as 3811 Dixon Street, Des Moines, Iowa 50313 (the "Des Moines Real Estate") as collateral for the Obligations to Plaintiff. A true and correct copy of the Des Moines Mortgage is attached hereto and incorporated herein as **Exhibit 16**.

57. The Urbandale Mortgage, Grinnell Mortgage, Ames Mortgage and Des Moines Mortgage are collectively referred to herein as the "Mortgages."

58. The Urbandale Real Estate, Grinnell Real Estate, Ames Real Estate and Des Moines Real Estate are collectively referred to herein as the "Real Estate Collateral."

-13-

59.     All of the Collateral other than the Real Estate Collateral is collectively referred to herein as the "Personal Property Collateral."

60.     Plaintiff's secured interests in the Collateral were and remain perfected by, *inter alia*:

(a)     those certain UCC Financing Statements filed with the Iowa Secretary of State and assigned File Nos. (i) X25000838-9, (ii) X25000839-6, (iii) X25000840-1, (iv) X25000841-8, (v) X25000842-5, (vi) X25000843-2, (vii) X25000844-9, (viii) X25000845-6, (ix) X25000846-3, (x) X25000847-0, (xi) X25000848-7, (xii) X25000849-4, (xiii) X25000850-9, (xiv) X25000851-6 and (xv) X25000852-3;

(b)     the filing on the Trademark Security Agreement with the United States Patent and Trademark Office at Reel: 008708 Frame: 0950;

(c)     Plaintiff's (i) notations of its liens on the Certificates of Titles issued in connection with certain titled Personal Property Collateral, (ii) delivery of the requisite applications and Certificates of Title, and payments/deposits of all applicable fees, as required to perfect its security interests for certain Iowa-titled and California-titled Personal Property Collateral in accordance with, *inter alia*, Iowa Code Ann. § 321.50 and Cal. Veh. Code § 6300 and/or (iii) possession of the applicable Certificates of Title for any titled Personal Property Collateral which constitutes inventory (*see, e.g.*, Cal. Veh. Code §§ 5907 and 6303); and

(d)     recording of the Mortgages with the applicable Recorders, as detailed above.

61.     True and correct copies of the aforementioned UCC Financing Statements and certain Certificates of Title are attached hereto and incorporated herein as **Exhibit 17**.

62.     The Credit Agreement, Notes, Guarantees, Security Agreements, Mortgages, UCC Financing Statements and relevant Certificate of Title documents are collectively referred to herein as the "Loan Documents."

## IV.     The Defaults.

63.     By no later than June 30, 2025, Defaults, defaults, Events of Default, events of default, breaches and violations (however so defined) had occurred and remained ongoing under

the Loan Documents based upon, at least, each of the following events (collectively, and as further supplemented herein, the "Defaults"):

(a)  the Borrowers' failure to maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 for the Computation Period ended June 30, 2025, September 30, 2025, December 31, 2025 and March 30, 2026 (*see* Credit Agreement. (**Ex. 1**), §§ 7.25(a) and 10.5);

(b)  the Borrowers' failure to reduce the Temporary Overadvance Amount to $0.00 as of January 31, 2026 and thereafter (a Temporary Overadvance Amount of $6,500,000.00 remains outstanding);

(c)  the Borrowers' failure to own, safeguard and protect all Collateral for the Agent's account, including, without limitation, the alleged sale(s) of certain Collateral to Libertas Funding, LLC (*see* Credit Agreement. (**Ex. 1**), §§ 4.3-4.5, 10.4-10.5 and 10.8);

(d)  the Borrowers' failure to defend the Agent's and Lenders' interests in the Collateral against all Persons (*see* Credit Agreement. (**Ex. 1**), §§ 4.6, 10.5 and 10.8);

(e)  the Borrowers' failure to comply with the disclosure/reporting requirements set forth in Sections 9.1-9.4 of the Credit Agreement (including, without limitation, the Loan Parties' failure to timely notify Plaintiff of the Libertas Transactions (as such term is defined herein)) (*see* Credit Agreement. (**Ex. 1**), §§ 9.1-9.4, 10.3 and 10.5);

(f)  one or more of the Defendants' failure to timely and fully deliver Plaintiff the audited financial statements of the Loan Parties for the fiscal year 2025 as required by Section 9.5 of the Credit Agreement (*see* Credit Agreement. (**Ex. 1**), §§ 9.5 and 10.3); and

(g)  one or more of the Defendants becoming insolvent (*see* Credit Agreement. (**Ex. 1**), § 10.7).

64.  In light of the then-existing Defaults, and pursuant to, *inter alia*, that certain Notice of Events of Default, Imposition of Default Interest, Acceleration, Demand for Return of Collateral and Reservation of Rights dated May 21, 2026 (the "Acceleration Notice"), Plaintiff accelerated the Defendants' Obligations to Plaintiff and declared all outstanding amounts owed by the respective Defendants under and in connection with the Loan Documents immediately due and payable. A true and correct copy of the Acceleration Notice is attached hereto and incorporated herein as **Exhibit 18**.

65. Notwithstanding Plaintiff's Acceleration Notice and other demands to the Defendants, to date, the Defendants have failed to: (i) timely and fully satisfy their Obligations to Plaintiff under and in connection with the Loan Documents; (ii) cure the Defaults; and (iii) deliver the Personal Property Collateral to Plaintiff, or otherwise assemble or make the Personal Property Collateral available to Plaintiff as required by the Loan Documents. Each of these failures constitute additional Defaults.

66. This Complaint shall constitute another demand upon the Defendants to: (i) fully cure the Defaults; (ii) deliver the Personal Property Collateral to Plaintiff or otherwise assemble or make the Personal Property Collateral available to Plaintiff as required by the Loan Documents; and (iii) otherwise satisfy their respective Obligations to Plaintiff under and in connection with the Loan Documents.

67. After applying all applicable credits, as of May 27, 2026, the aggregate outstanding balance immediately due and owing to Plaintiff under and in connection with the Loan Documents is no less than $19,909,187.37 *plus* certain interest, expenses, attorneys' fees and costs which have accrued and continue to accrue.

68. At all relevant times, Plaintiff was and remains the holder of the Loan Documents and has performed all of the terms, conditions and covenants required of it thereunder, and all conditions precedent for the maintenance of this action have been performed, satisfied or waived.

69. Plaintiff has performed all of its obligations under each of the Loan Documents.

### FACTS SUPPORTING A RECEIVERSHIP
### OVER THE CORPORATE DEFENDANTS AND COLLATERAL

70. "Federal courts have the inherent equitable power to appoint a receiver during the pendency of litigation." *Miller v. Up in Smoke, Inc.*, No. 1:09-CV-242, 2010 WL 5095812, at *2 (N.D. Ind. Dec. 8, 2010) (quoting *JPMorgan Chase Bank, N.A. v. Heritage Nursing Care, Inc.*,

No. 06 C 4803, 2007 WL 2608827, at *8–9 (N.D. Ill. Sep. 6, 2007)); *see also* Fed. R. Civ. P. 66 (specifically allowing for the appointment of a receiver).

71.     "The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." *Heritage Nursing*, 2010 WL 5095812 at *7 (internal citations/quotations omitted).  However, the federal court may look to underlying state law for purposes of "shaping" the underlying relief.  *See Houseware Sales Corp. v. Quaker Stretcher Co.,* 70 F. Supp. 747, 750 (E.D. Wis. 1947); *see also Morgan Stanley Smith Barney LLC v. Johnson*, 952 F.3d 978, 983 (8th Cir. 2020) ("Though appointing a receiver is a matter of federal law, in the absence of substantial federal precedent in a particular context, federal courts are quite likely to look to state law for guidance.").

72.     A plaintiff seeking the appointment of a receiver "must first show that he or she has some legally recognized right in that property that amounts to more than a mere claim against defendant." *Heritage Nursing*, 2010 WL 5095812 at *7 (internal citations omitted).  Notably, "secured creditors clearly have an interest in the property on which they have a security interest that may provide a basis for convincing the court to appoint a receiver ending a foreclosure suit or any other action to enforce one or more outstanding liens." *Id.* (internal citations/quotations omitted).

73.     Additional factors which federal courts consider when determining if a receiver should be appointed include:

> 1. Any fraudulent conduct on the part of the defendant; 2. The imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; 3. The inadequacy of the available legal remedies; 4. The probability that the harm to the plaintiff by the denial of the appointment would be greater than the injury to the parties opposing appointment; and 5. The plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*See Miller,* 2010 WL 5095812 at *3 (internal citations omitted).  The foregoing list is non-

exhaustive and there is no "precise formula" that federal courts use. *Id.*; *see also Heritage Nursing*, 2010 WL 5095812 at *9 (internal citations omitted).

74. Each of these factors are present here. **First**, the Defendants have engaged in—and continue to engage in—fraudulent conduct.

75. More specifically, within the last year, the Borrowers knowingly and brazenly "sold" or encumbered certain Collateral to Libertas and/or its affiliates, in a series of nine (9) transactions, which caused the Borrowers to incur additional debt of at least $8,500,000.00 bearing an annual interest rate in excess of 40% (collectively, the "Libertas Transactions").

76. The Libertas Transactions were not approved by Plaintiff, were only disclosed to Plaintiff after they were completed and were in direct violation of the Loan Documents.

77. **Second**, the Collateral is in imminent danger of being lost, concealed, injured, diminished in value or squandered, as evidenced by, *inter alia*, the following items reflected in recent financial reporting provided by the Borrowers to Plaintiff:

(a) the Borrowers' forecasted continued operations are largely (if not entirely) dependent upon their ongoing use and consumption of Collateral (including accounts receivable), rather than self-generated cash flow, thereby subjecting the Collateral and its revenue-producing potential to continued depletion, dissipation and impairment;

(b) the Borrowers' forecasted weekly operating disbursements materially exceed the Borrowers' forecasted cash receipts, jeopardizing the Borrowers' ability to pay payroll, tax, trade debt and amounts owed to Plaintiff;

(c) the Borrowers lack sufficient unencumbered assets to pay their unsecured debts as they come due (including, without limitation, approximately $2,800,000.00 in past-due payables to third parties); and

(d) the Borrowers are unable to procure financing or equity from other sources without further cannibalizing Collateral pledged to Plaintiff.

78. In fact, upon information and belief, JT Logistics and LIVIT Staffing failed to satisfy their latest weekly payroll obligations in an aggregate approximate amount of $446,998.29.

79.     Moreover, upon information and belief, JT Logistics is more than 60 days' past-due on real property lease payments, in an aggregate amount of at least $2,130,052.07, in connection with four of its places of business, resulting in at least three landlords sending the JT Logistics default notices and a fourth landlord sending JT Logistics a "Notice to Quit."

80.     Upon information and belief, the leased real estate at issue in the foregoing paragraph is essential to the Borrowers' operations, as the Borrowers actively operate from such locations and store, *inter alia*, critical inventory, equipment and customer goods owned by third parties at such locations.

81.     Moreover, the Borrowers have no less than approximately $700,000.00 of past-due payments on their Capital One and WEX Bank credit cards.

82.     Thus, the Borrowers are insolvent and are unable to (or in imminent danger of being unable to) satisfy their operating expenses (including their payroll), which will almost assuredly lead to an operational shutdown, loss of over 300 jobs and rapid deterioration of the Collateral's value.

83.     The Defendants' insolvency and general failure to pay their debts as they become due is further evidenced by, *inter alia*, the Defendants' failure to timely and fully make the payments due and owing to Plaintiff under and in connection with the Loan Documents.

84.     The Defendants continue to use the Collateral for their own benefit, which: (i) violates their obligations under the Loan Documents; (ii) depreciates the Collateral's value; and (iii) subjects the Collateral to waste, loss, dissipation and impairment and danger thereof.

85.     ***Third***, the failures of the Defendants to cure the Defaults, coupled with the Defendants' current and projected diminishing financial conditions and ongoing breaches of the Loan Documents, indicate the Defendants would likely be unable to satisfy the money judgments

requested herein, and thus any remedy at law would be inadequate.

86. Given such inability, Plaintiff will suffer immediate and irreparable injury if the Defendants continue to possess and operate the Collateral without court supervision.

87. So long as the Collateral is used by the Defendants in violation of the Loan Documents—all to the Defendants' windfall and Plaintiff's detriment—there is an immediate danger of irreparable loss, impairment, liability, depreciation and encumbrance to the Collateral, which Plaintiff specifically seeks to forestall by way of the appointment of a receiver.

88. The Defendants do not own any material assets other than the Collateral.

89. The Borrowers' assets are subject to an ongoing and rapid diminution in value.

90. The aggregate value of the Defendants' assets is substantially less than the aggregate amount of the Defendants' combined outstanding debts.

91. *Fourth*, as detailed elsewhere in this Complaint, Plaintiff is likely to suffer great harm if a receiver is not appointed.

92. On the other hand, the Defendants are unlikely to suffer substantial injury from the appointment of a receiver.

93. Indeed, in the Loan Documents, the Defendants agreed that the Defaults entitle Plaintiff to the appointment of a receiver. *See, e.g.,* Credit Agreement (**Ex. 1**), § 11.1(l); *see also* Mortgages (**Exs. 13-16**), § 12(d).

94. Appointment of a receiver is proper and necessary in order to (i) protect, maintain and maximize the value of the Defendants and Collateral and (ii) facilitate the transfer of information concerning the same as required under the Loan Documents and applicable law.

95. If a court-appointed receiver obtains timely access to the Defendants' books, records and assets, Plaintiff is ready, willing and able to provide additional funding to stabilize the

Defendants' operations and save the jobs of their employees, with such additional funding being afforded the protections contemplated in a subsequently entered order appointing receiver. *See also, e.g.,* 765 ILCS § 1090/12(a)(4) (authorizing a receiver to "incur debt under a secured obligation in effect as of the receiver's appointment subject to the same terms, conditions, and lien priorities that existed as of the receiver's appointment").

96. Appointment of a receiver will permit Plaintiff to make additional protective advances, through the vehicle and structure of the receivership proceeding, to effectively manage and preserve the Defendants and Collateral, to keep it in proper repair, and to make payments to appropriate parties to facilitate an orderly sale of the corporate Defendants and Collateral.

97. ***Fifth***, in light of the verified allegations set forth herein, Plaintiff has established *prima facie* causes of action on its underlying breach of contract, replevin and detinue claims.

98. The proposed receiver's qualifications and fee structure, as well as a proposed order appointing receiver, will be tendered to the Court with a subsequent motion filed by Plaintiff.

### COUNT I
### BREACH OF REVOLVING NOTE AGAINST THE BORROWERS

99. Plaintiff adopts and incorporates the allegations set forth in each of the above Paragraphs as though fully set forth herein for this Paragraph.

100. Despite Plaintiff's demand, to date, the Borrowers have failed to: (i) pay Plaintiff the full outstanding Revolving Loans indebtedness due and owing under and in connection with the Revolving Note and Credit Agreement; and (ii) otherwise cure the Defaults.

101. By failing to cure the Defaults or otherwise satisfy their Obligations to Plaintiff concerning the Revolving Loans, the Borrowers have materially breached—and remain in material breach of—the Revolving Note and Credit Agreement.

102. Plaintiff has performed all of its obligations under the Revolving Note and Credit

Agreement.

103. Plaintiff is entitled to recover from the Borrowers its costs and attorneys' fees incurred in connection with the enforcement of Plaintiff's rights and remedies under and in connection with the Loan Documents. *See*, *e.g.*, Credit Agreement (**Ex. 1**), § 16.16.

104. After applying all applicable credits to the Revolving Loans, as of May 27, 2026, the amount immediately due and owing by the Borrowers to Plaintiff under and in connection with the Revolving Loans was no less than $13,787,889.95, excluding certain interest, fees and costs that have accrued and will continue to accrue.

**WHEREFORE**, Plaintiff respectfully requests the Court to: (i) enter a money judgment in favor of Plaintiff and against the Borrowers, jointly and severally, in an amount to be established through evidence acceptable to this Court; (ii) award it all additional expenses incurred in this cause including, but not limited to, collection costs and attorneys' fees; and (iii) award it such further relief as is appropriate.

Additionally, Plaintiff respectfully requests that this Court enter an order: (i) appointing a receiver over the Borrowers and Collateral; (ii) granting said receiver broad powers, including, without limitation, the powers to (a) assume custody and control of the Borrowers and Collateral, (b) market and sell the Collateral (in whole, in part, cumulatively and/or consecutively, all subject to Plaintiff's right to credit bid), free and clear of liens, claims and interests (with such liens, claims and interests to transfer to the proceeds of sale for subsequent resolution by the Court of any priority or other inter-creditor disputes) and (c) take all other actions authorized under applicable law; and (iii) granting Plaintiff any additional relief this Court deems just and appropriate.

**COUNT II**
**BREACH OF TERM NOTE AGAINST THE BORROWERS**

105. Plaintiff adopts and incorporates the allegations set forth in each of the above

-22-

Paragraphs as though fully set forth herein for this Paragraph.

106.    Despite Plaintiff's demand, to date, the Borrowers have failed to: (i) pay Plaintiff the full outstanding Term Loan indebtedness due and owing under and in connection with the Term Note and Credit Agreement; and (ii) otherwise cure the Defaults.

107.    By failing to cure the Defaults or otherwise satisfy their Obligations to Plaintiff concerning the Term Loan, the Borrowers have materially breached—and remain in material breach of—the Term Note and Credit Agreement.

108.    Plaintiff has performed all of its obligations under the Term Note and Credit Agreement.

109.    Plaintiff is entitled to recover from the Borrowers its costs and attorneys' fees incurred in connection with the enforcement of Plaintiff's rights and remedies under and in connection with the Loan Documents. *See*, *e.g.*, Credit Agreement (**Ex. 1**), § 16.16.

110.    After applying all applicable credits to the Term Loan, as of May 27, 2026, the amount immediately due and owing by the Borrowers to Plaintiff under and in connection with the Term Loan was no less than $2,000,419.31, excluding certain interest, fees and costs that have accrued and will continue to accrue.

**WHEREFORE**, Plaintiff respectfully requests the Court to: (i) enter a money judgment in favor of Plaintiff and against the Borrowers, jointly and severally, in an amount to be established through evidence acceptable to this Court; (ii) award it all additional expenses incurred in this cause including, but not limited to, collection costs and attorneys' fees; and (iii) award it such further relief as is appropriate.

Additionally, Plaintiff respectfully requests that this Court enter an order: (i) appointing a receiver over the Borrowers and Collateral; (ii) granting said receiver broad powers, including,

-23-

without limitation, the powers to (a) assume custody and control of the Borrowers and Collateral, (b) market and sell the Collateral (in whole, in part, cumulatively and/or consecutively, all subject to Plaintiff's right to credit bid), free and clear of liens, claims and interests (with such liens, claims and interests to transfer to the proceeds of sale for subsequent resolution by the Court of any priority or other inter-creditor disputes) and (c) take all other actions authorized under applicable law; and (iii) granting Plaintiff any additional relief this Court deems just and appropriate.

**COUNT III**
**BREACH OF CAPEX NOTE AGAINST THE BORROWERS**

111. Plaintiff adopts and incorporates the allegations set forth in each of the above Paragraphs as though fully set forth herein for this Paragraph.

112. Despite Plaintiff's demand, to date, the Borrowers have failed to: (i) pay Plaintiff the full outstanding Capex Loan(s) indebtedness due and owing under and in connection with the Capex Note and Credit Agreement; and (ii) otherwise cure the Defaults.

113. By failing to cure the Defaults or otherwise satisfy their Obligations to Plaintiff concerning the Capex Loan(s), the Borrowers have materially breached—and remain in material breach of—the Capex Note and Credit Agreement.

114. Plaintiff has performed all of its obligations under the Capex Note and Credit Agreement.

115. Plaintiff is entitled to recover from the Borrowers its costs and attorneys' fees incurred in connection with the enforcement of Plaintiff's rights and remedies under and in connection with the Loan Documents. *See, e.g.*, Credit Agreement (**Ex. 1**), § 16.16.

116. After applying all applicable credits to the Capex Loan(s), as of May 27, 2026, the amount immediately due and owing by the Borrowers to Plaintiff under and in connection with the Capex Loan(s) was no less than $1,539,668.73, excluding certain interest, fees and costs that

have accrued and will continue to accrue.

**WHEREFORE**, Plaintiff respectfully requests the Court to: (i) enter a money judgment in favor of Plaintiff and against the Borrowers, jointly and severally, in an amount to be established through evidence acceptable to this Court; (ii) award it all additional expenses incurred in this cause including, but not limited to, collection costs and attorneys' fees; and (iii) award it such further relief as is appropriate.

Additionally, Plaintiff respectfully requests that this Court enter an order: (i) appointing a receiver over the Borrowers and Collateral; (ii) granting said receiver broad powers, including, without limitation, the powers to (a) assume custody and control of the Borrowers and Collateral, (b) market and sell the Collateral (in whole, in part, cumulatively and/or consecutively, all subject to Plaintiff's right to credit bid), free and clear of liens, claims and interests (with such liens, claims and interests to transfer to the proceeds of sale for subsequent resolution by the Court of any priority or other inter-creditor disputes) and (c) take all other actions authorized under applicable law; and (iii) granting Plaintiff any additional relief this Court deems just and appropriate.

**COUNT IV**
**BREACH OF HVAC EQUIPMENT LOAN NOTE AGAINST THE BORROWERS**

117. Plaintiff adopts and incorporates the allegations set forth in each of the above Paragraphs as though fully set forth herein for this Paragraph.

118. Despite Plaintiff's demand, to date, the Borrowers have failed to: (i) pay Plaintiff the full outstanding HVAC Equipment Loan indebtedness due and owing under and in connection with the HVAC Equipment Loan Note and Credit Agreement; and (ii) otherwise cure the Defaults.

119. By failing to cure the Defaults or otherwise satisfy their Obligations to Plaintiff concerning the HVAC Equipment Loan, the Borrowers have materially breached—and remain in material breach of—the HVAC Equipment Loan Note and Credit Agreement.

-25-

120.    Plaintiff has performed all of its obligations under the HVAC Equipment Loan Note and Credit Agreement.

121.    Plaintiff is entitled to recover from the Borrowers its costs and attorneys' fees incurred in connection with the enforcement of Plaintiff's rights and remedies under and in connection with the Loan Documents. *See, e.g.*, Credit Agreement (**Ex. 1**), § 16.16.

122.    After applying all applicable credits to the HVAC Equipment Loan, as of May 27, 2026, the amount immediately due and owing by the Borrowers to Plaintiff under and in connection with the HVAC Equipment Loan was no less than $2,581,209.38, excluding certain interest, fees and costs that have accrued and will continue to accrue.

**WHEREFORE**, Plaintiff respectfully requests the Court to: (i) enter a money judgment in favor of Plaintiff and against the Borrowers, jointly and severally, in an amount to be established through evidence acceptable to this Court; (ii) award it all additional expenses incurred in this cause including, but not limited to, collection costs and attorneys' fees; and (iii) award it such further relief as is appropriate.

Additionally, Plaintiff respectfully requests that this Court enter an order: (i) appointing a receiver over the Borrowers and Collateral; (ii) granting said receiver broad powers, including, without limitation, the powers to (a) assume custody and control of the Borrowers and Collateral, (b) market and sell the Collateral (in whole, in part, cumulatively and/or consecutively, all subject to Plaintiff's right to credit bid), free and clear of liens, claims and interests (with such liens, claims and interests to transfer to the proceeds of sale for subsequent resolution by the Court of any priority or other inter-creditor disputes) and (c) take all other actions authorized under applicable law; and (iii) granting Plaintiff any additional relief this Court deems just and appropriate.

**COUNT V**
**BREACH OF HOLDING GUARANTY**
**AND SECURITY AGREEMENT AGAINST HOLDING**

123. Plaintiff adopts and incorporates the allegations set forth in each of the above Paragraphs as though fully set forth herein for this Paragraph.

124. Pursuant to the Holding Guaranty and Security Agreement, Holding unconditionally and irrevocably guaranteed the Borrowers' Obligations to Plaintiff, including, *inter alia*, all of the Borrowers' obligations under the Credit Agreement and Notes *plus* attorneys' fees and costs incurred by Plaintiff in enforcing its rights in connection with the Loan Documents. *See* Holding Guaranty and Security Agreement (**Ex. 6**), §§ 1-2, 9 and 11.

125. Despite demand by Plaintiff, to date, Holding has failed to cure the Defaults or otherwise satisfy its obligations under the Holding Guaranty and Security Agreement.

126. By failing to cure the Defaults or otherwise satisfy the Holding Guaranty and Security Agreement obligations, Holding materially breached, and remains in material breach of, the Holding Guaranty and Security Agreement.

127. Plaintiff has performed all of its obligations under the Holding Guaranty and Security Agreement.

128. After applying all applicable credits to the Holding Guaranty and Security Agreement obligations, as of May 27, 2026, the amount immediately due and owing by Holding to Plaintiff under and in connection with the Holding Guaranty and Security Agreement was no less than $19,909,187.37, excluding certain interest, fees and costs that have accrued and will continue to accrue.

**WHEREFORE**, Plaintiff respectfully requests the Court to: (i) enter a money judgment in favor of Plaintiff and against Holding in an amount to be established through evidence acceptable

-27-

to this Court; (ii) award it all additional expenses incurred in this cause including, but not limited to, collection costs and attorneys' fees; and (iii) award it such further relief as is appropriate.

Additionally, Plaintiff respectfully requests that this Court enter an order:  (i) appointing a receiver over Holding and the Collateral; (ii) granting said receiver broad powers, including, without limitation, the powers to (a) assume custody and control of Holding and the Collateral, (b) market and sell the Collateral (in whole, in part, cumulatively and/or consecutively, all subject to Plaintiff's right to credit bid), free and clear of liens, claims and interests (with such liens, claims and interests to transfer to the proceeds of sale for subsequent resolution by the Court of any priority or other inter-creditor disputes) and (c) take all other actions authorized under applicable law; and (iii) granting Plaintiff any additional relief this Court deems just and appropriate.

## COUNT VI
## BREACH OF CORD GUARANTY AGAINST CORD

129.    Plaintiff adopts and incorporates the allegations set forth in each of the above Paragraphs as though fully set forth herein for this Paragraph.

130.    Pursuant to the Cord Guaranty, Cord unconditionally and irrevocably guaranteed the Borrowers' Obligations to Plaintiff, including, *inter alia*, all of the Obligations under the Credit Agreement and Notes *plus* attorneys' fees and costs incurred by Plaintiff in enforcing its rights in connection with the Loan Documents.  *See* Cord Guaranty (**Ex. 7**), §§ 1 and 8.

131.    Despite demand by Plaintiff, to date, Cord has failed to cure the Defaults or otherwise satisfy his obligations under the Cord Guaranty.

132.    By failing to cure the Defaults or otherwise satisfy the Cord Guaranty obligations, Cord materially breached, and remains in material breach of, the Cord Guaranty.

133.    Plaintiff has performed all of its obligations under the Cord Guaranty.

134.    After applying all applicable credits to the Cord Guaranty obligations, as of May

-28-

27, 2026, the amount immediately due and owing by Cord to Plaintiff under and in connection with the Cord Guaranty was no less than $19,909,187.37, excluding certain interest, fees and costs that have accrued and will continue to accrue.

**WHEREFORE**, Plaintiff respectfully requests the Court to: (i) enter a money judgment in favor of Plaintiff and against Cord in an amount to be established through evidence acceptable to this Court; (ii) award it all additional expenses incurred in this cause including, but not limited to, collection costs and attorneys' fees; and (iii) award it such further relief as is appropriate.

Additionally, Plaintiff respectfully requests that this Court enter an order: (i) appointing a receiver over the Collateral owned by Cord (including, without limitation, the Titled Collateral (as such term is defined in the Motor Vehicle/Equipment Security Agreement) and Urbandale Real Estate; (ii) granting said receiver broad powers, including, without limitation, the powers to (a) assume custody and control of such Collateral, (b) market and sell such Collateral (in whole, in part, cumulatively and/or consecutively, all subject to Plaintiff's right to credit bid), free and clear of liens, claims and interests (with such liens, claims and interests to transfer to the proceeds of sale for subsequent resolution by the Court of any priority or other inter-creditor disputes) and (c) take all other actions authorized under applicable law; and (iii) granting Plaintiff any additional relief this Court deems just and appropriate.

**COUNT VII**
**BREACH OF STRAWHECKER GUARANTY AGAINST STRAWHECKER**

135.    Plaintiff adopts and incorporates the allegations set forth in each of the above Paragraphs as though fully set forth herein for this Paragraph.

136.    Pursuant to the Strawhecker Guaranty, Strawhecker unconditionally and irrevocably guaranteed certain of the Borrowers' Obligations to Plaintiff, including, *inter alia*, all of the Borrowers' Obligations under the Credit Agreement and Notes *plus* attorneys' fees and costs

incurred by Plaintiff in enforcing its rights in connection with the Loan Documents. *See* Strawhecker Guaranty (**Ex. 8**), §§ 1 and 8.

137. Despite demand by Plaintiff, to date, Strawhecker has failed to cure the Defaults or otherwise satisfy his obligations under the Strawhecker Guaranty.

138. By failing to cure the Defaults or satisfy the Strawhecker Guaranty obligations, Strawhecker materially breached, and remains in material breach of, the Strawhecker Guaranty.

139. Plaintiff has performed all of its obligations under the Strawhecker Guaranty.

140. After applying all applicable credits to the Strawhecker Guaranty obligations, as of May 27, 2026, the amount immediately due and owing by Strawhecker to Plaintiff under and in connection with the Strawhecker Guaranty was no less than $19,909,187.37, excluding certain interest, fees and costs that have accrued and will continue to accrue.

**WHEREFORE**, Plaintiff respectfully requests the Court to: (i) enter a money judgment in favor of Plaintiff and against Strawhecker in an amount to be established through evidence acceptable to this Court; (ii) award it all additional expenses incurred in this cause including, but not limited to, collection costs and attorneys' fees; and (iii) award it such further relief as is appropriate.

Additionally, Plaintiff respectfully requests that this Court enter an order: (i) appointing a receiver over the Borrowers and Collateral; (ii) granting said receiver broad powers, including, without limitation, the powers to (a) assume custody and control of the Borrowers and Collateral, (b) market and sell the Collateral (in whole, in part, cumulatively and/or consecutively, all subject to Plaintiff's right to credit bid), free and clear of liens, claims and interests (with such liens, claims and interests to transfer to the proceeds of sale for subsequent resolution by the Court of any priority or other inter-creditor disputes) and (c) take all other actions authorized under applicable law; and

(iii) granting Plaintiff any additional relief this Court deems just and appropriate.

**COUNT VIII**
**BREACH OF MYERS GUARANTY AGAINST MYERS**

141. Plaintiff adopts and incorporates the allegations set forth in each of the above Paragraphs as though fully set forth herein for this Paragraph.

142. Pursuant to the Myers Guaranty, Myers unconditionally and irrevocably guaranteed certain of the Borrowers' Obligations to Plaintiff, including, *inter alia,* certain of the Borrowers' Obligations under the Credit Agreement and Notes *plus* attorneys' fees and costs incurred by Plaintiff in enforcing its rights in connection with the Loan Documents. *See* Myers Guaranty (**Ex. 9**), §§ 1, 8 and 22.

143. Despite demand by Plaintiff, to date, Myers has failed to cure the Defaults or otherwise satisfy his obligations under the Myers Guaranty.

144. By failing to cure the Defaults or otherwise satisfy the Myers Guaranty obligations, Myers materially breached, and remains in material breach of, the Myers Guaranty.

145. Plaintiff has performed all of its obligations under the Myers Guaranty.

146. After applying all applicable credits to the Myers Guaranty obligations, as of May 27, 2026, the amount immediately due and owing by Myers to Plaintiff under and in connection with the Myers Guaranty was no less than $1,083,355.00, excluding certain interest, fees and costs that have accrued and will continue to accrue.

**WHEREFORE**, Plaintiff respectfully requests the Court to: (i) enter a money judgment in favor of Plaintiff and against Myers in an amount to be established through evidence acceptable to this Court; (ii) award it all additional expenses incurred in this cause including, but not limited to, collection costs and attorneys' fees; and (iii) award it such further relief as is appropriate.

## COUNT IX
## BREACH OF EKIS GUARANTY AGAINST EKIS

147. Plaintiff adopts and incorporates the allegations set forth in each of the above Paragraphs as though fully set forth herein for this Paragraph.

148. Pursuant to the Ekis Guaranty, Ekis unconditionally and irrevocably guaranteed certain of the Borrowers' Obligations to Plaintiff, including, *inter alia*, certain of the Borrowers' Obligations under the Credit Agreement and Notes *plus* attorneys' fees and costs incurred by Plaintiff in enforcing its rights in connection with the Loan Documents. *See* Ekis Guaranty (**Ex. 10**), §§ 1, 8 and 22.

149. Despite demand by Plaintiff, to date, Ekis has failed to cure the Defaults or otherwise satisfy his obligations under the Ekis Guaranty.

150. By failing to cure the Defaults or otherwise satisfy the Ekis Guaranty obligations, Ekis materially breached, and remains in material breach of, the Ekis Guaranty.

151. Plaintiff has performed all of its obligations under the Ekis Guaranty.

152. After applying all applicable credits to the Ekis Guaranty obligations, as of May 27, 2026, the amount immediately due and owing by Ekis to Plaintiff under and in connection with the Ekis Guaranty was no less than $1,083,355.00, excluding certain interest, fees and costs that have accrued and will continue to accrue.

**WHEREFORE**, Plaintiff respectfully requests the Court to: (i) enter a money judgment in favor of Plaintiff and against Ekis in an amount to be established through evidence acceptable to this Court; (ii) award it all additional expenses incurred in this cause including, but not limited to, collection costs and attorneys' fees; and (iii) award it such further relief as is appropriate.

**COUNT X**
**REPLEVIN/REPOSSESSION**

153.     Plaintiff adopts and incorporates the allegations set forth in each of the above Paragraphs as though fully set forth herein for this Paragraph.

154.     Pursuant to the terms of the Security Agreements and applicable law, the Defaults grant Plaintiff a right to immediate possession of the Personal Property Collateral. *See, e.g.,* Credit Agreement (**Ex. 1**), §§ 11.1(g)-(j); *see also* Holding Guaranty and Security Agreement (**Ex. 6**), § 6.2(ii); Trademark Security Agreement (**Ex. 11**), § 4; Motor Vehicle/Equipment Security Agreement (**Ex. 12**), § 1.4; 810 ILCS § 5/9-609 (authorizing a secured party to take possession of its collateral after a default); Iowa Code Ann. § 554.9609.

155.     As a result of each of the Defaults, Plaintiff is lawfully entitled to immediate possession of the Collateral, which is being wrongfully detained by the Defendants.

156.     Plaintiff's perfected security interests in the Personal Property Collateral, coupled with the Defaults, establish Plaintiff maintains a right to immediate possession of the Personal Property Collateral which is superior to any rights of the Defendants.

157.     None of the Personal Property Collateral has been taken for any tax, assessment or fine levied by virtue of any law of any state against the property of Plaintiff, or against Plaintiff individually, nor seized under any lawful process against the goods and chattels of Plaintiff subject to such lawful process, nor held by virtue of any order of replevin against Plaintiff.

158.     Despite demand by Plaintiff, to date, the Defendants have failed to remit the Personal Property Collateral to Plaintiff, and they continue to wrongfully detain and use the Personal Property Collateral.

159.     By failing to cure the Defaults and surrender possession of the Personal Property Collateral as demanded by Plaintiff and as required under the Loan Documents, the Defendants

-33-

are wrongfully using and withholding the Personal Property Collateral from Plaintiff, to the detriment of Plaintiff.

160.    This Complaint, in addition to all previous demands, shall constitute demand upon the Defendants to immediately surrender possession of the Personal Property Collateral to Plaintiff.

161.    Plaintiff will suffer irreparable injury if the Defendants or other unpermitted third parties continue using the Personal Property Collateral. So long as the Personal Property Collateral is being used in violation of the terms of the Loan Documents, there is a serious risk of impairment, liability and encumbrance, which Plaintiff specifically seeks to forestall by providing for seizure.

162.    So long as it is being used by the Defendants or unpermitted third parties, the Personal Property Collateral is at risk and may become subject to obligations and charges which, if unpaid, could lead to revocation of the Personal Property Collateral and additional fees, costs and liens thereon, thereby destroying or impairing the value of the Personal Property Collateral. Moreover, the Personal Property Collateral continues to depreciate with time, thereby further diminishing its value.

163.    Any remedy at law is inadequate, since the available money judgments against the Defendants are no substitute for Plaintiff's security interest in the Personal Property Collateral, right to foreclose on that security interest and right to obtain specific performance. Moreover, as evidenced by, *inter alia*, their respective failures to satisfy their Obligations in connection with the Loans, the Defendants are having serious financial difficulties and are unable to pay their obligations when due.

164.    The Loan Documents require the Defendants to pay Plaintiff's costs and attorneys' fees incurred with Plaintiff's enforcement of the Loan Documents and its rights and interests in

and to the Collateral. *See, e.g.,* Credit Agreement (**Ex. 1**), § 16.16; *see also* Holding Guaranty and Security Agreement (**Ex. 6**), § 2(c); Cord Guaranty (**Ex. 7**), §§ 1 and 8; Strawhecker Guaranty (**Ex. 8**), §§ 1 and 8; Myers Guaranty (**Ex. 9**), §§ 1, 8 and 22; Ekis Guaranty (**Ex. 10**), §§ 1, 8 and 22.

165. Plaintiff has performed all of its obligations under each of the Security Agreements.

**WHEREFORE**, Plaintiff respectfully requests this Court issue an order/judgment of replevin against the Defendants, jointly and severally, which: (i) grants Plaintiff immediate possession of the Personal Property Collateral; (ii) make the Personal Property Collateral immediately available to Plaintiff for inspection and removal or, in the alternative, deliver the Personal Property Collateral to Plaintiff, at a location designated by it, within ten days of the entered order/judgment; (iii) authorizes and directs the offices of the applicable sheriffs of the applicable counties/cites/states to break open, enter and search for the Personal Property Collateral in any place it may be located for purposes of delivering possession of the Personal Property Collateral to Plaintiff; (iv) grants Plaintiff the value of the Personal Property Collateral not delivered to Plaintiff; (v) grants Plaintiff damages for the Subject Entities' wrongful detention of the Personal Property Collateral; (vi) grants Plaintiff its costs and attorneys' fees; and (vii) grants Plaintiff any additional relief this Court deems just and appropriate.

Additionally, Plaintiff respectfully requests that this Court enter an order: (i) appointing a receiver over the corporate Defendants and Collateral; (ii) granting said receiver broad powers, including, without limitation, the powers to (a) assume custody and control of the corporate Defendants and Collateral, (b) market and sell the Collateral (in whole, in part, cumulatively and/or consecutively, all subject to Plaintiff's right to credit bid), free and clear of liens, claims and

interests (with such liens, claims and interests to transfer to the proceeds of sale for subsequent resolution by the Court of any priority or other inter-creditor disputes) and (c) take all other actions authorized under applicable law; and (iii) granting Plaintiff any additional relief this Court deems just and appropriate.

**COUNT XI**
**DETINUE/REPOSSESSION**

166. Plaintiff adopts and incorporates the allegations set forth in each of the above Paragraphs as though fully set forth herein for this Paragraph.

167. Some or all of the Personal Property Collateral is in Defendants' possession.

168. Plaintiff has clear, ascertainable rights to the Personal Property Collateral that are superior to any rights of the Defendants with respect to the same. The Defendants acknowledge Plaintiff's rights in the Loan Documents by, *inter alia*, recognizing Plaintiff's security interests in the Personal Property Collateral and agreeing that certain breaches of the Loan Documents (including, without limitation, the ongoing Defaults) would give rise to Plaintiff's seizure of the Personal Property Collateral.

169. The balance of equities favors Plaintiff since the Defendants are putting the Personal Property Collateral at risk by operating it.

170. Plaintiff claims the fair market value of the unreturned Personal Property Collateral.

**WHEREFORE**, Plaintiff respectfully requests this Court issue an order/judgment of replevin against the Defendants, jointly and severally, which: (i) grants Plaintiff immediate possession of the Personal Property Collateral; (ii) make the Personal Property Collateral immediately available to Plaintiff for inspection and removal or, in the alternative, deliver the Personal Property Collateral to Plaintiff, at a location designated by it, within ten days of the entered

order/judgment; (iii) authorizes and directs the offices of the applicable sheriffs of the applicable counties/cites/states to break open, enter and search for the Personal Property Collateral in any place it may be located for purposes of delivering possession of the Personal Property Collateral to Plaintiff; (iv) grants Plaintiff the value of the Personal Property Collateral not delivered to Plaintiff; (v) grants Plaintiff damages for the Subject Entities' wrongful detention of the Personal Property Collateral; (vi) grants Plaintiff its costs and attorneys' fees; and (vii) grants Plaintiff any additional relief this Court deems just and appropriate.

Additionally, Plaintiff respectfully requests that this Court enter an order: (i) appointing a receiver over the corporate Defendants and Collateral; (ii) granting said receiver broad powers, including, without limitation, the powers to (a) assume custody and control of the corporate Defendants and Collateral, (b) market and sell the Collateral (in whole, in part, cumulatively and/or consecutively, all subject to Plaintiff's right to credit bid), free and clear of liens, claims and interests (with such liens, claims and interests to transfer to the proceeds of sale for subsequent resolution by the Court of any priority or other inter-creditor disputes) and (c) take all other actions authorized under applicable law; and (iii) granting Plaintiff any additional relief this Court deems just and appropriate.

Dated: June 1, 2026

Respectfully submitted,

ASSOCIATED BANK, NATIONAL ASSOCIATION

By: */s/ Michael D. Leifman*
One of Its Attorneys

-38-

Michael M. Eidelman (ARDC No. 6197788)
Michael D. Leifman (ARDC No. 6324233)
Randall M. Lending (ARDC No. 6198407)
Vedder Price P.C.
222 North Lasalle Street, Suite 2400
Chicago, Illinois 60601
T: (312) 609-7500
meidelman@vedder.com
mleifman@vedder.com
rlending@vedder.com

## VERIFICATION

| STATE OF MINNESOTA | ) | |
|---|---|---|
| | ) | ss: |
| COUNTY OF HENNEPIN | ) | |

I, Alison Tregilgas, depose and state as follows:

1.      I am over the age of eighteen (18) years old and of sound mind and mental capacity.

2.      I am employed by Associated Bank, National Association ("Plaintiff") as its Senior Vice President and Special Assets Team Lead.  I am authorized to give this verification on Plaintiff's behalf.

3.      I have personal knowledge of the facts set forth in the foregoing Verified Complaint, except as to those matters alleged upon information and belief, and as to those matters, I believe them to be true.

4.      The documents attached to the Verified Complaint as Exhibits are true and correct copies of the originals of such documents.

5.      The basis for my knowledge and belief is Plaintiff's books and records and the Defendants' books and records which were shared with Plaintiff, all of which were made at or near the time of the events recorded in the records by or from information transmitted by a person with knowledge.  These records are kept in the ordinary course of a regularly conducted business activity and it is Plaintiff's regular practice to keep such records, and upon information and belief, I believe this to be equally true with respect to the records provided by the Defendants.

In accordance with 28 U.S.C. § 1746 and Section 1-109 of the Illinois Code of Civil Procedure, the undersigned hereby certifies and declares, under penalty of perjury, that the foregoing statements are true and correct to the best of my knowledge, information, and belief, except as to matters herein stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that she verily believes the same to be true.

Dated: June __, 2026

Alison Tregilgas
Senior Vice President and Special Assets Team Lead
Associated Bank, National Association