# EXHIBIT 1

EXECUTION VERSION

# CREDIT AND SECURITY AGREEMENT

**dated as of December 27, 2024**

**among**

**JT LOGISTICS HOLDING COMPANY, LLC,**
**as Holdings,**

**JT LOGISTICS SOLUTIONS, LLC,**
**JT TRANSPORTATION, LLC,**
**JT FREIGHT, LLC,**
**LIVIT STAFFING, LLC,**
**JT REAL ESTATE HOLDINGS, LLC,**
**JT PROPERTY SOLUTIONS, LLC,**
**JT TRANSPORTATION LEASING SOLUTIONS, LLC,**
**WAREHOUSE BUILDOUT SYSTEMS AND SOLUTIONS, LLC,**
**JT ECOMMERCE SOLUTIONS, LLC,**
**JT PACKAGING SOLUTIONS, LLC,**
**JT BINDING SOLUTIONS, LLC,**
**JT INDUSTRIAL SERVICES, LLC,**
**JT EXPEDITED SOLUTIONS, LLC,**

**and**

**700 BLAKELY, LLC,**

**as the Borrowers,**

**ASSOCIATED BANK, NATIONAL ASSOCIATION**
**(as Administrative Agent, Issuer and a Lender)**,

**and**

**THE VARIOUS FINANCIAL INSTITUTIONS THAT ARE NOW OR HEREAFTER**
**BECOME A PARTY HERETO,**
**as Lenders**

164393.00001/150632148v.7

## TABLE OF CONTENTS

Page No.

**ARTICLE I DEFINITIONS** ................................................................................................1

| | | |
|---|---|---|
| 1.1 | Accounting Terms. | 1 |
| 1.2 | General Terms. | 2 |
| 1.3 | UCC Terms. | 35 |
| 1.4 | General Construction. | 35 |
| 1.5 | Time. | 36 |

**ARTICLE II COMMITMENTS OF THE LENDERS; BORROWING
PROCEDURE** ...............................................................................36

| | | |
|---|---|---|
| 2.1 | Revolving Loans; Swing Loans. | 36 |
| 2.2 | Term Loan. | 37 |
| 2.3 | Capex Loans; HVAC Equipment Loans. | 38 |
| 2.4 | Loan Procedures. | 39 |
| 2.5 | Loan Disbursement. | 41 |
| 2.6 | Maximum Advances. | 41 |
| 2.7 | Loan Repayment; Term Loan Amortization. | 41 |
| 2.8 | Statements. | 42 |
| 2.9 | Letters of Credit. | 42 |
| 2.10 | Other Letter of Credit Issues. | 47 |
| 2.11 | Manner of Borrowing and Payment; Settlement. | 48 |
| 2.12 | Defaulting Lender. | 50 |
| 2.13 | Voluntary Prepayments. | 51 |
| 2.14 | Additional Payments. | 51 |
| 2.15 | Use of Proceeds. | 51 |
| 2.16 | Taxes. | 52 |
| 2.17 | Mandatory Prepayment. | 55 |
| 2.18 | Application of Proceeds. | 56 |

**ARTICLE III INTEREST AND FEES**............................................................................57

| | | |
|---|---|---|
| 3.1 | Interest. | 57 |
| 3.2 | Interest Payment Dates. | 57 |
| 3.3 | Closing Fee. | 57 |
| 3.4 | Collateral Fees. | 57 |
| 3.5 | Non-Use Fee. | 58 |
| 3.6 | [Reserved]. | 58 |
| 3.7 | [Reserved]. | 58 |
| 3.8 | Agent Fees. | 58 |
| 3.9 | Computing Interest and Fees. | 58 |
| 3.10 | Maximum Charges. | 59 |
| 3.11 | Increased Costs. | 59 |
| 3.12 | Inadequacy or Unfairness. | 60 |
| 3.13 | Successor Rate. | 60 |

i

**ARTICLE IV COLLATERAL: GENERAL TERMS**...................................................................**63**

    4.1     Security Interest. ......................................................................................63

    4.2     Perfection. ................................................................................................63

    4.3     Dispositions...............................................................................................63

    4.4     Preserving Collateral.................................................................................63

    4.5     Ownership. ...............................................................................................64

    4.6     Defending Agent's and Lenders' Interests. ..............................................64

    4.7     Books and Records. ..................................................................................65

    4.8     Financial Disclosure.................................................................................65

    4.9     Laws. .......................................................................................................65

    4.10    Inspections and Appraisals. ......................................................................65

    4.11    Insurance. ................................................................................................66

    4.12    Paying Insurance. .....................................................................................66

    4.13    Paying Taxes.............................................................................................66

    4.14    Paying Leasehold Obligations. .................................................................67

    4.15    Accounts. .................................................................................................67

    4.16    Equipment Maintenance. ..........................................................................69

    4.17    No Liability. .............................................................................................69

    4.18    Environmental Matters..............................................................................70

    4.19    Financing Statements. ..............................................................................70

    4.20    Pledged Equity Interests. .........................................................................70

    4.21    [Reserved]. ...............................................................................................71

**ARTICLE V REPRESENTATIONS AND WARRANTIES**....................................................**71**

    5.1     Authority..................................................................................................71

    5.2     Formation; Qualification; and Subsidiaries. ............................................72

    5.3     Officers; Directors; Equity Interest Holders; and Capitalization..........................72

    5.4     No Governmental Approval; No Conflict.................................................72

    5.5     Tax Returns. ............................................................................................72

    5.6     Financial Information................................................................................72

    5.7     Name. ......................................................................................................73

    5.8     O.S.H.A. and Environmental Compliance................................................73

    5.9     Solvency; No Litigation, No Violation. ....................................................73

    5.10    Intellectual Property.................................................................................73

    5.11    Licenses and Permits................................................................................74

    5.12    Indebtedness Default.................................................................................74

    5.13    No Burdensome Restrictions; No Default. ................................................74

    5.14    No Labor Disputes. ..................................................................................74

    5.15    Margin Regulations..................................................................................74

    5.16    Investment Company Act. ........................................................................74

    5.17    Disclosure. ...............................................................................................74

    5.18    Hedging Agreement. ................................................................................74

    5.19    Material Business Agreements. .................................................................75

    5.20    Certain Laws and Regulations. ................................................................75

    5.21    Beneficial Ownership Certificate.............................................................75

    5.22    Compliance with OFAC; Anti-Corruption Laws.......................................75

5.23 EEA Financial Institutions. ...................................................................................75
5.24 ERISA Compliance. ...............................................................................................75

**ARTICLE VI AFFIRMATIVE COVENANTS** ..............................................................**77**

6.1 Conducting Business; Maintaining Existence; and Assets. .....................................77
6.2 Violations. ...............................................................................................................77
6.3 Supplemental Instruments. ......................................................................................77
6.4 Indebtedness. ...........................................................................................................77
6.5 Financial Statements. ..............................................................................................77
6.6 Taxes. ......................................................................................................................77
6.7 Deposit Accounts. ...................................................................................................77
6.8 Beneficial Ownership Certificate. ...........................................................................78
6.9 [Reserved]. ..............................................................................................................78
6.10 Employee Benefit Plans. .........................................................................................78
6.11 [Reserved]. ..............................................................................................................78
6.12 Post-Closing Matters. ..............................................................................................78

**ARTICLE VII NEGATIVE COVENANTS** .....................................................................**79**

7.1 Mergers; Consolidations; Acquisitions; and Asset Sales. .......................................79
7.2 Liens. ......................................................................................................................79
7.3 Guarantees. ..............................................................................................................79
7.4 Investments. ............................................................................................................79
7.5 Loans. ......................................................................................................................79
7.6 Capital Expenditures. ..............................................................................................79
7.7 Distributions. ...........................................................................................................80
7.8 Indebtedness. ...........................................................................................................80
7.9 Business. ..................................................................................................................80
7.10 Affiliate Transactions. ............................................................................................81
7.11 Leases. .....................................................................................................................81
7.12 Subsidiaries; Partnerships; and Disqualified Stock. ...............................................81
7.13 Fiscal Year and Accounting Changes. .....................................................................81
7.14 Pledging Credit. ......................................................................................................81
7.15 Amending Charter Documents. ...............................................................................81
7.16 ERISA. ....................................................................................................................81
7.17 Prepaying Indebtedness. ..........................................................................................81
7.18 Material Business Agreements. ...............................................................................82
7.19 Sanctions. ................................................................................................................82
7.20 Anti-Corruption Laws. ............................................................................................82
7.21 [Reserved]. ..............................................................................................................82
7.22 [Reserved]. ..............................................................................................................82
7.23 Amending Leases. ...................................................................................................82
7.24 Use of Proceeds. .....................................................................................................82
7.25 Financial Covenants. ...............................................................................................82

**ARTICLE VIII CONDITIONS PRECEDENT** ................................................................**82**

8.1 Conditions to Initial Loans. .....................................................................................82
8.2 Conditions to Each Loan and Advance. ...................................................................85

164393.00001/150632148v.7

**ARTICLE IX INFORMATION AS TO THE LOAN PARTIES**.............................................86

    9.1    Disclosure. ...............................................................................................86
    9.2    Borrowing Base Certificate; Schedules. ...............................................86
    9.3    Notice of Suits and Adverse Events. .....................................................86
    9.4    Material Events. ......................................................................................87
    9.5    Annual Financial Statements. .................................................................87
    9.6    Monthly Financial Statements. ...............................................................87
    9.7    Additional Information. ..........................................................................87
    9.8    Projected Operating Budget and Availability Forecast. ........................88
    9.9    Electronic Reporting. .............................................................................88
    9.10   Individual Guarantor PFS and Tax Returns............................................88

**ARTICLE X EVENTS OF DEFAULT**..............................................................................89

    10.1   Payment...................................................................................................89
    10.2   Misrepresentation....................................................................................89
    10.3   Not Furnishing Information. ...................................................................89
    10.4   Liens........................................................................................................89
    10.5   Covenant Breaches..................................................................................89
    10.6   Judgments. ..............................................................................................89
    10.7   Insolvency...............................................................................................89
    10.8   Material Adverse Effect..........................................................................89
    10.9   Lender's Lien Priority.............................................................................89
    10.10  Breaches Under Material Business Agreements......................................90
    10.11  Cross Default. .........................................................................................90
    10.12  Change of Control...................................................................................90
    10.13  Invalidity.................................................................................................90
    10.14  Intellectual Property................................................................................90
    10.15  Destruction of Collateral.........................................................................90
    10.16  Business Interruption. .............................................................................90
    10.17  Guarantor Repudiation............................................................................90
    10.18  Indictment; Forfeiture. ...........................................................................90
    10.19  Hedging Agreement. ...............................................................................91
    10.20  ERISA.....................................................................................................91
    10.21  Tenant Guaranty Default.........................................................................91

**ARTICLE XI LENDER'S RIGHTS AND REMEDIES AFTER AN EVENT OF
          DEFAULT**........................................................................................................91

    11.1   Rights and Remedies...............................................................................91
    11.2   Allocation of Payments After Event of Default......................................92
    11.3   No Waiver. ..............................................................................................94

**ARTICLE XII WAIVERS AND JUDICIAL PROCEEDINGS**........................................94

    12.1   Notice Waiver. ........................................................................................94
    12.2   Delay.......................................................................................................94
    12.3   Waiver of Jury Trial................................................................................94

164393.00001/150632148v.7

**ARTICLE XIII EFFECTIVE DATE AND TERMINATION**................................................94

    13.1    Term..............................................................................................................94
    13.2    Termination....................................................................................................94

**ARTICLE XIV LOAN PARTY REPRESENTATIVE** ....................................................95

    14.1    Appointment and Relationship. .....................................................................95
    14.2    Authority........................................................................................................95
    14.3    Notices. ..........................................................................................................95
    14.4    Joint and Several Obligations. ......................................................................95
    14.5    Cross Guaranty..............................................................................................97
    14.6    Waivers. .........................................................................................................99

**ARTICLE XV REGARDING THE AGENT** ...................................................................99

    15.1    Waivers. .........................................................................................................99
    15.2    Nature of Duties. .........................................................................................100
    15.3    Lack of Reliance on the Agent and Resignation..........................................100
    15.4    Certain Rights of the Agent. ........................................................................101
    15.5    Reliance........................................................................................................101
    15.6    Notice of Default..........................................................................................101
    15.7    Indemnification. ...........................................................................................101
    15.8    The Agent in its Individual Capacity. ..........................................................102
    15.9    Delivery of Documents. ...............................................................................102
    15.10  Loan Parties' Undertaking to the Agent. .....................................................102
    15.11  No Reliance on the Agent's Customer Identification Program. ....................102
    15.12  Erroneous Payments....................................................................................102

**ARTICLE XVI MISCELLANEOUS**................................................................................104

    16.1    Governing Law .............................................................................................104
    16.2    Entire Understanding and Amendments. ......................................................104
    16.3    Transfers and Assignments. .........................................................................106
    16.4    Payment Application.....................................................................................109
    16.5    INDEMNIFICATION BY THE BORROWERS. ...........................................109
    16.6    Non Liability of the Lender. ........................................................................110
    16.7    FORUM SELECTION AND CONSENT TO JURISDICTION. ......................111
    16.8    Notice............................................................................................................111
    16.9    Survival. .......................................................................................................113
    16.10  Severability. .................................................................................................113
    16.11  Injunctive Relief...........................................................................................113
    16.12  Consequential Damages................................................................................113
    16.13  Electronic Execution; Electronic Records; Counterparts. ...........................113
    16.14  Construction.................................................................................................114
    16.15  Confidentiality and Sharing Information......................................................114
    16.16  Costs, Expenses and Taxes. .........................................................................115
    16.17  Conflict. .......................................................................................................115
    16.18  No Waiver; Cumulative Rights, Enforcement. ..............................................116
    16.19  Keepwell. .....................................................................................................116

v

vi

16.20   Acknowledgement and Consent to Bail-In of EEA Financial Institutions. .........116

164393.00001/150632148v.7

**SCHEDULES AND EXHIBITS**

| | |
|---|---|
| Schedule 1 | Commitment of the Lenders |
| Schedule 1.2(a) | Owned Real Property |
| Schedule 1.2(b) | Liens |
| Schedule 4.5 | Inventory Locations |
| Schedule 4.15(c) | Loan Parties' States of Organization and Chief Executive Offices |
| Schedule 4.20 | Pledged Equity Interests |
| Schedule 5.2 | Incorporation/Organization/Foreign Qualification/Subsidiaries |
| Schedule 5.3 | Officers, Directors, Shareholders, Capitalization |
| Schedule 5.7 | Organization Name |
| Schedule 5.8(b) | Environmental |
| Schedule 5.9(b) | Litigation |
| Schedule 5.10 | Patents, Trademarks, Copyrights, and Licenses |
| Schedule 5.19 | Material Business Agreements |
| Schedule 5.24(d) | ERISA Matters |
| Schedule 6.7 | Deposit Accounts |
| Schedule 7.4 | Investments |
| Schedule 7.5 | Loans |
| Schedule 7.8 | Indebtedness |
| Schedule 7.10 | Affiliate Transactions |

| | |
|---|---|
| Exhibit 5.6 | Projections |
| Exhibit A | Form of Borrowing Base Certificate |
| Exhibit B | Form of Compliance Certificate |
| Exhibit C | Revolving Note |
| Exhibit D | Swing Loan Note |
| Exhibit E | Form of Notice of Borrowing |
| Exhibit F | Form of Notice of Conversion/Continuation |
| Exhibit G | Term Note |
| Exhibit H | Capex Note |
| Exhibit I | HVAC Equipment Loan Note |
| Exhibit J | Form of Joinder |
| Exhibit K | Form of Assignment and Assumption Agreement |

**CREDIT AND SECURITY AGREEMENT**

This Credit and Security Agreement, dated as of December 27, 2024, by and among JT LOGISTICS HOLDING COMPANY, LLC, an Iowa limited liability company ("Holdings"), JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins this Agreement as a Borrower, each a "Borrower" and collectively, the "Borrowers"), ASSOCIATED BANK, NATIONAL ASSOCIATION, a national banking association, as the Agent, a Lender, and the Issuer, and the other Lenders party hereto.

Each Lender, severally and not jointly, have agreed to make available to the Borrowers a term loan, a capex loan, an equipment loan and a revolving credit facility upon the terms and conditions set forth herein.

For good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Loan Parties, the Agent, the Lenders and the Issuer agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1    **Accounting Terms.**    Except as otherwise provided in this Agreement, all accounting and financial terms used in the Loan Documents are interpreted, all accounting determinations must be made, and all financial statements delivered in connection with the Loan Documents must be prepared in accordance with GAAP as in effect from time to time (but if GAAP (or its application) changes after the Closing Date and that change affects any provision in the Loan Documents, the Loan Documents are interpreted based on GAAP as in effect and applied immediately before the change). If the Loan Parties adopt a change in accounting principles (including any changes in GAAP) from those used in preparing the Loan Parties' financial statements delivered to the Agent before the Closing Date or that affects in any material respect (as determined by the Agent) the computation of or compliance with any of the provisions of the Loan Documents then, unless the Loan Documents have been amended to modify the provisions to take into account the change in accounting principles, all financial restrictions, provisions, and ratios must continue to be computed based on accounting principles in effect before adoption of

1

164393.00001/150632148v.7

the change. Notwithstanding anything to the contrary contained in this Section or in the definition of "Capital Lease Obligations," only those leases that would constitute capital leases based on GAAP prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842) shall be considered capital leases, and all calculations and deliverables under the Loan Documents must be made or delivered accordingly.

  1.2  **General Terms.** The following terms have the following meanings:

  "Accommodation Payment" has the meaning assigned to such term in Section 14.4.

  "Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or all or substantially all of any business or division of a Person, (b) the acquisition of more than 50% of the Equity Interests of any Person, or otherwise causing any Person to become a Subsidiary or (c) a merger or consolidation or any other combination with another Person (other than a Person that is already a Subsidiary).

  "Advances" means the Revolving Loans, the Letters of Credit, the Capex Loans, the HVAC Equipment Loans, and the Swing Loans.

  "Affiliate" of any Person means any Person that, directly or indirectly, Controls, is Controlled by, or is under common Control with that Person. For purposes of this definition only, Control of a Person means the power, directly or indirectly, (x) to vote five percent or more of the securities having ordinary voting power to elect directors of that Person, or (y) either individually or, with respect to an officer, director or manager, with any other officer(s), director(s) or manager(s), to direct or cause the direction of the management and policies of that Person whether by contract or otherwise.

  "Agent" means Associated Bank, National Association, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

  "Aggregate Commitment" means the sum of the Aggregate Revolving Commitment and the Aggregate Term Commitment.

  "Aggregate Credit Exposure" means, at any time, the aggregate Credit Exposure of all of the Lenders.

  "Aggregate Revolving Commitment" means, at any time, the aggregate Revolving Commitments of all the Lenders. The Initial Aggregate Revolving Commitment is $20,000,000.

  "Aggregate Term Commitment" means, at any time, the aggregate Term Loan Commitments of all of the Lenders. The initial Term Loan Commitment is $2,530,000.

  "Agreement" means this Credit and Security Agreement, as the same may be amended, modified, supplemented, renewed, extended, restated or replaced from time to time.

  "Allocable Amount" has the meaning assigned to such term in Section 14.4.

2

164393.00001/150632148v.7

"Applicable Rate" means, for any day, the rate per annum set forth below opposite the applicable Level then in effect (based on the Average Undrawn Availability ending on the last day of the most recently completed month), it being understood that the Applicable Rate for (a) Revolving Loans and Swing Loans that are Base Rate Loans shall be the percentage set forth under the column "Revolving Loans" and "Base Rate", (b) Revolving Loans that are Term SOFR Loans shall be the percentage set forth under the column "Revolving Loans" and "Term SOFR Rate & Letter of Credit Fee", (c) that portion of the Term Loan, Capex Loans, and HVAC Equipment Loans comprised of Base Rate Loans shall be the percentage set forth under the column "Term Loan, Capex Loans & HVAC Equipment Loans" and "Base Rate", (d) that portion of the Term Loan, the Capex Loans, and the HVAC Equipment Loans comprised of Term SOFR shall be the percentage set forth under the column "Term Loan, Capex Loans & HVAC Equipment Loans" and "Term SOFR Rate & Letter of Credit Fee", (e) the Letter of Credit Fee shall be the percentage set forth under the column "Revolving Loans" and "Term SOFR Rate & Letter of Credit Fee", and (f) the Non-Use Fee shall be the percentage set forth under the column "Non-Use Fee":

| Level | Average Undrawn Availability | Term SOFR Rate & Letter of Credit Fee | | Base Rate | | Non-Use Fee |
| | | Revolving Loans | Term Loan, Capex Loans & HVAC Equipment Loans | Revolving Loans and Swing Loans | Term Loan, Capex Loans & HVAC Equipment Loans | |
|---|---|---|---|---|---|---|
| 1 | Greater than or equal to $4,000,000 | 2.00% | 2.50% | 1.00% | 1.50% | 0.25% |
| 2 | Less than $4,000,000 but greater than or equal to $2,000,000 | 2.25% | 2.75% | 1.25% | 1.75% | 0.25% |
| 3 | Less than $2,000,000 | 2.50% | 3.00% | 1.50% | 2.00% | 0.25% |

Any increase or decrease in the Applicable Rate resulting from a change in the Average Undrawn Availability shall become effective as of the first Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 9.6; provided, however, that if a Compliance Certificate is not delivered when due in accordance with such Section, then the highest rate set forth in each column of the Applicable Rate shall apply, in each case as of the first Business Day after the date on which such Compliance Certificate was required to have been delivered and in each case shall remain in effect until the first Business Day following the date on which such Compliance Certificate is delivered. In addition, at all times while the Default Rate is in effect, the highest rate set forth in each column of the Applicable Rate shall apply.

3

If, as a result of any restatement of or other adjustment to the financial statements of the Borrowers or for any other reason, the Borrowers or the Agent determines that (i) the Average Undrawn Availability as calculated by the Borrowers as of any applicable date was inaccurate and (ii) a proper calculation of the Average Undrawn Availability would have resulted in higher pricing for such period, the Borrowers shall immediately and retroactively be obligated to pay to the Agent promptly on demand by the Agent (or, after the occurrence of an actual or deemed entry of an order for relief with respect to any Borrower under the Bankruptcy Code of the United States, automatically and without further action by the Agent), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period.

This paragraph shall not limit the rights of the Agent under any provision of this Agreement to payment of any Obligations hereunder at the Default Rate under Section 3.1. The Borrowers' obligations under this paragraph shall survive the termination of the Commitments and the repayment of all other Obligations hereunder.

The initial Applicable Rate shall be set forth in Level 2 until the first Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 9.6 for the first full fiscal quarter to occur following the Closing Date to the Agent. Any adjustment in the Applicable Rate shall be applicable to all Loans then existing or subsequently made or issued.

"Approved Electronic Communication" means each notice, demand, communication, information, document and other material transmitted, posted or otherwise made or communicated by the StuckyNet System©, email, facsimile, or any other equivalent electronic service agreed to by the Agent, whether owned, operated or hosted by the Agent, any of its Affiliates, or any other Person, that any party is obligated to, or otherwise chooses to, provide to the Agent under any Loan Document (including any financial statement, financial and other report, notice, request, certificate and other information material). Approved Electronic Communications does not, however, include any notice, demand, communication, information, document, or other material that the Agent specifically instructs a Person to deliver in physical form.

"Asset Disposition" means a sale, lease, license, consignment, transfer or other disposition of any asset or property of any Loan Party or Subsidiary of any Loan Party, including a disposition of any asset or property in connection with a sale-leaseback transaction or synthetic lease; including, without limitation, the following (each a "Permitted Disposition"):

(a) sales, abandonment, or other dispositions of machinery and Equipment that is substantially worn, damaged, or obsolete or no longer used or useful in the ordinary course of business and leases or subleases of Owned Real Property not useful in the conduct of the business of the Loan Parties and their Subsidiaries;

(b) the use or transfer of cash or cash equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents;

(c) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business;

4

(d) the sale or discount, in each case without recourse, of accounts receivable (other than Eligible Accounts) arising in the ordinary course of business, but only in connection with the compromise or collection thereof;

(e) any involuntary loss, damage or destruction of property;

(f) any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(g) the leasing or subleasing of assets of any Loan Party or its Subsidiaries in the ordinary course of business;

(h) dispositions of machinery and Equipment (other than Eligible Purchase M&E and Eligible Purchase HVAC M&E) to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, or (ii) the proceeds of such disposition are applied to the purchase price of such replacement property; provided, that to the extent the property being transferred constitutes Collateral, such replacement property shall constitute Collateral; and

(i) so long as no Event of Default has occurred and is continuing or would immediately result therefrom, transfers of assets (i) from any Loan Party or any of its Subsidiaries (other than any Borrower) to a Loan Party, and (ii) from any Subsidiary of any Loan Party that is not a Loan Party to any other Subsidiary of any Loan Party;

provided that any Permitted Disposition involving an Affiliate shall be subject to Section 7.10.

"Assignment and Assumption" means a document in the form of Exhibit K hereto, properly completed and otherwise in form and substance satisfactory to Agent, or any other assignment and assumption agreement entered into by a Lender that is an assignee, that is in form and substance reasonably satisfactory to the Agent.

"Associated" means Associated Bank, National Association and any successor thereto.

"Authority" has the meaning assigned to such term in Section 4.18(b).

"Authorized Officer" means a Person's president, chief executive officer, chief financial officer, or any other officer approved by the Agent in its Discretion.

"Availability Reserve" means, as of any date of determination, one or more amounts or a percent of a specified category or item as the Agent may from time to time establish and revise in its Permitted Discretion discretion to reduce the amount of Revolving Loans and Letters of Credit that would otherwise be available to Borrowers under the lending formula provided for herein, including, without duplication: (a) amounts to reflect events, conditions, contingencies or risks which, as determined by the Agent, affect the assets, business or prospects of Borrower, or the Collateral or any other property which is security for the Obligations or its value, or the enforceability, perfection or priority of the Agent's Lien in the Collateral (including the Agent's ability to collect, or enforce its rights against, the Collateral); (b) the aggregate amount of liabilities secured by Liens (other than Permitted Liens) upon Collateral that are senior to the Agent's Liens

5

(but imposition of any such reserve shall not waive a Default or an Event of Default (if any) arising therefrom); (c) amounts to reflect Agent's judgment that any collateral report or financial information furnished by or on behalf of any Borrower or any other Loan Party to the Agent is or may have been incomplete, inaccurate or misleading in any material respect; (d) amounts to reflect any state of facts which do or would with notice or passage of time or both, constitute an Event of Default; (e) to reflect liability, contingent or otherwise, of the Agent or any Affiliate of Agent to any third party in connection with any Bank Product; (e) amounts to reflect conditions, contingencies or risks in connection with Bank Products offered by the Agent or any Affiliate of Agent to any Borrower, (f) for rent at locations leased by any Borrower and for storage, processing, and other charges of third-parties in possession of Collateral; (g) for payroll, taxes, fees, assessments, and other governmental charges with respect to the Collateral or any Borrower; (h) amounts to reflect deferred or unearned revenue; (i) the amount, if any, of dilution with respect to the Accounts as calculated by the Agent that is or is reasonably likely to be greater than two and one-half percent (2.5%); (j) the Rent, Charges and Insurance Reserve; and (k) the Bank Product Reserve.

"Average Undrawn Availability" means, as of any date of determination, Undrawn Availability at the close of business on each day in the thirty (30) consecutive day period ending immediately prior to such date, divided by 30.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Product" means any service or facility extended to any Loan Party by the Agent or its Affiliates including: (a) credit cards, (b) credit card processing services, (c) debit cards, (d) purchase cards, (e) automated clearing house transactions, (f) cash management, including controlled disbursement accounts or services and (g) Hedging Agreements.

"Bank Product Agreements" means those certain cash management service agreements entered into from time to time between any Loan Party and the Agent or its Affiliates in connection with any Bank Product.

"Bank Product Debt" means Indebtedness and other obligations of a Loan Party relating to Bank Products.

"Bank Product Obligations" means all obligations, liabilities, contingent reimbursement obligations, fees and expenses owing by the Loan Parties to the Agent or its Affiliates pursuant to or evidenced by the Bank Product Agreements and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all such amounts that a Loan Party is obligated to reimburse to the Agent or its Affiliates as a result of the Agent or its Affiliates purchasing participations or

6

executing indemnities or reimbursement obligations with respect to the Bank Products provided to the Loan Parties pursuant to the Bank Product Agreements.

"Bank Product Reserve" means the aggregate amount of reserves established by Agent from time to time in its Discretion in respect of Bank Product Debt, which may be at least equal to the sum of all Bank Product Obligations, in each case, except to the extent that such Bank Product Debt has been Cash Collateralized.

"Bankruptcy Code" means Title 11 of the United States Code or any similar federal or state debtor relief laws.

"Base Rate" means for any day, a fluctuating rate of interest per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Agent as its "prime rate," and (c) the Term SOFR plus 1.00%, subject to the interest rate floors set forth therein; provided that if the Base Rate shall be less than one percent (1.00%), such rate shall be deemed one percent (1.00%) for purposes of this Agreement. The "prime rate" is a rate set by the Agent based upon various factors including the Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such prime rate announced by the Agent shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means any Loan that bears interest at or by reference to the Base Rate.

"Base Rate Revolving Loan" means any Revolving Loan that bears interest based on the Base Rate.

"Beneficial Owner" means, with respect to each Loan Party: (1) each individual, if any, that, directly or indirectly, owns 25% or more of that Loan Party's Equity Interests; and (2) a single individual with significant responsibility to Control, manage, or direct that Loan Party.

"Beneficial Ownership Certificate" means, for each Loan Party, a certificate acceptable to the Agent in its discretion (as amended or modified by the Agent from time to time in its discretion), certifying, among other things, the Beneficial Owner of each Loan Party.

"Benefited Lender" has the meaning set forth in Section 2.11(d).

"Borrower" and "Borrowers" have the meanings assigned to such terms in the Preamble.

"Borrowing Base" means, at any time, the sum of:

(a)     up to 90% of the Value of the Borrowers' Eligible Accounts; plus

(b)     Availability Reserves.

The Agent may in its discretion reduce the advance rates, adjust Availability Reserves or any other reserves, or reduce one or more of the elements used to compute the Borrowing Base.

7

"Borrowing Base Certificate" means a certificate executed by the Loan Party Representative's Authorized Officer that is appropriately completed and in the form attached as Exhibit A.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Lender is located.

"Capex Availability" means (i) the aggregate amount of the Capex Commitment less (ii) the original principal amount of all Capex Loans advanced pursuant to this Agreement.

"Capex Availability Period" means the period from (i) the Closing Date until (ii) December 27, 2025.

"Capex Commitment" means the and Lender's commitment to make Capex Loans pursuant to Section 2.3(a). The aggregate amount of the Capex Commitment is $3,000,000.

"Capex Loan" means the Loans made under Section 2.3(a).

"Capex Maturity Date" means the earlier of (a) December 27, 2027 or (b) the Termination Date.

"Capex Outstandings" means, at any time, the aggregate principal amount of all outstanding Capex Loans.

"Capex Note" has the meaning assigned to such term in Section 2.3(a).

"Capital Expenditures" means any expenditure made or liability incurred that in accordance with GAAP is treated as a capital expenditure (and not as an expense item) in the year in which it was made or incurred.

"Capital Lease" means, with respect to any Person, any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or financing leases on that Person's balance sheet under GAAP, and the amount of these obligations is the capitalized amount determined in accordance with GAAP.

"Capital Lease Obligations" of any Person means that Person's obligations to pay rent or other amounts under any Capital Lease.

"Cash Collateralize" means, to pledge and deposit with or deliver to the Agent, as collateral for the Letter of Credit Exposure or such other applicable Obligations, (a) cash or deposit account balances, (b) backstop letters of credit entered into on terms, from issuers and in amounts satisfactory to the Agent, and/or (c) if the Agent shall agree, in its sole discretion, other credit support, in each case, in Dollars and pursuant to documentation in form and substance satisfactory to the Agent.

"Cash Collateral" has a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"Cash Concentration Account" means the Borrowers' commercial deposit account maintained at the Agent that is designated by the Agent as the Cash Concentration Account. The funds in this account are the Agent's sole and exclusive property, for the benefit of the Agent and the Lenders, and may only be withdrawn by the Agent.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et seq.).

"Change of Control" means any of the following: (1) the Permitted Holders do not own and Control, directly or indirectly, collectively, free and clear of all Liens, at least 51% of the outstanding voting Equity Interests of each Loan Party on a fully diluted basis; (2) Jamie Cord fails to own and Control, directly or indirectly, free and clear of all Liens, at least 50% of the outstanding voting Equity Interests of Holdings on a fully diluted basis (3) the occurrence of any event (whether in one or more transactions) that results in the Permitted Holders not having the power to designate a majority of the directors (or the individuals performing similar functions) of any Borrower; (4) any merger or consolidation of any Loan Party with another Person; (5) the sale of all or substantially all of any Loan Party's assets; or (6) any Loan Party does not own and Control, free and clear of all Liens, 100% of the outstanding voting Equity Interests of any existing or future Subsidiary.

"Charges" means all of the following imposed on any Collateral or any Loan Party by any taxing or other similar Governmental Body, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund): all taxes, charges, fees, imposts, levies, or other assessments (including with respect to net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims, and charges), together with any interest and any penalties, additions to tax, or additional amounts.

"Charter Documents" means, as to any Person (other than a natural person), the charter, certificate, or articles of incorporation or organization, by-laws, regulations, general or limited partnership agreement, limited partnership certificate, formation certificate, operating agreement, and other similar organizational or governing documents.

"CIP Regulations" has the meaning assigned to such term in Section 15.11.

"Closing Date" means December 27, 2024.

"CME" means CME Group Benchmark Administration Limited.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all real and personal property in which any Loan Party has any interest of any kind, whether now existing or arising or acquired or received by the Loan Parties in the future, and wherever located, including:

9

(a)     All Accounts.

(b)     All Inventory.

(c)     All Equipment and Fixtures.

(d)     All General Intangibles, Payment Intangibles, and Intellectual Property.

(e)     All Investment Property and the Pledged Equity Interests.

(f)     All Deposit Accounts and any and all monies credited by or due from any financial institution or any other depository.

(g)     All Chattel Paper, Instruments, and Documents.

(h)     All of each Loan Party's right, title, and interest in and to: (1) its goods and other personal property including all merchandise returned or rejected by Account Debtors; (2) all of each Loan Party's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor (including stoppage in transit, set-off, detinue, replevin, reclamation, and repurchase); (3) all additional amounts due to each Loan Party from any Account Debtors; (4) warranty claims; (5) all of each Loan Party's contract rights, rights to payment under contract rights, Instruments (including promissory notes), Documents, Chattel Paper (including electronic chattel paper), warehouse receipts, letters of credit, and money; (6) all Commercial Tort Claims; (7) all collateral securing any obligations owed to any Loan Party; (8) all Letter-of-Credit Rights; (9) all Supporting Obligations; and (10) any other goods or personal property or real property in which the Loan Parties at any time grant a Lien to the Agent or any Lender under any Loan Document or under any other agreement.

(i)     All of each Loan Party's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software, computer programs, tapes, disks, and documents relating to (a), (b), (c), (d), (e), (f), (g), or (h) of this definition.

(j)     All Proceeds and Products of (a), (b), (c), (d), (e), (f), (g), (h), and (i) of this definition in whatever form, including: cash, deposit accounts (whether comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood, business interruption, and credit insurance), negotiable instruments, and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds, and tort claim proceeds.

"Collateral Pledge Agreement" means that certain Collateral Pledge Agreement dated as of the Closing Date made by Holdings, in favor of Agent, as amended, restated, amended and restated or otherwise modified from time to time.

"Commitment" means the Revolving Commitment, the Term Loan Commitment, the Capex Commitment, and the HVAC Equipment Loan Commitment, as applicable.

"Commitment Percentage" of any Lender shall mean the percentage set forth on the Commitment Schedule, as it may be adjusted pursuant to the terms of this Agreement.

164393.00001/150632148v.7

"Commitment Schedule" means the Schedule 1 attached to this Agreement, as it may be amended from time to time pursuant to the terms of this Agreement.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. Section 1 et seq.).

"Communication" means this Agreement, any Loan Document and any document, any amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to any Loan Document.

"Compliance Certificate" means a certificate of the Loan Parties signed by the Loan Party Representative's Authorized Officer appropriately completed and in substantially the form of Exhibit B.

"Computation Period" means each period of four consecutive Fiscal Quarters ending on the last day of a Fiscal Quarter.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consents" means all filings and all licenses, permits, consents, approvals, authorizations, qualifications, and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Loan Party's business.

"Control" means possessing, directly or indirectly, the power to direct or cause the direction of the management or policies of a Person (whether through the ability to exercise voting power, by contract, or otherwise). "Controlling" and "Controlled" have correlative meanings.

"Controlled Group" means all members of a controlled group of corporations, all members of a controlled group of trades or businesses (whether or not incorporated) under common control and all members of an affiliated service group that, together with any Borrower or any of their Subsidiaries, are treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"Credit Exposure" shall mean, as to any Lender at any time, such Lender's Revolving Exposure plus such Lender's Commitment Percentage of the outstanding principal balance of the Term Loan.

"Customs" has the meaning assigned to such term in Section 2.11(b).

"Customer" means and includes the account debtor with respect to any Account and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Loan Party, pursuant to which such Loan Party is to deliver any personal property or perform any services.

11

164393.00001/150632148v.7

"Default" means an event that, with notice, the passage of time, or both, would be an Event of Default.

"Default Condition" means that either or both a Default and an Event of Default exist.

"Defaulting Lender" has the meaning set forth in Section 2.12(a) hereof.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"Discretion" means a determination made in good faith in the exercise of the Agent's business judgment from the perspective of a prudent, secured, asset-based Agent. The burden of establishing that the Agent did not act in its Discretion is on the Loan Parties.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable under a sinking fund obligation or otherwise, or is redeemable in whole within one year after the Termination Date.

"Dodd-Frank Act" means the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111-203, H.R. 4173).

"Dollar" and the sign "$" means lawful money of the United States of America.

"Earnings Before Interest and Taxes" means, for any fiscal period, the sum of (1) net income (or loss) for that period (excluding extraordinary gains and gains on asset sales (other than Inventory sold in the ordinary course of business)); plus (2) all interest expense for that period; plus (3) all charges against (or minus credits to) income for federal, state, and local taxes for that period, in each case, calculated on a consolidated basis for Holdings and its Subsidiaries.

"EBITDA" means, with respect to any fiscal period, the sum of (1) Holdings' and its Subsidiaries' consolidated net income (or loss), plus (2) non-cash extraordinary losses, Interest Expense, income taxes, depreciation and amortization and increases in any change in LIFO reserves for such period, minus (3) extraordinary gains, interest income, non-operating income and income tax benefits and decreases in any change in LIFO reserves, in each case, determined on a consolidated basis for the Holdings and its Subsidiaries in accordance with GAAP.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Record" and "Electronic Signature" have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

"Eligible Accounts" means, at any time, each Borrower's Accounts that the Agent determines in its sole discretion are Eligible Accounts. Without limiting the Agent's sole discretion, Eligible Accounts does not include any Account:

(a) That is not subject to a first-priority perfected Lien in the Agent's favor for the benefit of the Agent and the Lenders.

(b) That is subject to any Lien (other than a Permitted Lien that does not have priority over the Agent's Lien for the benefit of the Agent and the Lenders).

(c) (1) that is unpaid more than 90 days after the original invoice date, (2) that is unpaid more than 60 days after the original due date, or (3) that has been or should have been written off the Borrowers' books or is otherwise uncollectible.

(d) That is owing by an Account Debtor if more than 50% of all Accounts owing from that Account Debtor and its Affiliates are ineligible.

(e) That is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from that Account Debtor and its Affiliates to the Borrowers exceeds 25%, or in the case of Accounts owning by Flexe, Inc. and its Affiliate to the Borrowers, to the extent the aggregate amount of Accounts owing from Flexe, Inc. and its Affiliate to the Borrowers exceeds 50%.

(f) With respect to which any covenant, representation, or warranty in any Loan Document has been breached or is not true.

(g) That: (1) does not arise from the sale of goods or performance of services in the ordinary course of business; (2) is not evidenced by an invoice or other documentation satisfactory to the Agent in its discretion that has been sent to the Account Debtor; (3) is contingent upon a Borrower's completion of any further performance; (4) is a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery, any repurchase or return basis, or any other similar basis; or (5) is for interest, storage, or other similar charges.

(h) For which the goods giving rise to the Account have not been shipped to the Account Debtor, or for which the services giving rise to the Account have not been performed by a Borrower, or if the Account was invoiced more than once.

(i) With respect to which any payment has been returned uncollected for any reason.

(j) That is owed by an Account Debtor that: (1) has applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator; (2) has had a material part of its property taken by any receiver, custodian, trustee, or liquidator; (3) has filed, or had filed against

164393.00001/150632148v.7

it, any request or petition for liquidation, reorganization, arrangement, debt adjustment, winding-up, or a voluntary or involuntary case under any state or federal bankruptcy laws; (4) has admitted in writing its inability (or is generally unable) to pay its debts as they become due; (5) is insolvent; (6) has stopped operating its business; (7) has sold a material portion of its assets; (8) requires a Borrower to support its obligations to such Account Debtor with a performance bond; (9) is the government (or any government department, agency, public corporation, or instrumentality) of any country other than the U.S. unless the Account is backed by a letter of credit acceptable to the Agent in its discretion that has been assigned to the Agent; (10) is the U.S. government (or any U.S. department, agency, public corporation, or instrumentality) unless the Federal Assignment of Claims Act of 1940 has been complied with to the Agent's satisfaction; or (11) is an Affiliate, employee, officer, director, agent, or Equity Interest holder of any Loan Party.

(k)     That is owed by an Account Debtor that (1) does not maintain its chief executive office in the United States or (2) is not organized under the law of the United States, or any state of the United States, unless, in each case, the sale is on letter of credit, guaranty, or acceptance terms, in each case satisfactory to the Agent in its discretion, or such Account is insured by credit insurance satisfactory to the Agent in its discretion with the Agent named as loss payee.

(l)     That is owed in any currency other than Dollars.

(m)     That is owed by an Account Debtor or any Affiliate of an Account Debtor that is a creditor or supplier of any Loan Party, or that is otherwise subject to a potential offset, counterclaim, dispute, deduction, discount, recoupment, reserve, defense, chargeback, credit, or allowance (but ineligibility is limited to the amount thereof).

(n)     That represents a progress billing or retainage, or relates to services for which a performance, surety or completion bond, or similar assurance has been issued.

(o)     That is evidenced by a promissory note, chattel paper, or an instrument.

(p)     That is owed by an Account Debtor located in any jurisdiction that requires filing of a "Notice of Business Activities Report" or other similar report to permit a Borrower to seek judicial enforcement in that jurisdiction of payment of that Account (unless the applicable Borrower has filed that report or is qualified to do business in that jurisdiction).

(q)     With respect to which a Borrower has made any agreement with the Account Debtor for any reduction to the Account (other than discounts and adjustments given in the ordinary course of business that are consistent with practices that existed on the Closing Date and that have been disclosed to the Agent in writing), or any Account that was partially paid and a Borrower created a new receivable for the unpaid portion of the Account.

(r)     That does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state, or local, including the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act, and Regulation Z of the FRB.

(s)     That is for goods that have been sold under a purchase order, contract, or other agreement or understanding (written or oral) that indicates that any Person other than a Borrower

14

has or has had an ownership interest in the goods, or that indicates any Person (other than a Borrower) as payee or remittance party.

(t)     That is otherwise not acceptable to the Agent in its Permitted Discretion for any other reason.

If an Eligible Account becomes ineligible, the Loan Party Representative must notify the Agent of that within one Business Day of the Loan Party Representative obtains knowledge of such Eligible Account becoming ineligible. In determining the amount of Eligible Accounts, the Agent may reduce the face amount of Accounts by (1) all accrued and actual discounts, claims, credits, pending credits, promotional program allowances, price adjustments, finance charges, or other allowances (including any amount that a Loan Party may be obligated to rebate to an Account Debtor under any agreement or understanding (written or oral)) and (2) the aggregate amount of all cash received with respect to Accounts but not yet applied by the Borrowers to reduce Accounts.

"Eligible Assignee" means any of the following Persons: (a) a Lender; (b) an Affiliate of a Lender; and (c) any other Person (other than a natural person) approved by (i) the Agent, and (ii) in the case of any assignment of a commitment to make Advances hereunder, the Issuer; provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include any Borrower or any of such Borrower's Affiliates or Subsidiaries and; provided, further, that, notwithstanding the foregoing, a Person shall only be an "Eligible Assignee" if the assignment to or participation of such Person shall not constitute a "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code).

"Eligible Purchased M&E" means machinery and Equipment of the Borrowers purchased after the Closing Date that is in good order, repair, running and marketable condition that at all times satisfies the criteria set forth below as determined from time to time by Agent in its Discretion.  Without limiting the generality of the immediately preceding sentence, neither machinery nor Equipment may be Eligible Purchased M&E unless it meets all the following minimum requirements:

(a)     A Borrower has good, valid, and marketable title to the machinery or Equipment, such Borrower has the right to subject it to a Lien in favor of Agent, the machinery or Equipment is subject to a first-priority perfected Lien in the Agent's favor for the benefit of the Agent and the Lenders and, except for Permitted Liens that do not have priority over the Agent's Lien for the benefit of the Agent and the Lenders, is not subject to any other Lien.

(b)     No representation or warranty in any Loan Document with respect to the machinery or Equipment has been breached.

(c)     The machinery or Equipment is (x) in good working order and condition (ordinary wear and tear excepted), (y) not obsolete or materially defective and (z) currently in a condition that is usable in the ordinary course of business of the Borrowers.

(d)     The machinery or Equipment does not constitute a Fixture.

(e)     The machinery or Equipment (1) is located in the United States; (2) is located at a location owned or leased by a Borrower and, with respect to any leased location, the lessor has

15

delivered to the Agent a Waiver (or the Agent in its discretion has established a Reserve for that location) or is in any third-party warehouse or in a bailee's possession and the warehouseman or bailee has delivered to the Agent a Waiver and such other documentation as the Agent may require (or the Agent in its discretion has established a Reserve for that location); (3) does not contain or bear any Intellectual Property rights licensed to a Borrower unless the Agent is satisfied that the Agent may sell or otherwise dispose of the machinery or Equipment without (x) infringing the licensor's rights, (y) violating any contract with the licensor, or (z) incurring any liability to pay royalties; (4) complies in all material respects with all standards, laws, and regulations imposed by any Governmental Body; and (5) to the extent a Certificate of Title evidences ownership of such machinery or Equipment, the Agent's Lien shall be noted on such Certificate of Title and the Agent (or its agent) shall have possession of such Certificate of Title.

(f)　　The machinery or Equipment is otherwise acceptable to the Agent in its Permitted Discretion.

"Eligible Purchased HVAC M&E" means heating, ventilation, and air conditioning machinery and Equipment of the Borrowers purchased after the Closing Date that (a) is at all times installed in the Borrowers' facility located in Altoona, Iowa, (b) is in good order, repair, running and marketable condition, and (c) is acceptable to the Agent in its Discretion.

"Environmental Complaint" has the meaning assigned to such term in Section 4.18(b).

"Environmental Laws" means all federal, state, and local environmental, land use, zoning, health, chemical use, safety, and sanitation laws, statutes, ordinances, and codes related to protecting the environment or governing the use, storage, treatment, generation, transportation, processing, handling, production, or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders, and directives issued by Governmental Bodies with respect to these matters.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust, or other equity ownership interests in a Person (and any warrants, options, or other rights entitling the holder to purchase or acquire any equity ownership interest).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 or Section 430 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of any Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate a Pension Plan or Multiemployer Plan, or the

16

treatment of a plan amendment as a termination of a Pension Plan or Multiemployer Plan under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan or Multiemployer Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any ERISA Affiliate; or (i) a failure by any Borrower or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules in respect of a Pension Plan, whether or not waived, or the failure by any Borrower or any ERISA Affiliate to make any required contribution to a Multiemployer Plan.

"Erroneous Payment" has the meaning assigned to it in Section 15.12(a).

"Event of Default" has the meaning assigned to such term in Article 10.

"Excluded Hedging Obligations" means, with respect to any Guarantor, any Hedging Obligation if, and solely to the extent that, all or a portion of a Guarantor's Guaranty of, or the grant by that Guarantor of a Lien under the Loan Documents to secure, the Hedging Obligations (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission by virtue of that Guarantor's failure for any reason to constitute an "eligible contract participant" (as defined in the Commodity Exchange Act as of the date of that Guaranty or the grant of a Lien would otherwise have become effective with respect to such related Hedging Obligation). If a Hedging Obligation arises under a master agreement governing more than one swap, the exclusion applies only to the portion of the Hedging Obligation that is attributable to swaps for which the Guaranty or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of a Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of a Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (i) a Lender acquires such interest in the Loan (other than pursuant to an assignment request by the Borrowers under Section 15.3) or (ii) a Lender changes its Lending Office, except in each case to the extent that, amounts with respect to such Taxes were payable either to a Lender's assignor immediately before the Lender became a party hereto or to the Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17(g), and (d) any withholding Taxes imposed pursuant to FATCA.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001.

17

"Expenses" means all reasonable and documented fees, costs, expenses, charges, and out-of-pocket disbursements incurred by the Agent, the Lenders and their counsel (including the allocated costs of in-house counsel) and court costs, in any way arising from or in connection with the Loan Documents, any Collateral (including costs and expenses to preserve and protect Collateral), any Obligations, or the business relationship between the Agent, the Lenders and any Loan Party, including: (1) audit fees at the per day rate provided for below; (2) all the Agent's, the Lenders and their counsels' fees and expenses (including recording fees and insurance policy fees) to prepare, examine, conduct due diligence with respect to, approve, negotiate, execute, and deliver, and close the transactions contemplated by the Loan Documents; (3) all fees and out-of-pocket disbursements incurred by the Agent (including attorneys' fees) arising from or in connection with (x) any action taken by the Agent to monitor, advise, administer, enforce, or collect any Obligations, any Loan Documents, or any other present or future documents or agreements between the Agent and any one or more of the Loan Parties, (y) the business relationship between the Agent, the Lenders and any Loan Party, and (z) background checks regarding senior management, or key investors, as the Agent determines in its discretion; (4) all out-of-pocket expenses and fees (including attorneys' fees) incurred in relation to, in connection with, in defense of, or in prosecution of any litigation (including any actions to lift the automatic stay or to otherwise in any way monitor or participate in any Insolvency Proceeding involving a Loan Party) related to the Obligations, the Loan Documents, the Collateral, or any Loan Party (including any litigation instituted by a Loan Party or any third party, any so called "Agent liability" action, any claim and delivery or other action for possession of, or foreclosure on, any of the Collateral, post judgment enforcement of any rights or remedies (including enforcing judgments and prosecuting appeals whether discretionary or as of right and whether in connection with pre judgment or post judgment matters)); (5) all costs, expenses, and fees incurred by the Agent or its agents in connection with any appraisals or environmental assessments (and the Loan Parties must fully cooperate with the appraisers and inspectors and make their property available for appraisal and inspection in connection with as many appraisals or environmental assessments as the Agent may request); and (6) all costs, expenses, and fees incurred by the Agent, the Lenders or their counsel in connection with consultants, expert witnesses, or other professionals retained by the Agent or its counsel to assist, advise, or give testimony with respect to any matter relating to the Loan Documents, the Collateral, the Obligations, the Loan Parties, or the business relationship between the Agent and any one or more of the Loan Parties. The Loan Parties will receive summary invoices showing only the total amount due and the summary invoices may not contain any narrative description of the services provided (and the Agent's delivery of summary invoices does not waive any of the Agent's rights or privileges (including the attorney-client privilege)).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471 (b) (1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Bodies and implementing such Sections of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such

18

day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Associated on such day on such transactions as determined by the Agent.

"Fiscal Quarter" means a fiscal quarter of a Fiscal Year.

"Fiscal Year" means each fiscal year of the Borrowers and their Subsidiaries, which period shall be the 12-month period ending on December 31.

"Fixed Charge Coverage Ratio" means, with respect to Holdings and its Subsidiaries for any fiscal period, the ratio of (x) EBITDA during such period minus (1) Non-Financed Capital Expenditures made (to the extent not already incurred in a prior period) or incurred during such period, (b) cash taxes paid during such period, to the extent greater than zero, and (c) Pass-Through Tax Liabilities to (ii) Fixed Charges for such period.

"Fixed Charges" means, with respect to any fiscal period and with respect to Holdings and its Subsidiaries determined on a consolidated basis in accordance with GAAP, the sum, without duplication, of (a) cash Interest Expense paid during such period (other than interest paid-in-kind, amortization of financing fees, and other non-cash Interest Expense), (b) principal payments paid in cash in respect of Indebtedness paid during such period, including cash payments with respect to Capital Leases, and (c) other distributions paid in cash during such period (other than Pass-Through Tax Liabilities).

"Foreign Lender" means a Lender that is not a United States Person within the meaning of Code Section 7701(a)(30).

"FRB" means the Board of Governors of the Federal Reserve System or any successor thereto.

"FRBNY" means the Federal Reserve Bank of New York.

"GAAP" means the generally accepted accounting principles established in the United States of America by the Financial Accounting Standards Board.

"Governmental Body" means any nation or government, any state or other political subdivision of a nation or government, or any entity exercising the legislative, judicial, regulatory, or administrative functions of or pertaining to a government.

"Group" means, in some instances, Term SOFR Loans having the same Interest Period.

"Guarantor" means, (a) Holdings, and (b) each other Person that guaranties all or any Obligations.

"Guaranty" of or by any Person means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other

19

obligation of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect: (1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for its payment; (2) to purchase or lease property, securities, or services to assure the owner of such Indebtedness or other obligation of the payment of that Indebtedness; (3) to maintain working capital, equity capital, or any other financial statement condition or liquidity of the Primary Obligor so as to enable the Primary Obligor to pay that Indebtedness or other obligation; or (4) as an account party in respect of any letter of credit or letter of guaranty issued to support that Indebtedness or obligation (but "Guaranty" does not include endorsements for collection or deposit in the ordinary course of business).

"Hard Costs" means, with respect to the purchase by the Borrowers of an item of Eligible Purchased M&E or Eligible Purchased HVAC M&E, the cash amount actually paid to acquire title to such item, net of all incentives, trade in allowances, discounts and rebates, and exclusive of freight, delivery charges, installation costs and charges, software costs, charges and fees, warranty costs, taxes, insurance and other incidental costs or expenses and all indirect costs or expenses of any kind.

"Hazardous Discharge" has the meaning assigned to such term in Section 4.18(b).

"Hazardous Substance" means, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances, or related materials as defined in CERCLA, the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 et seq.), RCRA, or other applicable Environmental Law.

"Hazardous Wastes" means all waste materials regulated by CERCLA, RCRA, or applicable state law, and any other applicable federal and state laws relating to hazardous waste disposal.

"Hedging Agreement" means any interest rate, currency or commodity swap agreement, cap agreement or collar agreement, and any other agreement or arrangement designed to protect a Person against fluctuations in interest rates, currency exchange rates or commodity prices.

"Hedging Obligation" means, with respect to any Person, any liability of such Person under any Hedging Agreement. The amount of any Person's obligation in respect of any Hedging Obligation will be deemed to be the incremental obligation that would be reflected in the financial statements of such Person in accordance with GAAP.

"Holdings" has the meaning assigned to such terms in the Preamble.

"Honor Date" has the meaning assigned to such term in Section 2.9(c).

"HVAC Equipment Loan Availability" means (i) the aggregate amount of the HVAC Equipment Loan Commitment less (ii) the original principal amount of all HVAC Equipment Loans advanced pursuant to this Agreement.

20

"HVAC Equipment Loan Availability Period" means the period from (i) the Closing Date until (ii) December 27, 2025.

"HVAC Equipment Loan Commitment" means the and Lender's commitment to make HVAC Equipment Loans pursuant to Section 2.3(b). The aggregate amount of the HVAC Equipment Loan Commitment is $2,900,000.

"HVAC Equipment Loan" means the Loans made under Section 2.3(b).

"HVAC Equipment Loan Maturity Date" means the earlier of (a) December 27, 2027 or (b) the Termination Date.

"HVAC Equipment Loan Outstandings" means, at any time, the aggregate principal amount of all outstanding HVAC Equipment Loans.

"HVAC Equipment Loan Note" has the meaning assigned to such term in Section 2.3(b).

"Increased Tax Burden" means the additional federal, state, or local taxes assumed to be payable by a Pass-Through Owner of a Pass-Through Loan Party due to its status as a Pass-Through Loan Party, as evidenced and substantiated by the tax returns filed by that Pass-Through Owner (with these taxes calculated for all Pass-Through Owners at the highest federal and state marginal rates applicable to any Pass-Through Owner and taking into account losses previously allocated to each Pass-Through Owner by that Pass-Through Loan Party to the extent those losses have not previously been applied to reduce the Increased Tax Burden (but (1) capital losses and capital loss carry forwards are taken into account only to the extent they are currently usable to offset income or gain allocated by that Pass-Through Loan Party to a Pass-Through Owner and (2) that to the extent that any losses allocated by that Pass-Through Loan Party result in a payback by a Pass-Through Owner to that Pass-Through Loan Party of previous tax distributions in accordance with this Agreement then those losses are not taken into account for purposes of determining the Increased Tax Burden)).

"Indebtedness" of any Person means, as of any date: (1) that Person's obligations for borrowed money or similar obligations; (2) that Person's Capital Lease Obligations; (3) that Person's obligations that are secured by any Lien on any of its assets or property whether or not the secured obligation has been assumed by that Person; (4) except for trade accounts payable arising in the ordinary course of business that are not more than 90 days past due, that Person's obligations for the unpaid purchase price for goods, property, or services; (5) that Person's obligations to purchase goods, property, or services where payment is required regardless of whether delivery of the goods or property or the performance of the services is ever made or tendered (generally referred to as "take or pay contracts"); (6) that Person's obligations for unfunded benefit liabilities under any Plan of that Person or any ERISA Affiliate; (7) that Person's obligations for Hedging Obligations, or other similar transactions (valued in an amount equal to the highest termination payment, if any, that would be payable by that Person upon termination for any reason on the determination date); (8) that Person's obligations for outstanding reimbursement and similar obligations under letters of credit, bankers acceptances, and similar instruments; (9) the aggregate outstanding amount of all Off-Balance Sheet Liabilities (based on the aggregate outstanding amount as if the transaction were structured as a secured loan and an on

21

balance sheet financing, whether or not shown as a liability on a consolidated balance sheet of the Person); and (10) that Person's obligations for or relating to Indebtedness of other Persons similar to the Indebtedness described in the preceding clauses (based on the maximum amount that may be payable).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Insolvency Proceeding" means any proceeding by or against a Loan Party (or any Person obligated to a Loan Party) under any provision of the Bankruptcy Code or under any other bankruptcy or insolvency law (including assignments for the benefit of creditors, formal or informal moratoria, compositions, or proceedings seeking reorganization, liquidation, arrangement, or other similar relief).

"Intellectual Property" means patents, patent rights, patent applications, copyrights, works that are the subject matter of copyrights, copyright registrations, trademarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the preceding, all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the preceding, all rights to sue for past, present, and future infringement of any of the preceding, inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards, goodwill, customer and other lists, trade secret rights, copyright rights, rights in works of authorship, and contract rights relating to computer software programs.

"Interest Expense" means for any period the consolidated interest expense of Holdings and its Subsidiaries for such period (including all imputed interest on Capital Lease Obligations).

"Interest Period" means as to each Term SOFR Loan, the period commencing on the date such Term SOFR Loan is disbursed or converted to or continued as a Term SOFR Loan and ending on the date one month thereafter, as selected by the Loan Party Representative in its Notice of Borrowing or Notice of Conversion/Continuation, as applicable, or such other period that is twelve months or less requested by the Loan Party Representative and consented to by the Agent (in the case of each requested Interest Period, subject to availability); provided that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless, in the case of a Term SOFR Loan, such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)     any Interest Period pertaining to a Term SOFR Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period for Loans under a facility shall extend beyond the Maturity Date applicable to such facility.

22

"Issuer" means, with respect to any Letter of Credit, the issuer of such Letter of Credit and shall be, with respect to any Letter of Credit hereunder, Associated, and each of its successors and assigns (in each case, which may be replaced by the Agent in its sole discretion).

"Joinder" means a joinder agreement substantially in the form of Exhibit J to this Agreement.

"L/C Borrowing" has the meaning assigned to such term in Section 2.9(g).

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Obligations" means the sum (without duplication) of (a) all Unreimbursed Amounts; (b) the aggregate undrawn amount of all outstanding Letters of Credit; and (c) all fees and other amounts owing by any Borrower with respect to Letters of Credit.

"Lender" and "Lenders" means each Person listed on the Commitment Schedule, as amended from time to time, and each additional Person that becomes a party hereto pursuant to an Assignment and Assumption.

"Lender Default" has the meaning assigned to such term in Section 2.12(a).

"Lending Office" means the office or offices of the Agent as the Agent may from time to time notify the Loan Party Representative, which office may include any Affiliate of the Agent or any domestic or foreign branch of the Agent or such Affiliate.

"Letter of Credit" means any standby letter of credit issued hereunder.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form use by the Agent.

"Letter of Credit Expiration Date" means the day that is seven (7) days prior to the Maturity Date then in effect for the Revolving Commitments (or, if such day is not a Business Day, the immediately preceding Business Day).

"Letter of Credit Exposure" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Letter of Credit Fee" has the meaning assigned to such term in Section 2.9(g).

"Letter of Credit Sublimit" means an amount equal to the lesser of (a) $1,000,000 and (b) the Revolving Commitment. The Letter of Credit Sublimit is part of, and not in addition to, the Revolving Commitment.

23

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim, encumbrance, preference, priority, or other security agreement or preferential arrangement held or asserted with respect to any asset of any kind or nature including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the preceding, and the filing of, or agreement to give, any financing statement under the UCC or comparable law of any jurisdiction.

"Liquidity" means, as at any date of determination, an amount equal to (a) Undrawn Availability as of such date, minus (b) all amounts owed to each Borrower's trade creditors that are outstanding sixty (60) or more days beyond the due date.

"Loan" means each Revolving Loan, each Capex Loan, each HVAC Equipment Loan, and the Term Loan; and "Loans" means all Revolving Loans, Capex Loans, HVAC Equipment Loans, and the Term Loan.

"Loan Account" has the meaning assigned to such term in Section 2.8.

"Loan Documents" means this Agreement, the Notes, the Perfection Certificate, each Borrowing Base Certificate, each Compliance Certificate, the Letters of Credit, the Beneficial Ownership Certificate, the Waivers, the Mortgages, if any, the Collateral Pledge Agreement, any Guaranty, any Hedging Agreement, and any and all other agreements, instruments and documents, including guaranties, pledges, powers of attorney, consents, and all other writings before, now, or later executed by any Loan Party or delivered to the Agent, the Issuer or any Lender with respect to the transactions contemplated by the Loan Documents.

"Loan Party" means each Borrower, each Guarantor and each Person that grants the Agent, for the benefit of the Lenders, a Lien on any Collateral to secure any Obligation.

"Loan Party Representative" means JT Logistics Solutions, LLC, an Iowa limited liability company.

"Material Adverse Effect" means a material adverse effect in or on: (1) the Loan Parties' aggregate financial condition, operational results, business, or prospects; (2) the Loan Parties' ability, in the aggregate, to pay or perform any Obligation in accordance with its terms; (3) the value of the Collateral, the Liens of the Agent of any Lender on the Collateral, or the priority of the Agent's or any Lender's Lien on any Collateral; (4) the validity or enforceability of any Loan Document or the Agent's rights or remedies under any Loan Document; or (5) the practical realization of the Agent's rights and remedies under the Loan Documents.

"Material Business Agreement" means any agreement that if terminated, rescinded, or breached could reasonably be expected to have a Material Adverse Effect on any Loan Party.

"Maturity Date" means the earlier of (1) the Termination Date or (2) the date on which the Revolving Commitment, the Capex Commitment, and the HVAC Equipment Loans Commitment are reduced to zero or otherwise terminated.

24

"<u>Maximum Borrowing Amount</u>" means, at any time, an amount equal to the lesser of (1) the Aggregate Revolving Commitment minus all Availability Reserves and (2) the Borrowing Base.

"<u>Maximum Swing Loan Amount</u>" shall mean an amount equal to ten percent (10%) of the Aggregate Revolving Commitment.

"<u>Mortgages</u>" means each mortgage or other agreement that conveys or evidences a Lien on Owned Real Property that secures any Obligation.

"<u>Mortgage Lender</u>" means Dupaco Credit Union, in its capacity as the mortgagee of the Owned Real Property.

"<u>Multiemployer Plan</u>" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or has been obligated to make contributions.

"<u>Multiple Employer Plan</u>" means a Plan which has two or more contributing sponsors (including any Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"<u>Net Cash Proceeds</u>" means:

(a) with respect to any Asset Disposition, the aggregate cash proceeds received (including cash proceeds received pursuant to policies of insurance or by way of deferred payment of principal pursuant to a note, installment receivable or otherwise, but only as and when received) by any Loan Party pursuant to such Asset Disposition net of (i) the direct costs relating to such sale, transfer or other disposition (including sales commissions and legal, accounting and investment banking fees), (ii) taxes paid or reasonably estimated by the Borrowers to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (iii) amounts required to be applied to the repayment of any Debt secured by a Lien on the asset subject to such Asset Disposition (other than the Loans);

(b) with respect to any issuance of Equity Interests, the aggregate cash proceeds received by any Loan Party pursuant to such issuance, net of the direct costs relating to such issuance (including sales and underwriters' commissions); and

(c) with respect to any issuance of Debt, the aggregate cash proceeds received by any Loan Party pursuant to such issuance, net of the direct costs of such issuance (including up-front, underwriters' and placement fees).

"<u>Non-Consenting Lender</u>" has the meaning assigned to such term in Section 16.3(i).

"<u>Non-Defaulting Lender</u>" has the meaning assigned to such term in Section 2.12(b).

25

"Non-Financed Capital Expenditures" means Capital Expenditures not financed by the seller of the capital asset, by a third party Agent or by means of any extension of credit by Agent other than by means of a Revolving Loan or a Swing Loan.

"Note" means one or all of the Revolving Note, the Capex Note, the HVAC Equipment Loan Note, the Term Note and the Swing Loan Note.

"Notice" is defined under Section 15.8.

"Notice of Borrowing" has the meaning given in Section 2.4.

"Notice of Continuation/Conversion" has the meaning assigned to such term in Section 2.4(f).

"Obligations" means and includes any and all loans, advances, debts, liabilities, obligations, covenants and duties (absolute, contingent, matured or unmatured) of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed or allowable in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document (including the Loan Documents), whether or not for the payment of money, (a) owing by the Loan Parties to the Lenders, the Agent, the Swing Loan Lender or the Issuer or to any other direct or indirect subsidiary or affiliate of the Lenders, the Agent, the Swing Loan Lender or the Issuer pursuant to the terms of this Agreement or the other Loan Documents, (b) owing by the Loan Parties to the Agent or any direct or indirect subsidiary or affiliate of the Agent arising (i) by reason of an equipment lease or guarantee, (ii) under any Hedging Agreement, (iii) in connection with any commercial credit cards, stored value cards, cash management or treasury administration services or in any other manner, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise), (iv) out of the Agent's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, or (v) under any other agreement between the Agent and any Loan Party, in each case, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and any amendments, extensions, renewals or increases and all costs and expenses of the Agent, the Swing Loan Lender, the Lenders and the Issuer incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses. "Obligations" shall not include, with respect to any Guarantor, Excluded Swap Obligations of such Guarantor.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of Treasury.

"Off-Balance Sheet Liability" of a Person means: (1) any obligation under a sale and leaseback transaction that is not a Capital Lease; (2) any so-called "synthetic lease" or "tax

26

ownership operating lease" transaction; (3) the amount of obligations outstanding under any asset securitization or similar transaction on any determination date that would be characterized as principal if that asset securitization or similar transaction were structured as a secured lending transaction rather than as a purchase; or (4) any other transaction (excluding operating leases for purposes of this clause (4)) that is the functional equivalent of or takes the place of borrowing but that is not a liability on that Person's balance sheet. The amount of any Off-Balance Sheet Liability is calculated based on the aggregate amount of obligations outstanding under the transaction on any determination date that would be characterized as principal if the transaction were structured as a secured lending transaction, whether or not shown as a liability on that Person's balance sheet, all in a manner reasonably satisfactory to the Agent.

"Original Indebtedness" has the meaning assigned to such term in Section 7.8(f).

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 16.3(g)).

"Owned Real Property" means all Real Property listed on Schedule 1.2(a).

"Parent" is defined in the defined term "Subsidiary".

"Participant" shall have the meaning set forth in Section 16.3(e).

"Pass-Through Loan Parties" means each Loan Party that is a limited liability company, a subchapter S corporation, or any other entity that is disregarded for federal and state income tax purposes while it has elected to be treated as a pass through entity for federal and state income tax purposes.

"Pass-Through Owner" is defined under the defined term "Permitted Tax Distributions".

"Pass-Through Tax Liabilities" means the amount of state and federal income tax paid or to be paid by the Pass-Through Owners on taxable income earned by a Borrower and attributable to the Pass-Through Owners as a result of a Borrower's "pass-through" tax status, assuming the highest marginal income tax rate for federal and state (for the state or states in which any owner is liable for income taxes with respect to such income) income tax purposes, after taking into account any deduction for state income taxes in calculating the federal income tax liability and all other deductions, credits, deferrals and other reductions available to the Pass-Through Owners from or through such Borrower.

164393.00001/150632148v.7

"Payment Office" means the office that the Agent specifies in writing to the Loan Party Representative.

"Payment Recipient" has the meaning assigned to such term in Section 15.12(a).

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan but excluding a Multiemployer Plan) that is maintained or is contributed to by any Borrower and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Perfection Certificate" means the perfection certificate or perfection certificates provided by the Borrowers to the Agent.

"Permitted Discretion" means the Agent's reasonable credit judgment (from the perspective of a secured asset-based lender) made in good faith in accordance with customary business practices for comparable asset based lending transactions.

"Permitted Dividends" means dividends and distributions that meet each of the following conditions: (1) no Default or Event of Default exists or would occur after giving pro forma effect to the dividend or distribution; (2) the Loan Parties are in pro forma compliance with the financial covenants set forth in Section 7.25 both before and after giving effect to the dividend or distribution; (3) the Borrowers shall have a Fixed Charge Coverage Ratio, as of the last day of the most recently ended fiscal quarter on a pro forma basis, of greater than 1.25 to 1.00; (4) the Borrowers shall have Undrawn Availability of at least $3,000,000 in each case for 30 days prior to the payment of such dividend or distribution and after giving effect to the payment of such dividend or distribution; and (5) the Borrowers shall have delivered to the Agent written notice of its intention to make such dividend or distribution at least ten (10) Business Days, which notice shall be accompanied by (i) a Compliance Certificate for the monthly and / or quarterly period then ended demonstrating compliance with all financial covenants, and (ii) the proforma calculation demonstrating that no Default or Event of Default shall result after giving effect to such proposed dividend or distribution.

"Permitted Holders" means Jamie Cord, Troy Strawhecker, Andre Ekis, and Jamie Myers.

"Permitted Liens" means (1) Liens in favor of the Agent, for the benefit of the Lenders; (2) Liens for taxes, assessments, or other Charges that (x) are not delinquent or (y) are being contested in good faith by appropriate proceedings that stay the enforcement of those Liens and with respect

28

to which proper reserves have been taken by the Loan Parties in accordance with GAAP (but only if these Liens have no effect on the priority of the Agent's Liens or the value of the Collateral, and a stay of enforcement of the Lien is in effect); (3) deposits or pledges to secure obligations under worker's compensation, social security, or similar laws (excluding Liens arising under ERISA), or under unemployment insurance or general liability or product liability insurance; (4) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds, and other similar obligations arising in the ordinary course of any Loan Party's business; (5) mechanics', workers', materialmen's, warehousemen's, common carriers', landlord's or other similar Liens arising in the ordinary course of any Loan Party's business with respect to obligations that are not due or that are being contested in good faith by the applicable Loan Party; (6) Liens placed on equipment and real estate assets acquired to secure a portion of the purchase price (but only if (x) the Lien does not encumber any other of the Loan Parties' property and (y) the aggregate amount of Indebtedness secured by these Liens incurred during any fiscal year does not exceed the amount allowed by Section 7.6); (7) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants, and other similar title exceptions or Liens affecting Real Property, none of which materially impairs the use or value of that Real Property; (8) Liens on owned Real Property of the Loan Parties' in favor of Mortgage Lender (but only if the principal amount secured is not increased and no additional assets become subject to the Lien); and (9) Liens disclosed on Schedule 1.2(b) (but only if the principal amount secured is not increased and no additional assets become subject to the Lien).

"Permitted Tax Distributions" means dividends and distributions that meet each of the following conditions: (1) they are allowed under all applicable law; (2) no Event of Default or Default exists or would occur after giving pro forma effect to the dividend or distribution; (3) the Loan Parties are in pro forma compliance with the financial covenants set forth in Section 7.24 both before and after giving effect to the dividend or distribution; and (4) they are made by a Pass-Through Loan Party to its members or shareholders in an aggregate amount equal to the Increased Tax Burden of its shareholders and members (each, a "Pass-Through Owner"). Permitted Tax Distributions may be made on a quarterly basis to allow each Pass-Through Owner to pay estimated taxes during the course of the taxable year using reasonable estimates of the anticipated aggregate amount of Permitted Tax Distributions for that taxable year at the time of payment, with any excess of aggregate installments with respect to any such taxable year over the actual amount of Permitted Tax Distributions permitted for such taxable year reducing any future Permitted Tax Distributions otherwise allowed under this Agreement if less than $50,000 in the aggregate at any time, otherwise the Borrowers must cause the recipients of the excess installments to return the excess to the Borrowers within 10 days of it becoming known that excess installments were made.

"Person" means any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity, or Governmental Body.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of any Borrower or any ERISA Affiliate or any such Plan to which any Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

29

164393.00001/150632148v.7

"Pledged Equity Interests" has the meaning assigned to such term in Section 4.20.

"Pre-Adjustment Successor Rate" has the meaning assigned to such term in Section 3.13.

"Primary Obligor" is defined under the defined term "Guaranty".

"Prior Lender" means Old National Bank, a national banking association.

"Projections" has the meaning assigned to such term in Section 5.6(a).

"RCRA" means the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et seq.).

"Real Property" means the Loan Parties' owned and leased real property.

"Recipient" means the Lenders, the Agent, any issuer of a Letter of Credit pursuant to Section 2.9 hereunder, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Refinance Indebtedness" has the meaning assigned to such term in Section 7.8(f).

"Register" has the meaning assigned to such term in Section 15.3(c).

"Related Adjustment" means, in determining any Successor Rate, the first relevant available alternative set forth in the order below that can be determined by the Agent applicable to such Successor Rate:

(a)      the spread adjustment, or method for calculating or determining such spread adjustment, that has been selected or recommended by the Relevant Governmental Body for the relevant Pre-Adjustment Successor Rate (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto) and which adjustment or method is published on an information service as selected by the Agent from time to time in its reasonable discretion; or

(b)      the spread adjustment that would apply (or has previously been applied) to the fallback rate for a derivative transaction referencing the ISDA definitions (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, consultants, service providers and representatives of such Person and of such Person's Affiliates.

"Release" has the meaning assigned to such term in Section 5.8(b).

"Relevant Governmental Body" means the FRB and/or the FRBNY, or a committee officially endorsed or convened by the FRB and/or the FRBNY.

30

164393.00001/150632148v.7

"Rent, Charges and Insurance Reserve" means the aggregate of (a) a reserve for all past due rent and other amounts owing by a Loan Party to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder or other Person who possesses any Collateral or could assert a Lien on any Collateral; and (b) a reserve at least equal to three (3) months' rent and other periodic charges that could reasonably be expected to be payable to any such Person; and (c) a reserve for insurance premiums and payments due or which may become due, in each case, as determined by Agent in its sole discretion.

"Reportable Event" means a reportable event as defined in Section 4043 of ERISA and the regulations issued thereunder as to which the PBGC has not waived the notification requirement of Section 4043(a), or the failure of a Pension Plan to meet the minimum funding standards of Section 412 of the Code (without regard to whether the Pension Plan is a plan described in Section 4021(a)(2) of ERISA) or under Section 302 of ERISA.

"Required Lenders" means, any of the Lenders (other than Swing Loan Lender (in its capacity as such) or Defaulting Lenders) holding at least 66 2/3% in the aggregate, based on each Lender's Commitment Percentage, of (a) prior to the Termination Date, the Aggregate Commitment, and (b) after the Termination Date, the Aggregate Credit Exposure; provided that, as long as (y) there are only two Lenders (that are not Defaulting Lenders), Required Lenders shall mean both Lenders (that are not Defaulting Lenders) and (z) there are more than two Lenders (that are not Defaulting Lenders), Required Lenders shall mean at least two Lenders (that are not Defaulting Lenders) holding at least 66 2/3% in the aggregate, based on each Lender's Commitment Percentage.

"Revolving Commitment" means the commitment of each Lender to make Revolving Loans, participate in Swing Loans and issue Letters of Credit, as such commitment may be reduced pursuant to the terms of this Agreement. The initial amount of each Lender's Revolving Commitment is set forth on the Commitment Schedule.

"Revolving Exposure" means, at any time, the sum of (1) the outstanding principal amount of Revolving Loans and Swing Loans and (2) Letter of Credit Exposure.

"Revolving Loan" means a Loan made under Section 2.1(a).

"Revolving Note" has the meaning assigned to such term in Section 2.1(a).

"Sanction(s)" means any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury ("HMT") or other relevant sanctions authority.

"Scheduled Unavailability Date" has the meaning assigned to such term in Section 3.13.

"Settlement" has the meaning assigned to such term in Section 2.11(c)(ii).

"Settlement Date" has the meaning assigned to such term in Section 2.11(c)(ii).

"Specified Blocked Accounts" means, collectively, the Deposit Accounts of the Loan Parties set forth on Schedule 6.7, other than the Specified Dupaco Accounts.

31

"Specified Dupaco Accounts" means, collectively, the Deposit Accounts of JT Real Estate set forth on Schedule 6.7 maintained with Dupaco Credit Union.

"SOFR Adjustment" with respect to Term SOFR means 0.11448% (11.448 basis points) for an Interest Period of one-month's duration.

"Specified Equity Contribution" has the meaning assigned to such term in Section 7.25(e).

"Specified Financial Covenants" has the meaning assigned to such term in Section 7.25(e).

"Specified Financial Covenant Defaults" has the meaning assigned to such term in Section 7.25(e).

"Specified Period" means, with respect to each specific Borrowing Base Certificate delivered to the Agent (the "Current Borrowing Base Certificate"), the period from the last date included in a Borrowing Base Certificate previously delivered to the Agent through and including the date that is two Business Days before the date of the Current Borrowing Base Certificate.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if the financial statements were prepared in accordance with GAAP, as well as any other Person (1) of which Equity Interests representing more than 50% of the Equity Interest or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of that date, owned, Controlled, or held, or (2) that is, as of such date, otherwise Controlled, by the parent or one or more Subsidiaries of the parent.

"Successor Rate" has the meaning assigned to such term in Section 3.13.

"Successor Rate Conforming Changes" means, with respect to any proposed Successor Rate, any conforming changes to the definition of Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definition of Business Day, timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the discretion of the Agent, to reflect the adoption and implementation of such Successor Rate and to permit the administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such Successor Rate exists, in such other manner of administration as the Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

"Swing Loan Lender" means Associated, in its capacity as lender of the Swing Loans.

"Swing Loan Note" means the promissory note described in Section 2.1(b)(i).

"Swing Loans" means the Advances made pursuant to Section 2.1(b)(i).

"Taxes" means all present or future taxes, duties, levies, imposts, deductions, assessments, charges, withholdings (including backup withholding) or other charges imposed by any Governmental Body, including any interest, penalties and additions to taxes applicable thereto.

"Tenant Guaranty" means that certain Guaranty Agreement, by and among Bayer Production Supply LLC, as guarantor, JT Logistics, as warehouse, and the other parties thereto, as amended, restated, amended and restated or otherwise modified from time to time.

"Term Loan" means the Loan made under Section 2.2.

"Term Loan Commitment" means the commitment of each Lender to make a Term Loan on the Closing Date. After advancing the Term Loan, each reference to each Lender's Term Loan Commitment refers to the outstanding principal amount of its Term Loan.

"Term Loan Maturity Date" means the earlier of (a) December 27, 2027 or (b) the Termination Date.

"Term Note" has the meaning assigned to such term in Section 2.2.

"Term SOFR" means:

(a)     for any Interest Period with respect to a Term SOFR Loan, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the commencement of such Interest Period with a term equivalent to such Interest Period; provided that if the rate is not published prior to 11:00 a.m. on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto, in each case, *plus* the SOFR Adjustment for such Interest Period; and

(b)     for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to the Term SOFR Screen Rate with a term of one month commencing that day;

*provided* that if the Term SOFR determined in accordance with either of the foregoing provisions (a) or (b) of this definition would otherwise be less than zero, the Term SOFR shall be deemed zero for purposes of this Agreement.

"Term SOFR Loan" means a Loan that bears interest at a rate based on clause (a) of the definition of Term SOFR.

"Term SOFR Screen Rate" means the forward-looking SOFR term rate administered by CME (or any successor administrator satisfactory to the Agent) and published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Agent from time to time).

"Termination Date" means December 27, 2027.

"Threshold Amount" means $500,000.

33

"Total Plan Liability" means, at any time, the present value of all vested and unvested accrued benefits under all Pension Plans, determined as of the then most recent valuation date for each Pension Plan, using PBGC actuarial assumptions for single employer plan terminations.

"Toxic Substances" means any material that has been shown to have an adverse effect on human health or that is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. Section 2601 et seq., applicable state law, or any other present and future applicable Federal or state laws related to toxic substances, and includes asbestos, polychlorinated biphenyls (PCBs) and lead based paints.

"UCC" means the Uniform Commercial Code as in effect from time to time in Illinois (but if the law, perfection, or the effect of perfection or non-perfection of any Lien on any Collateral is governed by the Uniform Commercial Code in effect in a different jurisdiction, "UCC" means the Uniform Commercial Code as in effect in that other jurisdiction with respect to perfection or the effect of perfection or non-perfection).

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce ("ICC") Publication No. 600 (or such later version thereof as may be in effect at the time of issuance).

"UFCA" has the meaning assigned to such term in Section 14.4(d).

"UFTA" has the meaning assigned to such term in Section 14.4(d).

"Undrawn Availability" means, as of any determination date, an amount equal to (x) the Maximum Borrowing Amount, minus (y) the sum of (1) the Revolving Exposure, plus (2) all amounts owed to each Borrower's trade creditors that are outstanding 60 or more days beyond the due date, plus (3) fees and Expenses that any Loan Party is liable for but that have not been paid or charged to the Loan Account, plus (4) all amounts owing for taxes that are past due.

"Unreimbursed Amount" has the meaning assigned to such term in Section 2.9(c).

"Unused Revolving Commitment" means, at any time, the excess of (a) the Revolving Commitment at such time over (b) the Revolving Exposure at such time.

"U.S. Borrower" means any Borrower that is a U.S. Person.

"U.S. Government Securities Business Day" means any Business Day, except any Business Day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

164393.00001/150632148v.7

"Value" means for an Account, its face amount, net of any returns, rebates, discounts (calculated on the shortest terms), credits, allowances or Taxes (including sales, excise or other Taxes) that have been or could reasonably be expected to be claimed by the Account Debtor or any other Person.

"Waivers" means all landlord's waivers, warehouseman's waivers, creditor's waivers, mortgagee waivers, processing facility and bailee waivers, freight forwarder waivers and customs broker waivers that are executed and delivered in connection with this Agreement.

"Withholding Agent" means the Borrowers and the Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.3 **UCC Terms.** Unless defined in the Loan Documents, all terms used in the Loan Documents and defined in the UCC have the meaning given in the UCC. These UCC terms include: "Account", "Account Debtor", "Certificated Security", "Chattel Paper", "Commercial Tort Claim", "Commodities Account", "Deposit Account", "Document", "Equipment", "Farm Products", "Financial Asset", "Fixture", "General Intangible", "Goods", "Instrument", "Inventory", "Investment Property", "Lease", "Lessor", "Letter-of-Credit Rights", "money", "Payment Intangibles", "Proceeds", "Product", "Record", "Secured Party", "Securities Account", "Security", "Security Entitlement", "Security Interest", and "Supporting Obligation".

1.4 **General Construction.** When computing time periods from a specified date to a later specified date, "from" means "from and including" and "to" and "until" each mean "to but excluding". In the Loan Documents: (1) all references to laws and statutes include all regulations and Governmental Body interpretations; (2) all references to laws, statutes, and regulations include any amendments, renewals, extensions, replacements, or successor laws, statutes, or regulations; (3) any definition of or reference to any agreement, instrument, or other document means the agreement, instrument, or other document as from time to time amended, amended and restated, supplemented, modified, substituted, or replaced; (4) any reference to any Person includes that Person's successors and assigns (and if the Person is a natural person, that Person's heirs, executors, and personal representatives) and, unless expressly stated otherwise, its Subsidiaries; (5) the words "herein," "hereof," and "hereunder," and words with similar meanings, refer to this Agreement in its entirety and not any particular provision or section; (6) "discretion" when not capitalized means a determination made by the Agent in its sole and absolute discretion; (7) any reference to payment, repayment, or prepayment means payment in immediately available funds in Dollars; (8) any pronoun covers all genders; (9) wherever appropriate in the context, terms used in the Loan Documents in the singular also include the plural and vice versa; (10) any reference to any Loan Document or any other document, agreement, instrument, report, certificate, or other similar deliverable means that the Loan Document or other deliverable is satisfactory in form and substance to the Agent in its discretion; (11) the words "include," "includes," and "including" are treated as being followed by "without limitation"; (12) wherever appropriate in the context, terms used in the singular also include the plural and vice versa; (13) captions used in the Loan Documents are for convenience only and are not taken into account in interpreting the document;

35

(14) all references to the time of day shall mean the time in Chicago, Illinois; and (15) the words "knowledge," or "know" refers, as it pertains to any Person (or in the case of any Person that is an entity, the officers and directors of such Person), the knowledge such Person, or a Person in a similar position, actually knows or would know following a reasonable inquiry in connection with the relevant subject matter. All financial and Borrowing Base calculations must be performed with Inventory valued on first-in, first-out basis, at the lower of cost or market value. A Default or an Event of Default exists at all times during the period beginning on the date that it occurs to the date on which it is waived in writing by the Agent or, in the case of a Default, is cured within any cure period expressly provided for in this Agreement. All covenants are given independent effect so that if a particular action or condition is not permitted by any covenant, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant does not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties in the Loan Documents are given independent effect so that if a particular representation or warranty is incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached does not affect the incorrectness or a breach of a representation or warranty.

1.5     **Time.**  Except as otherwise specified herein, any reference to a particular time means such time in Green Bay, Wisconsin.

## ARTICLE II
## COMMITMENTS OF THE LENDERS; BORROWING PROCEDURE

2.1     **Revolving Loans; Swing Loans.**

(a)     Revolving Loans. Subject to the terms and conditions in this Agreement, each Lender, severally and not jointly, will make Revolving Loans to the Borrowers in aggregate amounts outstanding at any time before the Maturity Date equal to such Lender's Commitment Percentage of the Maximum Borrowing Amount minus such Lender's Commitment Percentage of the Letter of Credit Exposure and Swing Loans. The Revolving Loans initially bear interest as Base Rate Loans (but may be converted into a Term SOFR Loan in accordance with Section 2.4(f)). If requested by a Lender, that Lender's Revolving Loans shall be evidenced by a promissory note (each, a "Revolving Note") substantially in the form attached as Exhibit C.

(b)     Swing Loans.

(i)     Availability of Swing Loans.  Subject to the terms and conditions set forth in this Agreement, and in order to minimize the transfer of funds between Revolving Lenders and Agent for administrative convenience, Agent, Revolving Lenders and Swing Loan Lender agree that in order to facilitate the administration of this Agreement, Swing Loan Lender may, at its election and option made in its sole discretion cancelable at any time for any reason whatsoever, make swing loan advances ("Swing Loans") available to Borrowers as provided for in this Section 2.1(b) at any time or from time to time after the Closing Date to, but not including, the last day of the term of this Agreement, in an aggregate principal amount up to but not in excess of the Maximum Swing Loan Amount, provided that the outstanding aggregate principal amount of Swing Loans and the Revolving Loans at any one time outstanding shall not exceed an amount equal to the

36

Maximum Borrowing Amount less the Maximum Undrawn Amount of all outstanding Letters of Credit. All Swing Loans shall be Base Rate Loans only. Borrowers may borrow (at the option and election of Swing Loan Lender), repay and re-borrow (at the option and election of Swing Loan Lender) Swing Loans and Swing Loan Lender may make Swing Loans as provided in this Section 2.1(b) during the period between Settlement Dates. All Swing Loans shall be evidenced by a secured promissory note (the "Swing Loan Note") substantially in the form attached as Exhibit D hereto. Swing Loan Lender's agreement to make Swing Loans under this Agreement is cancelable at any time for any reason whatsoever and the making of Swing Loans by Swing Loan Lender from time to time shall not create any duty or obligation, or establish any course of conduct, pursuant to which Swing Loan Lender shall thereafter be obligated to make Swing Loans in the future.

(ii)    Swing Loan Advances.    Upon either (i) any request by Loan Party Representative for a Revolving Loan made pursuant to Section 2.1(a) hereof or (ii) the occurrence of any deemed request by Borrowers for a Revolving Loan pursuant to the terms hereof, Swing Loan Lender may elect, in its sole discretion, to have such request or deemed request treated as a request for a Swing Loan, and may advance same day funds to Borrowers as a Swing Loan; provided that notwithstanding anything to the contrary provided for herein, Swing Loan Lender may not make Swing Loans if Swing Loan Lender has been notified by Agent or by Required Lenders that one or more of the applicable conditions set forth in Section 8.2 have not been satisfied or the Revolving Commitments have been terminated for any reason.

(iii)    Participations in Swing Loans. Upon the making of a Swing Loan (whether before or after the occurrence of a Default or an Event of Default and regardless of whether a Settlement has been requested with respect to such Swing Loan), each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from Swing Loan Lender, without recourse or warranty, an undivided interest and participation in such Swing Loan in proportion to its Commitment Percentage. Swing Loan Lender or Agent may, at any time, require the Revolving Lenders to fund such participations by means of a Settlement as provided for in Section 2.11(c). From and after the date, if any, on which any Revolving Lender is required to fund, and funds, its participation in any Swing Loans purchased hereunder, Agent shall promptly distribute to such Revolving Lender its Commitment Percentage of all payments of principal and interest and all proceeds of Collateral received by Agent in respect of such Swing Loan; provided that no Revolving Lender shall be obligated in any event to make Revolving Loans in an amount in excess of the amount of its Revolving Commitment minus its Commitment Percentage (taking into account any reallocations under Section 2.11) of the Letter of Credit Exposure.

2.2    **Term Loan.**    Subject to the terms and conditions in this Agreement, each Lender, severally and not jointly, will make a term loan (the "Term Loan") to the Borrowers on the Closing Date equal to such Lender's Commitment Percentage of the Term Loan Commitment by transferring immediately available funds to the Loan Account or as the Loan Party Representative may otherwise instruct in writing. The Term Loan initially bears interest as a Base Rate Loan and may be converted into a Term SOFR Loan in accordance with Article 3). If requested by a Lender,

that Lender's Term Loan shall be evidenced by a promissory note (each, a "Term Note") substantially in the form attached as Exhibit G.

    2.3    **Capex Loans; HVAC Equipment Loans.**

    (a)    Capex Loans. Subject to the terms and conditions in this Agreement, during the Capex Availability Period, each Lender, severally and not jointly, will make a Capex Loan or Capex Loans to the Borrowers from time to time equal to such Lender's Commitment Percentage of the Capex Commitment, in each case in an amount not to exceed the Borrower's Capex Availability at such time, by transferring immediately available funds to the Loan Account or as the Loan Party Representative may otherwise instruct in writing; provided, that (i) the amount of any Capex Loan shall not exceed 80% of the Hard Costs of Eligible Purchased M&E purchased or to be purchased by Borrowers with the proceeds thereof, or such lesser amount as to any Capex Loan as Loan Party Representative may request in respect thereof, (ii) each Capex Loan shall be in an amount of at least $500,000 and an integral multiple of $100,000, and (iii) no more than three (3) such Capex Loans may be requested during the Capex Availability Period. The proceeds of each Capex Loan shall be used solely for the payment of the purchase price, or to reimburse the Borrowers for the cash previously paid by the Borrowers for the purchase price, for the Eligible Purchased M&E specified in the Notice of Borrowing applicable to such Capex Loan; provided, that in the case of a purchase price paid prior to the making of a Capex Loan, such purchase price was paid no more than 12 months (or such other date as may be agreed to by Agent in its discretion) prior to the date of such Capex Loan. No Notice of Borrowing for a Capex Loan shall include any Eligible Purchased M&E that has been included in any other Notice of Borrowing for a Capex Loan. A single Capex Loan may be used for the purchase price of one or more items constituting Eligible Purchased M&E specified in the Notice of Borrowing required to be delivered to Agent pursuant to Section 2.4(a) below and the minimum amount of such Capex Loan applies to such Capex Loan, not to the purchase price of any individual item of Eligible Purchased M&E. Each Capex Loan shall initially bear interest as a Base Rate Loan and may be converted into a Term SOFR Loan in accordance with Article 3). If requested by a Lender, that Lender's Capex Loans shall be evidenced by a promissory note (each, a "Capex Note") substantially in the form attached as Exhibit I.

    (b)    HVAC Equipment Loans. Subject to the terms and conditions in this Agreement, during the HVAC Equipment Loan Availability Period, each Lender, severally and not jointly, will make a HVAC Equipment Loan or HVAC Equipment Loans to the Borrowers from time to time equal to such Lender's Commitment Percentage of the HVAC Equipment Loan Commitment, in each case in an amount not to exceed the Borrower's HVAC Equipment Loan Availability at such time, by transferring immediately available funds to the Loan Account or as the Loan Party Representative may otherwise instruct in writing; provided, that (i) the amount of any HVAC Equipment Loan shall not exceed 80% of the Hard Costs of Eligible Purchased HVAC M&E purchased or to be purchased by Borrowers with the proceeds thereof, or such lesser amount as to any HVAC Equipment Loan as Loan Party Representative may request in respect thereof, (ii) each HVAC Equipment Loan shall be in an amount of at least $500,000 and an integral multiple of $100,000, and (iii) no more than three (3) such HVAC Equipment Loans may be requested during the HVAC Equipment Loan Availability Period. The proceeds of each HVAC Equipment Loan shall be used solely for the payment of the purchase price, or to reimburse the Borrowers for the cash previously paid by the Borrowers for the purchase price, for the Eligible Equipment specified

38

in the Notice of Borrowing applicable to such HVAC Equipment Loan; provided, that in the case of a purchase price paid prior to the making of a HVAC Equipment Loan, such purchase price was paid no more than 12 months (or such other date as may be agreed to by Agent in its discretion) prior to the date of such HVAC Equipment Loan.  No Notice of Borrowing for a HVAC Equipment Loan shall include any Eligible Purchased HVAC M&E that has been included in any other Notice of Borrowing for a HVAC Equipment Loan.  A single HVAC Equipment Loan may be used for the purchase price of one or more items constituting Eligible Purchased HVAC M&E specified in the Notice of Borrowing required to be delivered to Agent pursuant to Section 2.4(a) below and the minimum amount of such HVAC Equipment Loan applies to such HVAC Equipment Loan, not to the purchase price of any individual item of Eligible Purchased HVAC M&E.  Each HVAC Equipment Loan shall initially bear interest as a Base Rate Loan and may be converted into a Term SOFR Loan in accordance with Article 3). If requested by a Lender, that Lender's HVAC Equipment Loans shall be evidenced by a promissory note (each, a "HVAC Equipment Loan Note") substantially in the form attached as Exhibit I.

2.4     **Loan Procedures.**

(a)     Borrowing Procedures.  The Loan Party Representative shall give (i) written notice (delivered by hand, pdf by email communication, fax or other electronic transmission) (each such written notice, a "Notice of Borrowing") substantially in the form of Exhibit E or telephonic notice (followed immediately by a Notice of Borrowing) to the Agent of each proposed borrowing not later than 1:00 p.m. on the proposed date of such borrowing for Base Rate Loans or (ii) written notice (delivered by hand, pdf by email communication, fax or other electronic transmission) (each such written notice, a "Notice of Conversion/Continuation") substantially in the form of Exhibit F or telephonic notice (followed immediately by a Notice of Conversion/Continuation), with respect to any such conversion or continuation of Term SOFR Loans in accordance with Section 2.4(f), to the Agent of each such proposed conversion or continuation of Term SOFR Loans not later than 11:00 a.m. on the day three (3) Business Days before the date of such proposed conversion to or continuation of Term SOFR Loans).  Each such notice shall be effective upon receipt by the Agent, shall be irrevocable, and shall specify the date and amount of borrowing requested.  Not later than 1:00 p.m., the Agent shall pay over the funds to the Loan Party Representative on the requested borrowing date.  Each borrowing shall be on a Business Day.  Each borrowing shall be in an aggregate amount of at least $500,000 and an integral multiple of $100,000.

(b)     Groups of Loans.  With respect to Revolving Loans, Loans with Interest Periods ending on different days may be outstanding at the same time, provided that not more than three (3) different Groups of Loans shall be outstanding at any one time.  With respect to Capex Loans, Loans with Interest Periods ending on different days may be outstanding at the same time, provided that not more than three (3) different Groups of Loans shall be outstanding at any one time. With respect to HVAC Equipment Loans, Loans with Interest Periods ending on different days may be outstanding at the same time, provided that not more than three (3) different Groups of Loans shall be outstanding at any one time. Notwithstanding the foregoing or any other provision of this Agreement, prior to 90 days after the Closing Date, the Interest Period for any Loan shall be one month.

(c)     Certain Conditions.  Notwithstanding any other provision of this Agreement, the Lenders shall not have an obligation to make any Loan if an Event of Default or Default exists.

39

Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of the Required Lenders, no Term SOFR Loan shall be made available to Borrowers.

(d)     Additional Conditions for Capex Loans and HVAC Equipment Loans.  Agent shall have received, with respect to Eligible Purchased M&E and/or Eligible Purchased HVAC M&E that has been purchased prior to the date of a proposed Capex Loan or HVAC Equipment Purchase Loan, as applicable, (i) copies, or upon Agent's or any Lender's request, originals, of all agreements, documents and instruments relating to the sale of the Eligible Purchased M&E or Eligible Purchased HVAC M&E, as applicable to Borrowers, including any purchase orders, invoices, bills of sale or similar documents (provided, that, to the extent that Agent or any Lender may receive any originals, it will return such originals to Loan Party Representative after Agent or such Lender has finished its use of them), and (ii) evidence reasonably satisfactory to Agent that the Eligible Purchased M&E or Eligible Purchased HVAC M&E, as applicable, has been received and installed by Borrowers and is in good working order and operating for its intended purpose.

(e)     Term SOFR Rate Interest Period Election.  Loan Party Representative shall elect the initial Interest Period applicable to a Term SOFR Loan by its Notice of Conversion/Continuation given to the Agent pursuant to Section 2.4(f) below.  Loan Party Representative shall elect the duration of each succeeding Interest Period by giving irrevocable written notice to Agent of such duration not later than 11:00 a.m. on the day which is three (3) Business Days prior to the last day of the then current Interest Period applicable to such Term SOFR Loan.  If Agent does not receive timely notice of the Interest Period elected by Loan Party Representative, Loan Party Representative shall be deemed to have elected to convert such Term SOFR Loan to a Base Rate Loan as of the last day of the Interest Period applicable to such Term SOFR Loan subject to Section 2.4(f) below.

(f)     Conversion/Continuation of Term SOFR Loans.  Provided that no Default or Event of Default shall have occurred and be continuing, Loan Party Representative may, on the last Business Day of the then current Interest Period applicable to any outstanding Term SOFR Loan, or on any Business Day with respect to Base Rate Loans, convert any such Term SOFR Loan into a Base Rate Loan in the same aggregate principal amount, provided that any conversion of a Term SOFR Loan shall be made only on the last Business Day of the then current Interest Period applicable to such Term SOFR Loan.  If Loan Party Representative desires to convert a Term SOFR Loan or a Base Rate Loan, Loan Party Representative shall give Agent written notice by no later than 11:00 a.m. (i) on the day which is three (3) Business Days prior to the date on which such conversion is to occur with respect to a conversion from a Base Rate Loan to a Term SOFR Loan, or (ii) on the day which is one (1) Business Day prior to the date on which such conversion is to occur (which date shall be the last Business Day of the Interest Period for the applicable Term SOFR Loan) with respect to a conversion from a Term SOFR Loan to a Base Rate Loan, specifying, in each case, the date of such conversion, the Term SOFR Loan(s) or Base Rate Loan(s) to be converted and if the conversion is to a Term SOFR Loan, the duration of the first Interest Period therefor.

(g)     Indemnity.  Each Borrower shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by any Borrower

40

in the payment of the principal of or interest on any Term SOFR Loan or failure by any Borrower to complete a borrowing of, a prepayment of or conversion of or to a Term SOFR Loan after notice thereof has been given, including, but not limited to, any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its Term SOFR Loans hereunder. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or any Lender to Loan Party Representative shall be conclusive absent manifest error.

2.5     **Loan Disbursement.** All Loans will be disbursed from an office or location that the Agent designates from time to time. Revolving Loans may be borrowed, repaid, and reborrowed in accordance with the Loan Documents. None of the Term Loan, any Capex Loan, or any HVAC Equipment Loan may be reborrowed once repaid. If funded by the Lenders, the Agent will make the proceeds of each Revolving Loan requested by the Loan Party Representative available to it by crediting the Loan to a Borrower's operating account at Associated. Revolving Loans treated as being requested by a Borrower will be disbursed to the Agent and applied to the obligation or liability related to the deemed request.

2.6     **Maximum Advances.** The Borrowers may not at any time allow the Revolving Exposure to exceed the Maximum Borrowing Amount (and if it does for any reason the Borrowers must immediately and without demand pay the excess to the Agent).

2.7     **Loan Repayment; Term Loan Amortization.**

(a)     The Loans are due and payable in full on the Termination Date (subject to earlier prepayment as provided in the Loan Documents).

(b)     The Term Loan amortizes in equal $90,357.14 quarterly installments on the first day of each quarter, beginning on the first day of the first quarter after the Closing Date. The final payment, equal to the remaining principal balance, is payable on the Maturity Date. Payments or prepayments of the Term Loan may not be reborrowed.

(c)     The Capex Loans amortize in equal quarterly installments on the first day of each quarter, beginning on the first day of the first quarter after the earlier of (x) the end of the Capex Availability Period and (y) the date upon which the Capex Loans have been advanced pursuant to Section 2.3(a) in an amount equal to the Borrower's Capex Availability, in an amount equal to, for each such payment, the Capex Outstandings as of such date multiplied by 5%. The final payment, equal to the remaining principal balance, is payable on the Maturity Date. Payments or prepayments of the Capex Loan may not be reborrowed.

(d)     The HVAC Equipment Loans amortize in equal quarterly installments on the first day of each quarter, beginning on the first day of the first quarter after the earlier of (x) the end of the HVAC Equipment Loan Availability Period and (y) the date upon which the HVAC Equipment Loans have been advanced pursuant to Section 2.3(b) in an amount equal to the Borrower's HVAC Equipment Loan Availability, in an amount equal to, for each such payment, the HVAC Equipment Loan Outstandings as of such date multiplied by 2.5%. The final payment, equal to the remaining principal balance, is payable on the Maturity Date. Payments or prepayments of the HVAC Equipment Loans may not be reborrowed.

41

(e)       Checks, notes, drafts, and other payment items may not be immediately collectible. Accordingly, when calculating outstanding availability, each payment and all other amounts received in the Cash Concentration Account is treated as received by the Agent (and the Agent and the Lenders will provisionally credit the Loan Account) on the Business Day immediately following the day on which the Agent receives actual possession of the payment item for deposit to the Cash Concentration Account.  In consideration for this accommodation, the Borrowers agree that in calculating interest and other charges and fees, all payments are treated as having been credited to the Loan Account on the second Business Day immediately following the Business Day on which the payments are treated as having been received by the Agent and the Lenders under this Section.  The Agent does not have to credit the Loan Account for any payment item that is not satisfactory to the Agent in its Permitted Discretion. All credits are provisional and are subject to verification and final settlement. The Agent may charge the Loan Account for any payment item that is returned unpaid or otherwise not collected. Any information and data reported to the Borrowers under any service that is received before final posting and confirmation is subject to correction. The Agent and the Lenders have no liability for the content of any preliminary service related information.

(f)       The Loan Parties must pay all payments under the Loan Documents to the Agent (without any deduction whatsoever, including any set-off, recoupment, or counterclaim), at the Payment Office, not later than 11:59 a.m., on the due date, in Dollars. The Agent may in its discretion pay any Obligations due under the Loan Documents (or other amounts any Loan Party is required to pay under the Loan Documents) by charging the Loan Account or by making Advances.

2.8       **Statements.**  The Agent will maintain a loan account in accordance with its customary procedures in the Borrowers' name (the "Loan Account") in which it will record, among other things, the date and amount of each Advance and the date and amount of each payment (but the Agent's failure to record this information does not affect the Agent's or Lenders' rights, create any liability, or release any Loan Party from any liability).

2.9       **Letters of Credit.**

(a)       The Letter of Credit Commitment.

(i)       Subject to the terms and conditions set forth herein, the Issuer agrees, (1) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit for the account of the Borrowers or any of their domestic Subsidiaries, and to amend or extend Letters of Credit previously issued by it, in accordance with Section 2.9(b), and (2) to honor drawings under the Letters of Credit; provided that after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the Revolving Exposure shall not exceed the Revolving Commitment, and (y) the Letter of Credit Exposure shall not exceed the Letter of Credit Sublimit.  Each request by the Borrowers for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrowers that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence.  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrowers' ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrowers may,

during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)     The Issuer shall have no obligation to issue any Letter of Credit if:

(A)     the expiry date of the requested Letter of Credit would occur more than twelve (12) months after the date of issuance;

(B)     the expiry date of the requested Letter of Credit would occur after the Letter of Credit Expiration Date;

(C)     any order, judgment or decree of any Governmental Body or arbitrator shall by its terms purport to enjoin or restrain the Issuer from issuing the Letter of Credit, or any law applicable to the Issuer or any request or directive (whether or not having the force of law) from any Governmental Body with jurisdiction over the Issuer shall prohibit, or request that the Issuer refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon the Issuer with respect to the Letter of Credit any restriction, reserve or capital requirement (for which the Agent, Lenders or Issuer are not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the Agent, Lenders or Issuer in good faith deem material to it;

(D)     the issuance of the Letter of Credit would violate one or more policies of the Issuer applicable to letters of credit generally;

(E)     except as otherwise agreed by the Agent, Lender and Issuer, the Letter of Credit is in an initial stated amount less than $250,000; or

(F)     the Letter of Credit is to be denominated in a currency other than Dollars.

(iii)     The Issuer shall be under no obligation to amend any Letter of Credit if (A) the Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to the Letter of Credit.

(iv)     The Issuer shall notify the Agent and the Lenders of the request by the Loan Party Representative for a Letter of Credit hereunder within a reasonable time after receiving such request.

(b)     Procedures for Issuance and Amendment of Letters of Credit.

(i)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrowers delivered to the Agent in the form of a Letter of Credit Application, appropriately completed and signed by the Borrowers and/or such Subsidiary . Such Letter of Credit Application may be sent by fax transmission, by United States mail,

43

by overnight courier, by electronic transmission using the system provided by the Agent, by personal delivery or by any other means acceptable to the Agent. Such Letter of Credit Application must be received by the Agent not later than 11:00 a.m. at least two (2) Business Days (or such later date and time as the Agent may agree in a particular instance in its sole discretion) prior to the proposed issuance date or date of amendment, as the case may be.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Agent:  (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) the purpose and nature of the requested Letter of Credit; and (H) such other matters as the Agent may require.  In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Agent (1) the Letter of Credit to be amended; (2) the proposed date of amendment thereof (which shall be a Business Day); (3) the nature of the proposed amendment; and (4) such other matters as the Agent may require. Additionally, the Borrower shall furnish to the Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the Agent may require.

(ii)     So long as the applicable conditions contained in Section 8 are satisfied, subject hereof, the Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrowers (or the applicable Subsidiary) or enter into the applicable amendment, as the case may be, in each case in accordance with the Issuer's usual and customary business practices.

(iii)     Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the Agent will also deliver to the Borrower a true and complete copy of such Letter of Credit or amendment.

(c)     Drawings and Reimbursements; Funding of Participations.  Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the Agent shall notify the Borrowers thereof.  Not later than 11:00 a.m. on the date of any payment by the Lenders under a Letter of Credit (each such date, an "Honor Date"), the Borrower shall reimburse the Agent, on behalf of the Lenders, the amount of such drawing (an "L/C Borrowing"). If the Borrower fails to so reimburse the Agent by such time, the Borrowers shall be deemed to have requested a Revolving Loan that is a Base Rate Loan to be disbursed on the Honor Date in an amount equal to the amount of the unreimbursed drawing (the "Unreimbursed Amount"), without regard to the minimum and multiples specified in Section 2.4 for the principal amount of Revolving Loans.  Any notice given by the Agent pursuant to this Section may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(d)     Obligations Absolute.  The obligation of the Borrowers to reimburse the Agent, on behalf of the Lenders, for each drawing under each Letter of Credit and to repay each L/C

44

164393.00001/150632148v.7

Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)     the existence of any claim, counterclaim, setoff, defense or other right that the Borrowers or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the Agent or any other Person, whether in connection with this Agreement or by such Letter of Credit, the transactions contemplated hereby or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)     any draft, demand, endorsement, certificate or other document presented under or in connection with such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)     waiver by the Agent of any requirement that exists for the Agent's or Lenders' protection and not the protection of the Borrowers or any waiver by the Agent which does not in fact materially prejudice the Borrowers;

(v)     honor of a demand for payment presented electronically even if such Letter of Credit requires that demand be in the form of a draft;

(vi)     any payment made by the Agent in respect of an otherwise complying item presented after the date specified as the expiration date of, or the date by which documents must be received under, such Letter of Credit if presentation after such date is authorized by the UCC, the ISP or the UCP, as applicable;

(vii)     any payment by the Agent or Lenders under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the Agent under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law; or

(viii)     any other circumstance that would constitute a defense or discharge of Borrowers' or any of their Subsidiaries' duties under applicable law.

The Borrowers shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrowers' instructions or other irregularity, the Borrowers will immediately notify the Agent. The Borrowers shall be conclusively deemed to have waived any such claim against the Agent and its correspondents unless such notice is given as aforesaid.

45

(e)     Role of Bank as Issuer.  The Borrowers agree that, in paying any drawing under a Letter of Credit, the Agent shall not have any responsibility to obtain any document (other than any sight or time draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  The Borrowers hereby assume all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrowers' pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the Agent, the Lenders any of their Related Parties nor any correspondent, participant or assignee of the Agent shall be liable or responsible for any of the matters described in this Section; provided, however, that anything in such clauses to the contrary notwithstanding, the Borrowers may have a claim against the Agent, and the Agent may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrowers which the Borrowers prove, as determined by a final nonappealable judgment of a court of competent jurisdiction, were caused by the Agent's willful misconduct or gross negligence or the Agent's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight or time draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in limitation of the foregoing, the Agent may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the Agent shall not be responsible for the validity or sufficiency of any instrument transferring, endorsing or assigning or purporting to transfer, endorse or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.  The Agent may send a Letter of Credit or conduct any communication to or from the beneficiary via the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") message or overnight courier, or any other commercially reasonable means of communicating with a beneficiary.

(f)     Applicability of ISP and UCP; Limitation of Liability.  Unless otherwise expressly agreed by the Agent and the Borrowers when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Letter of Credit.  Notwithstanding the foregoing, the Agent shall not be responsible to the Borrowers for, and the Agent's rights and remedies against the Borrowers shall not be impaired by, any action or inaction of the Agent required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the law or any order of a jurisdiction where the Agent or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Agents Association for Finance and Trade - International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

(g)     Letter of Credit Fees.  The Borrowers shall pay to the Agent a Letter of Credit fee (the "Letter of Credit Fee") for each standby Letter of Credit equal to the Applicable Rate **for** Revolving Loans that are Term SOFR Loans times the daily amount available to be drawn under such Letter of Credit.  Letter of Credit Fees shall be (1) due and payable on the first Business Day following each fiscal quarter end, commencing with the first such date to occur after the issuance

46

of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand and (2) computed on a quarterly basis in arrears. If there is any change in the Applicable Rate during any quarter, the daily amount available to be drawn under each standby Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(h)      <u>Fronting Fee and Documentary and Processing Charges</u>. The Borrowers shall pay directly to the Agent a fronting fee with respect to each standby Letter of Credit, at the rate per annum specified in in a fee letter with the Agent (or such other rate separately agreed between the Borrowers and the Agent, computed on the daily amount available to be drawn under such Letter of Credit on a quarterly basis in arrears. Such fronting fee shall be due and payable on or prior to the date that is ten (10) Business Days following each fiscal quarter end, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.2. In addition, the Borrowers shall pay directly to the Agent the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the Agent relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(i)      Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(j)      Letters of Credit Issued for Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary, the Borrowers shall be obligated to reimburse the Agent hereunder for any and all drawings under such Letter of Credit. The Borrowers hereby acknowledge that the issuance of Letters of Credit for the account of Subsidiaries inures to the benefit of the Borrowers, and that the Borrowers' business derives substantial benefits from the businesses of such Subsidiaries.

2.10    **Other Letter of Credit Issues.**

(a)      The Borrowers indemnify and save and hold the Agent, the Lenders and their Affiliates harmless from any loss, cost, Expense, or liability (including payments made by the Agent or any of the Agent's Affiliates incurred in connection with any Letter of Credit). The Borrowers are bound by the Agent's and Lenders' regulations and good faith interpretations of any Letter of Credit, although this interpretation may be different from the Borrowers' interpretation. Furthermore, neither the Agent, the Lenders nor any of their correspondents are liable for any error, negligence, or mistakes, whether by omission or commission, in following any of any Borrower's instructions or those contained in any Letter of Credit or of any modifications, amendments, or supplements to any Letter of Credit, or in issuing or paying any Letter of Credit.

(b)      Each Loan Party appoints the Agent, or its designee, as its attorney, with full power and authority: (1) to sign and endorse its name on any warehouse or other receipts, letter of credit applications and acceptances, and bills of lading; (2) to clear Inventory through the United States of America Customs Department ("<u>Customs</u>") in its name (or in the name of its designee), and to sign and deliver to Customs officials powers of attorney in its name; and (3) to complete in its

47

name, the Agent's name, or in the name of the Agent's designee, any order, sale, or transaction, and to obtain any related documents and collect the proceeds thereof. Neither the Agent nor its attorneys are liable for any acts or omissions nor for any error of judgment or mistakes of fact or law. This power, being coupled with an interest, is irrevocable as long as any Letter of Credit is outstanding.

(c)     Immediately upon the Agent's request (x) when an Event of Default exists, or (y) if any Letter of Credit is outstanding within five Business Days of the Termination Date, the Borrowers must Cash Collateralize the Letter of Credit Exposure in an amount equal to not less than 105% of the amount of such L/C Obligations. The Borrowers irrevocably authorize the Agent, on the Borrowers' behalf and in any Borrower's name, to open that account and to make and maintain the required deposits in that account or in an account opened by the Borrowers, out of the proceeds of Accounts or other Collateral, from an Advance, or out of any other of any Loan Party's funds coming into the Agent's possession. The Agent will deposit the cash collateral (less applicable Availability Reserves) in a non-interest bearing account. The Borrowers may not withdraw amounts in this account until the Obligations are irrevocably paid and performed in full and the Loan Documents have been terminated.

(d)     Each Lender shall to the extent of the amount equal to the product of such Lender's Commitment Percentage _multiplied by_ the aggregate amount of all unpaid reimbursement obligations arising from disbursements made or obligations incurred with respect to the Letters of Credit be deemed to have irrevocably purchased an undivided participation in each such unpaid reimbursement obligation.  In the event that at the time a disbursement is made the unpaid balance of Advances exceeds or would exceed, with the making of such disbursement, the Maximum Borrowing Amount, and such disbursement is not reimbursed by the Borrowers within two (2) Business Days, the Agent shall promptly notify each Lender and upon the Agent's demand each Lender shall pay to the Agent such Lender's proportionate share of such unpaid disbursement together with such Lender's proportionate share of the Agent's reasonable unreimbursed costs and expenses relating to such disbursement.  In the event the Issuer makes a disbursement in respect of a Letter of Credit, each Lender shall pay to such Issuer, upon such Issuer's demand, such Lender's proportionate share of such disbursement together with such Lender's proportionate share of such Issuer's reasonable unreimbursed costs and expenses relating to such disbursement. Upon receipt by the Agent of a repayment from any Borrower of any amount disbursed by the Agent for which the Agent had already been reimbursed by the Lenders, the Agent shall deliver to each Lender that Lender's pro rata share of such repayment.  Each Lender's participation commitment shall continue until the last to occur of any of the following events: (i) the Issuer ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (ii) no Letter of Credit issued hereunder remains outstanding and uncancelled or (iii) all Persons (other than the applicable Borrower) have been fully reimbursed for all payments made under or relating to Letters of Credit.

2.11   **Manner of Borrowing and Payment; Settlement.**

(a)     Each borrowing of Revolving Loans shall be advanced according to the applicable Commitment Percentages of the Lenders.

48

(b)      Each payment (including each prepayment) by the Borrowers on account of the principal of and interest on the Revolving Loans, shall be applied to the Revolving Loans pro rata according to the applicable Commitment Percentages of the Lenders.  Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest and fees shall be made without set off or counterclaim and shall be made to the Agent on behalf of the Lenders to the Payment Office, in each case on or prior to 1:00 p.m. in Dollars and in immediately available funds.

(c)      (i)      Promptly after receipt by Agent of a request for a Revolving Loan pursuant to Section 2.4 and, with respect to Revolving Loans, to the extent Agent elects not to provide a Swing Loan or the making of a Swing Loan would result in the aggregate amount of all outstanding Swing Loans exceeding the maximum amount permitted in Section 2.2(a), Agent shall notify the Revolving Lenders of its receipt of such request specifying the information provided by Loan Party Representative and the apportionment among Lenders of the requested Revolving Loan, as determined by Agent in accordance with the terms hereof.  Each Lender shall remit the principal amount of each Revolving Loan to Agent such that Agent is able to, and Agent shall, to the extent the applicable Lenders have made funds available to it for such purpose and subject to Section 8.2 hereof, fund such Revolving Loan to Borrowers in immediately available funds prior to the close of business, on the applicable borrowing date; provided that if any applicable Lender fails to remit such funds to Agent in a timely manner, Agent may elect in its sole discretion to fund with its own funds the Revolving Loans of such Lender on such borrowing date, and such Lender shall be subject to the repayment obligation in Section 2.11(e).

(ii)      Agent, on behalf of Swing Loan Lender, shall demand settlement (a "Settlement") of all or any Swing Loans with Revolving Lenders on at least a weekly basis, or on any more frequent date that Agent elects or that Swing Loan Lender at its option exercisable for any reason whatsoever may request, by notifying Revolving Lenders of such requested Settlement by facsimile, telephonic or electronic transmission no later than 3:00 p.m. on the date of such requested Settlement (the "Settlement Date").  Subject to any contrary provisions of Section 2.12 hereof, each Revolving Lender shall transfer the amount of such Revolving Lender's Commitment Percentage of the outstanding principal amount (plus interest accrued thereon to the extent requested by Agent) of the applicable Swing Loan with respect to which Settlement is requested by Agent, to such account of Agent as Agent may designate not later than 5:00 p.m. on such Settlement Date if requested by Agent by 3:00 p.m., otherwise not later than 5:00 p.m. on the next Business Day.  Settlements may occur at any time notwithstanding that the conditions precedent to making Revolving Loans set forth in Section 8.2 hereof have not been satisfied or the Revolving Commitments shall have otherwise been terminated at such time.  All amounts so transferred to Agent shall be applied against the amount of outstanding Swing Loans and, when so applied shall constitute Revolving Loans of such Revolving Lenders accruing interest as Base Rate Loans.  If any such amount is not transferred to Agent by any Revolving Lender on such Settlement Date, Agent shall be entitled to recover such amount on demand from such Revolving Lender together with interest thereon as specified in Section 2.11(e).

(d)      If any Lender or Participant (a "Benefited Lender") shall at any time receive any payment of all or part of its Advances or other Loans, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other

49

Lender's Advances or other Loans, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances or other Loans, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Lender so purchasing a portion of another Lender's Advances or other Loans may exercise all rights of payment (including, without limitation, rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

(e)     Unless the Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make the amount which would constitute its applicable Commitment Percentage of the Advances available to the Agent, the Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to the Agent on the next Settlement Date and, in reliance upon such assumption, make available to the Borrowers a corresponding amount. The Agent will promptly notify the Borrowers of its receipt of any such notice from a Lender. If such amount is made available to the Agent on a date after such next Settlement Date, such Lender shall pay to the Agent on demand an amount equal to the product of (i) the daily average Federal Funds Effective Rate (computed on the basis of a year of 360 days) during such period as quoted by the Agent, *multiplied by* (ii) such amount, *multiplied by* (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately available to the Agent. A certificate of the Agent submitted to any Lender with respect to any amounts owing under this subsection (e) shall be presumed correct, in the absence of manifest error. If such amount is not in fact made available to the Agent by such Lender within three (3) Business Days after such Settlement Date, the Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to Revolving Loans hereunder, on demand from the Borrowers; provided, however, that the Agent's right to such recovery shall not prejudice or otherwise adversely affect the Borrowers' rights (if any) against such Lender.

2.12    **Defaulting Lender**.

(a)     Notwithstanding anything to the contrary contained herein, in the event any Lender (i) has refused (which refusal constitutes a breach by such Lender of its obligations under this Agreement) to make available its portion of any Advance, (ii) notifies either the Agent or the Loan Party Representative that it does not intend to make available its portion of any Advance (if the actual refusal would constitute a breach by such Lender of its obligations under this Agreement), (iii) has notified any Borrower, or has made a public statement, to the effect that it does not intend or expect to comply with any of its funding obligations under this Agreement, or (iv) becomes, or its parent becomes, subject to a Bankruptcy Event (each, a "Lender Default"), all rights and obligations hereunder of such Lender (a "Defaulting Lender") as to which a Lender Default is in effect and of the other parties hereto shall be modified to the extent of the express provisions of this Section 12 while such Lender Default remains in effect.

50

(b)      Advances shall be incurred pro rata from the Lenders (the "Non-Defaulting Lenders") which are not Defaulting Lenders based on their respective Commitment Percentages, and no Commitment Percentage of any Lender or any pro rata share of any Advances required to be advanced by any Lender shall be increased as a result of such Lender Default.  Amounts received in respect of principal of any type of Advances or other Loans shall be applied to reduce the applicable Advances or other Loans of each Lender pro rata based on the aggregate of the outstanding Advances or other Loans of that type of all Lenders at the time of such application; provided, that, such amount shall not be applied to any Advances or other Loans of a Defaulting Lender at any time when, and to the extent that, the aggregate amount of Advances or other Loans of any Non-Defaulting Lender exceeds such Non-Defaulting Lender's Commitment Percentage of all Advances or other Loans then outstanding.

(c)      A Defaulting Lender shall not be entitled to give instructions to the Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Loan Documents.  All amendments, waivers and other modifications of this Agreement and the Loan Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall be deemed not to be a Lender and not to have Advances outstanding.

(d)      Other than as expressly set forth in this Section 2.12, the rights and obligations of a Defaulting Lender (including the obligation to indemnify the Agent) and the other parties hereto shall remain unchanged.  Nothing in this Section 2.12 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Loan Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, the Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

A Defaulting Lender may be replaced in accordance with Section 16.3.  In the event a Defaulting Lender retroactively cures to the satisfaction of the Agent the breach which caused a Lender to become a Defaulting Lender, such Defaulting Lender shall no longer be a Defaulting Lender and shall be treated as a Lender under this Agreement

2.13    **Voluntary Prepayments.**  The Borrowers may from time to time prepay the Loans in whole or in part; provided that the Borrowers shall give the Agent notice thereof not later than 11:00 A.M., on the day of such prepayment (which shall be a Business Day), specifying the Loans to be prepaid and the date and amount of prepayment.  Any such partial prepayment shall be in an amount equal to $500,000 or a higher integral multiple of $100,000.  Any prepayment made under this Section 2.14 shall include any amount required to be paid pursuant to Section 3.8.

2.14    **Additional Payments.**  Any amounts expended by the Agent due to any Loan Party not performing or complying with its obligations under any Loan Document (including under Sections 2.9, 4.2, 4.4, 4.6, 4.12, 4.13, 4.15, 6.6, and 15.5) may be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations.

2.15    **Use of Proceeds.**  The Borrowers may only use the Advances and the Term Loan (1) to repay Indebtedness on the Closing Date in accordance with payoff letters received by the Agent; (2) to pay fees and Expenses relating to the transactions contemplated by the Loan

51

Documents; and (3) for general corporate purposes and working capital needs allowed under this Agreement, including Capital Expenditures and for such other legal and proper purposes as are consistent with all applicable laws and with this Agreement. The Borrowers may only use the Capex Loans to finance the purchase of Eligible Purchased M&E from time to time, in accordance with the terms of Section 2.3(a) of this Agreement. The Borrowers may only use the HVAC Equipment Loans to finance the purchase of Eligible Purchased HVAC M&E from time to time, in accordance with the terms of Section 2.3(b) of this Agreement.

2.16 **Taxes.**

(a) <u>Defined Terms</u>. For purposes of this Section, the term "Lender" includes any Issuer of a Letter of Credit pursuant to Section 2.9 and the term "applicable law" includes FATCA.

(b) <u>Payments Free of Taxes</u>. Any and all payments by or on account of any obligation of the Borrowers under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Body in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrowers shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c) <u>Payment of Other Taxes by the Borrowers</u>. The Borrowers shall timely pay to the relevant Governmental Body in accordance with applicable law, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(d) <u>Indemnification by the Borrowers</u>. The Borrowers shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Body. A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e) <u>Indemnification by the Lenders</u>. Each Lender shall severally indemnify the Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrowers have not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 16.3(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and

164393.00001/150632148v.7

any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Body. A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this paragraph (e).

(f)     Evidence of Payments. As soon as practicable after any payment of Taxes by the Borrowers to a Governmental Body pursuant to this Section, the Borrowers shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(g)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Agent, at the time or times reasonably requested by the Borrowers or the Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrowers or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Agent as will enable the Borrowers or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (g)(ii)(A), (ii)(B) and (ii)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

(A)     any Lender that is a U.S. Person shall deliver to the Borrowers and the Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the

164393.00001/150632148v.7

reasonable request of the Borrowers or the Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate in form and substance reasonably acceptable to the Agent to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrowers within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W 8BEN-E; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W 8BEN-E, a U.S. Tax Compliance Certificate in form and substance reasonably acceptable to the Agent, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate in form and substance reasonably acceptable to the Agent on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Agent to determine the withholding or deduction required to be made; and

164393.00001/150632148v.7

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Agent as may be necessary for the Borrowers and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Agent in writing of its legal inability to do so.

(h)     <u>Treatment of Certain Refunds</u>.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Body with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Body) in the event that such indemnified party is required to repay such refund to such Governmental Body.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Survival.  Each party's obligations under this Section shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

2.17   **Mandatory Prepayment**.

(a)     [<u>Reserved</u>].

(b)  Net Cash Proceeds of Asset Sales.  Subject to Section 7.1 hereof, upon the receipt by any Loan Party of the proceeds of any sale or other disposition of any Collateral (other than Inventory in the ordinary course of business), the Borrowers shall prepay the Loans with the Net Cash Proceeds of such sale or other disposition, such prepayments to be made promptly but in no event more than one (1) Business Day following receipt of such Net Cash Proceeds, and until the date of payment, such proceeds shall be held in trust for the Lenders.  The foregoing shall not be deemed to be implied consent to any such sale or other disposition otherwise prohibited by the terms and conditions hereof.

(c)  Events of Loss. If any Equipment or real property of the Borrowers which is subject to a Lien in favor of the Agent, for the benefit of the Lenders, or any other Collateral is damaged, destroyed or taken by condemnation in whole or in part, the Borrowers shall prepay the Loans with the proceeds thereof, such prepayment to be made promptly but in no event more than one (1) Business Day following receipt of such proceeds, and until the date of payment, such proceeds shall be held in trust for the Lenders.

(d)  Equity Issuances.  If any Loan Party issues Equity Interests or receives a capital contribution (including Specified Equity Contributions), no later than the Business Day following the date of receipt of the proceeds thereof, the Borrowers shall notify the Agent of such Loan Party's receipt of such proceeds and shall, or cause such Loan Party to, immediately prepay the Loans with the Net Cash Proceeds of such issuance of Equity Interests, and until so paid, such proceeds shall be held in trust for the Lenders.  The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions of this Agreement or to any Change of Control resulting from such sale.

(e)  Revolving Commitment.  If on any date (after giving effect to any other payments on such date), the Revolving Exposure exceeds the lesser of (i) the Revolving Commitment and (ii) the Borrowing Base, then, in the case of each of the foregoing, the Borrowers shall, on such day, prepay on such date the principal amount of Revolving Loans and, after all outstanding Revolving Loans have been paid in full, prepay the aggregate amount of all disbursements relating to Letters of Credit that have not been reimbursed by the Borrowers.

(f)  Capex Commitment.  If on any date on or prior to the last day of the Capex Availability Period (after giving effect to any other payments on such date), the Capex Outstandings exceed the Capex Commitment, then the Borrowers shall, on such day, prepay on such date the principal amount of Capex Loans in an aggregate amount at least equal to such excess.

(g)  HVAC Equipment Loan Commitment.  If on any date on or prior to the last day of the HVAC Equipment Loan Availability Period (after giving effect to any other payments on such date), the HVAC Equipment Loan Outstandings exceed the HVAC Equipment Loan Commitment, then the Borrowers shall, on such day, prepay on such date the principal amount of Capex Loans in an aggregate amount at least equal to such excess.

2.18  **Application of Proceeds.**  Each prepayment under Section 2.17(a), Section 2.17(b), Section 2.17(c) or Section 2.17(d) shall be applied, first, to prepay the principal repayment installments of the Term Loan in the inverse order of maturity until the Term Loan has been paid

56

in full, second, to prepay the principal repayment installments of the Capex Loans in the inverse order of maturity until the Capex Loans have been paid in full, third, to prepay the principal repayment installments of the HVAC Equipment Loans in the inverse order of maturity until the Capex Loans have been paid in full, fourth, to permanently reduce the Capex Commitment until reduced to zero, fifth to permanently reduce the HVAC Equipment Loan Commitment until reduced to zero, and, sixth to permanently reduce the Revolving Commitment until reduced to zero. If, upon giving effect to any reduction in the Revolving Commitment pursuant to the foregoing sentence, the Revolving Exposure exceed the Revolving Commitments, then the Borrowers shall repay Revolving Loans in an amount sufficient to eliminate such excess.

**ARTICLE III**
**INTEREST AND FEES**

3.1 **Interest.** The unpaid principal amount of each Loan made by the Lenders shall bear interest, for the period commencing on the date of such Loan until such Loan is paid in full, (i) for Base Rate Loans, at a rate per annum equal to the sum of the Base Rate from time to time in effect plus the Applicable Rate from time to time in effect, (ii) for Term SOFR Loans, at a rate per annum equal to the sum of Term SOFR for such Loan plus the Applicable Rate from time to time in effect; provided that at any time an Event of Default exists, unless the Agent otherwise consents in writing, the interest rate applicable to each Loan and other Obligations shall be automatically increased by 2.0% (and, in the case of Obligations not bearing interest, such Obligations shall bear interest at the Base Rate plus 2.0%) (the "Default Rate"), provided further that such increase may thereafter be rescinded by the Agent in writing, notwithstanding Section 15.2. Notwithstanding the foregoing, upon the occurrence of an Event of Default under Section 10.1 or 10.7, such increase shall occur automatically.

3.2 **Interest Payment Dates.** Accrued interest on each Loan shall be payable in arrears (i) in respect of each Base Rate Loan, on the first day of each calendar month, upon a prepayment of such Loan and at maturity and (ii) in respect of Term SOFR Loans, on the last day of each Interest Period applicable thereto, upon a prepayment of such Loan and at maturity. After maturity, and at any time an Event of Default exists, accrued interest on all Loans shall be payable on demand.

3.3 **Closing Fee.** The Borrowers must pay the Agent a $71,075.00 closing fee on the Closing Date, which shall be fully earned on the date paid.

3.4 **Collateral Fees.**

(a) Collateral Monitoring Fee. The Borrowers must pay the Agent a $12,000 per year collateral monitoring fee on the Closing Date and on the first day of the calendar month following each anniversary of the Closing Date thereafter.

(b) Collateral Evaluation Fee. Except as provided in Section 4.10, the Borrowers must pay to the Agent on the first day of the calendar month (and the Termination Date) following any month in which the Agent performed any collateral evaluation with respect to any Loan Party (including any field examination, collateral analysis, or other business analysis), a collateral evaluation fee equal to $1,000 per day for each Person performing the evaluation (plus all costs

57

and disbursements incurred by the Agent and the Persons performing the examination or analysis). Although the Agent may conduct as many examinations as the Agent desires, if (1) no Default Condition has existed within 60 days of the date on which an examination was ordered, then the Loan Parties are only required to pay for one examinations in any 12-month period (but if the Agent conducts an examination that the Loan Parties would not be obligated to pay for and that examination reveals that a Default Condition exists or that any material Reserve is appropriate, then the cost of that examination does not count against the one-per-12-month limit). Examinations that occurred before the Closing Date also do not count against the limit in the preceding sentence.

3.5 **Non-Use Fee.**

(a)     The Borrowers agree to pay to the Agent a non-use fee, for the ratable benefit of the Lenders, for the period from the Closing Date to the Termination Date, at a rate per annum equal to (a) the Applicable Rate in effect from time-to-time times (b) the Unused Revolving Commitment in effect on such day.  Such non-use fee shall be payable in arrears on the first day of each calendar month and on the Termination Date for any period then ending for which such non-use fee shall not have previously been paid.  The non-use fee shall be computed for the actual number of days elapsed on the basis of a year of 360 days.

(b)     The Borrowers agree to pay to the Agent a non-use fee, for the ratable benefit of the Lenders, for to the last day of the Capex Availability Period, at a rate per annum equal to (a) the Non-Use Fee in effect from time-to-time times (ii) the Capex Availability in effect on such day.  Such non-use fee shall be payable in arrears on the first day of each calendar month and on the last day of the Capex Availability Period for any period then ending for which such non-use fee shall not have previously been paid.  The non-use fee shall be computed for the actual number of days elapsed on the basis of a year of 360 days.

(c)     The Borrowers agree to pay to the Agent a non-use fee, for the ratable benefit of the Lenders, for to the last day of the HVAC Equipment Loan Availability Period, at a rate per annum equal to (a) the Non-Use Fee in effect from time-to-time times (ii) the HVAC Equipment Loan Availability in effect on such day.  Such non-use fee shall be payable in arrears on the first day of each calendar month and on the last day of the HVAC Equipment Loan Availability Period for any period then ending for which such non-use fee shall not have previously been paid.  The non-use fee shall be computed for the actual number of days elapsed on the basis of a year of 360 days.

3.6 **[Reserved].**

3.7 **[Reserved].**

3.8 **Agent Fees.**  The Loan Parties agree to pay to the Agent, for its own account, fees payable in the amounts and at the times separately agreed upon among the Loan Parties and the Agent.

3.9 **Computing Interest and Fees.**  Interest shall be computed for the actual number of days elapsed on the basis of a year of 360 days.  The applicable interest rate for each Base Rate Loan shall change simultaneously with each change in the Base Rate. The applicable interest rate for each Term SOFR Loan shall change simultaneously with each change in Term SOFR.

58

3.10 **Maximum Charges.** In no event whatsoever may interest, fees, and other charges charged under the Loan Documents exceed the highest rate allowed. If interest, fees, and other charges would exceed the highest rate allowed under law, the excess amount will instead be first applied to any unpaid principal balance owed by the Borrowers and then the Lenders will refund the remaining balance to the Borrowers. In addition, the Loan Documents will be automatically amended to provide for the highest allowed rate.

3.11 **Increased Costs.** If, after the date hereof, the adoption of, or any change in, any applicable law, rule or regulation, or any change in the interpretation or administration of any applicable law, rule or regulation by any Governmental Body or comparable agency charged with the interpretation or administration thereof, or compliance by the Lenders with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:

(a) imposes, modifies or deems applicable any reserve (including any reserve imposed by the FRB, but excluding any reserve included in the determination of Term SOFR pursuant to Article 3, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by the Lenders; or

(b) imposes on the Lenders any other condition affecting its Term SOFR Loans, its Notes or its obligation to make Term SOFR Loans; or

(c) subjects any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(d) and the result of anything described in clauses (a) and (c) above is to increase the cost to (or to impose a cost on) the Lenders (or any office of the Lenders) or such other Recipient of making, converting to, continuing or maintaining any Term SOFR, or to increase the cost to such Lender, such issuer of a Letter of Credit hereunder or such other Recipient of participating in, issuing or maintaining any such Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender (or its office), such issuer of a Letter of Credit hereunder or such other Recipient under this Agreement or under its Notes with respect thereto, then upon demand by such Lender, such issuer of a Letter of Credit hereunder or such other Recipient, as the case may be, the Borrowers shall pay directly to Agent (for the benefit of the Lenders), issuer of a Letter of Credit hereunder or other Recipient, as the case may be, such additional amount as will compensate Agent and such Lender, issuer of a Letter of Credit hereunder or other Recipient, as the case may be, for such increased cost or such reduction, so long as such amounts have accrued on or after the day that is 270 days prior to the date on which such Lender, issuer of a Letter of Credit hereunder or other Recipient, as the case may be, first made demand therefor.

If the Agent or any Lender determines that any change in, or the adoption or phase-in of, any applicable law, rule or regulation regarding capital adequacy, or any change in the interpretation or administration thereof by any Governmental Body or comparable agency charged with the interpretation or administration thereof, or the compliance by the Agent, Lender or any

59

Person controlling the Lender with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Agent's, Lenders' or such controlling Person's capital as a consequence of the Agent's or Lenders' obligations to a level below that which the Agent, any Lender or such controlling Person could have achieved but for such change, adoption, phase-in or compliance (taking into consideration the Agent's, Lenders' or such controlling Person's policies with respect to capital adequacy) by an amount deemed by the Agent, any Lender or such controlling Person to be material, then from time to time, upon demand by the Agent or any Lender, the Borrowers shall pay to the Agent or any such Lender such additional amount as will compensate the Agent, such Lender or such controlling Person for such reduction so long as such amounts have accrued on or after the day that is 270 days prior to the date on which the Agent or such Lender first made demand therefor (except that, if the change in law giving rise to such additional costs and reductions is retroactive, then the 270 day period referred to above shall be extended to include the period of retroactive effect thereof); provided, that such additional costs shall be generally consistent with the additional costs that the Agent is applying generally to loans impacted similarly to the Advances.

### 3.12 **Inadequacy or Unfairness.**

(a)      If in connection with any request for a Term SOFR Loans or a conversion to or continuation thereof, (i) the Agent determines that adequate and reasonable means do not exist for determining Term SOFR for any requested Loan and (2) the Scheduled Unavailability Date has not occurred (in each case with respect to this clause (i), "Impacted Loans"), or (ii) the Agent determines that for any reason Term SOFR for any requested Term SOFR Loans does not adequately and fairly reflect the cost to the Agent of funding such Loan, the Agent will promptly so notify the Loan Party Representative. Thereafter, the obligation of the Agent to make or maintain Term SOFR Loans shall be suspended (to the extent of the affected Term SOFR Loans) until the Agent revokes such notice. Upon receipt of such notice, the Loan Party Representative may revoke any pending request for a borrowing of, conversion to or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans) or, failing that, will be deemed to have converted such request into a request for a borrowing of Base Rate Loans in the amount specified therein

(b)      Notwithstanding the foregoing, if the Agent has made the determination described in clause (a)(i) of this Section 3.12, the Agent in consultation with the Loan Party Representative, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (i) the Agent revokes the notice delivered with respect to the Impacted Loans under clause (a)(i) of this Section 3.12, (ii) the Agent notifies the Loan Party Representative that such alternative interest rate does not adequately and fairly reflect the cost to the Agent of funding the Impacted Loans, or (iii) the Agent determines that any Law has made it unlawful, or that any Governmental Body has asserted that it is unlawful, for the Agent or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Body has imposed material restrictions on the authority of the Agent to do any of the foregoing.

### 3.13 **Successor Rate.**

(a)        Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Agent determines (which determination shall be conclusive absent manifest error), or the Loan Party Representative notifies the Agent that the Borrowers have determined, that adequate and reasonable means do not exist for ascertaining Term SOFR, including, without limitation, because Term SOFR is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(b)        the administrator of Term SOFR or a Governmental Body having jurisdiction over the Agent or such administrator has made a public statement identifying a specific date after which Term SOFR  shall no longer be made available, or used for determining the interest rate of loans, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Agent, that will continue to provide Term SOFR after such specific date (such specific date, the "Scheduled Unavailability Date"); or

(c)        the administrator of Term SOFR or a Governmental Body having jurisdiction over such administrator has made a public statement announcing that all tenors of Term SOFR are no longer representative; or

(d)        syndicated loans currently being executed, or that include language similar to that contained in this Section 3.11, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace Term SOFR;

then, in the case of clauses (a)-(c) above, on a date and time determined by the Agent (any such date, the "Replacement Date"), which date shall be on the relevant interest payment date for interest calculated and shall occur reasonably promptly upon the occurrence of any of the events or circumstances under clauses (a), (b) or (c) above and, solely with respect to clause (ii) above, no later than the Scheduled Unavailability Date, Term SOFR will be replaced hereunder and under any Loan Document with the alternative set forth below for any payment period for interest calculated that can be determined by the Agent, in each case, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document (the "Successor Rate"; and any such rate before giving effect to the Related Adjustment, the "Pre-Adjustment Successor Rate"):  the sum of (A) the alternate benchmark rate that has been selected by the Agent as the replacement for Term SOFR for the applicable tenor giving due consideration to (y) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (z) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for Term SOFR for dollar-denominated syndicated credit facilities at such time and (B) the Related Adjustment;

and in the case of clause (d) above, the Borrowers and the Agent may amend this Agreement solely for the purpose of replacing Term SOFR under this Agreement and under any other Loan Document in accordance with the definition of "Successor Rate" and such amendment will become effective at 5:00 p.m., on the fifth Business Day after the Agent shall have notified the Loan Party Representative and the Lenders of the occurrence of the circumstances described in clause (d) above, so long as the Agent has not received, by such time, written notice of objection to such Successor Rate from Lenders comprising the Required Lenders.

61

164393.00001/150632148v.7

The Agent will promptly (in one or more notices) notify the Loan Party Representative of (x) any occurrence of any of the events, periods or circumstances under clauses (a) through (d) above, (y) the Replacement Date and (z) the Successor Rate.

Any Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Agent, such Successor Rate shall be applied in a manner as otherwise reasonably determined by the Agent.

Notwithstanding anything else herein, if at any time any Successor Rate as so determined would otherwise be less than zero, the Successor Rate will be deemed to be zero for the purposes of this Agreement and the other Loan Documents.

In connection with the implementation of a Successor Rate, the Agent will have the right to make Successor Rate Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Successor Rate Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided that, with respect to any such amendment effected, the Agent shall post each such amendment implementing such Successor Rate Conforming Changes to the Loan Party Representative reasonably promptly after such amendment becomes effective.

If the events or circumstances of the type described in Section 3.13(a)-(d) have occurred with respect to the Successor Rate then in effect, then the successor rate thereto shall be determined in accordance with the definition of "Successor Rate."

Notwithstanding anything to the contrary herein, (A) after any such determination by the Agent, if the Agent determines that no Successor Rate is available on or prior to the Replacement Date, (B) if the events or circumstances described in Section 3.13(d) have occurred but no Successor Rate is available, or (C) if the events or circumstances of the type described in Section 3.13(a)-(c) have occurred with respect to the Successor Rate then in effect and the Agent determines that no Successor Rate is available, then in each case, the Agent and the Borrowers may amend this Agreement solely for the purpose of replacing Term SOFR or any then current Successor Rate in accordance with this Section 3.13 at the end of any relevant interest payment date or payment period for interest calculated, as applicable, with another alternate benchmark rate giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks and, in each case, including any Related Adjustments and any other mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such benchmarks, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Agent from time to time in its reasonable discretion and may be periodically updated. For the avoidance of doubt, any such proposed rate and adjustments shall constitute a Successor Rate. Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Agent shall have posted such proposed amendment to the Loan Party Representative and the Lenders so long as the Agent has not received, by such time, written notice of objection to such Successor Rate from Lenders comprising the Required Lenders.

164393.00001/150632148v.7

If, at the end of any relevant interest payment date or payment period for interest calculated, no Successor Rate has been determined in accordance with the preceding paragraphs of this Section 3.13 and the circumstances under Section 3.13(a) or (c) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Agent will promptly so notify the Loan Party Representative. Thereafter, the obligation of the Agent to make or maintain Term SOFR Loan shall be suspended, (to the extent of the affected Term SOFR Loans, interest payment dates or payment periods), until the Successor Rate has been determined in accordance with the preceding paragraphs of this Section 3.13. Upon receipt of such notice, the Loan Party Representative may revoke any pending request for a Borrowing of, conversion to or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans, interest payment dates or payment periods) or, failing that, will be deemed to have converted such request into a request for a Base Rate Loans (subject to the foregoing clause (y)) in the amount specified therein.

## ARTICLE IV
## COLLATERAL: GENERAL TERMS

4.1     **Security Interest.**   To secure the prompt payment and performance of the Obligations, each Loan Party grants to the Agent for its benefit, the benefit  of the Lenders, the benefit of the Issuer, and the benefit of each of their respective Affiliates, a continuing Lien on, security interest in, pledge of, and assignment of all of its Collateral. Each Loan Party must promptly give the Agent written notice of all commercial tort claims (including the case name, court it is pending in, and a brief description of each claim) and, upon the Agent receiving such notice, that Loan Party is treated as having granted to the Agent, the Lenders and the Issuer a security interest and Lien in and to those commercial tort claims and all proceeds thereof. **Perfection.** Each Loan Party must immediately take all action that the Agent requests to maintain the validity, perfection, enforceability, and priority of the Agent's Lien on the Collateral or to enable the Agent to protect, exercise, or enforce its rights under the Loan Documents and in the Collateral, including: (1) immediately discharging all Liens other than Permitted Liens; (2) obtaining any Waivers that the Agent may request in its discretion; (3) delivering to the Agent, endorsed (or accompanied by any assignments that the Agent may specify) and stamping or marking, as the Agent may specify, all Chattel Paper, Instruments, letters of credit (and advices), and Documents that are part of the Collateral; (4) entering into any other custodial arrangements satisfactory to the Agent; and (5) executing and delivering control agreements, pledges, Mortgages, notices, and assignments as requested by the Agent in its discretion. Each Loan Party authorizes the Agent to file against it one or more financing, continuation, or amendment statements. All Expenses and taxes that the Agent incurs in doing any of the preceding will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations (or, at the Agent's option, must be paid by the Borrowers to the Agent immediately on demand).

4.3     **Dispositions.**   Each Loan Party must safeguard and protect all Collateral for the Agent's account and may not, except as expressly permitted by this Agreement, dispose of any Collateral (whether by sale, lease, or otherwise).

4.4     **Preserving Collateral.**   Each Loan Party must cooperate fully with all of the Agent's efforts to preserve and protect the Collateral and must take any actions to preserve and protect the Collateral that the Agent may request in its Permitted Discretion. When a Default Condition exists, the Agent may from time to time in its discretion (and without any Loan Party's

164393.00001/150632148v.7

consent), make Revolving Loans for the Borrowers' account that the Agent in its discretion believes are necessary or desirable: (1) to preserve or protect any Collateral; (2) to enhance the likelihood of (or maximize the amount of) the repayment of the Obligations; or (3) to pay any amount chargeable to any Loan Party under the Loan Documents or applicable law. All of the Agent's Expenses referred to in this Section (including all Expenses related to bonding a custodian), will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations. Revolving Lenders shall be obligated to fund such Revolving Loans and effect a settlement with Agent therefor upon demand of Agent in accordance with their respective Commitment Percentages. To the extent any such Revolving Loans are not actually funded by the other Revolving Lenders, any such Revolving Loans funded by Agent shall be deemed to be Revolving Loans made by and owing to Agent, and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Revolving Lender with respect to such Revolving Loans.

4.5 **Ownership.** At all times with respect to all Collateral: (1) a Loan Party must be its sole owner and fully authorized and able to sell, transfer, pledge, and grant the Agent, on behalf of the Lenders, a first priority Lien in it; (2) except for Permitted Liens, the Collateral must be free and clear of all Liens; (3) each document and agreement executed by each Loan Party or delivered to the Agent in connection with the Collateral must be true and correct in all respects; (4) each Loan Party's signatures and endorsements must be genuine and properly authorized; and (5) each Loan Party's Collateral may only be located at the locations listed on Schedule 4.5 (as may be updated from time to time by Loan Party Representative upon five Business Days' prior written notice to the Agent with new locations in the United States that are acceptable to the Agent in its sole discretion) and may not be removed from those locations (except (a) selling Collateral in the ordinary course of business when an Event of Default does not exist and as otherwise permitted under this Agreement, and (b) Collateral in transit from one location identified on Schedule 4.5 to another location identified on Schedule 4.5).

4.6 **Defending Agent's and Lenders' Interests.** Until (x) the Obligations are irrevocably paid and performed in full and (y) all Commitments and the Loan Documents have been terminated in writing, the Agent's and the Lenders' interests in the Collateral continue in full force and effect. Each Loan Party must defend the Agent's and Lenders' interests in the Collateral against all Persons. When an Event of Default exists: (1) the Agent may take possession of the Collateral (and the indicia of ownership of any Collateral) in whatever physical form contained (including labels, stationery, documents, instruments, and advertising materials); (2) at the Agent's request the Loan Parties must assemble the Collateral in the best manner possible and make it available to the Agent at a place designated by the Agent; (3) each Loan Party must, and the Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers, or others receiving or holding cash, checks, Inventory, documents, or instruments in which the Agent holds a Lien to deliver them to the Agent and subject them to the Agent's order (and if they come into any Loan Party's possession it must hold them in trust for the Agent and immediately deliver them to the Agent in their original form (together with any necessary endorsement)); (4) each Loan Party grants to the Agent and its assignees an irrevocable, assignable, non-exclusive license (exercisable without royalty payments or other compensation) to use, assign, license, or sublicense any present or future Intellectual Property (including in the license or sublicense access to all media in which any of the licensed items may be recorded or stored and to all related computer programs); (5) each Loan Party grants to the Agent and its assignees an irrevocable, assignable, non-exclusive license and lease or sublease to use, assign, license, or sublicense any leased Real Property or

64

Owned Real Property (exercisable without paying any royalty, rent, or other compensation); (6) each Loan Party authorizes the Agent to pay, purchase, contest, or compromise any Lien that in the Agent's discretion appears to conflict with the Agent's Liens (and to pay all related Expenses and to charge the Loan Account); (7) each Loan Party authorizes the Agent to hire security guards or implement other security measures; (8) each Loan Party authorizes the Agent to employ and maintain at any of each Loan Party's premises a custodian (and each Loan Party grants the custodian full authority to do all acts necessary to protect and preserve the Collateral); (9) each Loan Party authorizes the Agent to lease warehouse facilities to which all or part of the Collateral may be moved; (10) each Loan Party authorizes the Agent to use any Loan Party's owned or leased lifts, hoists, trucks, and other facilities or equipment to handle or remove Collateral; (11) each Loan Party authorizes the Agent to enter the premises where Collateral is located, to take and maintain possession of the Collateral; and (12) the Agent may at any time take any other steps that the Agent in its discretion believes are necessary or desirable to protect and preserve the Collateral. All of the Agent's Expenses incurred in accordance with the preceding (including all Expenses related to bonding a custodian), will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations.

4.7     **Books and Records.**  Each Loan Party must: (1) keep complete and accurate books and records in which entries are made of all of its dealings and transactions; (2) establish accruals on its books for all Charges; and (3) on a current basis post on its books earnings, allowances against doubtful Accounts, advances and investments, and all other proper accruals (including for premiums due on required payments, and accruals for depreciation, obsolescence, or amortization). All requirements under this Section must be made in all material respects in accordance with GAAP consistently applied in the Loan Parties' current independent public accountants' opinion.

4.8     **Financial Disclosure.**  Each Loan Party irrevocably authorizes and directs its accountants and auditors at any time and promptly after the Agent's request to deliver to the Agent copies of each Loan Party's financial statements, trial balances, and other accounting records of any sort in the accountant's or auditor's possession, and to disclose to the Agent any information the accountants may have concerning each Loan Party's financial status and business operations. Each Loan Party irrevocably authorizes all federal, state, and municipal authorities to furnish to the Agent copies of reports or examinations relating to each Loan Party.

4.9     **Laws.**  Each Loan Party must comply with all laws, acts, rules, regulations, and orders of any Governmental Body (except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect). The Loan Parties must at all times cause all Collateral to be maintained strictly in accordance with the requirements of all insurance carriers that insure any of the Collateral so that all insurance remains in full force and effect.

4.10     **Inspections and Appraisals.**  The Agent may at any time during normal business hours, examine, audit, check, inspect, and make abstracts and copies of each Loan Party's books, records, audits, correspondence, and all other materials related to the Collateral. The Agent and its agents may at any time enter upon any of each Loan Party's premises and any premises where any Collateral is located to examine, audit, inspect, or appraise the Collateral and to do the things provided in the preceding sentence. The Agent may conduct examinations, audits, inspections, and appraisals at any time the Agent elects, in each case, except as provided in the next sentence at the Loan Parties' expense in accordance with Section 3.4(b).  Although the Agent may conduct as

65

many examinations and appraisals as the Agent desires, if (1) no Default Condition has existed within 60 days of the date on which an appraisal or an examination was ordered, then the Loan Parties are only required to pay for one examination in any 12-month period and one Equipment appraisal in any 12-month period (but if the Agent conducts an examination or appraisal that the Loan Parties would not be obligated to pay for and that examination reveals that a Default Condition exists or that any material Availability Reserve is appropriate, then the cost of that examination does not count against the foregoing limits). Appraisals and examinations that occurred before the Closing Date also do not count against the limits in the preceding sentence.

4.11 **Insurance.** Each Loan Party bears the full risk of any loss with respect to the Collateral. At each Loan Party's own cost and expense, in amounts and with carriers acceptable to the Agent, each Loan Party must: (1) keep all properties and assets in which any Loan Party has an interest insured against fire, flood, sprinkler leakage, those other hazards covered by extended coverage insurance, and other hazards (and for such amounts) as the Agent may require in its discretion and maintain business interruption insurance as is customary for companies engaged in businesses similar to each Loan Party's; (2) maintain a bond in amounts that are customary for companies engaged in businesses similar to the Loan Parties insuring against larceny, embezzlement, and other criminal misappropriations; (3) maintain public and product liability insurance against claims for personal injury, death, or property damage suffered by others; (4) maintain worker's compensation or similar insurance as required by law; and (5) furnish the Agent with (a) a status report with respect to the renewal of all insurance no later than 30 days before expiration, (b) evidence that all insurance has been renewed at least 10 days before expiration, and (c) Agent-loss-payable, additional-insured, and mortgagee endorsements, naming the Agent as an additional-insured, Agent-loss-payee, and mortgagee, and providing (A) that all insurance proceeds for loss or damage to Collateral must be payable to the Agent, (B) no insurance is affected by any act or neglect of the insured or property owner, and (C) that each policy and loss payable clause may not be cancelled, amended, or terminated without at least 30 days' prior written notice to the Agent. The Loan Parties must provide copies of all insurance policies (including the appropriate Agent-loss-payee and additional-insured endorsements) within five days after the Agent's request. Each insurance carrier is directed by the Agent and the Loan Parties to make all payments for all losses to the Agent solely in the Agent's name (and not to a Loan Party or to a Loan Party and the Agent jointly). If nonetheless any insurance losses are paid by check, draft, or other instrument payable to any Loan Party or to any Loan Party and the Agent jointly, the Agent may endorse each Loan Party's name and do such other things as the Agent may deem advisable to reduce the same to cash. The Agent has the sole authority to adjust and compromise claims under insurance coverage with respect to Collateral and business interruption insurance. All insurance loss recoveries with respect to Collateral received by the Agent may be applied to the Obligations in the order and manner determined by the Agent in its discretion (and the Agent will pay any surplus to the Loan Parties or as otherwise required by law). The Loan Parties must pay any deficiency to the Agent on demand.

4.12 **Paying Insurance.** If any Loan Party does not obtain, maintain, or renew any insurance required by the Loan Documents, the Agent may obtain and pay for it (but all premiums will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations).

4.13 **Paying Taxes.** Each Loan Party must pay, when due, all taxes, assessments, and other Charges levied or assessed against it or any of the Collateral, including real and personal

164393.00001/150632148v.7

property taxes, assessments, and Charges, and all franchise, income, employment, social security benefits, withholding, and sales taxes (except those being disputed in good faith, by expeditious and diligent protest, administrative or judicial appeal, or similar proceeding (but only if reserves are posted with the Agent to protect the Agent's and Lenders' Lien on the Collateral)). If any tax is or may be imposed on the Agent or any Collateral due to any transaction between the Agent and any Loan Party, or other Charges are not paid when due, or if any claim is made which, in the Agent's discretion, may possibly create a Lien on the Collateral, the Agent may without notice to the Loan Parties pay the taxes, assessments, or other Charges and each Loan Party indemnifies and holds the Agent harmless for that payment. All payments by the Agent under this Section will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations.

Each Lender shall severally indemnify the Agent for any taxes (but only to the extent that the Loan Parties have not already indemnified the Agent for such taxes and without limiting the obligation of the Loan Parties to do so) attributable to such Lender that are paid or payable by the Agent in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such taxes were correctly or legally imposed or asserted by the relevant Governmental Body.   This indemnity obligation shall be paid within ten (10) days after the Agent delivers to the applicable Lender a certificate stating the amount of taxes so paid or payable by Agent.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.

4.14    **Paying Leasehold Obligations.**    Each Loan Party must pay when due its obligations under all leases and must otherwise comply with all other material terms of its leases and keep them in full force and effect and, at the Agent's request, provide evidence of having done so to the Agent.

4.15    **Accounts.**

(a)    Accounts. Each Account: (1) is a valid Account for a bona fide obligation incurred by the named Account Debtor; (2) is for the fixed amount stated in the invoice for a Borrower's absolute sale or lease and delivery of goods on stated terms, or for work, labor, or services rendered by a Borrower on the date each Account is created; and (3) is due and owing without dispute, set-off, counterclaim, reduction, or defense.

(b)    Solvency. Each Account Debtor is and will be solvent and able to pay all of its Accounts in full when due.

(c)    Locations. Each Loan Party's state of organization and chief executive office are located at the addresses listed on Schedule 4.15(c). Until the Loan Party Representative gives the Agent 30 days' prior written notice, all records must be kept at the executive office listed on Schedule 4.15(c).

(d)    Notification. The Agent may at any time notify Account Debtors of the Agent's Lien on the Borrowers' Accounts. When an Event of Default exists, the Agent may notify Account Debtors to make payments directly to the Agent (and the Agent then has the sole right to collect Accounts).

164393.00001/150632148v.7

(e)     Agent's Power to Act on the Loan Parties' Behalf. The Agent may at any time receive, endorse, assign, and deliver in the Agent's or any Loan Party's name any checks, drafts, and other instruments, and each Loan Party waives notice of presentment, protest, and non-payment of any instrument so endorsed. Each Loan Party appoints the Agent and any of the Agent's designees as its attorney with power: (A) at any time to: (1) endorse each Loan Party's name on any notes, acceptances, checks, drafts, money orders, or other evidences of payment or Collateral; (2) sign each Loan Party's name on any invoice or bill of lading relating to any Accounts, drafts against Account Debtors, and assignments and verifications of Accounts; (3) send Account verifications to Account Debtors; and (4) to do all other acts and things necessary to carry out or implement the Loan Documents and the Loan Party's obligations under law; and (B) at any time when an Event of Default exists to: (1) demand payment of the Accounts; (2) enforce payment of the Accounts by legal proceedings or otherwise; (3) exercise all of the Loan Parties' rights and remedies with respect to collecting Accounts and any other Collateral; (4) settle, adjust, compromise, extend, or renew Accounts; (5) settle, adjust, or compromise any legal proceedings brought to collect Accounts; (6) prepare, file, and sign each Loan Party's name on a proof of claim in bankruptcy (or other similar document) against any Account Debtor; and (7) prepare, file, and sign each Loan Party's name on any notice of Lien, assignment, lien satisfaction, or other similar document.  Each Loan Party ratifies and confirms all actions of the attorney or designee (and the attorney or designee is not liable for any acts of omission or commission or for any error of judgment or mistake of fact or of law). This power of attorney is coupled with an interest and is irrevocable while any of the Obligations remain unsatisfied or unperformed. When an Event of Default or a Default exists, the Agent may change the address for delivery of mail to any Loan Party to any address that the Agent may designate and the Agent may receive, open, and dispose of all mail addressed to any Loan Party.

(f)     No Liability. Neither the Agent nor any Lender shall have any liability for any error or omission or delay of any kind occurring in the settlement, collection, or payment of any of the Accounts or any instrument received in payment of Accounts, or for any damage resulting therefrom. The Agent may accept the return of the goods represented by any of the Accounts (without notice to or consent by any Loan Party), all without discharging or in any way affecting any Loan Party's liability.

(g)     Deposit Accounts. The Borrowers must maintain with the Agent (or another bank selected by the Agent) any deposit accounts required by the Agent, including the Cash Concentration Account.

(h)     Cash Concentration Account. All collections and all other proceeds of Collateral will be deposited daily directly into the Cash Concentration Account and shall be deemed to be payments and shall be applied in accordance with Section 2.7(d). All funds in the Cash Concentration Account are the Agent's exclusive property and are subject to the Agent's sole control. The Borrowers do not have control over or any interest in the Cash Concentration Account. If any Borrower, any Affiliate or Subsidiary of a Borrower, any shareholder, officer, director, employee or agent of a Borrower or any Affiliate or Subsidiary of a Borrower, or any other Person acting for or in concert with a Loan Party shall receive any monies, checks, notes, drafts or other payments relating to or as proceeds of Accounts or other Collateral, the Borrowers and each such Person shall promptly upon receipt thereof remit the same (or cause the same to be remitted) in kind to the Cash Concentration Account.  All collections with respect to Collateral and all proceeds

68

of Collateral received by the Loan Parties: (1) are received in trust for the Lender, for the benefit of Agent as the Lender's fiduciary; (2) may not be commingled with any of the Loan Parties' other funds or property and are held in trust for the Lender, or the benefit of Agent as the Lender's fiduciary; and (3) except as provided in the following sentence with respect to the Specified Blocked Accounts, must on the day received be deposited into the Cash Concentration Account. With respect to the Specified Blocked Accounts: (1) they may remain open for up to 90 days after the Closing Date; (2) until the Agent exercises its right to send a "Notice of Exclusive Control" to the depository bank under the deposit account control agreements with such depository bank, the balance of each of the Specified Blocked Accounts may not exceed the amount that the Borrowers reasonably and in good faith determine are necessary to pay anticipated disbursements from the Specified Blocked Accounts in the next five Business Days (any amount on any Business Day that exceeds this amount is called the "Excess Amount"); and (3) on each Business Day the Borrowers must wire transfer the Excess Amount to the Cash Concentration Account. The Borrowers acknowledge that the Agent may deliver a "Notice of Exclusive Control" under the deposit account control agreements at any time in its discretion. Agent shall apply all funds received by it from the Cash Concentration Account to the satisfaction of the Obligations in such order as Agent shall determine, subject to Borrowers' ability to re-borrow Revolving Loans in accordance with the terms hereof; provided that, in the absence of any Event of Default, Agent shall apply all such funds representing collection of Accounts first to the prepayment of the principal amount of the Swing Loans, if any, and then to the Revolving Loans.

(i) Adjustments. Without the Agent's prior written consent, no Loan Party may (1) compromise or adjust any Account (or extend the time for its payment) or (2) accept any returns of merchandise or grant any discounts, allowances, or credits (except those done in the ordinary course of the Borrowers' business and consistent with past practices that existed on the Closing Date and that have been disclosed to the Agent in writing).

(j) Fees. Each Loan Party must pay to the Agent on demand all fees and Expenses that the Agent incurs in connection with (1) forwarding Advance proceeds and (2) establishing and maintaining the accounts required under the Loan Documents. The Agent may (without making demand) charge all fees and Expenses any Loan Party is obligated to pay under the Loan Documents to the Loan Account as a Base Rate Revolving Loan and add them to the Obligations.

4.16 **Equipment Maintenance.** Each Loan Party must maintain its Equipment in good operating condition and repair (reasonable wear and tear excepted), in accordance with industry standards, and must make all necessary replacements and repairs so that its value and operating efficiency are maintained and preserved. No Loan Party may use or operate the Equipment in a way that violates any law, statute, ordinance, code, rule, or regulation.

4.17 **No Liability.** Nothing herein contained shall be construed to constitute the Agent, any Lender or the Issuer as any Loan Party's agent for any purpose whatsoever, nor shall the Agent, any Lender or the Issuer be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof. Neither the Agent, nor the Issuer nor the Lenders, whether by anything herein or in any assignment or otherwise, assume any of any Loan Party's obligations under any contract or agreement assigned to the Agent, the Issuer or the Lenders, and neither the Agent, nor the Issuer

69

nor any Lender shall be responsible in any way for the performance by any Loan Party of any of the terms and conditions thereof.

4.18    **Environmental Matters.**

(a)    The Loan Parties must ensure that the Real Property complies with all Environmental Laws, except where the failure to comply could not reasonably be expected to have a Material Adverse Effect, and the Loan Parties must ensure that no Hazardous Substances are on any Real Property (except as permitted by applicable law or appropriate Governmental Bodies).

(b)    If any Loan Party obtains, gives, or receives notice of any Release or threat of Release of a reportable quantity of any Hazardous Substances at the Real Property (each, a "Hazardous Discharge"), or receives any notice of violation, request for information, notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, demand letter, or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Loan Party's interest in any Real Property (each, an "Environmental Complaint") from any Person, including any state agency responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency (each, an "Authority"), then the Loan Parties must promptly, but in any event within five (5) Business Days, send a written notice to the Agent detailing the facts and circumstances giving rise to the Hazardous Discharge or Environmental Complaint.

(c)    The Loan Parties must immediately send to the Agent copies of any request for information, notification of potential liability, or demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated, or used by any Loan Party to dispose of Hazardous Substances and must continue to forward copies of correspondence between any Loan Party and the Authority regarding such claims to the Agent until the claim is settled. The Loan Parties must immediately forward to the Agent copies of all documents and reports concerning a Hazardous Discharge at the Real Property that any Loan Party is required to file under any Environmental Laws. All information provided to the Agent under the Loan Documents is provided solely to protect its Lien on the Collateral and does not create any obligation on the Agent's part.

4.19    **Financing Statements.**    Except for financing statements filed with respect to Permitted Liens, no financing statement covering any of any Loan Party's assets is on file in any public office or has been authorized by any Loan Party to be filed in any public office.

4.20    **Pledged Equity Interests.**

(a)    Except as provided in the following sentence, each Loan Party grants a security interest in, Lien on, and pledges and collaterally assigns all of each Loan Party's present and future rights and title to the Equity Interests of each present and future Subsidiary of each Loan Party (including those listed on Schedule 4.20) (all of the preceding and all proceeds, the "Pledged Equity Interests").

(b)    Each Loan Party represents and warrants that (1) Schedule 4.20 is a complete and accurate list of each Loan Party's (and its Subsidiaries') issued and outstanding Equity Interests;

70

(2) the Loan Parties have executed appropriate transfer powers with respect to the Pledged Equity Interests and have deposited the Pledged Equity Interests and transfer powers with the Agent; (3) all Pledged Equity Interests have been duly authorized, validly issued, are fully paid and non-assessable; (4) with respect to any certificates delivered to the Agent representing any Pledged Equity Interests, either (x) they are Securities as defined in Article 8 of the UCC, or (y) if they are not Securities, then the Loan Parties must immediately inform the Agent in writing so that the Agent may take steps to perfect its Lien as a General Intangible (and no Loan Party may cause such certificates to become Securities as defined in Article 8 of the UCC without the Agent's prior written consent); (5) all Pledged Equity Interests held by a securities intermediary are subject to a control agreement establishing the Agent's control; (6) none of the Pledged Equity Interests have been issued or transferred in violation of the securities registration, securities disclosure, or similar laws of any jurisdiction; (7) except as listed on Schedule 4.20, there are no options, warrants, calls, or commitments whatsoever relating to the Pledged Equity Interests or that obligate the issuer of any Pledged Equity Interests to issue additional Equity Interests; and (8) no consent, approval, authorization, or other action by, and no giving of notice, filing with, any Governmental Body or any other Person is required for any Loan Party's pledge of the Pledged Equity Interests under this Agreement or for the Agent's exercise of any remedies with respect to the Pledged Equity Interests (except as may be required in connection with the disposition by laws affecting the offering and sale of securities generally).

(c)     When an Event of Default exists, (1) each Loan Party authorizes the Agent to transfer the Pledged Equity Interests into the Agent's (or any nominee's) name (but the Agent is not obligated to do so); (2) the Agent may vote the Pledged Equity Interests; (3) the Agent may receive all dividends and other distributions made with respect to the Pledged Equity Interests; (4) the Agent has all the rights and remedies under the Loan Documents and those available to a secured party under the UCC and applicable law; and (5) the Agent may sell, assign, transfer, and deliver the Pledged Equity Interests at any time and from time to time. If the Agent determines that the Pledged Equity Interests are declining in value or that the Pledged Equity Interests are customarily sold in any recognized market, then the Agent does not have to give the Loan Parties prior notice before selling the Pledged Equity Interests. Otherwise, the Agent will give the Loan Party Representative at least 10 days' prior notice before selling the Pledged Equity Interests. Each Loan Party waives any advertisement requirement and (except to the extent specifically required by the preceding sentence) waives notice of any kind with respect to a sale of any of the Pledged Equity Interests.

4.21    **[Reserved].**

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants that:

5.1    **Authority.**  It has the full power, authority, and legal right to enter into the Loan Documents and to perform its obligations under the Loan Documents. Each Loan Party's execution, delivery, and performance of the Loan Documents has been approved by all necessary legal and organizational Persons. All obligations under each Loan Document it executes are legal, valid, and binding obligations enforceable against it in accordance with their terms.

71

5.2    **Formation; Qualification; and Subsidiaries.**    Schedule 5.2 lists: (1) each jurisdiction where each Loan Party is incorporated or organized; (2) each jurisdiction where each Loan Party is in good standing or qualified to do business; and (3) all of each Loan Party's Subsidiaries. The jurisdictions listed on Schedule 5.2 are all of the jurisdictions in which each Loan Party is required to be in good standing or qualified to do business.

5.3    **Officers; Directors; Equity Interest Holders; and Capitalization.**  Schedule 5.3 lists (1) the names and titles of each Loan Party's executive officers and directors; (2) the names of each Loan Party's Equity Interest holders and a description of their Equity Interests (including certificate numbers and the number of Equity Interests (and the percentage of total Equity Interests)); and (3) all outstanding subscriptions, options, warrants, calls, rights, and other agreements or commitments related to each Loan Party's (and its Subsidiaries') Equity Interests in any Loan Party (or any of its Subsidiaries).

5.4    **No Governmental Approval; No Conflict.**  The transactions contemplated by the Loan Documents (1) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Body (except for those that have been obtained); (2) do not violate any law applicable to any Loan Party or any of its Subsidiaries; (3) do not violate or create a default under any indenture, agreement, or other instrument binding on any Loan Party, any of its Subsidiaries, or any of their respective assets; (4) do not require any Loan Party to make any payment to any Person (other than the Agent); and (5) do not create any Lien on any asset of any Loan Party (except Liens created under the Loan Documents).

5.5    **Tax Returns.**  Each Loan Party has (a) filed all federal, state, and other tax returns and reports required to be filed, and (b) has paid all federal, state and other taxes, assessments, fees, and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except (a) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.6    **Financial Information.**

(a)    The Loan Parties' projected income statements, cash-flow statements, balance sheets, and availability forecasts attached as Exhibit 5.6 (the "Projections") were prepared by the Loan Party Representative's Authorized Officer in good faith, are based on reasonable assumptions and estimates, and reflect the Loan Parties' judgment based on present circumstances.

(b)    Each of (1) the audited consolidated and consolidating balance sheets of the Loan Parties (and, if applicable, any other Persons) as of December 31, 2023, and the related income statements, changes in stockholders' equity, and changes in cash flow and (2) the consolidated and consolidating balance sheets of the Loan Parties (and, if applicable, any other Persons) as of October 31, 2024, and the related income statements, changes in stockholders' equity, and changes in cash flow (which were prepared by an Authorized Officer of the Loan Party Representative and true copies of which were delivered to the Agent), were prepared in accordance with GAAP, consistently applied, and present fairly in all material respects the Loan Parties' financial condition at such date and the results of their operations for that period. Since December 31, 2023, there has

72

been no change in (x) the Loan Parties' financial condition or (y) the aggregate value of the Loan Parties' machinery, Equipment, and Real Property (if any).

5.7    **Name.**  Except as stated on Schedule 5.7, during the last five years (1) no Loan Party has been known by any other name or has sold Inventory under any other name and (2) no Loan Party has been the surviving entity of a merger or consolidation or has acquired a material portion of the assets of any Person.

5.8    **O.S.H.A. and Environmental Compliance.**  Each Loan Party has complied with, and (1) its facilities, business, assets, property, and Equipment and (2) its leaseholds, comply in all material respects with the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA, and all other Environmental Laws that the failure to comply with could reasonably be expected to have a Material Adverse Effect, and no citations, notices, or non-compliance orders have been issued to any Loan Party under any of these laws, rules, and regulations.

(a)    Each Loan Party has been issued all required federal, state, and local licenses, certificates, and permits with respect to Environmental Laws.

(b)    Except as stated on Schedule 5.8(b), (1) there are no releases, spills, discharges, leaks, or disposals (each, a "Release") of Hazardous Substances at, upon, under or within any Real Property; (2) there are no underground storage tanks or polychlorinated biphenyls on any Real Property; (3) no Real Property has ever been used as a treatment, storage, or disposal facility for Hazardous Waste; and (4) no Hazardous Substances are present on the Real Property.

5.9    **Solvency; No Litigation, No Violation.**

(a)    After giving effect to the transactions contemplated by the Loan Documents, (1) the Loan Parties are and will continue to be solvent, able to pay their debts as they mature, and have sufficient capital to carry on their business and all businesses in which they are about to engage and (2) the present fair saleable value of each Loan Party's assets is more than its liabilities (including contingent liabilities).

(b)    Except as listed on Schedule 5.9(b), (1) no Loan Party has any pending or threatened litigation, arbitration, actions, or proceedings that could reasonably be expected to have a Material Adverse Effect; (2) no Loan Party has violated any statute, regulation, or ordinance that could reasonably be expected to have a Material Adverse Effect; and (3) no Loan Party has violated any order of any court, Governmental Body, arbitration board, or tribunal that could reasonably be expected to have a Material Adverse Effect.

5.10    **Intellectual Property.**  Schedule 5.10 lists all Intellectual Property owned or utilized by any Loan Party. Except as stated on Schedule 5.10, (1) the Intellectual Property is valid; (2) has been duly registered or filed with all appropriate Governmental Bodies; (3) is all of the Intellectual Property necessary for the Loan Parties to operate their business; (4) there are no objections to or challenges to the validity of any Intellectual Property (nor is any Loan Party aware of any grounds for any challenge); (5) all Intellectual Property is either original material or property developed by a Loan Party or was lawfully acquired by the Loan Party; and (6) all

73

Intellectual Property has been maintained to preserve its value (except where the failure to do so could not reasonably be expected to have a Material Adverse Effect).

5.11    **Licenses and Permits.**  Each Loan Party (1) has complied in all material respects with and (2) has all material licenses or permits required by any applicable federal, state, or local law, or regulation to operate its business in each jurisdiction where it conducts or plans to conduct business.

5.12    **Indebtedness Default.**  No Loan Party is in default under any Indebtedness nor does it reasonably believe that it will be in default under any Indebtedness, in each case, aggregating more than $100,000, or to the extent such default allows the holder of the Indebtedness to accelerate the Indebtedness (whether or not that right has been waived or deferred).

5.13    **No Burdensome Restrictions; No Default.**  No Loan Party: (1) is subject to any restriction (or is a party to any contract or agreement, including its Charter Documents) which compliance with or performance of could reasonably be expected to have a Material Adverse Effect; (2) has agreed (whether on the happening of a contingency or otherwise) that any of its present or future assets will be subject to a Lien that is not a Permitted Lien; and (3) is in default under any contract that could reasonably be expected to have a Material Adverse Effect.

5.14    **No Labor Disputes.**  No Loan Party (1) is involved in any labor dispute (or is aware that any strikes, walkouts, or union organization exist or are threatened), (2) is a party to any labor contract that expires within six months after the Termination Date or (3) is subject to any labor or collective bargaining agreement.  Hours worked by and payment made to employees of the Loan Parties are not in violation of the Fair Labor Standards Act or any other applicable law, rule or regulation dealing with such matters.

5.15    **Margin Regulations.**  No Loan Party is engaged (nor will it engage) in extending credit for "purchasing" or "carrying" any "margin stock" (the quoted terms in this Section have the meanings given under Regulation U of the FRB). Furthermore, no part of the proceeds of any Advance or any Loan will be used for "purchasing" or "carrying" "margin stock" or will otherwise violate, or be inconsistent with, the provisions of Regulation T, U or X of the FRB or any other regulation of the FRB.

5.16    **Investment Company Act.**  No Loan Party is an "investment company" under the Investment Company Act of 1940 (nor is it Controlled by a Person that is an "investment company").

5.17    **Disclosure.**  No representation or warranty made by any Loan Party in any Loan Document or in any financial statement, report, certificate, or other document furnished to the Agent by any Loan Party is untrue or misleading in any respect or omits any fact or circumstance necessary to make any statement not misleading. Each Loan Party has disclosed to the Agent in writing each fact and circumstance that could reasonably be expected to have a Material Adverse Effect.

5.18    **Hedging Agreement.**  No Loan Party is a party to (nor will it be a party to) any Hedging Agreement unless (1) it provides that termination damages are payable on a "two-way

74

164393.00001/150632148v.7

basis" without regard to fault on the part of either party and (2) it is entered into in the ordinary course of business (and not for speculative purposes).

5.19    **Material Business Agreements.**  Schedule 5.19 lists all of each Loan Party's Material Business Agreements and no default or event of default exists under any of these agreements, except to the extent that such default, individually or in the aggregate, could not reasonably cause a Material Adverse Effect.

5.20    **Certain Laws and Regulations.**  No Loan Party or any of its Affiliates is subject to any statute, rule, or regulation that regulates incurring any Indebtedness (including statutes or regulations related to common or interstate carriers or to selling electricity, gas, steam, water, telephone, telegraph, or other public utility services).

5.21    **Beneficial Ownership Certificate.**  Each Loan Party's Beneficial Ownership Certificate delivered to the Agent on the Closing Date (and as updated from time to time) is accurate, complete, and correct.

5.22    **Compliance with OFAC; Anti-Corruption Laws.**

(a)     No Loan Party, any of their respective Subsidiaries, nor, to the knowledge of the Loan Parties, any director, officer, employee, agent, affiliate or representative thereof, or any person who owns a controlling interest in or otherwise controls a Loan Party is an individual or entity that is (a) listed on the Specially Designated Nationals and Blocked Person List maintained by OFAC, the Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority, (b) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Order, (c) currently the subject or target of any Sanctions, or (d) located, organized or resident in a Designated Jurisdiction.

(b)     The Loan Parties and their Subsidiaries have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions, and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

5.23    **EEA Financial Institutions.**  No Loan Party is an EEA Financial Institution.

5.24    **ERISA Compliance.**

(a)     Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state laws.  Each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service covering, among other legally-required changes for tax-qualified retirement plans, the changes required by the Pension Protection Act of 2006, to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the

75

164393.00001/150632148v.7

Internal Revenue Service. To the best knowledge of each Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)      There are no pending or, to the best knowledge of each Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)      (i)  No ERISA Event has occurred, and neither any Borrower nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan or Multiemployer Plan; (ii) each Borrower and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and neither any Borrower nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date; (iv) neither any Borrower nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) neither any Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA;  (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan; and (vii) neither any Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4021 or 4243 of ERISA with respect to a Multiemployer Plan; and (viii) the Unfunded Liability of all Plans does not in the aggregate exceed the Threshold Amount.

(d)      Neither any Borrower or any ERISA Affiliate maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Pension Plan or Multiemployer Plan other than (A) on the Closing Date, those listed on Schedule 5.24(d) hereto and (B) thereafter, Pension Plans and Multiemployer Plans not otherwise prohibited by this Agreement.

(e)      Each "non-qualified deferred compensation plan" (as such term is defined in Section 409A of the Code and the Treasury regulations thereunder) sponsored or maintained by any Borrower or any Subsidiary (or to which any Borrower or any Subsidiary is (or was) a party), including without limitation the individual awards under such plan, has been maintained, operated and administered with, and is in documentary compliance with, Section 409A of the Code and guidance issued thereunder (including the final Treasury Section 409A regulations) such that there is not a "plan failure" under Section 409A(a)(1) of the Code or, if there is a "plan failure", such failure could not reasonably be expected to result in liabilities to the Borrowers or any of their Subsidiaries in excess of the Threshold Amount.

164393.00001/150632148v.7

## ARTICLE VI
## AFFIRMATIVE COVENANTS

Until all Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened), and all Commitments and the Loan Documents have been terminated, each Loan Party must:

6.1    **Conducting Business; Maintaining Existence; and Assets.**

(a)    Continuously conduct and operate its business according to good business practices.

(b)    Keep its existence in full force and effect, file all reports and pay all franchise and other taxes and license fees, and do all other acts and things that are necessary or desirable to maintain its rights, licenses, leases, powers, and franchises, except to the extent that such failure, individually or in the aggregate, (i) could not cause a Material Adverse Effect, or (ii) would not result in a lien or forfeiture in the rights, licenses, leases, powers, or franchises of any Loan Party.

6.2    **Violations.**  Promptly, and in any event within five (5) Business Days, notify the Agent in writing if any Loan Party or any Collateral violates or is alleged to have violated any Governmental Body's laws, statutes, regulations, or ordinances.

6.3    **Supplemental Instruments.**  From time to time at the Loan Parties' expense, execute and deliver, and cause each Subsidiary to execute and deliver, or cause to be executed and delivered, to the Agent all documents, agreements, and instruments, and take or cause to be taken such further actions (including filing and recording financing statements, fixture filings, Mortgages, deeds of trust, and other documents and actions) that are required by law or that the Agent may request to carry out the terms and conditions of the Loan Documents and to ensure the perfection and priority of the Agent's Liens.

6.4    **Indebtedness.**  Pay all Indebtedness when due and not otherwise default under any Indebtedness aggregating more than $100,000, or to the extent any such default allows the holder of the Indebtedness to accelerate the Indebtedness (whether or not that right has been waived or deferred).

6.5    **Financial Statements.**  Cause all financial statements delivered to the Agent (a) to be prepared as required by this Agreement; b) to be complete and correct in all material respects (subject, for interim financial statements, to notes and normal year-end audit adjustments); and (c) to be prepared in reasonable detail.

6.6    **Taxes.**  If any tax, assessment, or other Charge creates a Lien on any Collateral the Agent may without notice to the Loan Parties pay the tax, assessment, or other Charges. Any payments under this Section will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations (or, at the Agent's option, must be paid to the Agent by the Borrowers immediately on demand).

6.7    **Deposit Accounts.**  Except for the accounts listed on Schedule 6.7 and subject to Section 4.15(h), maintain all deposit, investment, brokerage, and other financial accounts with the

164393.00001/150632148v.7

Agent. Each account on Schedule 6.7 must at all times be subject to an account control agreement satisfactory to the Agent; provided, that, Borrowers may maintain the Specified Dupaco Accounts, in each case, so long as, (x) the average daily balance of the Specified Dupaco Accounts does not exceed $50,000 in the aggregate at any time and (y) at no time shall any funds representing collection of Accounts be deposited in the Specified Dupaco Accounts.  With respect to accounts maintained with the Agent, (a) normal charges shall be assessed thereon, (b) although no compensating balance is required, the Borrowers must keep monthly balances in order to merit earnings credits which will cover the Agent's service charges for demand deposit account activities, and (c) the Borrowers shall enter into agreements with Agent for standard cash management services. The Borrowers shall be responsible for all normal charges assessed thereon. The Borrowers shall not open any other bank account other than the accounts maintained with the Agent and those set forth on Schedule 6.7 without Agent's prior written consent.

6.8     **Beneficial Ownership Certificate.**  Provide to the Agent: (1) confirmation that the information in the most recent Beneficial Ownership Certificate is accurate; (2) a new Beneficial Ownership Certificate when the individual(s) identified as a Beneficial Owner have changed; and (3) any other information and documentation that the Agent may request from time to time related to the Agent's compliance with applicable laws (including the USA PATRIOT Act and other "know your customer" and anti-money laundering rules and regulations).

6.9     **[Reserved].**

6.10    **Employee Benefit Plans.**

(a)     Maintain, and cause each ERISA Affiliate to maintain, each  Plan in substantial compliance with all applicable requirements of law and regulations.

(b)     Make, and cause each ERISA Affiliate to make, on a timely basis, all required contributions to any Multiemployer Plan.

(c)     Not, and not permit any ERISA Affiliate to (i) seek a waiver of the minimum funding standards of ERISA, (ii) terminate or withdraw from any Pension Plan or Multiemployer Plan or (iii) take any other action with respect to any Pension Plan that would reasonably be expected to entitle the PBGC to terminate, impose liability in respect of, or cause a trustee to be appointed to administer, any Pension Plan, unless the actions or events described in clauses (i), (ii) and (iii) individually or in the aggregate would not have a Material Adverse Effect

6.11    **[Reserved].**

6.12    **Post-Closing Matters.**  Execute and deliver the documents, take the actions, and complete the tasks in the table below, in each case within the applicable time limit following the Closing Date specified or such later date as approved by the Agent in its sole discretion:

| Requirement | Time Limit |
|---|---|
| 1.  Delivery to the Agent of a deposit account control agreement with respect to each of the accounts set forth on Schedule 6.7 executed by the applicable depository bank, Borrowers and Agent. | 15 Business Days |

| | |
|---|---|
| 2. Delivery to Agent of Waivers, in form and substance reasonably acceptable to Agent, by and among Borrowers, Agent, and the respective landlord, for each of the locations set forth on Schedule 4.15. | 30 days |

**ARTICLE VII**
**NEGATIVE COVENANTS**

Until all Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments and the Loan Documents have been terminated, no Loan Party may:

7.1 **Mergers; Consolidations; Acquisitions; and Asset Sales.**

(a) Merge, consolidate, or otherwise reorganize with or into any Person or acquire all or a material portion of any Person's assets or Equity Interests.

(b) Sell, pledge, lease, transfer, or otherwise dispose of any of its properties or assets (except as expressly permitted by this Agreement, including, without limitation, the "Permitted Dispositions" permitted under the definition of "Asset Disposition").

7.2 **Liens.** Except Permitted Liens, create, assign, transfer, or allow to exist any Lien on any of its property (including the Collateral).

7.3 **Guarantees.** Be liable for any other Person's obligations by assumption, endorsement, guaranty, or otherwise except for (1) endorsing checks in the ordinary course of business and (2) guaranteeing or being jointly and severally liable for a Loan Party's Obligations.

7.4 **Investments.** Purchase or acquire obligations or Equity Interests of, or any other interest in, any Person, except: (1) investments existing on the Closing Date and listed on Schedule 7.4; (2) obligations issued or guaranteed by the United States of America; (3) commercial paper with a maturity of not more than 180 days and a published rating of not less than A-1 or P-1; (4) certificates of deposit and bankers' acceptances having maturities of not more than 180 days; and (5) U.S. money market funds (x) rated AAA by Standard & Poors, Inc. or with an equivalent rating from Moody's Investors Service, Inc., or (y) that invest solely in obligations issued or guaranteed by the United States of America.

7.5 **Loans.** Except as set forth in Schedule 7.5, make advances, loans, or credit extensions to any Person (including any Affiliate), except for commercial trade credit in connection with Inventory sales in the ordinary course of its business and consistent with practices that existed on the Closing Date and that have disclosed to the Agent in writing.

7.6 **Capital Expenditures.** Make or incur any Capital Expenditure or commitments for Capital Expenditures (including capitalized leases), other than any Capital Expenditures financed with the proceeds of the Capex Loans or the HVAC Equipment Loans, in any fiscal year in an aggregate amount for the Loan Parties on a consolidated basis of more than $2,000,000.

79

7.7     **Distributions.**

(a)     Except for Permitted Dividends and Permitted Tax Distributions, pay dividends (or any distribution on account of any of its Equity Interests) or redeem, purchase, or otherwise acquire directly or indirectly any of its Equity Interests.

(b)     Enter into or issue, as applicable, any subscriptions, options, warrants, calls, rights, or other agreements or commitments of any kind relating to any Equity Interests of any Loan Party.

(c)     Pay any management, advisory, consulting, or other similar fees to any Person, other than any reasonable fees in connection with any accounting, tax, legal or similar consulting or advisory services arising in the ordinary course of business.

7.8     **Indebtedness.**  Create, incur, assume, or allow to exist any Indebtedness except:

(a)     Indebtedness existing on the Closing Date and listed on Schedule 7.8 (including any extensions, renewals, refinancings, or replacements in accordance with clause (g) below).

(b)     Indebtedness to the Agent, the Lenders and the Issuer under or pursuant to the Loan Documents;

(c)     Indebtedness to fund Capital Expenditures allowed by Section 7.6.

(d)     Indebtedness permitted under Sections 7.3 and 7.11.

(e)     Indebtedness under Hedging Agreements required under this Agreement.

(f)     Indebtedness in favor of the Mortgage Lender in connection with the mortgage on the Owned Real Property (but only if the principal amount secured is not increased).

(g)     Indebtedness that represents extensions, renewals, refinancings, or replacements ("Refinance Indebtedness") of any of the Indebtedness described in clauses (a),(c), (d) (as it pertains to Section 7.3) and (e) ("Original Indebtedness") if: (1) the Refinance Indebtedness does not increase the principal amount or interest rate of the Original Indebtedness; (2) any Liens securing that Refinance Indebtedness are not extended to any additional property; (3) no Loan Party or any Subsidiary that was not originally obligated to repay that Original Indebtedness becomes obligated for that Refinance Indebtedness; (4) the Refinance Indebtedness does not shorten the average weighted maturity of the Original Indebtedness; (5) the terms of the Refinance Indebtedness are not less favorable to the obligor than the original terms of the Original Indebtedness; and (6) if the Original Indebtedness was subordinated in right of payment to the Obligations, then the terms and conditions of the Refinance Indebtedness must include subordination terms and conditions that are at least as favorable to the Agent as those that applied to the Original Indebtedness.

7.9     **Business.**  Change in any material respect the nature of the business that it is engaged in on the Closing Date and businesses reasonably related thereto.

7.10    **Affiliate Transactions.**    Directly or indirectly, purchase, acquire, or lease any property from, or sell, transfer, or lease any property to, or otherwise deal with, any Affiliate (except transactions in the ordinary course of business that existed on the Closing Date and are listed on Schedule 7.10, on an arm's length basis, and on terms no less favorable than terms that could be obtained from a Person who is not an Affiliate).

7.11    **Leases.**    Enter as lessee into any lease for real or personal property (unless capitalized and permitted under Section 7.6) if after giving effect to the lease the aggregate annual rental payments for all leased property that are not guaranteed or reimbursed by Customers of the Loan Parties would exceed $5,000,000 in any fiscal year in the aggregate for all Loan Parties.

7.12    **Subsidiaries; Partnerships; and Disqualified Stock.**

(a)    Form any Subsidiary unless (1) that Subsidiary expressly becomes a Loan Party and becomes jointly and severally liable for the Obligations; (2) the Loan Party pledges 100% of the Equity Interests of the Subsidiary to the Agent for the benefit of the Lenders; (3) such Subsidiary is joined as a Borrower hereunder and provides to the Agent a Joinder to this Agreement; (4) the Agent has received all documents (including organizational documents and legal opinions) it may require; and (5) the Subsidiary grants the Agent for the benefit of the Lenders first-priority perfected Liens in its present and future assets. If a Subsidiary becomes a Borrower, none of its assets may be included in the Borrowing Base until the Agent has conducted a field examination and makes that determination in its discretion.

(b)    Enter into any partnership, joint venture, or similar agreement.

(c)    Issue any Disqualified Stock.

7.13    **Fiscal Year and Accounting Changes.**    Change its fiscal year-end from December 31 or make any material change (1) in accounting treatment and reporting practices (except as required by GAAP) or (2) in tax reporting treatment (except as required or permitted by law).

7.14    **Pledging Credit.**    Pledge the Agent's or any Lender's credit on any purchase or for any purpose.

7.15    **Amending Charter Documents.**    Amend, modify, or waive any term or provision of its Charter Documents (except amendments, modifications, and waivers acceptable to the Agent in its discretion as confirmed in writing before the applicable amendment, modification, or waiver).

7.16    **ERISA.**    Become part of a Controlled Group or create, maintain, or become obligated to contribute to any Plan or Multiemployer Plan.

7.17    **Prepaying Indebtedness.**    At any time, directly or indirectly (including by establishing any sinking fund for any Indebtedness) prepay any Indebtedness (other than to the Agent, the Lenders or the Issuer) or repurchase, redeem, retire, or otherwise acquire any Indebtedness.

81

7.18 **Material Business Agreements.** Without the Agent's prior written consent, amend, waive, or modify in any respect the terms of any Material Business Agreement if that change would be detrimental in any material respect to the Agent or any Loan Party.

7.19 **Sanctions.** Directly or indirectly, use the proceeds of any Loan, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity, to fund any activities of or business with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any individual or entity (including any individual or entity participating in the transaction, whether as the Agent, Lender, Issuer or otherwise) of Sanctions.

7.20 **Anti-Corruption Laws.** Directly or indirectly use the proceeds of any Loan for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions.

7.21 **[Reserved].**

7.22 **[Reserved].**

7.23 **Amending Leases.** Materially, or in any way that is adverse to Agent and the Lenders, amend, modify, or waive any term or provision of any lease of real property (except amendments, modifications, and waivers consented to in writing by the Agent in its discretion).

7.24 **Use of Proceeds.** Use, or permit the use of, the proceeds of any Advances or any Loan for any purpose other than those permitted by Section 2.16.

7.25 **Financial Covenants.**

(a) Fixed Charge Coverage Ratio. Not permit the Fixed Charge Coverage Ratio for any Computation Period, commencing with the Computation Period ending December 31, 2024, and for each Computation Period thereafter, to be less than the applicable ratio set forth below for such Computation Period:

| Computation Period Ending | Fixed Charge Coverage Ratio |
| --- | --- |
| December 31, 2024 and each Computation Period thereafter | 1.10 to 1.00 |

**ARTICLE VIII**
**CONDITIONS PRECEDENT**

8.1 **Conditions to Initial Loans.** The Agent's, Lenders' and Issuer's obligation to make Loans and Advances on the Closing Date is subject to its satisfaction of each the following conditions precedent:

82

164393.00001/150632148v.7

(a)    Credit and Security Agreement.  This Agreement shall have been executed by the Loan Parties and the Agent and the Lender hereto.

(b)    Notes.  The Borrowers shall have executed and delivered to the Agent the Notes.

(c)    Perfection Certificate.  A Perfection Certificate completed and executed by each Loan Party.

(d)    Collateral and Security. All Collateral items required to be physically delivered to the Agent under the Loan Documents have been delivered (accompanied by any transfer instruments requested by the Agent) or arrangements satisfactory to the Agent for delivery are in place. All taxes, fees, Expenses, and other charges have been paid in full that relate to (1) the Collateral, (2) incurring the Obligations, and (3) delivering the Loan Documents.

(e)    Searches. The Agent has received accurate and complete copies of all Lien, pending suit, title, background investigation, and other searches required by the Agent.

(f)    Filings; Registrations; and Recordings. Each document required by the Loan Documents, by law (including UCC financing statements and Mortgages), or requested by the Agent to be filed, registered, or recorded to create or perfect in the Agent's favor, for the benefit of Lenders, a Lien on the Collateral has been properly filed, registered, or recorded in each jurisdiction where filing, registration, or recordation is required or requested, and all actions necessary to perfect and protect the Agent's Liens have been taken.

(g)    Organizational Proceedings. The Agent has received a copy of the resolutions of each Loan Party's Board of Directors, Shareholders, managers, or Members authorizing (1) executing, delivering, and performing the Loan Documents and (2) granting the Liens on the Collateral.

(h)    Resolutions; Incumbency Certificates. For each Loan Party, such Person's (a) resolutions of its board of directors (or similar governing body) approving and authorizing such Person's execution, delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby; and (b) signature and incumbency certificates of its officers executing any of the Loan Documents (it being understood that the Agent may conclusively rely on each such certificate until formally advised by a like certificate of any changes to the information set forth therein), all certified by its secretary or an assistant secretary (or similar officer) as being in full force and effect without modification.

(i)    Charter Documents. The Agent has received complete copies of (1) each Loan Party's Charter Documents (certified by the Secretary of State or other appropriate official of that entity's jurisdiction of formation, incorporation, or organization) and (2) each Loan Party's governance documents.

(j)    Good Standing. The Agent has received copies of good standing certificates (or other analogous certificates) for each Loan Party dated not more than 10 days before the Closing Date in each jurisdiction where each Loan Party is required to be in good standing (or other analogous status), unless the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

164393.00001/150632148v.7

(k)  Legal Opinion. The Agent has received an executed legal opinion from the Loan Parties' counsel.

(l)  No Litigation. No litigation, investigation, or proceeding is pending or threatened against any Loan Party (or against its officers, directors, or managers), (1) in connection with the Loan Documents or (2) that could (as determined in the Agent's Discretion) have a Material Adverse Effect. No injunction, writ, or restraining order has been issued by any Governmental Body that is adverse to any Loan Party (or its business) or is inconsistent with the Loan Documents.

(m)  Collateral Examination. The Agent has (1) completed a Collateral examination and received appraisals (both of which must be satisfactory to the Agent in its discretion), including an appraisal of the Borrowers' machinery and Equipment, and (2) reviewed all books and records in connection with the Collateral.

(n)  Fees. The Agent and Lenders have received all fees and Expenses payable to the Agent.

(o)  Financial Statements; Projections. The Agent has received and found satisfactory the financial statements required by Section 5.6(b) and the Projections.

(p)  Insurance. The Agent has received evidence that each Loan Party has the insurance required by the Loan Documents and that the Agent is listed as Agent-loss-payee, additional-insured, and mortgagee (as required by the Agent).

(q)  Collection Accounts. The Agent has received (1) other agreements establishing the Cash Concentration Account and all other required accounts; (2) evidence that Borrowers have directed all Account Debtors to make all payments to the Cash Concentration Account and (3) deposit account control agreements or similar agreements with respect to the Deposit Accounts set forth on Schedule 6.7 executed by the applicable depository bank, the applicable Borrower and the Agent.

(r)  Consents. The Agent has received all Consents and Waivers required by it.

(s)  No Adverse Material Change. Since December 31, 2023, no event, condition, or state of facts has occurred that could reasonably be expected to have a Material Adverse Effect. No representations made or information supplied to the Agent by any Loan Party or its agents or representatives has turned out to be inaccurate or misleading in any respect.

(t)  Contract Review and Capital Structure. The Agent is satisfied with all Material Business Agreements and the Loan Parties' legal and capital structure.

(u)  Existing Indebtedness. The Agent has received (1) a satisfactory payoff letter for any existing Indebtedness to be paid on the Closing Date and (2) evidence that, except for Permitted Liens, there will be no Liens on any Loan Party's assets.

(v)  Interest Rate Protection. If required by the Agent, the Borrowers have entered into Hedging Agreements acceptable to the Agent.

164393.00001/150632148v.7

(w)     Liquidity. After giving effect to the initial Loans and Advances and all other Closing Date transactions, the Borrowers' Liquidity is at least $1,500,000.

(x)     Beneficial Ownership Certificate. The Agent has received an executed Beneficial Ownership Certificate and such other documentation and information requested in connection with applicable "know your customer" and anti-money laundering rules and regulations.

(y)     Letter of Direction.  A letter of direction containing funds flow information with respect to the proceeds of the Loans to be made on the Closing Date.

(z)     Borrowing Base Certificate.  A Borrowing Base Certificate dated as of the Closing Date.

(aa)     Landlord Waivers.  In the case of any leased real property, a collateral access agreement from the landlord of such property waiving any landlord's Lien in respect of personal property kept at the premises subject to such lease and permitting the Agent to access such leased real property.

(bb)     Other. All corporate and other proceedings (and all documents, instruments, and other matters in connection with the transactions contemplated by the Loan Documents) must be satisfactory in form and substance to the Agent and its counsel.

8.2     **Conditions to Each Loan and Advance.**  The Agent's, Lender's and Issuer's obligation to make any Loan or Advance (including Loans and Advances on the Closing Date) is subject to the satisfaction of the following conditions precedent on the date each Advance or Loan is requested and made:

(a)     Notice.  The Agent shall have received, as applicable, a Notice of Borrowing meeting the requirements of Section 2.4 with respect to any Borrowing (conversion to or continuation of Term SOFR Loans).

(b)     Representations and Warranties. Each representation and warranty made by each Loan Party in (or in connection with any Loan Document) is true, correct, and complete with the same effect as though made on and as of the date of the Loan or Advance (it being understood that any representation or warranty that by its terms is made as of a specified date is required to be true and correct only as of that specified date).

(c)     No Default. No Default Condition exists or would exist after giving effect to the requested Advances or Loans (but nonetheless the Agent may in its discretion continue to make Advances or Loans, and if it does so that does not (1) waive any Event of Default or Default, (2) establish a course of dealing, or (3) obligate the Agent to make any other Advances or Loans).

(d)     Maximum Advances. After giving effect to the requested Advance or Loan, (a) the aggregate Revolving Exposure does not exceed the Maximum Borrowing Amount, (b) the aggregate principal amount of all Capex Loans advanced pursuant to this Agreement does not exceed the Capex Commitment, and (c) the aggregate principal amount of all HVAC Equipment Loans advanced pursuant to this Agreement does not exceed the HVAC Equipment Loan Commitment.

164393.00001/150632148v.7

(e)      Additional Conditions to Advances of HVAC Equipment Loans.  Prior to the making of the initial Advances of HVAC Equipment Loans pursuant to this Agreement, Agent shall have received a fully executed copy of the Tenant Guaranty, in form and substance satisfactory to the Agent.

Each Advance or Loan request is a representation and warranty by each Loan Party that each condition precedent to the Advance or Loan has been met on the date the Advance or Loan is requested and received.

## ARTICLE IX
## INFORMATION AS TO THE LOAN PARTIES

Until all Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments and the Loan Documents have been terminated, each Loan Party must:

9.1      **Disclosure.**  Immediately report to the Agent all matters materially affecting the value, enforceability, or collectability of any portion of the Collateral (including any Lien or claim asserted against the Collateral, any loss, damage, or destruction to any material amount of Collateral, any Loan Party's reclamation or repossession of any Collateral, the return to any Loan Party of a material amount of goods, or if any Account Debtor asserts any claims or set-offs against Accounts).

9.2      **Borrowing Base Certificate; Schedules.**  Deliver to the Agent on or before the thirtieth (30th) day of each month for the prior month (1) a detailed accounts receivable aging including all invoices aged by invoice date (reconciled to the general ledger and the Borrowing Base Certificate); (2) a detailed accounts payable aging including all accounts payable aged by invoice date (reconciled to the general ledger); (3) a schedule or perpetual reports detailing the Loan Parties' machinery and Equipment, in form satisfactory to the Agent, by location (and including the amounts of machinery and Equipment and the value thereof that is maintained at any leased locations and premises of third parties), specifying the Hard Costs and the current book and market value thereof, with additional detail showing additions to and deletions therefrom; and (4) a Borrowing Base Certificate (that is calculated prior month and which is not binding on the Agent).  Furthermore, the Loan Party Representative must deliver to the Agent at such intervals as the Agent may require: (i) assignment schedules; (ii) copies of Account Debtor invoices; (iii) evidence of shipment and delivery of goods or services; and (iv) such further schedules, documents, and information as the Agent may require (including trial balances and test verifications). The Agent may confirm and verify Accounts by any manner and through any medium it chooses. All items, reports, and information under this Section must be (x) satisfactory to the Agent in its discretion, (y) executed by the Loan Party Representative, and (z) timely delivered to the Agent.

9.3      **Notice of Suits and Adverse Events.**  Furnish the Agent with immediate notice of (1) any lapse or other termination of any Consent issued to any Loan Party by any Governmental Body or any other Person that is material to any Loan Party's operation of its business; (2) any refusal by any Governmental Body or any other Person to renew or extend any Consent; (3) copies of any periodic or special reports filed by any Loan Party with any Governmental Body or Person

86

(but only if (x) a report indicates any material adverse change in any Loan Party's business, operations, affairs, or condition or (y) if copies are requested by the Agent); and (4) copies of any material notices and other communications from any Governmental Body that specifically relate to any Loan Party or any Collateral.

9.4 **Material Events.** Immediately notify the Agent in writing if any of the following occur: (1) any Default Condition; (2) any default by any party under any Material Business Agreement; (3) any event, development, or circumstance that could reasonably be expected to cause any financial statement, projection (including the Projections), Borrowing Base Certificate, or other information or report furnished to the Agent to be untrue or misleading (including anything that could reasonably be expected to cause any financial statement to not present fairly in any material respect, in accordance with GAAP consistently applied, the Loan Parties' financial condition or operations on a consolidated or consolidating basis); (4) each default by any Loan Party under any Indebtedness; (5) any litigation, suit, or administrative proceeding affecting any Loan Party or the Collateral (whether or not the claim is covered by insurance); and (6) any other development that could reasonably be expected to have a Material Adverse Effect.

9.5 **Annual Financial Statements.** Furnish the Agent within 120 days after the end of each of the Loan Parties' fiscal years, the Loan Parties' audited financial statements on a consolidated and consolidating basis (including statements of income, stockholders' equity, and cash flow from the beginning of the current fiscal year to the end of the current fiscal year) and the balance sheet as at the end of the fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported on without qualification by an independent certified public accounting firm selected by the Loan Parties and satisfactory to the Agent in its sole discretion and setting forth in each case in comparative form the figures from the projected annual operating budget delivered under Section 9.8 for such fiscal year. In addition, these financial statements must be accompanied by a Compliance Certificate.

9.6 **Monthly Financial Statements.** Furnish the Agent within 30 days after the end of each fiscal month, the Loan Parties' unaudited balance sheet on a consolidated and consolidating basis and the Loan Parties' unaudited statements of income, stockholders' equity, and cash flow on a consolidated and consolidating basis reflecting the results of operations from the beginning of the fiscal month to the end of the month (and for the month), prepared on a basis consistent with prior practices and complete and correct in all material respects (subject to normal and recurring year-end adjustments that individually and in the aggregate are not material) and setting forth in each case in comparative form the figures from the projected annual operating budget delivered under Section 9.8 for the current fiscal year. In addition, these financial statements must be accompanied by a Compliance Certificate.

9.7 **Additional Information.**

(a) Together with the annual financial statements to be delivered pursuant to Section 9.5 above and with the monthly financial statements to be delivered pursuant to Section 9.6 following the end of each Fiscal Quarter, deliver to the Agent of all management letters, exception reports or similar letters or reports prepared by any Loan Party or received by any Loan Party from its independent certified public accounting firm.

164393.00001/150632148v.7

(b)      Promptly furnish the Agent with any additional information that the Agent may request in its discretion, as well as (1) copies of all environmental audits and reviews; (2) at least 30 days' prior written notice of any Loan Party opening any new place of business, closing any existing place of business, or changing its legal name, entity type, or jurisdiction of organization, incorporation, or formation; and (3) promptly, and in any event within five (5) Business Days, upon any Loan Party's learning thereof, notice of any material labor dispute, strike, or walkout affecting any Loan Party and 90 days' prior written notice of the expiration of any labor contract binding on any Loan Party.

9.8      **Projected Operating Budget and Availability Forecast.**  Furnish the Agent no later than 30 days after the beginning of each fiscal year of the Loan Parties (beginning with the first fiscal year after the Closing Date), the Loan Parties' month-by-month projected operating budget and cash flows on a consolidated and consolidating basis for the fiscal year (including for each month an income statement, a cash flow statement, and a balance sheet and availability projection). These projections must be accompanied by a certificate signed by the Loan Party Representative's Authorized Officer stating that the projections and forecasts were prepared using sound financial planning practices consistent with past budgets and financial statements and setting forth the assumptions upon which such projections are based, and that the officer has no reasonable basis to question the reasonableness of any assumptions on which the projections and forecasts were prepared.

9.9      **Electronic Reporting.**  Unless otherwise agreed in writing by the Agent, all items and information required to be submitted by the Loan Parties under this Article must be delivered to the Agent by the specific method of Approved Electronic Communication designated by the Agent. All information sent by Approved Electronic Communication is treated as an authenticated record sent by the individual and entity whose electronic mail address is provided on the communication as "sender" or initiating party. In addition to Approved Electronic Communications, the Agent may from time to time require that items and information be provided to the Agent in physical form.

9.10      **Individual Guarantor PFS and Tax Returns.**  Cause the following to be delivered to the Agent with respect to each Guarantor that is an individual:

(a)      Within fifteen days of the Agent's request, a personal financial statement on the Agent's current form and current as of the date delivered, signed and dated by the applicable individual Guarantor, provided that with respect to any individual Guarantor, the Agent will not request more than one personal financial statement in any 12-month period unless a Default Condition exists. If requested by the Agent, any personal financial statement delivered under this Section must be delivered with a verification of liquidity (current brokerage or bank statements) for all cash and marketable securities listed on such personal financial statement.

(b)      Copies of all federal, state and local income tax returns within 120 days of each calendar year end, or, if subject to a properly granted extension (copies of which have been provided to the Agent before the end of the 120 day period), within 5 days of being filed, but in no event later than October 15.

**ARTICLE X**
**EVENTS OF DEFAULT**

Each of the following events is an "Event of Default":

10.1 **Payment.** Any Loan Party does not pay any Obligation when due (whether at maturity, by acceleration, or otherwise).

10.2 **Misrepresentation.** Any representation or warranty made or treated as having been made by any Loan Party in any Loan Document, any related agreement, or in any certificate, document, or financial or other statement furnished to the Agent is misleading in any respect on the date when made or treated as having been made.

10.3 **Not Furnishing Information.** Any Loan Party does not (1) furnish financial information required under the Loan Documents when due; (2) furnish any additional information requested by the Agent within two days of when requested; or (3) permit the Agent or its agents to immediately (and without condition) inspect its books, its records, its premises, or any Collateral.

10.4 **Liens.** Any Lien (other than Permitted Liens), levy, assessment, injunction, or attachment is issued against any of any Loan Party's property other than as permitted hereunder.

10.5 **Covenant Breaches.** Any Loan Party does not perform, keep, or observe any term, provision, condition, or covenant in any Loan Document or in any other agreement with the Agent, any Lender, or the Issuer.

10.6 **Judgments.** Any judgment or judgments are rendered or judgment liens are filed against any Loan Party (or any of its property) for an aggregate amount exceeding $50,000 that, within 15 days, are not to the Agent's satisfaction satisfied, stayed, discharged of record, or bonded.

10.7 **Insolvency.** Any Loan Party: (1) becomes insolvent; (2) is unable, or admits in writing its inability, to pay its debts as they become due; (3) makes a general assignment for the benefit of creditors or to a liquidation agent; (4) files on its behalf or consents to an Insolvency Proceeding; (5) has an Insolvency Proceeding filed or instituted against it that is not dismissed within 30 days after it is filed or instituted; (6) applies to a court for the appointment of a receiver, trustee, or custodian for any of its assets; (7) has a receiver, trustee, or custodian appointed for any of its assets (with or without its consent); or (8) commences a self-liquidation of its assets. If an involuntary proceeding arises under Title 11 of the United States Code, the Lender and Issuer have no obligation to continue any financing from and after the proceeding begins.

10.8 **Material Adverse Effect.** Any change occurs in any Loan Party's condition, affairs (financial or otherwise), or prospects that the Agent determines in its discretion has or could reasonably be expected to have a Material Adverse Effect.

10.9 **Lender's Lien Priority.** For any reason any Lien created under any Loan Document is not a valid, perfected, first-priority Lien (other than purchase-money Liens on Equipment that are expressly allowed under this Agreement to be senior to the Lender's Liens).

89

10.10 **Breaches Under Material Business Agreements.** Any default occurs under any Material Business Agreement that any Loan Party is a party to, that is not cured within any applicable cure period, and that could reasonably be expected to have a Material Adverse Effect.

10.11 **Cross Default.** With respect to any Indebtedness with a balance of $50,000 or more (1) any Loan Party does not pay any principal or interest due after any cure period or (2) a default exists under that Indebtedness that allows the holder of the Indebtedness to accelerate the Indebtedness (whether or not that right has been waived or deferred).

10.12 **Change of Control.** A Change of Control occurs.

10.13 **Invalidity.** Any provision of any Loan Document is not, for any reason, at all times valid and binding on each Loan Party, or any Loan Party claims in writing that any provision of any Loan Document is not, for any reason, valid and binding on any Loan Party.

10.14 **Intellectual Property.** Any Governmental Body: (1) revokes, terminates, suspends, or adversely modifies any of any Loan Party's Intellectual Property which (x) is material to the conduct of its business, (y) constitutes a material portion of the Collateral, or (z) which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; (2) begins proceedings to suspend, revoke, terminate, or adversely modify any of any Loan Party's Intellectual Property necessary or desirable to the conduct of its business as typically conducted and those proceedings are not dismissed or discharged within 30 days; or (3) schedules or conducts a hearing on the renewal of any Intellectual Property material to any Loan Party's business and the Governmental Body issues a report recommending the termination, revocation, suspension, or material, adverse modification of any Intellectual Property.

10.15 **Destruction of Collateral.** Any portion of the Collateral is seized or taken by a Governmental Body, or any Loan Party (or any Loan Party's title or rights) are the subject to litigation that might, as determined by the Agent in its discretion, result in material impairment or loss of the security provided by any Loan Document, or a casualty occurs as to any material asset used in the conduct of any Loan Party's business.

10.16 **Business Interruption.** Any Loan Party's operations are interrupted at any time for more than five consecutive days.

10.17 **Guarantor Repudiation.** (1) Any Guaranty of any of the Obligations is not in full force and effect; (2) any action is taken to discontinue or to assert that any Guaranty of any of the Obligations is not in full force and effect; (3) any Guarantor of any of the Obligations does not comply with any of the terms or provisions of its Guaranty or any other default occurs under any Guaranty; or (4) any Guarantor of any of the Obligations denies or gives the Agent notice that it does not have any further liability under any Guaranty.

10.18 **Indictment; Forfeiture.** The indictment of, or institution of any legal process or proceeding against, any Loan Party, or any of its or their officers or directors, under any applicable law where the relief, penalties, or remedies sought or available are a felony or include the forfeiture of more than $25,000 of property of any Loan Party or the imposition of any stay or other order, the effect of which could be to restrain in any material way the conduct by any Loan Party of its business in the ordinary course.

90

10.19 **Hedging Agreement.** If any event of default, termination event, or other similar event occurs under any Hedging Agreement that a Loan Party is a party to.

10.20 **ERISA.** (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Borrower or an ERISA Affiliate under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) any Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount.

10.21 **Tenant Guaranty Default.** With respect to the Tenant Guaranty: (1) the Tenant Guaranty is not in full force and effect; (2) any action is taken to discontinue or to assert that the Tenant Guaranty is not in full force and effect; (3) any guarantor under the Tenant Guaranty does not comply with any of the terms or provisions of the Tenant Guaranty or any other default occurs under the Tenant Guaranty; or (4) any guarantor under the Tenant Guaranty denies or gives the Agent notice that it does not have any further liability under the Tenant Guaranty.

## ARTICLE XI
## LENDER'S RIGHTS AND REMEDIES AFTER AN EVENT OF DEFAULT

11.1 **Rights and Remedies.** When an Event of Default occurs under Section 10.7, all Obligations are immediately due and payable and the Lender's obligation to make Loans or Advances immediately terminates. When any Event of Default exists, the Agent, Lenders and Issuer have all rights and remedies provided under the Loan Documents, by law, and under all other existing and future agreements between the Agent, Lender, Issuer and any Loan Party. All rights and remedies are cumulative. Without limiting the preceding, when an Event of Default exists, the Agent may, at its election, without notice and without demand, do any one or more of the following (all of which are authorized by the Loan Parties):

(a) Declare all Obligations immediately due and payable.

(b) Declare the Commitments terminated and stop making Loans or Advances.

(c) (i) Terminate any Letter of Credit that may be terminated in accordance with its terms and/or (ii) require the Borrowers to Cash Collateralize all or any portion of the Letter of Credit Exposure in an amount equal to not less than 105% of the amount of the Letter of Credit Exposure.

(d) Terminate the Agent's, Lenders' and Issuer's future obligations to any Loan Party (which does not affect the Agent's or Lenders rights, its Liens on the Collateral, or the Obligations).

(e) Settle or adjust disputes and claims directly with Account Debtors for amounts and on terms that the Agent determines in its discretion (and the Agent will credit the Borrowers' Loan Account with only the net-cash amounts received by the Agent after deducting all Expenses).

164393.00001/150632148v.7

(f)     Direct the Loan Parties to hold and segregate all returned Inventory in trust for the Agent for the benefit of Lenders.

(g)     Make payments and do acts that the Agent considers necessary or appropriate in its discretion to protect and preserve its Lien on the Collateral. If requested by the Agent, the Loan Parties must assemble the Collateral, deliver the Collateral to any location specified by the Agent, or allow the Agent or its agents to pick up the Collateral.

(h)     Without retaining any Collateral in satisfaction of an obligation (within the meaning of Section 9-620 of the UCC), the Agent may hold or set-off and apply to the Obligations any: (1) balances and deposits of any one or more of the Loan Parties held by the Agent (including any amounts received in a blocked account); (2) Indebtedness at any time owing to or for the credit or the account of any Loan Party held by the Agent; and (3) all of each Loan Party's balances and deposits held or controlled by the Agent (including any amounts received in a blocked account).

(i)     Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell the Collateral. The Loan Parties' rights under all licenses and all franchise agreements may be used by the Agent without cost.

(j)     Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including any Loan Party's premises) as the Agent determines is commercially reasonable. It is not necessary that the Collateral be present at any sale. The Agent will give notice of the disposition of the Collateral as required by law. Any deficiency that exists after disposition of the Collateral as provided above must be paid immediately by the Loan Parties. Any excess will be remitted without interest by the Agent to the party or parties legally entitled to the excess.

(k)     Credit bid and purchase at any public sale.

(l)     Agent is entitled to the immediate appointment of a receiver for all or any part of the Collateral (whether the receivership is incidental to a proposed sale of the Collateral under the UCC or otherwise). Each Loan Party consents to the appointment of a receiver without notice or bond, to the fullest extent not prohibited by applicable law, and waives all notices of and defenses to the appointment of a receiver and may not oppose any application the Agent makes for the appointment of a receiver. At the Agent's option the receivership may continue until the Obligations are fully satisfied and performed.

In addition, the Agent has all rights and remedies provided by law and any rights and remedies contained in the Loan Documents. The exercise or non-exercise of any right or remedy does not preclude the exercise of any other right or remedy. All rights and remedies are cumulative.

11.2    **Allocation of Payments After Event of Default.**

Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the Agent or any Lender on account of the Obligations or any other amounts outstanding under any of the Loan Documents or in respect of the Collateral shall be paid over or delivered as follows:

164393.00001/150632148v.7

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of the Agent in connection with enforcing the rights of the Lenders and the Issuer under this Agreement and the Loan Documents and any protective advances made by the Agent with respect to the Collateral under or pursuant to the terms of this Agreement;

SECOND, to payment of any fees owed to the Agent;

THIRD, to the payment of all accrued fees and interest due in respect of each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 16.2(b);

FOURTH, to the payment of the outstanding principal amount of the each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 16.2(b);

FIFTH, to the payment of all of the Obligations consisting of accrued interest on account of the Swing Loans;

SIXTH, to the payment of the outstanding principal amount of the Obligations consisting of Swing Loans;

SEVENTH, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of each of the Lenders and the Issuer in connection with enforcing its rights under this Agreement and the Loan Documents or otherwise with respect to the Obligations owing to such Lender or the Issuer;

EIGHTH, to the payment of all of the Obligations consisting of accrued fees and interest arising under or pursuant to this Agreement or the Loan Documents;

NINTH, to the payment of the outstanding principal amount of the Obligations constituting Advances (including the payment or cash collateralization of the outstanding amount of Letters of Credit), treasury management services and Hedging Contracts;

TENTH, to all other Obligations and other obligations which shall have become due and payable under the Loan Documents or otherwise and not repaid pursuant to clauses "FIRST" through "NINTH" above; and

ELEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (a) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (b) each of the Lenders and the Issuer shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that the then outstanding Advances held by such Lender or the Issuer bears to the aggregate then outstanding Advances) of amounts available to be applied pursuant to clauses "FIFTH" through "SEVENTH" above; and (c) to the extent that any amounts available for distribution pursuant to clause "NINTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by the Agent in a cash collateral account and applied (i) first, to reimburse the Issuer from time to time for any

93

drawings under such Letters of Credit and (ii) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clause "TENTH" above in the manner provided in this Section 11.2.

11.3   **No Waiver.**   No delay on the Agent's part in exercising any right, power, or privilege under this Agreement or any Loan Document is a waiver, nor does any single or partial exercise of any right, power, or privilege under this Agreement or otherwise preclude the exercise of any other right, power, or privilege.

## ARTICLE XII
## WAIVERS AND JUDICIAL PROCEEDINGS

12.1   **Notice Waiver.**   To the fullest extent not prohibited by law, each Loan Party waives all notices and demands that it would otherwise be entitled to receive (including non-payment of any of the Accounts, demand, presentment, protest, notice of acceptance, notice of Loans or Advances made, credit extended, or Collateral received or delivered).

12.2   **Delay.**   Any delay or omission by the Agent, any Lender, or the Issuer in exercising any right, remedy, or option does not waive that right (or any other right, remedy, option, or default).

12.3   **Waiver of Jury Trial.**   **EACH OF THE BORROWERS, THE AGENT AND LENDERS HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, ANY NOTE, ANY OTHER LOAN DOCUMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR THAT MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

## ARTICLE XIII
## EFFECTIVE DATE AND TERMINATION

13.1   **Term.**   This Agreement inures to the benefit of, and is binding on, the respective successors and permitted assigns of each Loan Party, the Agent, each Lender, the Issuer and their respective successors and assigns, is effective on the Closing Date, and continues in full force and effect until the Termination Date unless sooner terminated as provided in this Agreement.

13.2   **Termination.**   The termination of this Agreement does not affect any Loan Party's Obligations arising before the effective termination date, and the Loan Documents remain in full force and effect until all Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments have been terminated. The Liens and rights granted to the Agent for the benefit of the Lenders (including the financing statements) continue in full force and effect notwithstanding the termination of this Agreement or that the Loan Account may from time to time be in a zero or credit position, until all of the Obligations of each Loan Party have been paid or performed in full

94

(other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments have been terminated. Accordingly, each Loan Party waives any rights that it may have under the UCC or other applicable law to require that the Agent file termination statements or mortgage discharges with respect to the Collateral unless and until this Agreement has been terminated in accordance with its terms, and all Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments have been terminated. All indemnification obligations in the Loan Documents survive the termination of the Loan Documents and payment and performance of the Obligations in full and the termination of the Commitments. In addition, certain provisions of the Loan Documents remain in effect even after all Obligations are irrevocably paid and performed in full and the Commitments have been terminated.

## ARTICLE XIV
## LOAN PARTY REPRESENTATIVE

14.1     **Appointment and Relationship.**  The Loan Party Representative is appointed by each Loan Party as its contractual representative under each Loan Document and each Loan Party irrevocably authorizes the Loan Party Representative to act as the contractual representative with the rights and duties set forth in the Loan Documents. The Loan Party Representative agrees to act as such contractual representative. Additionally, each Loan Party appoints the Loan Party Representative as its agent to receive all Loan proceeds in its operating account and to promptly disburse the Loans to the appropriate Borrower (it being understood that Revolving Loans disbursed to any Borrower may not exceed that Borrower's Borrowing Base availability). The Agent, Lenders and their officers, directors, agents, or employees are not liable to the Loan Party Representative or any Loan Party for any action taken or omitted to be taken by the Loan Party Representative or the Loan Parties under this Article.

14.2     **Authority.**  Each Loan Party authorizes the Loan Party Representative on its behalf to execute and deliver to the Agent the Loan Documents and all related agreements, certificates, documents, and instruments as are necessary or appropriate to effect the purposes of the Loan Documents (including Borrowing Base Certificates and Compliance Certificates). Each Loan Party agrees that any action taken by the Loan Party Representative (or the other Borrowers) in accordance with the terms of the Loan Documents, and the Loan Party Representative's exercise of its powers in the Loan Documents (together with such other powers as are reasonably incidental) are binding on all of the Loan Parties.

14.3     **Notices.**  Each Loan Party and the Loan Party Representative must immediately notify the Agent if a Default Condition exists. Any notice of a Default Condition provided by the Agent to the Loan Party Representative is treated as notice to each Loan Party.

14.4     **Joint and Several Obligations.**

(a)     Each Loan Party is jointly and severally liable for all Obligations and this joint and several liability is not affected by any extensions, renewals, waivers, or forbearances granted by the Agent on behalf of the Lenders, the Agent's or any Lender's failure to give any Loan Party notice of any borrowing or any other notice, the Agent's or any Lender's failure to pursue or

95

preserve its rights against any Loan Party or other Person, the Agent's or any Lender's release of any Collateral, or any other defense available to a surety.

(b)     Each covenant, agreement, obligation, representation, and warranty of the Loan Parties contained in the Loan Documents is the joint and several undertaking of each Loan Party. Each Loan Party acknowledges that its obligations might be construed to be, at least in part, a guarantee of the Obligations of the other Loan Parties and, in full recognition of that fact, each Loan Party consents and agrees that the Agent may, at any time and from time to time without notice or demand, whether before or after any actual or purported termination, repudiation, or revocation of this Agreement by any Loan Party, and without affecting the enforceability or continuing effectiveness of the Loan Documents as to any Loan Party or each Loan Party's joint and several liability for the Obligations: (1) supplement, restate, modify, amend, waive, increase, decrease, extend, renew, or otherwise change the Loan Documents (including time for payment (including any increase or decrease of the interest rates or advance rates in the Borrowing Base)); (2) accept partial payments; (3) release, reconvey, terminate, waive, abandon, fail to perfect, subordinate, exchange, substitute, transfer, or enforce any security or guarantees (and apply any security and direct the order or manner of sale as determined by the Agent); (4) release any Person from any liability with respect to any of the Loan Documents; (5) settle, release on terms satisfactory to the Agent or by operation of applicable law or otherwise liquidate or enforce any security or Guaranty in any manner, consent to the transfer of any security, and bid and purchase at any sale; or (6) consent to a merger, change, or any other restructuring or termination of any Loan Party's existence and correspondingly restructure the Obligations.

(c)     Each Loan Party states and acknowledges that: (1) the Loan Parties desire to utilize their borrowing potential on a consolidated basis as if they were merged into a single entity and that the Loan Documents establish credit facilities that would not otherwise be available to the Loan Parties if each Loan Party were not jointly and severally liable for the Obligations; (2) it has determined that it will benefit specifically and materially from the Loans and Advances under this Agreement; (3) it is both a condition precedent to the Agent's obligations and the desire of the Loan Parties that each Loan Party execute and deliver the Loan Documents to the Agent; and (4) the Loan Parties have requested and bargained for the structure and terms of and security for the advances under the Loan Documents. If for any reason any Loan Party's obligations under the Loan Documents (or if any Liens securing the joint and several Obligations), would, but for this Section, be unenforceable under applicable law, then the joint and several liability and each Lien is valid and enforceable to the maximum extent that would not cause the joint and several liability or Liens to be unenforceable under applicable law (and the joint and several liability and each Lien is treated as having been automatically amended accordingly at all relevant times).

(d)     To the extent that any Loan Party, under this Agreement as a joint and several obligor or a Guarantor, repays any Obligations constituting either or both Loans or other Obligations incurred directly and primarily by any other Loan Party (an "Accommodation Payment"), then the Loan Party making an Accommodation Payment is entitled to contribution and indemnification from (and to be reimbursed by) each of the other Loan Parties in an amount, for each of the other Loan Parties, equal to a fraction of the Accommodation Payment, the numerator of which is the other Loan Parties' Allocable Amount (as defined below) and the denominator of which is the sum of the Allocable Amounts of all of the Loan Parties. As of any determination date the "Allocable Amount" of each Loan Party is equal to the maximum liability

96

for Accommodation Payments that could be asserted against that Loan Party without: (1) rendering that Loan Party "insolvent" within the meaning of Section 101(31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"); (2) leaving that Loan Party with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA; or (3) leaving that Loan Party unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA. All rights and claims for contribution, indemnification, and reimbursement under this Section and applicable law are subordinate in right of payment to the prior payment in full of the Obligations and the termination of all Commitments and the Loan Documents.  The provisions of this Section, to the extent expressly inconsistent with other provisions of the Loan Documents, supersede the inconsistent provisions.

14.5    **Cross Guaranty.**

(a)    Notwithstanding that the Loan Parties are jointly and severally liable for all Obligations, if for any reason the Loan Parties are found in a final, non-appealable order not to be jointly and severally liable for all Obligations, then provisions of this Section apply and each Loan Party absolutely and unconditionally guarantees to the Agent, on behalf of the Lenders, and their successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration, or otherwise) and performance of all Obligations. Each Loan Party's Guaranty obligation is in addition to all other Guaranty obligations and is a payment and performance Guaranty (and not a collection Guaranty), and its obligations under this Section are absolute and unconditional, irrespective of, and not affected by:

(i)    The genuineness, validity, regularity, enforceability or any future amendment of, or change in, any other Loan Document or any other agreement, document, or instrument to which the other Loan Parties are or may become a party.

(ii)    Agent not enforcing the Loan Documents (including this Section).

(iii)    The existence, value, or condition of any Collateral, the Agent not perfecting its Lien on any Collateral, the Agent releasing any Collateral, or any Person liable for the Obligations.

(iv)    Any other action or circumstances that could be a legal or equitable defense of a surety or guarantor.

(b)    Agent does not have to proceed against any other Person (including any other Loan Party) or any Collateral before requiring payment by any one or more of the Loan Parties. The Agent may proceed, before, after, or at the same time to enforce its rights under this Section and against any Collateral.

(c)    Each Loan Party waives and agrees that it may not at any time insist on, plead, or claim, or take the benefit or advantage of any laws, claims, or doctrines related to appraisal, valuation, stay, extension, marshaling, redemption, or exemption. Each Loan Party waives with respect to its obligations and with respect to any of the Obligations: (1) all defenses with respect to diligence, presentment, demand, maturity, extension of time, change in nature or form of the

97

Obligations, acceptance, release of security, composition, or agreement arrived at as to the amount of, or the terms of, the Obligations; (2) notice of adverse change in the other Loan Parties' financial condition; and (3) any other fact that might increase the risk to that Loan Party. Each Loan Party also waives the benefit of all provisions of law that are or might be in conflict with the terms of this Section. Each Loan Party represents, warrants, and agrees that its obligations under this Section are not and will not be subject to any set-offs, defenses, or counterclaims. Each Loan Party's obligations under this Section remain in full force and effect until the Obligations have been irrevocably paid and performed in full and all Commitments and the Loan Documents have been terminated (other than contingent obligations with respect to which no claim has been asserted or threatened). Each Loan Party is in the same position as a principal debtor with respect to the Obligations and expressly waives all rights it has and may have to require that the Agent proceed against any other Loan Party or any Collateral before proceeding against, or as a condition to proceeding against, that Loan Party. The parties acknowledge that, but for the provisions of this Section (including the waivers), the Agent would not enter into the Loan Documents.

(d)     Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, until the Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments and the Loan Documents have been terminated, each Loan Party:

(i)     Subordinates and defers all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification, set-off, or any other rights that a surety could have against a principal, a guarantor, a maker, a co-maker, an obligor, an accommodation party, a holder, a transferee, and that a Loan Party may have against any Person (including another Loan Party) in connection with or as a result of a Loan Party performing its obligations under the Loan Documents or any other agreements.

(ii)     Irrevocably subordinates and defers any "claim" (as defined in the Bankruptcy Code) against any Person (including the other Loan Parties and any surety for any of the Obligations), either directly or as an attempted set-off to any action instituted by the Agent against any Person (including the other Loan Parties).

(iii)     Acknowledges and agrees (x) that this subordination and deferral is intended to benefit the Agent and does not limit or otherwise affect that Loan Party's liability or the enforceability of this Section and (y) that the Agent and its respective successors and assigns are intended third-party beneficiaries of the waivers and agreements set forth in this Section.

(e)     If the Agent enforces its rights with respect to any Collateral (either by judicial foreclosure or by non-judicial sale or enforcement), the Agent may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights, remedies, and benefits under this Section. If, in the exercise of any of its rights and remedies, the Agent forfeits any of its rights or remedies, including its right to enter a deficiency judgment against any Loan Party or any other Person, whether because of any applicable laws relating to "election of remedies" or similar laws, the Loan Parties consent to that action by the Agent and waive any claim based on that action, even if the action by the Agent results in a full or partial loss of any subrogation or other rights that a Loan Party might otherwise have had but for the Agent's action.

Any election of remedies that results in the denial or impairment of the Agent's right to seek a deficiency judgment against a Loan Party does not impair the other Loan Parties' obligation to pay the full amount of the Obligations. If the Agent bids at any foreclosure sale, trustee sale, or at any private sale, the Agent may bid all or less than the amount of the Obligations and the amount of the Agent's bid need not be paid by the Agent but will instead be credited against the Obligations. The amount of the successful bid at any such sale, whether by the Agent or any other bidder, is conclusively treated as the fair market value of the Collateral (and the difference between that bid amount and the remaining balance of the Obligations is conclusively treated as the amount of the Obligations guaranteed under this Section, notwithstanding that any law, court decision, or ruling may have the effect of reducing the amount of the deficiency claim but for bidding at any sale).

(f) The Guaranty in this Section is a continuing Guaranty that remains in full force and effect until the Obligations are irrevocably paid and performed in full and all Commitments and the Loan Documents have been terminated.

(g) Each Loan Party's liability under this Section is limited to an amount not to exceed on any determination date the greater of (1) or (2):

(i) The net amount of all Loans to and Letters of Credit issued for the benefit of the other Loan Parties under this Agreement and then re-loaned or otherwise transferred to or directly benefiting the subject Loan Party.

(ii) The Loan Party's Allocable Amount, after taking into account, among other things, that Loan Party's right of contribution and indemnification from the other Loan Parties under Section 14.4.

14.6 **Waivers.** Each Loan Party waives (1) all rights with respect to subrogation, reimbursement, indemnity, exoneration, contribution, or any other claim that has or could have against the other Loan Parties or other Person directly or contingently liable for the Obligations, or against or with respect to the other Person's (including any Loan Party's) property (including, any property that is Collateral for the Obligations), arising in connection with the Loan Documents, until all Commitments and the Loan Documents are terminated and the Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and (2) any defense it may otherwise have to paying and performing the Obligations based on any contention that its liability under the Loan Documents is limited and not joint and several. The preceding waivers and all other waivers in the Loan Documents are a material inducement to the Agent's agreement to enter into the Loan Documents and to make Advances and other Loans.

## ARTICLE XV
## REGARDING THE AGENT

15.1 **Waivers.** Each Lender and the Issuer hereby designates Associated to act as the Agent for each such Lender and the Issuer under this Agreement and the Loan Documents. Each Lender and the Issuer hereby irrevocably authorizes the Agent to take such action on its behalf under the provisions of this Agreement and the Loan Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the

164393.00001/150632148v.7

Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and the Agent shall hold all Collateral, payments of principal and interest, fees, charges and collections (without giving effect to any collection days) received pursuant to this Agreement, for the ratable benefit of the Lenders and the Issuer. The Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including without limitation, collection of the Notes) the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding; provided, however, that the Agent shall not be required to take any action which exposes the Agent to liability or which is contrary to this Agreement or the Loan Documents or applicable law unless the Agent is furnished with an indemnification reasonably satisfactory to the Agent with respect thereto.**Nature of Duties.** The Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Loan Documents. Neither the Agent nor any of its officers, directors, employees or agents shall be (a) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross negligence or willful misconduct, or (b) responsible in any manner for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement, or in any of the Loan Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any of the Loan Documents, as the case may be, or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Loan Documents or for any failure of any Loan Party to perform its obligations hereunder. The Agent shall not be under any obligation to any Lender or the Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Loan Documents, or to inspect the properties, books or records of any Loan Party. The duties of the Agent as respects the Advances to the Loan Party shall be mechanical and administrative in nature; the Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender or the Issuer; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon the Agent any obligations in respect of this Agreement except as expressly set forth herein.

15.3 **Lack of Reliance on the Agent and Resignation.** Independently and without reliance upon the Agent, any other Lender or the Issuer, each Lender and the Issuer has made and shall continue to make (a) its own independent investigation of the financial condition and affairs of each Loan Party in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (b) its own appraisal of the creditworthiness of each Loan Party. The Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender or the Issuer with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by any Loan Party pursuant to the terms hereof. The Agent shall not be responsible to any Lender or the Issuer for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Loan Document, or of the financial condition of any Loan Party, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the

100

Note, the Loan Documents or the financial condition of any Loan Party, or the existence of any Event of Default or any Default.

The Agent may resign on thirty (30) days' written notice to each of the Lenders, the Issuer and the Loan Party Representative and upon such resignation, the Required Lenders will designate prior to the end of such thirty day period a successor the Agent reasonably satisfactory to the Loan Parties (provided that no notice to or approval of the Loan Parties shall be required (i) in any case where the successor Agent is one of the Lenders or (ii) after the occurrence and during the continuance of any Event of Default).

Any such successor of the Agent shall succeed to the rights, powers and duties of the Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former the Agent's rights, powers and duties as the Agent shall be terminated, without any other or further act or deed on the part of such former the Agent. After the Agent's resignation as the Agent, the provisions of this Article 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement.

15.4 **Certain Rights of the Agent.** If the Agent shall request instructions from the Lenders and the Issuer with respect to any act or action (including failure to act) in connection with this Agreement or any Loan Document, the Agent shall be entitled to refrain from such act or taking such action unless and until the Agent shall have received instructions from the Required Lenders; and the Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, the Lenders and the Issuer shall not have any right of action whatsoever against the Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.**Reliance.** The Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Loan Documents and its duties hereunder, upon advice of counsel selected by it. The Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by the Agent with reasonable care.

15.6 **Notice of Default.** The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Loan Documents, unless the Agent has received notice from a Lender, the Issuer or a Loan Party referring to this Agreement or the Loan Documents, describing such Default or Event of Default. In the event that the Agent receives such a notice, the Agent shall give notice thereof to the Lenders and the Issuer. The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided, that, unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders and the Issuer.

15.7 **Indemnification.** To the extent the Agent is not reimbursed and indemnified by the Loan Parties, each Lender will reimburse and indemnify the Agent and the Issuer in proportion to its respective portion of the Loans and other Advances (or, if no Loans or other Advances are

101

outstanding, according to its Commitment Percentage), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Agent or the Issuer in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Loan Document; provided that, the Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or willful misconduct.

15.8    **The Agent in its Individual Capacity.**  With respect to the obligation of the Agent to lend under this Agreement, the Loans and other Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as the Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include the Agent in its individual capacity as a Lender.  The Agent may engage in business with any Loan Party as if it were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to the Lenders.

15.9    **Delivery of Documents.**  To the extent the Agent receives financial statements required under Article 9 of this Agreement, the Agent will promptly furnish such documents and information to the Lenders and the Issuer.

15.10    **Loan Parties' Undertaking to the Agent.**  Without prejudice to their respective obligations to the Lenders and/or the Issuer under the other provisions of this Agreement, each Loan Party hereby undertakes with the Agent to pay to the Agent from time to time on demand all amounts from time to time due and payable by it for the account of the Agent, the Lenders or the Issuer or any of them pursuant to this Agreement to the extent not already paid.  Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Loan Party's obligations to make payments for the account of the Lenders and the Issuer or the relevant one or more of them pursuant to this Agreement.

15.11    **No Reliance on the Agent's Customer Identification Program.**  Each of the Lenders and the Issuer acknowledges and agrees that neither such Lender nor the Issuer, nor any of their Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Issuer's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, this Agreement, the Loan Documents or the transactions hereunder or contemplated hereby: (a) any identity verification procedures, (b) any record keeping, (c) comparisons with government lists, (d) customer notices or (e) other procedures required under the CIP Regulations or such other laws.

15.12    **Erroneous Payments.**

(a)    If the Agent notifies a Lender, Issuer, any secured party, or any other Person who has received funds on behalf of a Lender, Issuer or other secured party (any such Lender, Issuer,

102

secured party, or other recipient, a "Payment Recipient") that the Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Issuer or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Agent, and such Lender, Issuer or other secured party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b) Without limiting immediately preceding clause (a), each Lender, Issuer or other secured party, or any Person who has received funds on behalf of a Lender, Issuer or other secured party, hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates), or (z) that such Lender, Issuer, secured party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii) such Lender, Issuer or secured party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Agent pursuant to this Section 15.12(b).

(c) Each Lender, Issuer or secured party hereby authorizes the Agent to set off, net and apply any and all amounts at any time owing to such Lender, Issuer or secured party under any Loan Document, or otherwise payable or distributable by the Agent to such Lender, Issuer or

103

164393.00001/150632148v.7

secured party from any source, against any amount due to the Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)     The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrowers or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Agent from the Borrowers or any other Loan Party for the purpose of making such Erroneous Payment.

(e)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(f)     Each party's obligations, agreements and waivers under this Section 15.12 shall survive the resignation or replacement of the Agent, the termination of the Aggregate Commitment and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## ARTICLE XVI
## MISCELLANEOUS

16.1     **Governing Law** THIS AGREEMENT AND EACH NOTE SHALL BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

16.2     **Entire Understanding and Amendments.**

(a)     This Agreement and the other Loan Documents (including all recitals) are the entire agreement among the parties related to the subject matter of the Loan Documents. The Loan Documents supersede all prior agreements, commitments (including any commitment letters), and understandings among the parties related to the subject matter of the Loan Documents. Any promises, representations, warranties, or guarantees that may arise in the future among the parties are not effective unless they are in a writing signed by each Loan Party's and the Agent's and Lenders' respective officers. No part of the Loan Documents may be changed, modified, amended, waived, supplemented, discharged, cancelled, or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing signed by the Agent and the Loan Parties. Each Loan Party acknowledges that it has been advised by counsel in connection with the execution of the Loan Documents (or has had the opportunity to be advised) and that it is not relying on any oral representations or statements by the Agent in entering into the Loan Documents.

(b)     The Required Lenders, the Agent with the consent in writing of the Required Lenders, and the Loan Parties may, subject to the provisions of this Section 16.2, from time to time enter into written supplemental agreements to this Agreement or the Loan Documents executed by

the Loan Parties, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of the Lenders, the Issuer, the Agent or the Loan Parties thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, the consent of the Issuer must be obtained with respect to any amendment, waiver or consent with respect to Section 2.9 or any other provisions, the amendment or waivers of which would adversely affect the Issuer and, provided, further, that no such supplemental agreement shall:

(i)     Increase the Commitment of any Lender, without the written consent of the Agent and such Lender;

(ii)     extend the maturity of any Note or the due date for any amount payable hereunder without the written consent of the Agent and each Lender affected thereby;

(iii)     decrease the rate of interest or reduce any fee payable by the Loan Parties to the Lenders and/or the Issuer pursuant to this Agreement without the written consent of the Agent and each Lender and/or Issuer affected thereby;

(iv)     alter the definition of the term Required Lenders without the consent of the Agent and each Lender;

(v)     alter, amend or modify this Section 16.2(b)(v) without the consent of the Agent and each Lender;

(vi)     release all or substantially all of the Collateral without the consent of each Lender;

(vii)     change the rights and duties of the Agent without the consent of each Lender;

(viii)     increase the advance rates in the definition of Borrowing Base above the advance rates in effect on the Closing Date without the consent of each Lender;

(ix)     release any Loan Party from the Obligations under this Agreement, or any Loan Document without the consent of each Lender; or

(x)     alter, amend or modify Section 11.2 hereof without the consent of each Lender.

Any such supplemental agreement shall apply equally to each Lender and the Issuer and shall be binding upon the Loan Parties, the Lenders, the Issuer, the Agent and all future holders of the Obligations.  In the case of any waiver, the Loan Parties, the Agent, the Lenders and the Issuer shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

164393.00001/150632148v.7

Notwithstanding (a) the existence of a Default or an Event of Default, (b) that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or (c) any other provision of this Agreement, the Agent may at its discretion and without the consent of the Lenders, voluntarily permit the outstanding Revolving Loans and the amount of Letters of Credit outstanding at any time to exceed one hundred five percent (105%) of the Borrowing Base for up to ninety (90) consecutive Business Days provided that such outstanding Advances do not exceed the Aggregate Revolving Commitment. For purposes of the preceding sentence, the discretion granted to the Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Borrowing Base was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be either "Eligible Accounts" becomes ineligible or collections of Accounts applied to reduce outstanding Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral. In the event the Agent involuntarily permits the outstanding Advances to exceed the Borrowing Base by more than five percent (5%), the Agent shall use its efforts to have the Loan Parties decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Advances made after the Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence.

(c) If, following the Closing Date, the Agent and the Loan Party Representative shall have agreed in their sole and absolute discretion that there is an ambiguity, inconsistency, manifest error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Agent and the Loan Party Representative shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof (it being understood that the Agent has no obligation to agree to any such amendment).

16.3    **Transfers and Assignments.**

(a) Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Loan Parties may not assign or otherwise transfer any of their rights or Obligations hereunder without the prior written consent of the Agent. No Lender may assign or otherwise transfer any of its rights or obligations hereunder except: (i) to an Eligible Assignee in accordance with the provisions of Section 16.3(b), (ii) by way of participation in accordance with the provisions of Section16.3(d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 16.3(e) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 16.3(d) and, to the extent expressly contemplated hereby, the Affiliates of each of the Agent, the Lenders and the respective directors, officers, employees, agents and advisors of such Affiliates) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Transfer of Commitments. Upon first obtaining the prior written consent of the Loan Party Representative (provided that if an Event of Default has occurred and is continuing,

prior written consent of the Borrowers Representative shall not be required), any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its commitment to make Advances hereunder and the Advances at the time owing to such Lender); provided that (i) except in the case of an assignment of the entire remaining amount of the assigning Lender's commitment to make Advances hereunder and the Advances at the time owing to such Lender or in the case of an assignment to a Lender or an Affiliate of a Lender, the aggregate amount of the commitment to make Advances hereunder (which for this purpose includes Advances outstanding thereunder) or, if the applicable commitment to make Advances hereunder is not then in effect, the principal outstanding balance of the Advances of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than Five Million Dollars ($5,000,000), in the case of any assignment in respect of Advances, unless the Agent otherwise consents; (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Advances or the commitment to make Advances hereunder assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations in Advances on a non-pro rata basis; (iii) any assignment of a commitment to make Advances hereunder must be approved by the Agent unless the Person that is the proposed assignee is itself a Lender with a commitment to make Advances hereunder (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and (iv) the parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of Three Thousand Five Hundred Dollars ($3,500). Subject to acceptance and recording thereof by the Agent pursuant to Section 16.3(d), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 16.5 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 16.3(d).

(c)    Maintenance of Register. The Agent, acting solely for this purpose as an agent of the Loan Parties, shall maintain at its office in Cleveland, Ohio, a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the commitments to make Advances and other Loans hereunder of, and principal amounts of the Advances and other Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Loan

107

Party Representative and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, the Loan Party Representative or the Agent, sell participations to any Person (other than a natural person or any Loan Party or any of the Loan Party's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its commitment to make Advances hereunder and/or the Advances owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations (iii) the Loan Parties, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and (iv) the selling Lender maintains a register that reflects the name and address and principal amounts of the Advances owing to such Participant.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 16.2(b)(i) through 16.2(b)(iv) that affects such Participant.  The Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.10, 3.11, 3.12, and 16.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 16.3(a).

A Participant shall not be entitled to receive any greater payment under Section 16.5 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Loan Parties' prior written consent.

(e)     Pledge of Interests.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)     Notes.  The Loan Parties shall execute and deliver: (i) to the Agent, the transferor and the transferee, any consent or release (of all or a portion of the obligations of the transferor) to be delivered in connection with each Assignment and Assumption, (ii) if a Lender's entire interest in its commitments to make Advances hereunder has been transferred to the transferee, appropriate replacement notes against return of the Notes (each marked "replaced") held by the transferor and (iii) if only a portion of a Lender's interest in its commitments to make Advances and other Loans hereunder has been transferred, replacement notes to each of the transferor and the transferee against return of the Notes of the transferor (each marked "replaced") held by the transferor; provided, that, simultaneously with the Loan Parties' delivery of new Notes pursuant to this Section 16.3(f), the transferor Lender will deliver to the Loan Party Representative any Note being replaced in whole or in part, and each such Note delivered by the transferor Lender shall be conspicuously marked "replaced" when so delivered.

108

(g)     Replacement of Certain Lenders.  If any Lender is a Defaulting Lender hereunder, then the Loan Party Representative may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 16.3(a)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations; provided that: (i) the Loan Party Representative shall have received the prior written consent of the Agent (not to be unreasonably withheld), and (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Advances and other Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Loan Parties (in the case of all other amounts).  No Lender shall be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Loan Party Representative to require such assignment and delegation cease to apply.

(h)     Replacement of Non-Consenting Lenders.  If, in connection with any proposed amendment, waiver or consent hereunder pursuant to Section 16.2(b) hereof: (i) requiring the consent of all Lenders, the consent of Required Lenders is obtained but the consent of all Lenders whose consent is required is not obtained or (ii) requiring the consent of Required Lenders, the consent of Lenders holding fifty-one percent (51%) or more is obtained but the consent of Required Lenders is not obtained (any Lender withholding consent as described in clause (i) and (ii) hereof being referred to as a "Non-Consenting Lender"), then, so long as the Agent is not a Non-Consenting Lender, the Agent may, at the sole expense of the Loan Parties, upon notice to such Non-Consenting Lender and the Loan Party Representative, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 16.3(a)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that such Lender shall have received payment of an amount equal to the outstanding principal of its Advances and other Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Loan Parties (in the case of all other amounts).

16.4     **Payment Application.**  The Agent has the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations in such order as the Agent determines. To the extent that any Loan Party makes a payment or the Agent, the Lenders, or the Issuer receives any payment or proceeds of the Collateral for any Loan Party's benefit that are later invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid to a trustee, debtor-in-possession, receiver, custodian, or any other Person under any bankruptcy law, common law, or equitable principal, then, to that extent, the Obligations or part of the Obligations intended to be satisfied is revived and continue as if the payment or proceeds had not been received by the Agent, the Lenders, or the Issuer.

16.5     **INDEMNIFICATION BY THE BORROWERS.  IN CONSIDERATION OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY THE AGENT AND EACH LENDER AND THE AGREEMENT TO EXTEND THE COMMITMENTS PROVIDED HEREUNDER, EACH BORROWER HEREBY AGREES TO INDEMNIFY, EXONERATE AND HOLD THE AGENT AND EACH LENDER, AND EACH OF THEIR**

109

**OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES AND AGENTS OF THE AGENT AND LENDERS (EACH A "INDEMNIFIED PARTY") FREE AND HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, LOSSES, LIABILITIES, DAMAGES AND EXPENSES, INCLUDING ATTORNEY COSTS (COLLECTIVELY, THE "INDEMNIFIED LIABILITIES"), INCURRED BY THE AGENT OR LENDER PARTIES OR ANY OF THEM AS A RESULT OF, OR ARISING OUT OF, OR RELATING TO (A) ANY TENDER OFFER, MERGER, PURCHASE OF EQUITY INTERESTS, PURCHASE OF ASSETS OR OTHER SIMILAR TRANSACTION FINANCED OR PROPOSED TO BE FINANCED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, WITH THE PROCEEDS OF ANY OF THE LOANS, (B) THE USE, HANDLING, RELEASE, EMISSION, DISCHARGE, TRANSPORTATION, STORAGE, TREATMENT OR DISPOSAL OF ANY HAZARDOUS SUBSTANCE AT ANY PROPERTY OWNED OR LEASED BY ANY LOAN PARTY, (C) ANY VIOLATION OF ANY ENVIRONMENTAL LAW WITH RESPECT TO CONDITIONS AT ANY PROPERTY OWNED OR LEASED BY ANY LOAN PARTY OR THE OPERATIONS CONDUCTED THEREON, (D) THE INVESTIGATION, CLEANUP OR REMEDIATION OF OFFSITE LOCATIONS AT WHICH ANY LOAN PARTY OR THEIR RESPECTIVE PREDECESSORS ARE ALLEGED TO HAVE DIRECTLY OR INDIRECTLY DISPOSED OF HAZARDOUS SUBSTANCES OR (E) THE EXECUTION, DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (INCLUDING, WITHOUT LIMITATION, THE INDEMNITEE'S RELIANCE ON ANY COMMUNICATION EXECUTED USING AN ELECTRONIC SIGNATURE, OR IN THE FORM OF AN ELECTRONIC RECORD) BY ANY OF THE AGENT OR LENDER PARTIES, EXCEPT FOR ANY SUCH INDEMNIFIED LIABILITIES ARISING ON ACCOUNT OF THE APPLICABLE AGENT OR LENDER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, THE BORROWERS HEREBY AGREE TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION OF EACH OF THE INDEMNIFIED LIABILITIES THAT IS PERMISSIBLE UNDER APPLICABLE LAW. ALL OBLIGATIONS PROVIDED FOR IN THIS SECTION 16.5 SHALL SURVIVE REPAYMENT OF THE LOANS, CANCELLATION OF THE NOTES, ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF THE COLLATERAL DOCUMENTS AND TERMINATION OF THIS AGREEMENT.**

16.6    **Non Liability of the Lender.**  The relationship between the Borrowers and each of the Lenders shall be solely that of borrowers and Lender.  Each Lender does not have any fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Loan Parties, and each of the Lenders in connection herewith or therewith is solely that of debtor and creditor. Each of the Lenders do not undertake any responsibility to any Loan Party to review or inform any Loan Party of any matter in connection with any phase of any Loan Party's business or operations. Each Borrower agrees, on behalf of itself and each other Loan Party, that each of the Lenders do not have liability to any Loan Party (whether sounding in tort, contract or otherwise) for losses

110

suffered by any Loan Party in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought. **NO LENDER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF ANY INFORMATION OR OTHER MATERIALS OBTAINED THROUGH INTRALINKS OR OTHER SIMILAR INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT, NOR SHALL ANY LENDER PARTY HAVE ANY LIABILITY WITH RESPECT TO, AND EACH BORROWER ON BEHALF OF ITSELF AND EACH OTHER LOAN PARTY, HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE CLOSING DATE).** Each Borrower acknowledges that it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party. No joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lender and the Loan Parties.

16.7 **FORUM SELECTION AND CONSENT TO JURISDICTION. ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS; PROVIDED THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE AGENT OR LENDERS FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION. EACH BORROWER HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. EACH BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF ILLINOIS. EACH BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.**

16.8 **Notice.** Any notice or request may be given to the Loan Party Representative (individually or on behalf of each Loan Party) or to the Agent at their addresses stated below (or at such other address as may be specified in a notice designated as a notice of change of address under this Section). Any notice, request, demand, direction, or other communication (for purposes of this Section only, a "Notice") to be given to or made on any party under any provision of the Loan Documents must be given or made in writing (which includes by means of electronic

111

transmission (i.e., "email") or facsimile transmission). Any Notice must be delivered to the applicable parties at the addresses and numbers set forth under their respective names in this Section or in accordance with any later unrevoked Notice from any party that is given in accordance with this Section. When any Lender or the Issuer gives a Notice to the Loan Party Representative or any Loan Party, such Lender or the Issuer shall concurrently send a copy thereof to the Agent, and the Agent shall promptly notify the other Lenders and the Issuer. Any notice given to the Loan Party Representative is treated as having been given to each other Loan Party. Any Notice is effective:

(a)     In the case of hand-delivery, when delivered.

(b)     If given by mail, three (3) Business Days after the Notice is deposited into the U.S. mail.

(c)     In the case of a facsimile transmission, when sent to the applicable party's facsimile machine number if the sending party receives a delivery confirmation from its own facsimile machine.

(d)     In the case of other electronic transmission, when actually received.

(e)     If given by other means (including by overnight courier), when actually received.

As of the Closing Date, the applicable parties' addresses and numbers are as follows:

(A)     If to the Agent at:     Associated Bank, National Association
Corporate Banking – Asset Based Lending
525 W. Monroe Street, Suite 2300
Chicago, IL 60661
Attention: Steve McGreevy
Telephone: 312-544-4536
Email:
stephen.mcgreevy@associatedbank.com

With a copy to     Blank Rome LLP
(which is not notice):     444 W. Lake Street, Suite 1650
Chicago, Illinois 60606
Attention: Kenneth Ottaviano
Telephone: 312-776-2511
Email: ken.ottaviano@blankrome.com

(B)     If to Loan Party
Representative at:     JT Logistics Solutions, LLC
3811 Dixon Street
Des Moines, Iowa 50313
Attention: Dave Weber
Telephone: 515-323-7105

112

Email: dave.weber@jtlogistics.com

With a copy to        BrownWinick Law Firm
(which is not notice):  666 Grand Avenue, Suite 2000
Des Moines, Iowa 50309
Attention: Amy Johnson
Telephone: 515-242-2493
Email: amy.johnson@brownwinick.com

16.9     **Survival.**  The Loan Parties' obligations under Sections 2.4(g), 2.11, 2.14, 3.10, 3.11, and 15.5 survive the termination of all Commitments and the Loan Documents and payment in full of the Obligations.

16.10   **Severability.**  If any part of the Loan Documents is found for any reason to be unenforceable, all other parts nevertheless remain enforceable.

16.11   **Injunctive Relief.**  If any Loan Party does not perform, observe, or discharge its obligations or liabilities under the Loan Documents (or threatens to fail or refuse to perform, observe, or discharge its obligations or liabilities) any remedy at law may prove to be inadequate relief to the Agent. Therefore, the Agent is entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

16.12   **Consequential Damages.**  Under no circumstances is the Agent or Lenders, their Affiliates, their agents, or their attorneys liable to any Loan Party for any special, incidental, consequential, or punitive damages (including those arising from any breach of contract, tort, or other wrong relating to the Obligations, the Loan Documents, the Collateral, any Bank Product, or any agreement between the Lenders and any one or more of the Loan Parties).

16.13   **Electronic Execution; Electronic Records; Counterparts.**  This Agreement, any Loan Document and any other Communication, including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures. Each of the Loan Parties and the Agent agrees that any Electronic Signature on or associated with any Communication shall be valid and binding on such Person to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of such Person enforceable against such Person in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered. Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Agent may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and

113

enforceability as a paper record. Notwithstanding anything contained herein to the contrary, the Agent is not under any obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by such Person pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Agent has agreed to accept such Electronic Signature, the Agent shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification and (b) upon the request of the Agent, any Electronic Signature shall be promptly followed by such manually executed counterpart. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

The Agent shall not be responsible for or have any duty to ascertain or inquire into the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with the Agent's reliance on any Electronic Signature transmitted by telecopy, emailed .pdf or any other electronic means). The Agent shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Loan Document by acting upon, any Communication (which writing may be a fax, any electronic message, Internet or intranet website posting or other distribution or signed using an Electronic Signature) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the maker thereof).

Each of the Loan Parties hereby waives (i) any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document based solely on the lack of paper original copies of this Agreement, such other Loan Document, and (ii) waives any claim against the Agent and each Related Party for any liabilities arising solely from the Agent's reliance on or use of Electronic Signatures, including any liabilities arising as a result of the failure of the Loan Parties to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

16.14 **Construction.** Each party and its counsel have reviewed this Agreement. Accordingly, the normal rule of construction that any ambiguities are resolved against the drafting party does not apply in interpreting this Agreement, any other Loan Document, or any amendments, schedules, or exhibits to this Agreement and the other Loan Documents.

16.15 **Confidentiality and Sharing Information.** The Agent agrees to use commercially reasonable efforts (equivalent to the efforts the Agent applies to maintain the confidentiality of its own confidential information) to maintain as confidential all information provided to it by any Loan Party and designated as confidential, except that the Agent may disclose such information: (a) to Persons employed or engaged by the Agent in evaluating, approving, structuring or administering the Loans and the Commitments; (b) to its Affiliates, its auditors and its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (c) to any assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this Section 15.5 (and any such assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as

114

164393.00001/150632148v.7

described in clause (a) above); (d) as required or requested by any federal or state regulatory authority or examiner, or any insurance industry association, or as reasonably believed by the Agent to be compelled by any court decree, subpoena or legal or administrative order or process; (e) as, on the advice of the Agent's counsel, is required by law; (f) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any litigation to which the Agent is a party; (g) to any nationally recognized rating agency that requires access to information about the Agent's investment portfolio in connection with ratings issued with respect to the Agent; (h) to any Affiliate of the Agent who may provide Bank Products to the Loan Parties; or (i) that ceases to be confidential through no fault of the Agent. Notwithstanding the foregoing, each Borrower consents to the publication by the Agent of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement, and the Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements. In addition, the Agent may disclose the existence of this Agreement and information about this Agreement to other market data collectors, similar service providers to the lending industry and service providers to the Agent in connection with the administration of this Agreement, the other Loan Documents, and the Commitments. Notwithstanding anything in this Agreement or any other Loan Document to the contrary, any information with respect to the "tax treatment" or "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby shall not be confidential, and the Agent and other parties hereto may disclose without limitation of any kind any information that is provided to the Agent with respect to the "tax treatment" or "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4); provided that to the extent any Loan Document contains information that relates to the "tax treatment" or "tax structure" and contains other information, this paragraph shall only apply to the information regarding the "tax treatment" or "tax structure."

16.16 **Costs, Expenses and Taxes.** Each Borrower agrees to pay on demand all Expenses of the Agent (including Attorney Costs and any Taxes) in connection with the preparation, execution, syndication, delivery and administration (including perfection and protection of any collateral and the costs of Intralinks (or other similar service), if applicable) of this Agreement, the other Loan Documents and all other documents provided for herein or delivered or to be delivered hereunder or in connection herewith (including any amendment, supplement or waiver to any Loan Document), whether or not the transactions contemplated hereby or thereby shall be consummated, and all reasonable out-of-pocket costs and expenses (including Attorney Costs and any Taxes) incurred by the Agent and Lenders after an Event of Default, in connection with the collection of the Obligations or the enforcement of this Agreement, the other Loan Documents or any such other documents or during any workout, restructuring or negotiations in respect thereof. In addition, each Borrower agrees to pay, and to save the Agent and Lenders harmless from all liability for, any fees of such Borrower's auditors in connection with any reasonable exercise by the Agent and Lenders of their rights pursuant to Section 4.10. All Obligations provided for in this Section 16.16 shall survive repayment of the Loans, cancellation of the Notes and termination of this Agreement.

16.17 **Conflict.** If there is any conflict, inconsistency, or discrepancy between the provisions of this Agreement and the provisions of the other Loan Documents, the provisions giving the Agent greater rights or remedies (as determined by the Agent) govern to the maximum extent not prohibited by applicable law (it being understood that the purpose of this Agreement and any Loan Document is to add to, and not to limit, detract, or derogate from, diminish, or

115

otherwise impair or reduce the rights granted to the Agent in this Agreement or the Loan Documents). For greater certainty, where the provisions of this Agreement and the provisions of the other Loan Documents deal with the same subject matter but are not identical, no conflict between the documents will exist or be deemed to exist unless observing or complying with the provisions of one document will cause a default under the provisions of the other document.

16.18 **No Waiver; Cumulative Rights, Enforcement.** No failure by the Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

16.19 **Keepwell.** Each Borrower at the time a guaranty or a grant of the security interest under the Loan Documents by any Specified Loan Party, becomes effective with respect to any Hedging Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Hedging Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under its guaranty and the other Loan Documents in respect of such Hedging Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Borrower's obligations and undertakings under this Section or any guaranty voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Borrower under this Section shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full. Each Borrower intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

16.20 **Acknowledgement and Consent to Bail-In of EEA Financial Institutions.** Solely to the extent the Lender is an EEA Financial Institution and notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of the Lender arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by the Agent for the benefit of a Lender that is an EEA Financial Institution; and

(b) the effects of any Bail-In Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

116

(ii)　　a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)　　the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[Remainder of Page Intentionally Left Blank – Signature Pages Follow]

117

The Loan Parties, the Agent, and the Lenders entered into this Agreement on the Closing Date.

**HOLDINGS:**

**JT LOGISTICS HOLDING COMPANY, LLC**

_____
James R. Cord, Manager

**BORROWERS:**

**JT LOGISTICS SOLUTIONS, LLC**

_____
James R. Cord, Manager

**JT TRANSPORTATION, LLC,**

_____
James R. Cord, Manager

**JT FREIGHT, LLC**

_____
James R. Cord, Manager

Signature Page to Credit and Security Agreement

**LIVIT STAFFING, LLC**

_____
James R. Cord, Manager

**JT REAL ESTATE HOLDINGS, LLC**

_____
James R. Cord, Manager

**JT PROPERTY SOLUTIONS, LLC**

_____
James R. Cord, Manager

**JT TRANSPORTATION LEASING
SOLUTIONS, LLC**

_____
James R. Cord, Manager

**WAREHOUSE BUILDOUT SYSTEMS &
SOLUTIONS, LLC**

_____
James R. Cord, Manager

Signature Page to Credit and Security Agreement

**JT ECOMMERCE SOLUTIONS, LLC**

James R. Cord, Manager

**JT PACKAGING SOLUTIONS, LLC**

James R. Cord, Manager

**JT BINDING SOLUTIONS, LLC**

James R. Cord, Manager

**JT INDUSTRIAL SERVICES, LLC**

James R. Cord, Manager

**JT EXPEDITED SOLUTIONS, LLC**

James R. Cord, Manager

Signature Page to Credit and Security Agreement

**700 BLAKELY, LLC**

James R. Cord, Manager

Signature Page to Credit and Security Agreement

AGENT:

ASSOCIATED BANK, NATIONAL ASSOCIATION

By: _____
Name: Stephen McGreevy
Title: Senior Vice President

Signature Page to Credit and Security Agreement

**LENDERS:**

**ASSOCIATED BANK, NATIONAL ASSOCIATION**

By: _____

Name: Stephen McGreevy

Title: Senior Vice President

Signature Page to Credit and Security Agreement

## EXHIBIT 5.6

## PROJECTIONS

See attached.

32875152.1
164393.00001/150632148v.7



# JT Logistics
### All Entity Forecast
January - December 2025

| | Jan 2025 | Feb 2025 | Mar 2025 | Apr 2025 | May 2025 | Jun 2025 | Jul 2025 | Aug 2025 | Sep 2025 | Oct 2025 | Nov 2025 | Dec 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3M Company | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $4,800.00 |
| Ajinomoto Health & Nutrition North America, Inc. | | | | | | | | | | | | | $0.00 |
| Ajinomoto - Feed | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $180,000.00 |
| Ajinomoto - Food | $90,000.00 | $90,000.00 | $90,000.00 | $90,000.00 | $90,000.00 | $90,000.00 | $90,000.00 | $90,000.00 | $90,000.00 | $90,000.00 | $90,000.00 | $90,000.00 | $1,080,000.00 |
| Ajinomoto - Packaging and Raw Materials | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $26,400.00 |
| American Pop Corn Company | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $30,000.00 |
| Apex Protein Snacks LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARCHER-DANIELS-MIDLAND COMPANY | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARCHER-DANIELS-MIDLAND COMPANY dba ADM Nutrition | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $3,300.00 |
| ARCHER-DANIELS-MIDLAND COMPANY dba ADM Carb Solutions | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARCHER-DANIELS-MIDLAND COMPANY dba ADM CS43 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $3,600.00 |
| ARCHER-DANIELS-MIDLAND COMPANY dba ADM Kansas Protein | $125.00 | $125.00 | $125.00 | $125.00 | $125.00 | $125.00 | $125.00 | $125.00 | $125.00 | $125.00 | $125.00 | $125.00 | $1,500.00 |
| ARCHER-DANIELS-MIDLAND COMPANY dba ADM Wild Flavors | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| ARCHER-DANIELS-MIDLAND COMPANY dba ADM Fibersol | $300,000.00 | $300,000.00 | $300,000.00 | $300,000.00 | $300,000.00 | $300,000.00 | $300,000.00 | $300,000.00 | $300,000.00 | $300,000.00 | $300,000.00 | $300,000.00 | $3,600,000.00 |
| B&G Foods - Kitting | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $330,000.00 |
| B&G Foods - Storage | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $300,000.00 |
| ARCHER-DANIELS-MIDLAND COMPANY dba ADM Location 24X | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Ascendance Trucks Midwest, LLC | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $60,000.00 |
| BAKER ELECTRIC, INC | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $810,000.00 |
| Bayer US Crop Science | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Bayer 2402 | $175,000.00 | $175,000.00 | $175,000.00 | $175,000.00 | $175,000.00 | $175,000.00 | $175,000.00 | $175,000.00 | $175,000.00 | $175,000.00 | $175,000.00 | $175,000.00 | $2,100,000.00 |
| Bayer 700 | $215,000.00 | $215,000.00 | $215,000.00 | $215,000.00 | $215,000.00 | $215,000.00 | $215,000.00 | $215,000.00 | $215,000.00 | $215,000.00 | $215,000.00 | $215,000.00 | $2,580,000.00 |
| Belvoir Media Group | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Bionyx Biosciences Inc. | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $9,000.00 |
| Bowmar Nutrition LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Brenthaven - Pioneer Square Brands Inc | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $72,000.00 |
| Bright Power Inc. dba BPI | $210.00 | $210.00 | $210.00 | $210.00 | $210.00 | $210.00 | $210.00 | $210.00 | $210.00 | $210.00 | $210.00 | $210.00 | $2,520.00 |
| Buc-ee's Ltd. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Central Graphics and Container Group Ltd | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Chicago Tube & Iron | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Crafthouse Cocktails | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Cocoax Inc | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $1,100.00 | $13,200.00 |
| Continental Superior Tri-City LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| CPK Media LLC | $215,000.00 | $200,000.00 | $175,000.00 | $155,000.00 | $160,000.00 | $165,000.00 | $175,000.00 | $195,000.00 | $205,000.00 | $225,000.00 | $215,000.00 | $205,000.00 | $2,290,000.00 |
| Crown Packaging Corp. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Cummins Sales & Service | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $18,000.00 |
| Danfoss Power Solutions (US) Company | $275,000.00 | $275,000.00 | $275,000.00 | $275,000.00 | $275,000.00 | $275,000.00 | $275,000.00 | $275,000.00 | $275,000.00 | $275,000.00 | $275,000.00 | $275,000.00 | $3,300,000.00 |
| Danfoss Power Solutions (US) Company - Easley | $11,000.00 | $11,000.00 | $11,000.00 | $11,000.00 | $11,000.00 | $11,000.00 | $11,000.00 | $11,000.00 | $11,000.00 | $11,000.00 | $11,000.00 | $11,000.00 | $132,000.00 |
| Danfoss Power Solutions (US) Company - Hopkinsville | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Danfoss Power Solutions (US) Company c/o Williams & Associates, Inc. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Data Business Equipment, Inc. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| DEERE & COMPANY | | | | | | | | | | | | | $0.00 |
| DEERE 3811 | $370,000.00 | $370,000.00 | $370,000.00 | $370,000.00 | $370,000.00 | $370,000.00 | $370,000.00 | $370,000.00 | $370,000.00 | $370,000.00 | $370,000.00 | $370,000.00 | $4,440,000.00 |
| DEERE 700 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| DEERE 2561 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| DEERE Building A | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| DSM Nutritional Products, LLC | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $25,000.00 | $300,000.00 |
| Electrical Power Products EP2 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $11,250.00 | $135,000.00 |
| Enka de Colombia S.A. | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $9,000.00 |
| Excell Marketing, L.C. | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $180,000.00 |
| Pop Capacity, Inc. / Facebook | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $30,000.00 |
| Fixx, Inc. | | | | | | | | | | | | | $0.00 |
| Fixx - Aristocrat (5135) | $153,000.00 | $153,000.00 | $153,000.00 | $153,000.00 | $153,000.00 | $153,000.00 | $153,000.00 | $153,000.00 | $153,000.00 | $153,000.00 | $153,000.00 | $153,000.00 | $1,836,000.00 |
| Fixx - Aterian (3440) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Fixx - Burrow (1500) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Fixx - Daiso (1600) | $725,000.00 | $725,000.00 | $725,000.00 | $725,000.00 | $725,000.00 | $725,000.00 | $725,000.00 | $725,000.00 | $725,000.00 | $725,000.00 | $725,000.00 | $725,000.00 | $8,700,000.00 |
| Fixx - Daiso (600) | $1,300,000.00 | $1,300,000.00 | $1,300,000.00 | $1,300,000.00 | $1,300,000.00 | $1,300,000.00 | $1,300,000.00 | $1,300,000.00 | $1,300,000.00 | $1,300,000.00 | $1,300,000.00 | $1,300,000.00 | $15,600,000.00 |
| DAISO USA | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Fixx - Lowes (1500) | $555,000.00 | $555,000.00 | $555,000.00 | $555,000.00 | $555,000.00 | $555,000.00 | $555,000.00 | $555,000.00 | $555,000.00 | $555,000.00 | $555,000.00 | $555,000.00 | $6,660,000.00 |
| Fixx - Overstock Dallas | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Fixx - Petsmart | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Franklin Covey Company | $100,000.00 | $115,000.00 | $135,000.00 | $155,000.00 | $205,000.00 | $255,000.00 | $285,000.00 | $235,000.00 | $205,000.00 | $180,000.00 | $155,000.00 | $130,000.00 | $2,155,000.00 |
| GB Publishing Org | $345.00 | $345.00 | $345.00 | $345.00 | $345.00 | $345.00 | $345.00 | $345.00 | $345.00 | $345.00 | $345.00 | $345.00 | $4,140.00 |
| Great Northern Corp | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $95,000.00 | $1,140,000.00 |
| Heska Corporation | $5,250.00 | $5,250.00 | $5,250.00 | $5,250.00 | $5,250.00 | $5,250.00 | $5,250.00 | $5,250.00 | $5,250.00 | $5,250.00 | $5,250.00 | $5,250.00 | $63,000.00 |
| HY-VEE, INC. | | | | | | | | | | | | | $0.00 |
| Hy-Vee 1010 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| HY-VEE 2900 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| ImmunoGenomics LLC | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $12,000.00 |
| Kemin Foods, L.C. dba Kemin Health | $3,250.00 | $3,250.00 | $3,250.00 | $3,250.00 | $3,250.00 | $3,250.00 | $3,250.00 | $3,250.00 | $3,250.00 | $3,250.00 | $3,250.00 | $3,250.00 | $39,000.00 |
| Kemin Industries, Inc. | $325,000.00 | $325,000.00 | $325,000.00 | $325,000.00 | $325,000.00 | $325,000.00 | $325,000.00 | $325,000.00 | $325,000.00 | $0.00 | $0.00 | $0.00 | $2,600,000.00 |
| Killer Gear LLC | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $12,000.00 |
| La Quercia, L.L.C. | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $6,000.00 |
| Langer Juice Company, Inc. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| LOLA'S FINE SAUCES, INC. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Master of None, LLC DBA Barn Town | $2,550.00 | $2,550.00 | $2,550.00 | $2,550.00 | $2,550.00 | $2,550.00 | $2,550.00 | $2,550.00 | $2,550.00 | $2,550.00 | $2,550.00 | $2,550.00 | $30,600.00 |
| Marks Engineering Works | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Material Solutions Consulting, LLC | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $12,000.00 |
| MDK, Inc. | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $18,000.00 |
| Meredith Operations Corporation | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Meta Platforms, Inc. | | | | | | | | | | | | | $0.00 |
| Meta Platforms, Inc 2550 Altoona | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Meta Platforms, Inc 44211 Sterling | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| NorthPoint Forwarding, LLC dba NorthPoint Logistics | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Orora Visual LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Ozonics Hunting LLC | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $15,000.00 | $20,000.00 | $30,000.00 | $50,000.00 | $70,000.00 | $80,000.00 | $90,000.00 | $405,000.00 |
| PAC WORLDWIDE CORPORATION | $8,500.00 | $8,500.00 | $8,500.00 | $8,500.00 | $8,500.00 | $8,500.00 | $8,500.00 | $8,500.00 | $8,500.00 | $8,500.00 | $8,500.00 | $8,500.00 | $102,000.00 |
| Pioneer Hi-Bred International, Inc (Corteva Agriscience) | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $12,000.00 | $18,000.00 | $20,000.00 | $20,000.00 | $20,000.00 | $20,000.00 | $170,000.00 |
| Pioneer Hi-Bred International, Inc. | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $60,000.00 |
| Public Goods | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Purfoods, LLC | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $18,000.00 |
| Puris Proteins, LLC dba Puris | $47,500.00 | $47,500.00 | $47,500.00 | $47,500.00 | $47,500.00 | $47,500.00 | $47,500.00 | $47,500.00 | $47,500.00 | $47,500.00 | $47,500.00 | $47,500.00 | $570,000.00 |
| Seadon Limited | $4,000.00 | $4,000.00 | $4,000.00 | $4,000.00 | $4,000.00 | $4,000.00 | $4,000.00 | $4,000.00 | $4,000.00 | $4,000.00 | $4,000.00 | $4,000.00 | $48,000.00 |
| Sleep Number | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| SPAL-USA, INC. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Spirit Halloween | $6,600.00 | $6,600.00 | $6,600.00 | $6,600.00 | $30,000.00 | $40,000.00 | $50,000.00 | $60,000.00 | $60,000.00 | $30,000.00 | $10,000.00 | $0.00 | $307,200.00 |
| Spout Car Wash | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| STARBAR, INC. dba EV SUPPLIERS | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $9,000.00 |
| Tension Envelope Corporation | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $144,000.00 |
| Texas Petroleum Group, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| The Waldinger Corporation | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $67,500.00 | $810,000.00 |
| Thryv Inc | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Tumblin Marketing Co. | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $275.00 | $3,300.00 |
| Wasted Collective | $1,650.00 | $1,650.00 | $1,650.00 | $1,650.00 | $1,650.00 | $1,650.00 | $1,650.00 | $1,650.00 | $1,650.00 | $1,650.00 | $1,650.00 | $1,650.00 | $19,800.00 |
| Weaver Fundraising, LLC | | | | | | | | | | | | | $0.00 |
| Weaver Fundraising, LLC - 1500 | $0.00 | $0.00 | $0.00 | $0.00 | $1,000.00 | $5,000.00 | $11,000.00 | $20,000.00 | $20,000.00 | $10,000.00 | $2,000.00 | $0.00 | $69,000.00 |
| Weaver Fundraising, LLC - 3440 | $0.00 | $0.00 | $0.00 | $0.00 | $1,000.00 | $2,500.00 | $6,500.00 | $10,000.00 | $10,000.00 | $5,000.00 | $1,000.00 | $0.00 | $35,000.00 |
| WESTROCK CP, LLC | $92,000.00 | $92,000.00 | $92,000.00 | $92,000.00 | $92,000.00 | $92,000.00 | $92,000.00 | $92,000.00 | $92,000.00 | $92,000.00 | $92,000.00 | $92,000.00 | $1,104,000.00 |
| Whimsy Distributing LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Assemblies Unlimited | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| International Paper | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Great Northern Company | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Tactacam | $0.00 | $0.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $125,000.00 | $1,250,000.00 |
| Lowes Expansion | $83,350.00 | $83,350.00 | $83,350.00 | $83,350.00 | $83,350.00 | $83,350.00 | $83,350.00 | $83,350.00 | $83,350.00 | $83,350.00 | $83,350.00 | $83,350.00 | $1,000,200.00 |
| Sleep Number | $0.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $459,250.00 |
| TAG Iowa | $250,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | $3,000,000.00 |
| Ag Reliant | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $501,000.00 |
| ADM / NEW | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $360,000.00 |
| Corteva | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $41,750.00 | $501,000.00 |
| American Packaging Co | $167,000.00 | $167,000.00 | $167,000.00 | $167,000.00 | $167,000.00 | $167,000.00 | $167,000.00 | $167,000.00 | $167,000.00 | $167,000.00 | $167,000.00 | $167,000.00 | $2,004,000.00 |
| ITW Corp | $0.00 | $541,750.00 | $541,750.00 | $541,750.00 | $541,750.00 | $541,750.00 | $541,750.00 | $541,750.00 | $541,750.00 | $541,750.00 | $541,750.00 | $541,750.00 | $5,959,250.00 |
| Unknown Pursuits | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $120,000.00 |
| Warehouse Quote Lonza Greenwood, LLC | $205,000.00 | $205,000.00 | $205,000.00 | $205,000.00 | $205,000.00 | $205,000.00 | $205,000.00 | $205,000.00 | $205,000.00 | $205,000.00 | $205,000.00 | $205,000.00 | $2,460,000.00 |
| Other Income | | | | | | | | | | | | | $0.00 |

| Income by Entity | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JT Logistics | $6,226,580.00 | $6,810,080.00 | $6,930,080.00 | $6,930,080.00 | $7,010,280.00 | $7,085,780.00 | $7,151,780.00 | $7,161,280.00 | $6,838,280.00 | $6,808,280.00 | $6,751,280.00 | $6,713,280.00 | $82,417,060.00 |
| JT Transportation | $335,000.00 | $370,000.00 | $375,000.00 | $365,000.00 | $335,000.00 | $310,000.00 | $305,000.00 | $300,000.00 | $375,000.00 | $350,000.00 | $325,000.00 | $335,000.00 | $4,040,000.00 |
| JT Staffing | $735,000.00 | $725,000.00 | $740,000.00 | $575,000.00 | $650,000.00 | $635,000.00 | $615,000.00 | $600,000.00 | $575,000.00 | $700,000.00 | $735,000.00 | $725,000.00 | $8,195,000.00 |
| JT Freight | $600,000.00 | $605,000.00 | $610,000.00 | $605,000.00 | $625,000.00 | $675,000.00 | $750,000.00 | $720,000.00 | $680,000.00 | $650,000.00 | $620,000.00 | $605,000.00 | $7,750,000.00 |
| JT Real Estate | $117,000.00 | $117,000.00 | $117,000.00 | $117,000.00 | $117,000.00 | $117,000.00 | $117,000.00 | $117,000.00 | $117,000.00 | $117,000.00 | $117,000.00 | $117,000.00 | $1,404,000.00 |
| WareBorn | $15,000.00 | $25,000.00 | $75,000.00 | $75,000.00 | $50,000.00 | $25,000.00 | $25,000.00 | $125,000.00 | $150,000.00 | $25,000.00 | $25,000.00 | $15,000.00 | $645,000.00 |
| Verde View | $30,000.00 | $25,000.00 | $25,000.00 | $30,000.00 | $40,000.00 | $45,000.00 | $55,000.00 | $50,000.00 | $40,000.00 | $30,000.00 | $20,000.00 | $35,000.00 | $425,000.00 |
| JT Industrial | $90,000.00 | $85,000.00 | $85,000.00 | $90,000.00 | $125,000.00 | $115,000.00 | $95,000.00 | $85,000.00 | $85,000.00 | $90,000.00 | $80,000.00 | $80,000.00 | $1,110,000.00 |
| Total Income | $8,148,580.00 | $8,762,080.00 | $8,957,080.00 | $8,887,080.00 | $8,952,280.00 | $9,007,780.00 | $9,213,780.00 | $9,188,280.00 | $8,870,280.00 | $8,770,280.00 | $8,643,280.00 | $8,605,280.00 | $105,986,060.00 |

| Expenses by Entity | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JT Logistics | $6,495,000.00 | $6,615,000.00 | $6,635,000.00 | $6,625,000.00 | $6,645,000.00 | $6,695,000.00 | $6,785,000.00 | $6,765,000.00 | $6,735,000.00 | $6,705,000.00 | $6,675,000.00 | $6,715,000.00 | $80,090,000.00 |
| JT Transportation | $355,000.00 | $595,000.00 | $400,000.00 | $385,000.00 | $325,000.00 | $325,000.00 | $330,000.00 | $335,000.00 | $400,000.00 | $395,000.00 | $340,000.00 | $325,000.00 | $4,250,000.00 |
| JT Staffing | $705,000.00 | $695,000.00 | $710,000.00 | $550,000.00 | $625,000.00 | $610,000.00 | $590,000.00 | $575,000.00 | $645,000.00 | $675,000.00 | $685,000.00 | $690,000.00 | $7,855,000.00 |
| JT Freight | $605,000.00 | $610,000.00 | $615,000.00 | $615,000.00 | $620,000.00 | $640,000.00 | $725,000.00 | $710,000.00 | $650,000.00 | $600,000.00 | $610,000.00 | $610,000.00 | $7,240,000.00 |
| JT Real Estate | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $105,000.00 | $1,260,000.00 |
| WareBorn | $12,000.00 | $20,000.00 | $60,000.00 | $60,000.00 | $40,000.00 | $17,000.00 | $20,000.00 | $90,000.00 | $120,000.00 | $19,000.00 | $12,000.00 | $13,000.00 | $494,000.00 |
| Verde View | $18,000.00 | $15,000.00 | $15,000.00 | $17,000.00 | $23,000.00 | $25,000.00 | $31,000.00 | $32,000.00 | $23,000.00 | $19,000.00 | $12,000.00 | $20,000.00 | $250,000.00 |
| JT Industrial | $81,613.22 | $77,079.15 | $77,079.15 | $81,613.22 | $113,351.69 | $104,283.56 | $86,147.29 | $77,079.15 | $86,147.29 | $77,079.15 | $72,545.08 | $72,545.08 | $1,006,563.02 |
| Total Expense | $8,376,613.22 | $8,532,079.15 | $8,617,079.15 | $8,538,613.22 | $8,496,351.69 | $8,521,283.56 | $8,734,147.29 | $8,694,079.15 | $8,670,147.29 | $8,593,079.15 | $8,521,545.08 | $8,550,545.08 | $102,845,563.02 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecasted Revenue | $8,148,580.00 | $8,762,080.00 | $8,957,080.00 | $8,887,080.00 | $8,932,280.00 | $9,007,780.00 | $9,213,780.00 | $9,188,280.00 | $8,870,280.00 | $8,770,280.00 | $8,643,280.00 | $8,605,280.00 | $105,986,060.00 |
| Forecasted Expenses | $8,376,613.22 | $8,532,079.15 | $8,617,079.15 | $8,538,613.22 | $8,496,351.69 | $8,521,283.56 | $8,734,147.29 | $8,694,079.15 | $8,670,147.29 | $8,593,079.15 | $8,521,545.08 | $8,550,545.08 | $102,845,563.02 |
| | | | | | | | | | | | | | |
| Forecasted Net Income | -$228,033.22 | $230,000.85 | $340,000.85 | $348,466.78 | $435,928.31 | $486,496.44 | $479,632.71 | $494,200.85 | $200,132.71 | $177,200.85 | $121,734.92 | $54,734.92 | $3,140,496.98 |

A-1

## EXHIBIT A

## FORM OF BORROWING BASE CERTIFICATE

Attached.

A-1

**EXHIBIT B**
**COMPLIANCE CERTIFICATE**

This Compliance Certificate (this "Certificate") is given by JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company (the "Loan Party Representative"), as required by the Credit and Security Agreement among the Loan Party Representative, the other Loan Parties, Associated Bank, National Association, as agent, and the other Lenders, dated December 27, 2024 (as amended, restated, supplemented, or modified from time to time, the "Credit Agreement"). Capitalized terms used but not defined in this Certificate have the meanings given to them in the Credit Agreement. The undersigned, an Authorized Officer of the Loan Party Representative, certifies that:

They are familiar with the Loan Documents, have made, or caused to have been made under their supervision, a detailed review of the transactions and condition of the Loan Parties during the accounting period covered by the attached financial statements.

[Attached are the Loan Parties' [audited/reviewed] financial statements on a consolidated and consolidating basis (including statements of income, stockholders' equity, and cash flow).] [Attached are the Loan Parties' unaudited financial statements on a consolidated and consolidating basis (including statements of income, and stockholders' equity, and cash flow).]

[The Loan Parties' [reviewed/audited] financial statements have been prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail.][The Loan Parties' unaudited financial statements have been prepared on a basis consistent with prior practices and are complete and correct in all material respects, subject to normal and recurring year-end adjustments that individually and in the aggregate are not material to the Loan Parties' business.] If there has been any change in GAAP or in its application since the date of the audited financial statements referred to in Section 5.6(b) of the Credit Agreement, attached to this Certificate is a description of the change(s) and the effect of the change(s) on the financial statements accompanying this Certificate.

Based on an examination sufficient to permit the undersigned to make an informed statement:

No Default Condition existed at the end of the accounting period covered by the attached financial statements and no Default Condition exists on the date of this Certificate.

[**OR**]

One or more Defaults or Events of Default exist. Attached is a statement specifying each Default and Event of Default, its nature, when it occurred, whether it is continuing, and the steps the Loan Parties are taking with respect to each Default and Event of Default.

Exhibit A contains the calculations of the financial covenants required under Sections [7.6, 7.11, and 7.24] of the Credit Agreement and a calculation of the amounts allowed under clause (6) of the definition of Permitted Liens, which calculations [are][are not] in compliance with the terms of the Credit Agreement.

A-1

A-2

[Exhibit B contains the calculations to determine the Applicable Rate.]

164393.00001/150632148v.7

This Certificate is executed and delivered on [_____ ___, 20__].

**JT LOGISTICS SOLUTIONS, LLC**, an Iowa limited liability company

By:_____

Name: _____

Title: _____

B-3

164393.00001/150632148v.7

## EXHIBIT A TO COMPLIANCE CERTIFICATE

See attached.

B-4

164393.00001/150632148v.7

**[EXHIBIT B TO COMPLIANCE CERTIFICATE**

See attached.]

B-5

**EXHIBIT C**

**REVOLVING NOTE**

$[_____]                                    [_____ ___, 20__]

JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (which is defined below) as a Borrower, each a "Borrower" and collectively the "Borrowers"), jointly and severally promise to pay to the order of Associated Bank, National Association (the "Agent"), in immediately available funds, the aggregate principal amount of the Revolving Loans (as defined in the Credit Agreement), together with interest at the rates, on the dates, and on the terms in the Credit Agreement. The Borrowers must pay the unpaid principal amount of and accrued and unpaid interest on the Revolving Loans in full on the Termination Date (or such earlier date as the Revolving Loans shall be due and payable in full) and must make the mandatory repayments required to be made under the Loan Documents.

Agent will record in accordance with its usual practice the date and amount of each Revolving Loan and the date and amount of each principal payment.

This Revolving Note (this "Note") is one of the Revolving Notes issued in accordance with (and is entitled to the benefits of) the Credit and Security Agreement dated on or about the date of this Note (as amended, restated, supplemented, or modified from time to time, the "Credit Agreement"), among the Loan Parties, the Agent and the Lenders from time to time thereto. Capitalized terms used but not defined in this Note have the meanings given to them in the Credit Agreement. The Credit Agreement and the other Loan Documents govern certain of the terms and conditions of this Note, including the terms and conditions under which this Note may be prepaid or accelerated. This Note is secured by the Collateral.

[This Note amends and restates and is in substitution and exchange for the $_____ _____ Note dated _____ (the "Old Note"). This Note is not a novation of the Old Note and does not pay, terminate, extinguish, or discharge the undersigned's indebtedness

C-1

evidenced by the Old Note. All indebtedness evidenced by the Old Note continues under and is evidenced and governed by this Note. Any reference to the Old Note in any other document (including the Loan Documents) is to be treated as a reference to this Note.]

Borrowers waive presentment, demand, protest, and notice of any kind.

[Remainder of Page Intentionally Left Blank]

C-2

164393.00001/150632148v.7

**BORROWERS**:

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**JT FREIGHT, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**LIVIT STAFFING, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


C-3

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT TRANSPORTATION LEASING
SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**WAREHOUSE BUILDOUT SYSTEMS &
SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

C-4

**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**700 BLAKELY, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

C-5

**EXHIBIT D**

**SWING LOAN NOTE**

$[_____]                                         [_____ ___, 20__]

JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (which is defined below) as a Borrower, each a "Borrower" and collectively the "Borrowers"), jointly and severally promise to pay to the order of ASSOCIATED BANK, NATIONAL ASSOCIATION (the "Holder"), in immediately available funds, the aggregate principal amount of the Swing Loans (as defined in the Credit Agreement) made or extended to Borrowers by Holder, together with interest at the rates, on the dates, and on the terms in the Credit Agreement. The Borrowers must pay the unpaid principal amount of and accrued and unpaid interest on the Swing Loans made or extended to Borrowers by Holder in full on the Termination Date (or such earlier date as the Swing Loans shall be due and payable in full) and must make the mandatory repayments required to be made under the Loan Documents.

This Swing Loan Note (this "Note") is one of the Swing Loan Notes issued in accordance with (and is entitled to the benefits of) the Credit and Security Agreement dated on or about the date of this Note (as amended, restated, amended and restated, supplemented, or modified from time to time, the "Credit Agreement"), among the Loan Parties, the Agent and the Lenders from time to time thereto. Capitalized terms used but not defined in this Note have the meanings given to them in the Credit Agreement. The Credit Agreement and the other Loan Documents govern certain of the terms and conditions of this Note, including the terms and conditions under which this Note may be prepaid or accelerated. This Note is secured by the Collateral.

[This Note amends and restates and is in substitution and exchange for the $_____ _____ Note dated _____ (the "Old Note"). This Note is not a novation of the Old Note and does not pay, terminate, extinguish, or discharge the undersigned's indebtedness evidenced by the Old Note. All indebtedness evidenced by the Old Note continues under and is

D-1

evidenced and governed by this Note. Any reference to the Old Note in any other document (including the Loan Documents) is to be treated as a reference to this Note.]

Borrowers waive presentment, demand, protest, and notice of any kind.

[Remainder of Page Intentionally Left Blank]

D-2

164393.00001/150632148v.7

**BORROWERS**:

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**JT FREIGHT, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**LIVIT STAFFING, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

D-3

164393.00001/150632148v.7

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____

Name: _____

Title: _____


**JT TRANSPORTATION LEASING SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____

Name: _____

Title: _____


**WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____

Name: _____

Title: _____


**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____

Name: _____

Title: _____


**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____

Name: _____

Title: _____

D-4

**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**700 BLAKELY, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

D-5

**EXHIBIT E**

**NOTICE OF BORROWING**

dated as of_____ , 20__

The undersigned JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("Loan Party Representative"), delivers this Notice of Borrowing to ASSOCIATED BANK, NATIONAL ASSOCIATION, as agent ("Agent"), in connection with the Credit and Security Agreement dated as of December 27, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; capitalized terms used but not defined herein shall have the meanings given such terms in the Credit Agreement), by and among Loan Party Representative, the other Loan Parties party thereto, the Lenders party thereto and Agent.

The undersigned hereby requests a Revolving Loan (the "Requested Revolving Loan").[1]

1.  On [____], 20[__] (a Business Day) (the "Borrowing Date").

2.  In the amount of $[_____], consisting of Base Rate Loans.

3.  As of the Borrowing Date, before and after giving effect to the Requested Revolving Loan, no Default or Event of Default or will result from such proposed Revolving Loan.

JT LOGISTICS SOLUTIONS, LLC,
as Loan Party Representative

By: _____
Name:
Title:

---

[1] Complete each of items 1-3 for each Requested Revolving Loan.

E-1

**EXHIBIT F**

**NOTICE OF CONVERSION/CONTINUATION**

dated as of_____ , 20__

The undersigned JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("Loan Party Representative"), delivers this Notice of Conversion/Continuation to ASSOCIATED BANK, NATIONAL ASSOCIATION, as agent ("Agent"), in connection with the Credit and Security Agreement dated as of December 27, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; capitalized terms used but not defined herein shall have the meanings given such terms in the Credit Agreement), by and among Loan Party Representative, the other Loan Parties party thereto, the Lenders party thereto and Agent.

The undersigned hereby requests to.[2]

[1.    Convert $_____ in principal amount of presently outstanding Loans that are [Base Rate/Term SOFR] Loan[s] [having an Interest Period that expires on _____, 202_] to [Base Rate/Term SOFR] Loan[s] on ___, ___.   [The initial  Interest Period for such Term SOFR Loan[s] is requested to be a [one] [three] month period.].][3]

[2.    Continue as [a] Term SOFR Loan[s] $_____ in principal amount of presently outstanding Loans having an Interest Period that expires on __, 202_. The Interest Period for such Term SOFR Loan[s] commencing on ____, 202_ is requested to be a [one] [three] month period.]

The undersigned hereby certifies, in connection with any continuation of a Term SOFR Loan or any conversion of a Base Rate Loan to a Term SOFR Loan, that no Event of Default has occurred and is continuing under the Credit Agreement.

JT LOGISTICS SOLUTIONS, LLC,
as Loan Party Representative


By:  _____
Name:
Title:

---

[2] Complete each of items 1-3 for each Requested Revolving Loan.
[3] For Term SOFR Loans, this Notice of Conversion/Continuation must be provided 3 Business Days in advance of the proposed conversion/continuation date.

F-1

**EXHIBIT G**

**TERM NOTE**

$[_____]                                              [_____ ___, 20__]

JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (which is defined below) as a Borrower, each a "Borrower" and collectively the "Borrowers"), jointly and severally promise to pay to the order of Associated Bank, National Association (the "Agent"), in immediately available funds, the aggregate principal amount of the Term Loan (as defined in the Credit Agreement), together with interest at the rates, on the dates, and on the terms in the Credit Agreement. The Borrowers must pay the unpaid principal amount of and accrued and unpaid interest on the Term Loan in full on the Termination Date (or such earlier date as the Term Loans shall be due and payable in full) and must make the mandatory repayments required to be made under the Credit Agreement.

Agent will record in accordance with its usual practice, the date and amount of the Term Loan and the date and amount of each principal payment.

This Term Note (this "Note") is the Term Note issued in accordance with (and is entitled to the benefits of) the Credit and Security Agreement dated on or about the date of this Note (as amended, restated, supplemented, or modified from time to time, the "Credit Agreement"), among the Loan Parties, the Agent and the Lenders from time to time thereto. Capitalized terms used but not defined in this Note have the meanings given to them in the Credit Agreement. The Credit Agreement and the other Loan Documents govern certain of this Note, including the terms and conditions under which this Note may be prepaid or accelerated. This Note is secured by the Collateral.

[This Note amends and restates and is in substitution and exchange for the $_____ _____ Note dated _____ (the "Old Note"). This Note is not a novation of the Old Note and does not pay, terminate, extinguish, or discharge the undersigned's indebtedness

evidenced by the Old Note. All indebtedness evidenced by the Old Note continues under and is evidenced and governed by this Note. Any reference to the Old Note in any other document (including the Loan Documents) is to be treated as a reference to this Note.]

Borrowers waive presentment, demand, protest, and notice of any kind.

[Remainder of Page Intentionally Left Blank]

G-2

164393.00001/150632148v.7

G-2

**BORROWERS**:

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**JT FREIGHT, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**LIVIT STAFFING, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


G-2

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION LEASING
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**WAREHOUSE BUILDOUT SYSTEMS &
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


G-3

**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**700 BLAKELY, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

G-4

**EXHIBIT H**

**CAPEX NOTE**

$[_____]                                    [_____ ___, 20__]

JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (which is defined below) as a Borrower, each a "Borrower" and collectively the "Borrowers"), jointly and severally promise to pay to the order of Associated Bank, National Association (the "Agent"), in immediately available funds, the aggregate principal amount of all Capex Loans (as defined in the Credit Agreement), together with interest at the rates, on the dates, and on the terms in the Credit Agreement. The Borrowers must pay the unpaid principal amount of and accrued and unpaid interest on the Capex Loans in full on the Termination Date (or such earlier date as the Capex Loans shall be due and payable in full) and must make the mandatory repayments required to be made under the Credit Agreement.

Agent will record in accordance with its usual practice, the date and amount of the Capex Loans and the date and amount of each principal payment.

This Capex Note (this "Note") is one of the Capex Notes issued in accordance with (and is entitled to the benefits of) the Credit and Security Agreement dated on December 27, 2024 (as amended, restated, supplemented, or modified from time to time, the "Credit Agreement"), among the Loan Parties, the Agent, and the Lenders from time to time thereto. Capitalized terms used but not defined in this Note have the meanings given to them in the Credit Agreement. The Credit Agreement and the other Loan Documents govern certain of the terms and conditions of this Note, including the terms and conditions under which this Note may be prepaid or accelerated. This Note is secured by the Collateral.

[This Note amends and restates and is in substitution and exchange for the $_____ _____ Note dated _____ (the "Old Note"). This Note is not a novation of the Old Note and does not pay, terminate, extinguish, or discharge the undersigned's indebtedness evidenced by the Old Note. All indebtedness evidenced by the Old Note continues under and is

H-1

H-2

evidenced and governed by this Note. Any reference to the Old Note in any other document (including the Loan Documents) is to be treated as a reference to this Note.]

Borrowers waive presentment, demand, protest, and notice of any kind.

[Remainder of Page Intentionally Left Blank]

H-2

**BORROWERS**:

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**JT FREIGHT, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**LIVIT STAFFING, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


H-1

164393.00001/150632148v.7

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION LEASING
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**WAREHOUSE BUILDOUT SYSTEMS &
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


H-2

164393.00001/150632148v.7

**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**700 BLAKELY, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

H-3

**EXHIBIT I**

**HVAC EQUIPMENT LOAN NOTE**

$[_____]                                                    [_____ ___, 20__]

JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (which is defined below) as a Borrower, each a "Borrower" and collectively the "Borrowers"), jointly and severally promise to pay to the order of Associated Bank, National Association (the "Agent"), in immediately available funds, the aggregate principal amount of all HVAC Equipment Loans (as defined in the Credit Agreement), together with interest at the rates, on the dates, and on the terms in the Credit Agreement. The Borrowers must pay the unpaid principal amount of and accrued and unpaid interest on the HVAC Equipment Loans in full on the Termination Date (or such earlier date as the HVAC Equipment Loans shall be due and payable in full) and must make the mandatory repayments required to be made under the Credit Agreement.

Agent will record in accordance with its usual practice, the date and amount of the HVAC Equipment Loans and the date and amount of each principal payment.

This HVAC Equipment Loan Note (this "Note") is one of the HVAC Equipment Loan Notes issued in accordance with (and is entitled to the benefits of) the Credit and Security Agreement dated on December 27, 2024 (as amended, restated, supplemented, or modified from time to time, the "Credit Agreement"), among the Loan Parties, the Agent, and the Lenders from time to time thereto. Capitalized terms used but not defined in this Note have the meanings given to them in the Credit Agreement. The Credit Agreement and the other Loan Documents govern certain of the terms and conditions of this Note, including the terms and conditions under which this Note may be prepaid or accelerated. This Note is secured by the Collateral.

[This Note amends and restates and is in substitution and exchange for the $_____ _____ Note dated _____ (the "Old Note"). This Note is not a novation of the Old Note and does not pay, terminate, extinguish, or discharge the undersigned's indebtedness

I-1

164393.00001/150632148v.7

I-2

evidenced by the Old Note. All indebtedness evidenced by the Old Note continues under and is evidenced and governed by this Note. Any reference to the Old Note in any other document (including the Loan Documents) is to be treated as a reference to this Note.]

Borrowers waive presentment, demand, protest, and notice of any kind.

[Remainder of Page Intentionally Left Blank]

I-2

**BORROWERS**:

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**JT FREIGHT, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**LIVIT STAFFING, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


I-3

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT TRANSPORTATION LEASING
SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**WAREHOUSE BUILDOUT SYSTEMS &
SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

I-4

**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**700 BLAKELY, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

164393.00001/150632148v.7

**EXHIBIT J**

**FORM OF JOINDER**

This Joinder (this "Joinder") is executed and delivered as of this [__] day of [__], 20[__] by [_____] (the "New Borrower") in favor of Associated Bank, National Association ("Associated"), as Agent under and as defined in the Credit Agreement referred to below.

Reference is hereby made to that certain Credit and Security Agreement dated as of December 27, 2024 (as the same may be amended, restated, amended and restated, extended, supplemented, or otherwise modified from time to time, the "Credit Agreement") among JT LOGISTICS HOLDING COMPANY, LLC, an Iowa limited liability company ("Holdings"), JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, and JT Expedited, collectively, the "Existing Borrowers" and each individually an "Existing Borrower"), the Agent and the Lenders from time to time thereto.

Under the terms of the Credit Agreement, New Borrower is required, and does agree, to expressly join the Credit Agreement as a Borrower, and hereby agrees that it shall be deemed a party to the Credit Agreement as if it were originally signatory thereto. New Borrower hereby agrees to be bound by, and a maker and obligor of, all representations, warranties, indemnities, undertakings, covenants, limitations, waivers, exclusions, acknowledgements and agreements under the Credit Agreement relating to, pertaining to, or binding upon, a Borrower or made or agreed to by a Borrower to or for the benefit of the Agent on behalf of the Lenders.

Without limiting the foregoing, New Borrower, as security for the payment and performance in full of the Obligations, does hereby grant, assign, and pledge to Agent, on behalf of the Lenders, a security interest in and Lien on all personal property of New Borrower including all property of the type described in the Credit Agreement as "Collateral" (subject in all respects to the exclusions set forth in the definition of "Collateral"). The information on the attached Schedules hereto is hereby added to the applicable Schedules to the Credit Agreement. This Joinder is a supplement to, and not a novation of, the Credit Agreement, which remains in full force and effect, and the provisions of which are incorporated herein by reference.

J-1

J-2

[Signature Pages Follow]

164393.00001/150632148v.7

IN WITNESS WHEREOF, New Borrower has executed and delivered this Joinder as part of the Credit Agreement as of the date and year first set forth above.

NEW BORROWER:                    [_____]


By: _____
Name:
Title:


ACCEPTED AND AGREED:
ASSOCIATED BANK, NATIONAL ASSOCIATION,
as Agent


By:_____
Name:
Title:

J-3

**EXHIBIT K**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Assignment") is dated as of the Effective Date set forth below and is entered into by and between _____ (the "Assignor") and _____ (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by Agent as contemplated below, (i) all of the Assignor's rights and obligations as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including Guarantees), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or in any way based on or related to any of the foregoing, including, but not limited to contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity, related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

1.  Assignor:        _____.

    [Assignor [is] [is not] a Defaulting Lender]

2.  Assignee:        _____, [which is an Eligible Assignee].

3.  Borrowers:    JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company; JT TRANSPORTATION, LLC, an Iowa limited liability company; JT FREIGHT, LLC, an Iowa limited liability company; LIVIT STAFFING, LLC, an Iowa limited liability company; JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company; JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company; JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company; WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company; JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company; JT

J-1

PACKAGING SOLUTIONS, LLC, an Iowa limited liability company; JT BINDING SOLUTIONS, LLC, an Iowa limited liability company; JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company; JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company; and 700 BLAKELY, LLC, an Iowa limited liability company.

4.      Agent: Associated Bank, National Association, as the administrative agent and collateral agent under the Credit Agreement.

5.      Credit Agreement:      The Credit and Security Agreement, dated as of December 27, 2024, by and among Borrowers, the Lenders parties thereto, and Agent, as amended.

6.      Assigned Interest in Commercial Loan:

| Aggregate Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned |
|---|---|
| $_____ | $_____ |

7.      Assigned Interest in Residential Loan:

| Aggregate Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned |
|---|---|
| $_____ | $_____ |

Effective  Date:  _____,  20__  **[TO  BE  INSERTED  BY  AGENT  UPON RECEIPT BY AGENT]**

J-2

164393.00001/150632148v.7

J-3

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR:

_____

By: _____
       Name: _____
       Title:_____

ASSIGNEE:

_____

By: _____
       Name: _____
       Title:_____

**[Consented to and]** Accepted:

ASSOCIATED BANK, NATIONAL ASSOCIATION, as Agent

By: _____
Name:_____
Title:_____

**[Consented to and]** Accepted:

JT LOGISTICS SOLUTIONS, LLC, as Loan Party Representative

By: _____
Name:_____
Title:_____

J-3

ANNEX 1

**STANDARD TERMS AND CONDITIONS FOR**
**ASSIGNMENT AND ASSUMPTION**

(A)     Representations and Warranties.

(a)     1.1     Assignor.  Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the relevant Assigned Interest, (ii) such Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby, and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of any Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by any Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

(b)     1.2     Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under the Credit Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of such Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the relevant Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire such Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 9.5 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase such Assigned Interest, (vi) it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase such Assigned Interest, and (vii) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Agent, any other assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

(B)     Payments.  From and after the Effective Date, the Agent shall make all payments in respect of each Assigned Interest (including payments of principal, interest, fees and other

J-4

amounts) to the Assignee whether such amounts have accrued prior to, on or after the Effective Date.  The Assignor and the Assignee shall make all appropriate adjustments in payments by the Agent for periods prior to the Effective Date or with respect to the making of this assignment directly between themselves.

(C)     General Provisions.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by facsimile or other electronic transmission (*e.g.*, .pdf) shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of Illinois.

J-5

**SCHEDULE 1**
**COMMITMENTS OF THE LENDERS**

| LENDERS | COMMITMENT PERCENTAGE | REVOLVING COMMITMENT AMOUNT | TERM LOAN COMMITMENT AMOUNT | CAPEX LOAN COMMITMENT AMOUNT | HVAC EQUIPMENT LOAN COMMITMENT AMOUNT | AGGREGATE COMMITMENT |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTAL | | | | | | |

164393.00001/150632148v.7

SCHEDULES

See attached.

Schedule 1

Commitment of Lenders

| LENDERS | COMMITMENT PERCENTAGE | REVOLVING COMMITMENT AMOUNT | TERM LOAN COMMITMENT AMOUNT | CAPEX LOAN COMMITMENT AMOUNT | HVAC EQUIPMENT LOAN COMMITMENT AMOUNT | AGGREGATE COMMITMENT |
|---|---|---|---|---|---|---|
| ASSOCIATED BANK, NATIONAL ASSOCIATION | 100% | $20,000,000.00 | $2,530,000.00 | $3,000,000.00 | $2,900,000.00 | $28,430,000.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTAL | 100% | $20,000,000.00 | $2,530,000.00 | $3,000,000.00 | $2,900,000.00 | $28,430,000.00 |

164393.00001/151846144v.2

SCHEDULES

See attached.

Schedule 1.2(a)

Owned Real Property

- 700 Blakely Circle, Grinnell, Iowa 50112

164393.00001/151846144v.2

<u>Schedule 1.2(b)</u>

Liens

| Debtor | Jurisdiction | Secured Party | Filing Number | Filing Date | Collateral |
|---|---|---|---|---|---|
| JT Logistics Holding Company, LLC, JT Logistics Solutions, LLC, JT Transportation, LLC, JT Freight, LLC, LIVIT Staffing, LLC, JT Real Estate Holdings, LLC, JT Property Solutions, LLC, JT Transportation Leasing Solutions, LLC, Warehouse Buildout Systems and Solutions, LLC, JT eCommerce Solutions, LLC, JT Packaging Solutions, LLC, JT Binding Solutions, LLC, JT Industrial Services, LLC, JT Expedited Solutions, LLC, and 700 Blakely, LLC | Iowa SOS | VFI KR SPE I LLC | #P24001166-7 | 06/04/2024 | Specific leased equipment |
| JT Logistics Solutions, LLC | Iowa SOS | HYG Financial Services, Inc. | #X19091000-0 | 12/04/2019 | Specific leased equipment |
| JT Logistics Solutions, LLC | Iowa SOS | Tom Mcleod Software Corporation | #X22049517-2 | 07/29/2022 | Purchase money security interest in the Licensed Software, the Equipment, or Third Party Software in the amount of |

164393.00001/151846144v.2

| Debtor | Jurisdiction | Secured Party | Filing Number | Filing Date | Collateral |
|---|---|---|---|---|---|
| | | | | | its license fee or purchase price |
| JT Logistics Solutions, LLC | Iowa SOS | Encompass Capital Group, L.L.C. | #E22055853-4 | 08/01/2022 | Specific equipment |
| JT Logistics Solutions, LLC | Iowa SOS | Peoples Savings Bank | #E22083798-5 | 12/30/2022 | All parts, accessories, repairs, replacements, improvements, and accessions to specific properties listed |
| JT Logistics Solutions, LLC | Iowa SOS | Toyota Industries Commercial Finance, Inc. | #X23040041-8 | 11/28/2023 | Two (2) Toyota Forklift Model # Sr1-Hpm40 Serial # 00257, 00256 Two (2) Attachments Model# 18-125v-17, 36-1045-33oc Mfg Viking |
| JT Logistics Solutions, LLC | Iowa SOS | Raymond Leasing Corporation | #X23042284-7 | 12/15/2023 | All material handling equipment and associated accessories, including without limitation, lift trucks, pallet trucks, order pickers, batteries and chargers, in the possession of Debtor in accordance with Equipment Master Lease Schedule No. 42243 or any Schedule thereunder |
| JT Logistics Solutions, LLC | Iowa SOS | VFI KR SPE I LLC | #X24013119-0 | 04/15/2024 | Specific leased equipment |
| JT Logistics Solutions, LLC | Iowa SOS | Toyota Industries | #X24014239-9 | 04/22/2024 | Two (2) Toyota Forklift Model # 8fbcu25 Serial # 99289 Serial # 99308 |

164393.00001/151846144v.2

| Debtor | Jurisdiction | Secured Party | Filing Number | Filing Date | Collateral |
|---|---|---|---|---|---|
| | | Commercial Finance, Inc. | | | Attachments 18-D85-25<br><br>E973-43 |
| JT Logistics Solutions, LLC | Iowa SOS | JT Logistics Solutions, LLC | #P24001134-9 | 05/30/2024 | Specific equipment |
| JT Logistics Solutions, LLC | Iowa SOS | Toyota Industries Commercial Finance, Inc. | #X24019390-5 | 05/31/2024 | Two (2) Heli Forklift Model # Opl10-S Serial # 08010ra1269, 08010ra1270 |
| JT Logistics Solutions, LLC | Iowa SOS | Encompass Capital Group, L.L.C. | #19213-219 | 08/01/2022 | Specific equipment |
| JT Transportation, LLC | Iowa SOS | Encompass Capital Group, L.L.C. | #E22047607-6 | 06/09/2022 | 2023 Freightliner PT126DC day cab semi-tractor, VIN No. 3AKJHLDR3PDUG2582 |
| JT Transportation, LLC | Iowa SOS | Encompass Capital Group, L.L.C. | #E22055110-9 | 07/26/2022 | 1-2023 Freightliner PT126DC Day Cab Semi-Tractor, VIN #3AKJHLDR0PDUK1590 |
| JT Transportation, LLC | Iowa SOS | Encompass Capital Group, L.L.C. | #E22060806-8 | 08/30/2022 | 1 - 2023 Freightliner PT 126DC Day Cab Semi-Tractor, VIN #3AKJHLDR2PDUK1591 |
| JT Transportation, LLC | Iowa SOS | American Bank & Trust | #E22069472-5 | 10/14/2022 | 1-2023 Freightliner PT126SLP Semi-tractor, VIN |

164393.00001/151846144v.2

| Debtor | Jurisdiction | Secured Party | Filing Number | Filing Date | Collateral |
|---|---|---|---|---|---|
| | | Company, N.A. | | | #3AKJHHDR8PSUM6892 |

Schedule 4.5

Locations

| Address | City | State | Zip | Landlord (Payable Party) | Owned vs. Leased | Square Feet | Term (Months) | Lease End | Rent | CAM | Insurance | Taxes | Misc | Total | Cash Pmt | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1500 Waltham Way | McCarran | NV | 89434 | DG Waltham Way Property Owner, L.P. | Leased | 329,864 | 60 | 7/31/2027 | 253,964.88 | 18,248.08 | 4,132.10 | 21,656.05 | . | 297,941.11 | 297,941.11 | No change |
| 1600 North Polk Street | DeSoto | TX | 75115 | Sterling Investors Holdings, LLC dba SRE 1600 North Polk LLC | Leased | 351,194 | 60 | 6/30/2026 | 183,787.72 | 10,273.26 | 8,676.00 | 48,623.75 | . | 251,360.73 | 251,360.73 | No change |
| 225 S. Bell Avenue | Ames | IA | 50010 | Nona Zeicer | Leased | 20,000 | 12 | 12/31/2023 | 7,323.50 | - | - | - | . | 7,323.50 | 7,323.50 | No change |
| 2220 20th Ave NW | Altoona | IA | 50009 | I-80 Investors, LLC c/o Block Real Estate Services, LLC | Leased | 314,138 | 180 | 1/1/2039 | 200,262.98 | - | - | - | 37,930.54 | 238,193.52 | 238,193.52 | New space added in multi-tenant facility |
| 2301 21st Street NW | Altoona | IA | 50009 | Hawkeye Investment Partners I, LLC | Leased | 396,046 | 180 | 8/1/2039 | 252,479.33 | - | - | - | - | 252,479.33 | - | New space added in multi-tenant facility |
| 2402 21st Street NW | Altoona | IA | 50009 | Hawkeye Investment Partners I, LLC | Licensed | 259,297 | 180 | 10/1/2039 | | | | | | . | | New space added, dedicated to Bayer (sublease) |
| 2550 21st Street NW | Altoona | IA | 50009 | Graham Warehouse 5 LP | Leased | 300,000 | 60 | 10/31/2027 | 132,500.00 | - | - | 10,371.22 | . | 142,871.22 | 132,500.00 | No change |
| 2600 20th Avenue SW | Altoona | IA | 50009 | Sealy 20th Ave, LLC | Leased | 265,700 | 64 | 2/28/2028 | 136,353.92 | 14,353.40 | 3,668.29 | 27,906.01 | - | 182,281.62 | 182,281.62 | No change |
| 2900 21st Street NW | Altoona | IA | 50009 | Graham Warehouse 5 LP | Leased | 270,000 | 64 | 2/28/2026 | 118,125.00 | - | - | 36,058.57 | . | 154,183.57 | 118,125.00 | No change |
| 3190 21st Street NW | Altoona | IA | 50009 | Graham Warehouse 5 LP | Leased | 270,000 | 60 | 1/31/2027 | 118,125.00 | - | - | 39,299.05 | . | 157,424.05 | 118,125.00 | No change |
| 3440 Gannett Avenue | Des Moines | IA | 50321 | JES HP Iowa, LLC | Leased | 305,000 | 36 | 1/29/2025 | 107,841.00 | 3,490.00 | - | - | 63,900.91 | 175,231.91 | 111,331.00 | Lease expires Jan 2025, will not renew |
| 3811 Dixon Street | Des Moines | IA | 50313 | Dixon Properties - 3811 LLC | Leased | 400,000 | 60 | 5/31/2026 | 152,666.67 | 7,219.03 | 6,063.34 | 27,485.33 | - | 193,434.37 | 193,434.37 | No change |
| 4121 Dixon Street | Des Moines | IA | 50313 | Dixon Industrial Partners, LLC | Leased | 179,000 | 60 | 10/31/2028 | 56,925.78 | 11,223.87 | 6,386.93 | 18,400.78 | - | 92,937.36 | 92,937.36 | No change |
| 4201 S. James Street, Suite 240 | Grimes | IA | 50111 | Prairie Business Park III, LLC | Leased | 105,000 | 60 | 2/28/2027 | 45,062.50 | 9,860.85 | 2,321.78 | 19,679.86 | - | 76,924.99 | 76,924.99 | No change |
| 5135 East 76th Street North | Sperry | OK | 74073 | KCI Tulsa Commerce Center Building 2, LLC | Leased | 95,264 | 60 | 5/31/2029 | 61,127.73 | 3,801.60 | 1,100.16 | 4,922.49 | - | 70,951.98 | 70,951.98 | No change |
| 600 Spreckles | Manteca | CA | 95336 | N/A | Licensed | 300,000 | 36 | 12/31/2025 | - | - | - | - | - | - | - | JT operates a labor solution out of this warehouse. |
| 700 Blakely Circle | Grinnell | IA | 50112 | JT Real Estate Holdings, LLC | Owned | 266,340 | | | | | | | | | | Dedicated Facility for Bayer, direct lease with Landlord (JT Real Estate Holdings) |
| 8757 Autobahn Drive | Dallas | TX | 75237 | Bay Valley Foods, LLC | Leased | 132,825 | 59 | 4/30/2029 | 104,079.26 | - | - | - | - | 104,079.26 | 104,079.26 | No change |
| | | | | | | 4,559,668 | | | 1,930,565 | 78,470 | 32,349 | 318,304 | 37,931 | 2,397,619 | 1,986,509 | |

164393.00001/151846144v.2

Schedule 4.15(c)

Loan Parties' States of Organization and Chief Executive Offices

| Entity | Location | FEIN | Registration State | Registration Date | Registration Number | DUNS | DUNS Reference | EE Count | Status |
|---|---|---|---|---|---|---|---|---|---|
| JT Logistics Holding Company, LLC | Corporate | 88-3995257 | Iowa | 7/22/2022 | 718971 | | | 307 | Active |
| JT Logistics Solutions, LLC | Consolidated | 46-5403995 | Iowa | 3/26/2014 | 475468 | 96-131-9766 | Corporate | 260 | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2220 20th Ave. NW | 46-5403995 | | | | 11-918-1250 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 1010 NE 54th Ave. | 46-5403995 | | | | 11-841-4771 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 1500 Waltham Way | 46-5403995 | | | | 11-900-1786 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 1675 NE 51st St. | 46-5403995 | | | | 11-841-0392 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 1835 Broadway Ave. | 46-5403995 | | | | 11-841-4834 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 225 Bell Ave. | 46-5403995 | | | | 11-841-4828 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2550 21st Street NW | 46-5403995 | | | | 11-900-2662 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2561 Independence | 46-5403995 | | | | 11-837-7748 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2600 20th Avenue NW | 46-5403995 | | | | 11-889-8190 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2900 21st Street NW | 46-5403995 | | | | 11-841-0411 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 3190 21st Street NW | 46-5403995 | | | | 11-841-4800 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 3440 Gannett Ave. | 46-5403995 | | | | 11-900-3459 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 3811 Dixon St. | 46-5403995 | | | | 96-131-9766 | Corporate | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 4121 Dixon St. | 46-5403995 | | | | 11-773-9845 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 4201 S. James St. | 46-5403995 | | | | 11-866-3098 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 44211 Mercure Cir. | 46-5403995 | | | | 11-900-3464 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 700 Blakely Cir. | 46-5403995 | | | | 11-841-4840 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 802 SE Shurfine Dr. | 46-5403995 | | | | 11-775-4566 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2301 21st St. NW | 46-5403995 | | | | 11-939-2619 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 1600 North Polk St. | 46-5403995 | | | | 11-902-6538 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2402 21st St. NW | 46-5403995 | | | | 11-939-2623 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 5135 E 76th St. N. | 46-5403995 | | | | 11-923-6429 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 5701 Park Ave. | 46-5403995 | | | | 11-837-7748 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 600 Spreckels Ave. | 46-5403995 | | | | 11-919-2947 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 8757 Autobahn Dr. | 46-5403995 | | | | 11-928-6217 | Location | | Active |
| JT eCommerce Solutions, LLC | Consolidated | 88-3972365 | Iowa | 7/22/2022 | 718985 | 13-108-1867 | Entity | 0 | Inactive |
| JT Binding Solutions, LLC | Consolidated | 88-4019468 | Iowa | 7/22/2022 | 718982 | 11-632-9097 | Entity | 0 | Inactive |
| JT Packaging Solutions, LLC | Consolidated | 92-3248739 | Iowa | 3/31/2023 | 745233 | 13-790-8296 | Entity | 0 | Active |
| JT Transportation, LLC | Consolidated | 38-4093365 | Iowa | 9/7/2018 | 582192 | 11-008-7985 | Entity | 20 | Active |
| JT Expedited Solutions, LLC | Consolidated | 88-0949740 | Iowa | 3/1/2022 | 703268 | 06-349-1404 | Entity | 0 | Inactive |
| JT Freight, LLC | Consolidated | 38-4103942 | Iowa | 1/23/2019 | 592613 | 10-706-1837 | Entity | 6 | Active |
| JT Industrial Services, LLC | Consolidated | 86-2723863 | Iowa | 3/18/2021 | 661551 | 10-7047030 | Entity | 10 | Active |
| LIVIT Staffing, LLC | Consolidated | 86-2770225 | Iowa | 3/18/2021 | 661553 | 07-044-1526 | Entity | 9 | Active |
| JT Real Estate Holdings, LLC | Consolidated | 92-1353530 | Iowa | 10/26/2022 | 728792 | 12-799-3563 | Entity | 0 | Active |
| 700 Blakely, LLC | Consolidated | 93-1889973 | Iowa | 6/14/2023 | 753568 | 12-020-6713 | Entity | 0 | Active |
| JT Transportation Leasing Solutions, LLC | Consolidated | 86-3070670 | Iowa | 4/6/2021 | 663523 | 10-730-7101 | Entity | 0 | Inactive |
| Warehouse Build Out Systems & Solutions, L | Consolidated | 93-1469018 | Iowa | 5/22/2023 | 751123 | 13-812-9484 | Entity | 1 | Active |
| JT Property Solutions, LLC | Consolidated | 93-1879135 | Iowa | 6/14/2023 | 753569 | 12-012-2087 | Entity | 1 | Active |

Schedule 4.20

Pledged Equity Interests

All outstanding units in each of the following wholly owned subsidiaries of Holdings:

| |
|---|
| JT LOGISTICS SOLUTIONS, LLC |
| JT TRANSPORTATION, LLC |
| JT FREIGHT, LLC |
| LIVIT STAFFING, LLC |
| JT REAL ESTATE HOLDINGS, LLC |
| JT PROPERTY SOLUTIONS, LLC |
| JT TRANSPORTATION LEASING SOLUTIONS, LLC |
| WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC |
| JT ECOMMERCE SOLUTIONS, LLC |
| JT PACKAGING SOLUTIONS, LLC |
| JT BINDING SOLUTIONS, LLC |
| JT INDUSTRIAL SERVICES, LLC |
| JT EXPEDITED SOLUTIONS, LLC |
| 700 BLAKELY, LLC |

## Schedule 5.2

### Incorporation/Organization/Foreign Qualification/Subsidiaries

| Entity | Location | FEIN | Registration State | Registration Date | Registration Number | DUNS | DUNS Reference | EE Count | Status |
|---|---|---|---|---|---|---|---|---|---|
| JT Logistics Holding Company, LLC | Corporate | 88-3995257 | Iowa | 7/22/2022 | 718971 | | | 307 | Active |
| JT Logistics Solutions, LLC | Consolidated | 46-5403995 | Iowa | 3/26/2014 | 475468 | 96-131-9766 | Corporate | 260 | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2220 20th Ave. NW | 46-5403995 | | | | 11-918-1250 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 1010 NE 54th Ave. | 46-5403995 | | | | 11-841-4771 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 1500 Waltham Way | 46-5403995 | | | | 11-900-1786 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 1675 NE 51st St. | 46-5403995 | | | | 11-841-0392 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 1835 Broadway Ave. | 46-5403995 | | | | 11-841-4834 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 225 Bell Ave. | 46-5403995 | | | | 11-841-4828 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2550 21st Street NW | 46-5403995 | | | | 11-900-2662 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2561 Independence | 46-5403995 | | | | 11-837-7748 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2600 20th Avenue NW | 46-5403995 | | | | 11-889-8190 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2900 21st Street NW | 46-5403995 | | | | 11-841-0411 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 3190 21st Street NW | 46-5403995 | | | | 11-841-4800 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 3440 Gannett Ave. | 46-5403995 | | | | 11-900-3459 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 3811 Dixon St. | 46-5403995 | | | | 96-131-9766 | Corporate | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 4121 Dixon St. | 46-5403995 | | | | 11-773-9845 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 4201 S. James St. | 46-5403995 | | | | 11-866-3098 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 44211 Mercure Cir. | 46-5403995 | | | | 11-900-3464 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 700 Blakely Cir. | 46-5403995 | | | | 11-841-4840 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 802 SE Shurfine Dr. | 46-5403995 | | | | 11-775-4566 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2301 21st St. NW | 46-5403995 | | | | 11-939-2619 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 1600 North Polk St. | 46-5403995 | | | | 11-902-6538 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 2402 21st St. NW | 46-5403995 | | | | 11-939-2623 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 5135 E 76th St. N. | 46-5403995 | | | | 11-923-6429 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 5701 Park Ave. | 46-5403995 | | | | 11-837-7748 | Location | | Inactive |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 600 Spreckels Ave. | 46-5403995 | | | | 11-919-2947 | Location | | Active |
| JT Logistics Solutions, LLC | JT Logistics Solutions, LLC – 8757 Autobahn Dr. | 46-5403995 | | | | 11-928-6217 | Location | | Active |
| JT eCommerce Solutions, LLC | Consolidated | 88-3972365 | Iowa | 7/22/2022 | 718985 | 13-108-1867 | Entity | 0 | Inactive |
| JT Binding Solutions, LLC | Consolidated | 88-4019468 | Iowa | 7/22/2022 | 718982 | 11-632-9097 | Entity | 0 | Inactive |
| JT Packaging Solutions, LLC | Consolidated | 92-3248739 | Iowa | 3/31/2023 | 745233 | 13-790-8296 | Entity | 0 | Active |
| JT Transportation, LLC | Consolidated | 38-4093365 | Iowa | 9/7/2018 | 582192 | 11-008-7985 | Entity | 20 | Active |
| JT Expedited Solutions, LLC | Consolidated | 88-0949740 | Iowa | 3/1/2022 | 703268 | 06-349-1404 | Entity | 0 | Inactive |
| JT Freight, LLC | Consolidated | 38-4103942 | Iowa | 1/23/2019 | 592613 | 10-706-1837 | Entity | 6 | Active |
| JT Industrial Services, LLC | Consolidated | 86-2723863 | Iowa | 3/18/2021 | 661551 | 10-7047030 | Entity | 10 | Active |
| LIVIT Staffing, LLC | Consolidated | 86-2770225 | Iowa | 3/18/2021 | 661553 | 07-044-1526 | Entity | 9 | Active |
| JT Real Estate Holdings, LLC | Consolidated | 92-1353530 | Iowa | 10/26/2022 | 728792 | 12-799-3563 | Entity | 0 | Active |
| 700 Blakely, LLC | Consolidated | 93-1889973 | Iowa | 6/14/2023 | 753568 | 12-020-6713 | Entity | 0 | Active |
| JT Transportation Leasing Solutions, LLC | Consolidated | 86-3070670 | Iowa | 4/6/2021 | 663523 | 10-730-7101 | Entity | 0 | Inactive |
| Warehouse Build Out Systems & Solutions, L | Consolidated | 93-1469018 | Iowa | 5/22/2023 | 751123 | 13-812-9484 | Entity | 1 | Active |
| JT Property Solutions, LLC | Consolidated | 93-1879135 | Iowa | 6/14/2023 | 753569 | 12-012-2087 | Entity | 1 | Active |

Schedule 5.3

Officers, Directors, Shareholders, Capitalization

The following individuals own the noted percentages in Holdings:

James (Jamie) R Cord, Jr. – 50.00%
James (Jamie) Myers – 16.67%
Andre (Joe) J. Ekis – 16.67%
Troy Strawhecker – 16.67%

Each of the other Borrowers is wholly owned by Holdings.

James Cord is the Manager of Holdings and all other Borrowers.

Schedule 5.7

Organization Name

LIVIT Staffing, LLC was formerly known as JT Staffing Solutions, LLC

164393.00001/151846144v.2

Schedule 5.8(b)

Environmental

None.

164393.00001/151846144v.2

Schedule 5.9(b)

Litigation

The following case has been settled but not yet dismissed, dismissal paperwork is in process: Employee Relations Associates, Inc., and Talentbridge, Inc. v. Aleksander Mrkajic, Barbara Hooper, and Livit Staffing, LLC, No. LACL 159891, in the Iowa District Court for Polk County.

Schedule 5.10

Patents, Trademarks, Copyrights, and Licenses

| Owner | Wordmark | Serial Number | Class | Status | Registration Date |
|---|---|---|---|---|---|
| JT LOGISTICS SOLUTIONS, LLC (LIMITED LIABILITY COMPANY; IOWA, USA) | JT LOGISTICS | 90373521 | 035, 039 | LIVE, REGISTERED | October 10, 2023 |
| JT LOGISTICS SOLUTIONS, LLC (LIMITED LIABILITY COMPANY; IOWA, USA) | CREATE AMAZING | 90373572 | 039, 035 | LIVE, REGISTERED | June 6, 2023 |

164393.00001/151846144v.2

Schedule 5.19

Material Business Agreements

Provided to Agent under separate cover.

164393.00001/151846144v.2

Schedule 5.24(d)

ERISA Matters

| Loan Party | Coverage | Carrier and Policy Number | Coverage Limit | Details |
|---|---|---|---|---|
| JT Logistics Solutions, LLC | Property | Acuity - ZG9018 | Specific Limits | |
| JT Logistics Solutions, LLC | BPP | Acuity - ZG9018 | Specific Limits | Included Blanket BPP limit |
| JT Logistics Solutions, LLC | Business Income | Acuity - ZG9018 | 1,500,000.00 | |
| JT Logistics Solutions, LLC | Equipment Breakdown | Acuity - ZG9018 | Specific Limits | For all locations |
| JT Logistics Solutions, LLC | BPP - California | Ategrity - 01-C-CP-P20102739-0 | 2,500,000.00 | |
| JT Logistics Solutions, LLC | BPP - Oklahoma | Scottsdale - CPS7969056 | 150,000.00 | |
| JT Logistics Solutions, LLC | General Liability | Acuity - ZG9018 | 3,000,000/1,000,000 | All Locations except CA |
| JT Logistics Solutions, LLC | General Liability - Oklahoma | Scottsdale - | 2,000,000/1,000,000 | premium based off square footage |
| JT Logistics Solutions, LLC | General Liability - California | Ategrity - | 2,000,000/1,000,000 | Premium based off square footage |
| JT Logistics Solutions, LLC | Warehouse Legal | Acuity - ZG9018 | Specific Limits | All Locations |
| JT Logistics Solutions, LLC | Umbrella | Acuity - ZG9018 | 2,000,000.00 | |
| JT Logistics Solutions, LLC | Umbrella | Scottsdale - CXS4021382 | 3,000,000.00 | |
| JT Logistics Solutions, LLC | Excess Umbrella | Crum and Forester - SEO-129120 | 3,000,000.00 | |
| JT Logistics Solutions, LLC | Bonds | CA Shae - 170523006 | 25,000.00 | For bonded warehouse goods |
| JT Logistics Solutions, LLC | Crime | Travelers - 0107306731LB | 1,000,000.00 | |
| JT Logistics Solutions, LLC | EPLI | Travelers - 0107306731LB | 1,000,000.00 | |
| JT Logistics Solutions, LLC | Directors and Officers | Travelers - 0107306731LB | 1,000,000.00 | |
| JT Logistics Solutions, LLC | Workers Comp - California | QBE - QWC4002198 | Statutory | |
| JT Logistics Solutions, LLC | Workers Comp - All Others | SFM - 146015.103 | Statutory | 40% Variable Dividend |
| JT Transportation, LLC | Auto Liability | Acuity - ZG9018 | 1,000,000.00 | Auto Liability, Med Pay and UIM/UM |
| JT Transportation, LLC | Physical Damage | Acuity - ZG9018 | Specific Limits | Comp/Collision on all units including trailers |
| JT Transportation, LLC | Cargo | Acuity - ZG9018 | 300,000.00 | |
| JT Real Estate Holdings, LLC | Building | Acuity - ZG9018 | 25,092,794.00 | |
| JT Industrial Services, LLC | General Liability | Acuity - ZG9018 | 3,000,000/1,000,000 | |
| JT Industrial Services, LLC | Workers Compensation | Acuity - ZG9018 | Statutory | |
| JT Freight, LLC | Truck Broker Liability | Markel - TBP034003 | 2,000,000.00 | |
| JT Freight, LLC | Contingent Cargo | Hudson - GTUL00064903 | 100,000.00 | With refer breakdown |
| JT Freight, LLC | General Liability | Markel - TBP034003 | 1,000,000.00 | |
| JT Freight, LLC | Errors and Omissions | Markel - TBP034003 | 1,000,000.00 | |
| JT Freight, LLC | Brokerage Bond | CCI Surety - 79010655548 | 75,000.00 | |
| LIVIT Staffing, LLC | General Liability | Everest - 91GLN00288-241 | | Renewal, Hired Non-Owned Auto included |
| LIVIT Staffing, LLC | Professional Liability | Gemini - VPPL021036 | | |
| LIVIT Staffing, LLC | Workers Compensation | Work First Casualty - WC-WF-TS-0002104-01 | 1,000,000.00 | |
| LIVIT Staffing, LLC | Umbrella | Everest - 91EXN00074-241 | 1,000,000.00 | |
| LIVIT Staffing, LLC | Employment Practices | Travelers - 107886452 | 1,000,000.00 | |
| LIVIT Staffing, LLC | Bond | Old Republic - B150039449 | | |

## Schedule 6.7

## Deposit Accounts

| | | | | |
|---|---|---|---|---|
| JT Real Estate Holdings, LLC | Checking Account | | Business Checking | Dupaco Credit Union P.O. Box 179 Dubuque, Iowa 52004 |
| JT Real Estate Holdings, LLC | Savings Account | | Asset Builder | Dupaco Credit Union P.O. Box 179 Dubuque, Iowa 52005 |
| JT Logistics Holding Company, LLC | Checking Account | | Main Holding Account | Old National Bank One Main Street, Evansville, Indiana 47708 |
| JT Logistics Solutions, LLC | Checking Account | | Main Operating Account | Old National Bank One Main Street, Evansville, Indiana 47708 |
| LIVIT Staffing, LLC | Checking Account | | Staffing Operating Account | Old National Bank One Main Street, Evansville, Indiana 47708 |
| JT Freight, LLC | Checking Account | | Freight Operating Account | Old National Bank One Main Street, Evansville, Indiana 47708 |
| JT Transportation, LLC | Checking Account | | Transportation Operating Account | Old National Bank One Main Street, Evansville, Indiana 47708 |
| JT Industrial Services, LLC | Checking Account | | JTIS Operating Account | Old National Bank One Main Street, Evansville, Indiana 47708 |
| JT Binding Solutions, LLC | Checking Account | | Binding Operating Account | Old National Bank One Main Street, Evansville, Indiana 47708 |
| JT Expedited Solutions, LLC | Checking Account | | Expedited Operating Account | Old National Bank One Main Street, Evansville, Indiana 47708 |
| JT eCommerce Solutions, LLC | Checking Account | | eCommerce Operating Account | Old National Bank One Main Street, Evansville, Indiana 47708 |
| JT Logistics Solutions, LLC | Checking Account | | PSB JTL Account | People's Bank 400 E Iowa Avenue Indianola, Iowa 50125 |
| LIVIT Staffing, LLC | Checking Account | | PSB JTS Account | People's Bank 400 E Iowa Avenue Indianola, Iowa 50125 |
| JT Freight, LLC | Checking Account | | PSB JTF Account | People's Bank 400 E Iowa Avenue Indianola, Iowa 50125 |
| JT Transportation, LLC | Checking Account | | PSB JTT Account | People's Bank 400 E Iowa Avenue Indianola, Iowa 50125 |
| JT Industrial Services, LLC | Checking Account | | PSB JTIS Account | People's Bank 400 E Iowa Avenue Indianola, Iowa 50125 |
| JT Expedited Solutions, LLC | Checking Account | | PSB JTE Account | People's Bank 400 E Iowa Avenue Indianola, Iowa 50125 |
| JT eCommerce Solutions, LLC | Checking Account | | PSB JTeC Account | People's Bank 400 E Iowa Avenue Indianola, Iowa 50125 |

Schedule 7.4

Investments

None.

164393.00001/151846144v.2

<u>Schedule 7.5</u>

Loans

| Name of Loan Party | Description | Principal Value |
|---|---|---|
| JT Logistics Solutions, LLC | Owner Note - Jamie | 49,969.64 |
| JT Logistics Solutions, LLC | Owner Note - Troy | 424,473.75 |

Schedule 7.8

Indebtedness

| Name of Loan Party | Description | Lender | Lessee Address | Secu | Remaining Pa | Est. Value |
|---|---|---|---|---|---|---|
| JT Logistics Solutions, LLC | Yard Goat - Manteca | Amur Equipment Financing | 304 W 3rd St, Grand Island, NE 68801 | Yes | 75,005.19 | 79,821.58 |
| JT Transportation, LLC | Balboa - Trailers | Transportation / Balboa Capital | PO Box 79445, City of Industry, CA 91716-9445 | Yes | 30,407.41 | 30,844.18 |
| JT Transportation, LLC | BMO-Equipment Loan (#9382946-001) | Transportation / BMO Bank N.A. | P.O. Box 6201, Carol Stream, IL 60197-6201 | Yes | 208,739.84 | 161,086.03 |
| JT Transportation, LLC | eCD Acquisition & Racking Refi (#51573) | Logistics / Peoples Savings Bank | 400 E. Iowa Ave, Indianola, IA 50125 | Yes | 4,667,727.87 | 5,020,790.38 |
| JT Real Estate Holdings, LLC | Dupaco - 700 Blakely Mortgage (5097) | Real Estate / Dupaco | 1701 E 1ts St, Grimes, IA 50111 | Yes | 12,148,513.50 | ############# |
| JT Transportation, LLC | Engs / Mitsubishi - (224645 & 224646) | Transportation / Engs Commercial Finance | PO Box 128, Itaska, IL 60143-0128 | Yes | 87,595.56 | 89,119.11 |
| JT Transportation, LLC | Twin Rivers Acquisition | Transportation / Peoples Bank | 400 E. Iowa Ave, Indianola, IA 50125 | Yes | 261,844.00 | 277,715.84 |
| JT Transportation, LLC | People's - New Truck (#41531) | Transportation / Peoples Savings Bank | 1021 Main St, Scranton, IA 51462 | Yes | 79,536.52 | 87,431.33 |

164393.00001/151846144v.2

Schedule 7.10

Affiliate Transactions

| Name of Loan Party | Description | Principal Value |
|---|---|---|
| JT Logistics Solutions, LLC | Owner Note - Jamie | 49,969.64 |
| JT Logistics Solutions, LLC | Owner Note - Troy | 424,473.75 |

*Execution Version*

FIRST AMENDMENT TO CREDIT AND SECURITY AGREEMENT

This First Amendment to Credit and Security Agreement (this "Amendment") dated as of November 7, 2025 by and among JT LOGISTICS HOLDING COMPANY, LLC, an Iowa limited liability company ("Holdings"), JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (as defined below) from time to time as a Borrower, each a "Borrower" and collectively, the "Borrowers"), the Lenders party hereto, and ASSOCIATED BANK, NATIONAL ASSOCIATION, as administrative agent for the Lenders (as defined herein) (in such capacity, "Agent").

BACKGROUND

A.      Holdings, the Borrowers, the financial institutions from time to time party thereto (the "Lenders"), and Agent entered into that certain Credit and Security Agreement dated as of December 27, 2024 (as amended or otherwise modified prior to the effectiveness of this Amendment, the "Existing Credit Agreement" and as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), pursuant to which Agent and Lenders established certain financing arrangements with the Borrowers. Capitalized terms used herein but not specifically defined herein shall have the respective meanings ascribed to them in the Credit Agreement.

B.      On August 29, 2024, Agent delivered to Loan Parties a certain Notice of Events of Default and Reservation of Rights letter (the "ROR Letter"), pursuant to which, among other things, Agent identified a certain "Specified Event of Default" (as defined in such ROR Letter) that had occurred and were continuing under the Credit Agreement. In addition, as of the date hereof, certain additional Events of Default have occurred and are continuing under Section 10.5 of the Credit Agreement as a result of (i) JT Real Estate's formation of the following new Subsidiaries: (x) 4120 E. 13th Street, LLC, an Iowa limited liability company ("4120"), a wholly-owned subsidiary of JT Real Estate, and (y) JT Logistics 4120 Parcel A, LLC, an Iowa limited liability company ("4120 Parcel A"), a wholly-owned subsidiary of 4120, which, in each case, is prohibited under Section 7.2 of the Credit Agreement; (ii) JT Real Estate's transfer of its ownership

of the Owned Real Property having an address of 4120 East 13th Street, Ames, IA 50010 (such parcel, the "4120 Owned Real Property") to 4120 Parcel A, which is prohibited is prohibited under Section 7.1 and Section 7.10 of the Credit Agreement; and (iii) 4120 Parcel A entering into that certain Construction Loan Agreement, by and among 4120 Parcel A, as the borrower, BCL-CRE 3 LLC, an Illinois limited liability company ("BCI"), as the lender, and the other parties party thereto, pursuant to which, among other things, BCI agreed to provide a loan to 4120 Parcel A, and in order to induce BCI to provide the financial arrangements thereunder, 4120 Parcel A agreed to grant BCI a security interest in the 4120 Owned Real Property, which is prohibited under Section 7.2 and Section 7.8 of the Credit Agreement (collectively, the "Additional Events of Default", together with the Specified Event of Default and any other Defaults or Events of Default as of the date hereof under Article X of the Credit Agreement as a result of the occurrence and/or continuance of the Additional Events of Default and the Specified Event of Default, collectively, the "Existing Events of Default").

C.      The Loan Parties have requested that Agent and the Lenders make certain amendments to the Existing Credit Agreement and certain other agreements as more particularly set forth herein, and Agent and the Lenders has agreed to such requests on the terms and conditions set forth herein.

TERMS AND CONDITIONS

NOW, THEREFORE, with the foregoing background incorporated by reference and made a part hereof and intending to be legally bound, the parties agree as follows:

1.      Acknowledgement of Obligations, Outstanding Fees, and Existing Events of Default.

a.      Outstanding Obligations.      The Loan Parties confirm and acknowledge that as of the close of business on November 4, 2025, the Borrowers are indebted to Agent and the Lenders under the Credit Agreement and the other Loan Documents (i) in the aggregate principal amount of $28,343,571 with respect to the Loans and (ii) in the aggregate amount of $150,000 in respect of accrued and unpaid fees related to the Obligations ("Outstanding Fees"), in each case, together with interest and fees accrued and unpaid in respect thereof, and all other fees and other amounts due related thereto, in each case without any deduction, defense, setoff, claim or counterclaim, of any nature.

b.      No Other Events of Default.  The Loan Parties acknowledge that as of the date hereof, the Existing Events of Default have occurred and are continuing under the Credit Agreement and represent and warrant that no other Defaults or Events of Default are outstanding.

2.      Amendments to Credit Agreement.      Effective upon the satisfaction of the conditions set forth in Section 3 hereof, the Credit Agreement is hereby amended as follows:

a.      Section 1.2 of the Credit Agreement is hereby amended to add the following defined terms in the appropriate alphabetical order:

""Temporary Overadvance Amount" means $3,700,000."

2

164393.00001/155777398v.5

""Temporary Overadvance Period" means the period commencing on October 31, 2025 through and including November 14, 2025."

b.      The defined term "Borrowing Base" set forth <u>Section 1.2</u> of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

""<u>Borrowing Base</u>" means, at any time, the sum of:

(a)      up to 90% of the Value of the Borrowers' Eligible Accounts; *plus*

(b)      during the Temporary Overadvance Period, the Temporary Overadvance Amount; *minus*

(c)      Availability Reserves.

The Agent may in its discretion reduce the advance rates, adjust Availability Reserves or any other reserves, or reduce one or more of the elements used to compute the Borrowing Base."

c.      The defined term "Permitted Dividends" set forth <u>Section 1.2</u> of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

""<u>Permitted Dividends</u>" means dividends and distributions that meet each of the following conditions: (1) no Default or Event of Default exists or would occur after giving pro forma effect to the dividend or distribution; (2) the Loan Parties are in pro forma compliance with the financial covenants set forth in <u>Section 7.25</u> both before and after giving effect to the dividend or distribution; (3) the Borrowers shall have a Fixed Charge Coverage Ratio, as of the last day of the most recently ended fiscal quarter on a pro forma basis, of greater than 1.25 to 1.00; (4) the Borrowers shall have Undrawn Availability (without giving effect to the Temporary Overadvance Amount) of at least $3,000,000 in each case for 30 days prior to the payment of such dividend or distribution and after giving effect to the payment of such dividend or distribution; and (5) the Borrowers shall have delivered to the Agent written notice of its intention to make such dividend or distribution at least ten (10) Business Days, which notice shall be accompanied by (i) a Compliance Certificate for the monthly and / or quarterly period then ended demonstrating compliance with all financial covenants, and (ii) the proforma calculation demonstrating that no Default or Event of Default shall result after giving effect to such proposed dividend or distribution."

3.      <u>Effectiveness Conditions</u>.      This Amendment shall become effective on the first date that all of the following conditions have been fully satisfied by the Borrowers in form and substance satisfactory to Agent or waived by Agent in writing:

a.      Execution and delivery of this Amendment by each party hereto;

b.      After giving effect to this Amendment, no Default or Event of Default shall have occurred or be continuing (other than the Existing Events of Default);

3

164393.00001/155777398v.5

c.      The payment of all fees, expenses and other amounts due and payable on the date hereof under each of the Loan Documents, including without limitation all fees and expenses pertaining to this Amendment; and

d.      Borrowers shall have executed and delivered all other agreements, instruments and documents requested by Agent to effectuate and implement the terms hereof.

4.      <u>Conditions Subsequent</u>. The Loan Parties will execute and deliver the documents and complete the tasks set forth below, in each case, within the time limits specified below; it being understood that each such time limit may be extended by Agent in its sole discretion, so long as the Loan Parties are working diligently in good faith to complete, or cause their Subsidiaries to complete, the applicable requirement as determined by Agent in its sole discretion. If the Loan Parties fail to take, comply with or provide any of the actions or items referred to below within the time limits specified below (or such longer period of time as Agent may agree in writing in its sole and absolute discretion), such failure shall constitute an immediate Event of Default under the Loan Agreement, without further notice or action by or on behalf of Agent, any Lender or any other Person:

a.      On or before the end of the Temporary Overadvance Period, Agent shall have received payment of the Outstanding Fees; and

b.      On or before November 21, 2025, Agent shall have received evidence, in form and substance satisfactory to Agent in its sole discretion, that the Permitted Holders have made a cash equity contribution to Holdings in an amount of not less than $1,000,000.

c.      Promptly, but in no event more than one (1) Business Day following receipt by the applicable Permitted Holders of the Net Cash Proceeds of the sale of the Real Property located at 2301 21st Street NW, Altoona, IA, Agent shall have received evidence, in form and substance satisfactory to Agent in its sole discretion, that such Permitted Holders have made a cash equity contribution to Holdings with such Net Cash Proceeds in an amount of not less than $1,000,000 and such cash equity contribution shall have been disbursed to the Borrowers to prepay the Loans in an amount of not less than $1,000,000.

5.      <u>No Waiver; Acknowledgment of Rights and Remedies</u>.

a.      Agent, on behalf of Agent and each Lender, hereby specifically reserves all of the rights and remedies available to it under the Credit Agreement, the other Loan Documents, applicable law and otherwise, as a result of the Existing Events of Default.  Without limiting the scope of the preceding sentence, Agent, on behalf of Agent and each Lender, hereby specifically reserves the right, pursuant to <u>Section 3.1</u> of the Credit Agreement, to increase the rate of interest on the principal of the Obligations to the Default Rate, such increase to be effective as of the day on which the Existing Events of Default or any other Default or Event of Default first occurred. Neither Agent nor any Lender waives the Existing Events of Default or any other Event of Default which may have occurred prior to the date of this letter, which may exist on the date of this Amendment, or which may hereafter occur.  The specific identification of the Existing Events of

4

Default does not constitute and shall not be deemed to constitute a waiver by Agent or any Lender of the Existing Events of Default, or any other Default or Event of Default which may now or hereafter exist under the Credit Agreement or any of the other Loan Documents, or which may hereafter occur. A Default and an Event of Default may only be waived pursuant to an agreement in writing executed by Agent. Any delay or failure by Agent or any Lender in pursuing any rights or remedies as a result of any Default or Event of Default or otherwise shall not be deemed a waiver of such Default or Event of Default or any such rights or remedies.

b. Agent and each Lender may, in their sole discretion, continue to make loans, advances and extensions of credit, including, but not limited to, Revolving Loans, as provided for in the Credit Agreement to Borrowers from time to time, on and after the date hereof. The making of any loan, advance or Revolving Loan, or the extension of any other credit by Agent or any Lender to Borrowers, shall not constitute a waiver by Agent or any such Lender of the Existing Events of Default or any other Default or Event of Default (whether or not Agent or any Lender has knowledge thereof), or a waiver by Agent or any Lender of any of its rights, whether under the Credit Agreement, any of the other Loan Documents, applicable law or otherwise, and all of such rights, and all other rights, powers and remedies are hereby expressly reserved.

c. Nothing continued in this Amendment should be construed to limit the right of Agent or any Lender to act without any other or further notice to Loan Parties in accordance with the terms of the Credit Agreement, any of the other Loan Documents or applicable law. The Loan Parties are not entitled to rely upon any verbal statements made or purported to have been made by or on behalf of Agent or any Lender in connection with any alleged agreement by Agent or any Lender to refrain from exercising any of the rights under the Credit Agreement, any of the other Loan Documents, or applicable law.

6. <u>Representations, Warranties and Reaffirmation</u>. Each Loan Party hereby:

a. reaffirms all representations and warranties made to Agent under the Existing Credit Agreement and all of the Loan Documents and confirms that all such representations and warranties are true and correct in all material respects as of the date hereof (or, in the case of any such representation or warranty already qualified by materiality, such representation shall be true and correct in all respects) (except to the extent any such representations and warranties specifically relate to a specific date, in which case such representations and warranties were true and correct in all material respects on and as of such other specific date (or, in the case of any such representation or warranty already qualified by materiality, such representation shall be true and correct in all respects));

b. reaffirms all of the covenants contained in the Existing Credit Agreement and all of the Loan Documents;

c. represents and warrants to Agent that, other than the Existing Events of Default, no Default or Event of Default has occurred and is continuing under the Credit Agreement or any of the Loan Documents or would exist after giving effect to this Amendment;

5

164393.00001/155777398v.5

d.      represents and warrants that such Loan Party has the requisite authority and legal right to execute, deliver and perform its obligations under this Amendment and the other documents to be executed by it in connection herewith (this Amendment and such other documents, collectively, the "Amendment Documents"), that such actions were duly authorized by all necessary limited liability company or corporate action of such Loan Party, as applicable, and that the officers executing the Amendment Documents on such Loan Party's behalf were similarly authorized and empowered, and that the Amendment Documents do not contravene any provisions of such Loan Party's certificate of incorporation or formation, operating agreement, bylaws, or other formation documents, as applicable; and

e.      represents and warrants that each Amendment Document is valid, binding and enforceable in accordance with their respective terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally.

7.      Payment of Expenses.  The Borrowers shall pay or reimburse Agent for its/their reasonable out-of-pocket costs and expenses (including Attorney Costs and any Taxes) in connection with the preparation, negotiation and execution of this Amendment in accordance with Section 16.16 of the Credit Agreement.

8.      Reaffirmation of Credit Agreement.  Except as modified by the terms hereof, all of the terms and conditions of the Credit Agreement and all of the Loan Documents (i) are hereby reaffirmed and (ii) shall continue in full force and effect as therein written.

9.      Miscellaneous.

a.      Third Party Rights.  No rights are intended to be created hereunder for the benefit of any third party donee, creditor, or incidental beneficiary.

b.      Loan Document.  This Amendment is a "Loan Document" as defined in the Credit Agreement and all of the terms and provisions of the Credit Agreement relating to Loan Documents shall apply hereto.

c.      Captions.  The captions at various places in this Amendment are intended for convenience only and do not constitute and shall not be interpreted as part of this Amendment.

d.      Governing Law.  This Amendment and all matters relating hereto or arising herefrom (whether arising under contract law, tort law or otherwise) shall be governed by and construed in accordance with the laws of the State of Illinois.

e.      Severability.  If any part of this Amendment is contrary to, prohibited by, or deemed invalid under applicable laws, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

6

f.      Counterparts.  This Amendment may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by a party by facsimile or electronic transmission (including email transmission of a PDF image) shall be deemed to be an original signature hereto.

g.      Successors and Assigns.  This Amendment shall be binding upon and inure to the benefit of the parties hereto and its respective successors and assigns.

h.      Modifications.  No modification hereof or any agreement referred to herein shall be binding or enforceable unless in writing and signed on behalf of the party against whom enforcement is sought.

i.      Release; Covenant Not to Sue.

i.      In consideration of the agreements of Agent and the Lenders contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Loan Party, each on behalf of itself and its successors and assigns, and, to the maximum extent enforceable under applicable law, its present and former members, managers, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives (each Loan Party and all such other Persons being hereinafter referred to collectively as the "Releasing Parties" and individually as a "Releasing Party"), hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Agent, each Lender, and each of their respective successors and assigns, and their respective present and former shareholders, members, managers, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives (Agent, Lenders and all such other Persons being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from any and all demands, actions, causes of action, suits, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every kind and nature, known or unknown, suspected or unsuspected, at law or in equity, which any Releasing Party or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the date of this Amendment, for or on account of, or in relation to, or in any way in connection with this Amendment, the Credit Agreement, any of the other Loan Documents or any of the transactions hereunder or thereunder.  Releasing Parties hereby represent to the Releasees that they have not assigned or transferred any interest in any Claims against any Releasee prior to the date hereof.

ii.      Each Loan Party understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense to any above such Claim and may be used as a basis for an injunction against any action, suit or

7

164393.00001/155777398v.5

other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

iii.      Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered will affect in any manner the final, absolute and unconditional nature of the release set forth above.

iv.      <u>Covenant Not to Sue</u>.  Each Releasing Party hereby absolutely, unconditionally and irrevocably covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by any Releasing Party pursuant to <u>Section 9(i)(i)</u> above.  If any Releasing Party violates the foregoing covenant, each Loan Party, for itself and its successors and assigns, and, to the maximum extent enforceable under applicable law, its present and former members, managers, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all reasonable and documented out-of-pocket attorneys' fees and costs incurred by any Releasee as a result of such violation.

[Signature Pages Follow]

8

IN WITNESS WHEREOF, each of the parties has signed this Amendment as of the day and year first above written.

**HOLDINGS:**

**JT LOGISTICS HOLDING COMPANY, LLC,**
an Iowa limited liability company

By:_____

Name: James R. Cord

Title: Manager

**BORROWERS:**

**JT LOGISTICS HOLDING COMPANY, LLC,**
an Iowa limited liability company,

By:_____

Name: James R. Cord

Title: Manager

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,

By:_____

Name: James R. Cord

Title: Manager

**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,

By:_____

Name: James R. Cord

Title: Manager

Signature Page to First Amendment to Credit and Security Agreement

**JT FREIGHT, LLC,**
an Iowa limited liability company,

By: _James R Cord_____
Name: James R. Cord
Title: Manager


**LIVIT STAFFING, LLC,**
an Iowa limited liability company

By: _James R Cord_____
Name: James R. Cord
Title: Manager


**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company

By: _James R Cord_____
Name: James R. Cord
Title: Manager


**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company

By: _James R Cord_____
Name: James R. Cord
Title: Manager


**JT TRANSPORTATION LEASING SOLUTIONS, LLC,**
an Iowa limited liability company

By: _James R Cord_____
Name: James R. Cord
Title: Manager


Signature Page to First Amendment to Credit and Security Agreement

**WAREHOUSE BUILDOUT SYSTEMS &
SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: James R. Cord
Title: Manager


**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: James R. Cord
Title: Manager


**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: James R. Cord
Title: Manager


**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: James R. Cord
Title: Manager


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company

By:_____
Name: James R. Cord
Title: Manager


Signature Page to First Amendment to Credit and Security Agreement

**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company

By: _James R Cord_____

Name: James R. Cord

Title: Manager


**700 BLAKELY, LLC,**
an Iowa limited liability company

By: _James R Cord_____

Name: James R. Cord

Title: Manager


Signature Page to First Amendment to Credit and Security Agreement

**AGENT**:

**ASSOCIATED BANK, NATIONAL ASSOCIATION**

By: _____

Name: Stephen McGreevy

Title: Senior Vice President

**LENDERS:**

**ASSOCIATED BANK, NATIONAL ASSOCIATION**

By: _____

Name: Stephen McGreevy

Title: Senior Vice President

Signature Page to First Amendment to Credit and Security Agreement

FORBEARANCE AGREEMENT AND SECOND AMENDMENT TO CREDIT AND
SECURITY AGREEMENT

This Forbearance Agreement and Second Amendment to Credit and Security Agreement (this "Agreement") dated as of November 24, 2025 by and among JT LOGISTICS HOLDING COMPANY, LLC, an Iowa limited liability company ("Holdings"), JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (as defined below) from time to time as a Borrower, each a "Borrower" and collectively, the "Borrowers"), the Lenders party hereto, and ASSOCIATED BANK, NATIONAL ASSOCIATION, as administrative agent for the Lenders (as defined herein) (in such capacity, "Agent").

BACKGROUND

A.      Holdings, the Borrowers, the financial institutions from time to time party thereto (the "Lenders"), and Agent entered into that certain Credit and Security Agreement dated as of December 27, 2024 (as amended or otherwise modified prior to the effectiveness of this Agreement, the "Existing Credit Agreement" and as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), pursuant to which Agent and Lenders established certain financing arrangements with the Borrowers. Capitalized terms used herein but not specifically defined herein shall have the respective meanings ascribed to them in the Credit Agreement, as amended hereby.

B.      On August 29, 2024, Agent delivered to Loan Parties a certain Notice of Events of Default and Reservation of Rights letter (the "ROR Letter"), pursuant to which, among other things, Agent identified a certain "Specified Event of Default" (as defined in such ROR Letter) that had occurred and were continuing under the Credit Agreement. In addition, as of the date hereof, certain additional Events of Default have occurred and are continuing under Section 10.5 of the Credit Agreement as a result of (i) JT Real Estate's formation of the following new Subsidiaries: (x) 4120 E. 13th Street, LLC, an Iowa limited liability company ("4120"), a wholly-owned subsidiary of JT Real Estate, and (y) JT Logistics 4120 Parcel A, LLC, an Iowa limited

liability company ("4120 Parcel A"), a wholly-owned subsidiary of 4120, which, in each case, is prohibited under Section 7.2 of the Credit Agreement; (ii) JT Real Estate's transfer of its ownership of the Owned Real Property having an address of 4120 East 13th Street, Ames, IA 50010 (such parcel, the "4120 Owned Real Property") to 4120 Parcel A, which is prohibited is prohibited under Section 7.1 and Section 7.10 of the Credit Agreement; and (iii) 4120 Parcel A entering into that certain Construction Loan Agreement, by and among 4120 Parcel A, as the borrower, BCL-CRE 3 LLC, an Illinois limited liability company ("BCI"), as the lender, and the other parties party thereto, pursuant to which, among other things, BCI agreed to provide a loan to 4120 Parcel A, and in order to induce BCI to provide the financial arrangements thereunder, 4120 Parcel A agreed to grant BCI a security interest in the 4120 Owned Real Property, which is prohibited under Section 7.2 and Section 7.8 of the Credit Agreement (collectively, the "Additional Events of Default", together with the Specified Event of Default and any other Defaults or Events of Default as of the date hereof under Article X of the Credit Agreement as a result of the occurrence and/or continuance of the Additional Events of Default and the Specified Event of Default, collectively, the "Existing Events of Default").

C.     The Loan Parties have requested that Agent and the Lenders (i) forbear from exercising their rights and remedies with respect to the Existing Events of Default and (ii) make certain amendments to the Existing Credit Agreement and certain other agreements as more particularly set forth herein, and Agent and the Lenders have agreed to such forbearance and amendment, in each case, subject to the terms and conditions set forth in this Agreement. Loan Parties, Agent and the Lenders desire to set forth their agreements in writing.

TERMS AND CONDITIONS

NOW, THEREFORE, with the foregoing background incorporated by reference and made a part hereof and intending to be legally bound, the parties agree as follows:

1.     Acknowledgement of Obligations, Outstanding Fees, and Existing Events of Default.

a.     Outstanding Obligations.     The Loan Parties confirm and acknowledge that as of the close of business on November 24, 2025, the Borrowers are indebted to Agent and the Lenders under the Credit Agreement and the other Loan Documents (i) in the aggregate principal amount of $28,343,571 with respect to the Loans and (ii) in the aggregate amount of $150,000 in respect of accrued and unpaid fees related to the Obligations ("Outstanding Fees"), in each case, together with interest and fees accrued and unpaid in respect thereof, and all other fees and other amounts due related thereto, in each case without any deduction, defense, setoff, claim or counterclaim, of any nature.

b.     No Other Events of Default.     The Loan Parties acknowledge that as of the date hereof, the Existing Events of Default have occurred and are continuing under the Credit Agreement and represent and warrant that no other Defaults or Events of Default are outstanding.

c.     Default Rate.     The Loan Parties acknowledge and agree that the Default Rate of interest, as provided for under Section 3.1 the Credit Agreement, has been accruing on the Obligations, effective from July 1, 2025, and shall continue to remain in effect until the date the

2

164393.00001/155865101v.3

Existing Events of Default have been waived in writing by the Agent in its discretion, whether or not such date occurs after the Forbearance Termination Date (as defined below).

2.      <u>Forbearance</u>.

a.      <u>Grant of Forbearance</u>.  Subject to the terms and conditions hereof, and satisfaction of the conditions precedent set forth herein, for the period from the Forbearance Effective Date (as hereinafter defined) through the earlier of (i) January 31, 2026, and (ii) the date of the occurrence of any Default or Event of Default, other than the Existing Events of Default (such earlier date, the "<u>Forbearance Termination Date</u>"), Agent and the Lenders shall forbear from taking any action, or exercising any rights or remedies (including any right of setoff) against any Borrower or the property of any Borrower or the Collateral, in respect of the Existing Defaults. On the Forbearance Termination Date, all forbearance with respect to the Existing Defaults shall cease, and thereupon Agent may, in its discretion, exercise all rights and remedies with respect to the Existing Defaults or any other Event of Default against any Borrower or any of the Collateral as if this forbearance had never been granted.

b.      <u>Preservation of Rights</u>.

i.      By agreeing to temporarily forbear from the exercise of rights and remedies until the Forbearance Termination Date, Agent and the Lenders do not waive the Existing Events of Default. The Existing Events of Default are preserved. The granting of the temporary forbearance hereunder shall not, other than as expressly provided herein, be deemed a waiver of the rights and remedies of Agent and the Lenders or constitute a course of conduct or dealing on behalf of Agent and the Lenders.  Agent and the Lenders specifically reserve all rights and remedies. Notwithstanding anything to the contrary contained herein, Borrowers acknowledge and agree that (i) except to the extent specifically provided for otherwise in this Agreement, Agent and the Lenders are not obligated or required to make any advances or extensions of credit to Borrowers under the Credit Agreement and (ii) any advances made by Agent or the Lenders to Borrowers during the continuance of a Default or an Event of Default shall be made at the sole discretion of Agent and the Lenders and shall not obligate Agent or the Lenders to make any additional advances to Borrowers.

ii.      Upon the occurrence the Forbearance Termination Date, the agreement of Agent and Lenders hereunder to forbear from exercising their default-related rights and remedies shall immediately terminate without the requirement of any demand, presentment, protest, or notice of any kind, all of which each other Loan Party waives. Each Borrower and each other Loan Party agrees that Agent and Lenders may at any time thereafter proceed to exercise any and all of their respective rights and remedies under any or all of the Credit Agreement, any other Loan Document and/or applicable law, including, without limitation, their respective rights and remedies with respect to the Existing Events of Default. Without limiting the generality of the foregoing, upon the occurrence of the Forbearance Termination Date, Agent and Lenders may, in their sole discretion and

3

without the requirement of any demand, presentment, protect, or notice of any kind, (A) suspend or terminate any commitment to provide Revolving Loans or other extensions of credit under the Credit Agreement and other Loan Documents, (B) charge and demand payment of interest on any or all of the Obligations at the Default Rate of interest pursuant to Section 3.1 of the Credit Agreement retroactive to the date on which the first Existing Event of Default or any other Event of Default occurred, (C) commence any legal or other action to collect any or all of the Obligations from any or all of the Borrowers, any other Loan Party and/or any Collateral, (D) foreclose or otherwise realize on any or all of the Collateral, and/or as applicable, setoff or apply to the payment of any or all of the Obligations, any or all of the Collateral, in each case in accordance with the Credit Agreement, the other Loan Documents and/or applicable law, and (D) take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Credit Agreement, any other Loan Documents and/or applicable law, all of which rights and remedies are fully reserved by Agent and the Lenders.

3.    Additional Covenants; Milestones.  In addition to the covenants set forth in the Credit Agreement and the other Loan Documents, the Loan Parties hereby agree, unless otherwise waived or modified by Agent, in its sole discretion, as follows:

a.    Additional Covenants.

i.    Weekley Borrowing Base Certificates. Commencing with first week following the Agreement Effective Date and each week thereafter through the Forbearance Termination Date, to deliver a Borrowing Base Certificate, together with any other items, reports, or information Agent may require in its sole discretion.

ii.    Monthly Sales.  For each calendar month set forth below, to not permit the aggregate monthly sales of the Loan Parties to be less than the applicable amount set forth below for each such calendar month:

| Calendar Month Ending | Aggregate Monthly Sales of the Loan Parties |
|---|---|
| November 30, 2025 | $4,500,000 |
| December 31, 2025 | $4,750,000 |
| January 31, 2026 | $4,750,000 |

b.    Milestones.

i.    Permitted Holder Cash Equity Contribution. On or before November 21, 2025, to deliver to Agent, in form and substance satisfactory to Agent in its sole discretion, evidence that the Permitted Holders have made the Permitted Holder Cash Equity Contribution.

4

164393.00001/155865101v.3

ii.        Personal Guaranties. On or before November 21, 2025, to deliver to Agent, each in form and substance satisfactory to Agent in its sole discretion, (i) the Myers Guaranty and (ii) the Ekis Guaranty.

iii.        Collateral Pledge Agreements. On or before November 25, 2025, to deliver to Agent, each in form and substance satisfactory to Agent in its sole discretion, (i) the JMAC Collateral Pledge Agreement, (ii) the Archangel Collateral Pledge Agreement, (iii) the Strawhecker Collateral Pledge Agreement, and (iv) the Ekis Collateral Pledge Agreement.

iv.        Letter of Intent Re: Dixon Sale. On or before December 9, 2025, to deliver to Agent, in form and substance satisfactory to Agent in its sole discretion, a letter of intent with respect to the Dixon Sale.

v.        Mortgage. On or before December 12, 2025, use commercially reasonable effort to deliver to Agent, in form and substance satisfactory to Agent in its sole discretion, a Mortgage with respect to the property located at 700 Blakely Circle, Grinnell, IA.

vi.        Altoona Sale Cash Equity Contribution. On or before December 12, 2025, to deliver to Agent, in form and substance satisfactory to Agent in its sole discretion, evidence that certain of the Permitted Holders have made the Altoona Sale Cash Equity Contribution.

vii.        Joinder of 4120. On or before December 19, 2025, to cause (i) 4120 to become a Loan Party and become jointly and severally liable for the Obligations; (ii) the applicable Loan Parties to pledge 100% of the Equity Interests of 4120 to Agent for the benefit of the Lenders; (iii) 4120 to be joined as a Borrower under the Credit Agreement and provide to Agent a Joinder to the Credit Agreement and the other Loan Documents, in form and substance satisfactory to Agent in its sole discretion; (iv) 4120 to grant the Agent for the benefit of the Lenders first-priority perfected Liens in its present and future assets; and (v) Agent to have received all documents (including organizational documents and legal opinions) it may require, in each case, pursuant to Section 7.12 of the Credit Agreement.

viii.        Outstanding Fees. On or before December 19, 2025, to pay in full to Agent the Outstanding Fees.

ix.        Purchase Agreement Re: Dixon Sale. On or before December 31, 2025, to deliver to Agent, in form and substance satisfactory to Agent in its sole discretion, a purchase agreement, duly executed by the parties thereto, and the documents, schedules, and exhibits related thereto, with respect to the Dixon Sale.

x.        Letter of Intent Re: Grinnell Sale. On or before January 6, 2026, to deliver to Agent, in form and substance satisfactory to Agent in its sole discretion, a letter of intent with respect to the Grinnell Sale.

5

xi.      Dixon Sale.  On or before January 9, 2026, to deliver to Agent, in form and substance satisfactory to Agent in its sole discretion, that the Dixon Sale has been consummated.

xii.      Dixon Sale Cash Equity Contribution.  On or before January 9, 2026, to deliver to Agent, in form and substance satisfactory to Agent in its sole discretion, evidence that certain of the Permitted Holders have made the Dixon Sale Cash Equity Contribution.

xiii.      Purchase Agreement Re: Grinnell Sale.  On or before January 16, 2026, to deliver to Agent, in form and substance satisfactory to Agent in its sole discretion, a purchase agreement, duly executed by the parties thereto, and the documents, schedules, and exhibits related thereto, with respect to the Grinnell Sale.

xiv.      Grinnell Sale.  On or before January 30, 2026, to deliver to Agent, in form and substance satisfactory to Agent in its sole discretion, that the Grinnell Sale has been consummated.

xv.      Grinnell Sale Cash Equity Contribution.  On or before January 30, 2026, to deliver to Agent, in form and substance satisfactory to Agent in its sole discretion, evidence that certain of the Permitted Holders and/or JT Real Estate have made the Grinnell Sale Cash Equity Contribution.

xvi.      Default Interest and Additional Fees.  On or before January 30, 2026, to pay to Agent an amount of not less than $325,000 on account of past due fess and accrued interest at the Default Rate due and owing from July 1, 2025 through and including January 30, 2026.

4.      Amendments to Credit Agreement.  Effective upon the satisfaction of the conditions set forth in Section 6 hereof, the Credit Agreement is hereby amended (a) to delete the bold, red stricken text (indicated textually in the same manner as the following example: stricken text), (b) to add the bold, blue double-underlined text (indicated textually in the same manner as the following example: double-underlined text), and (c) to move the green stricken text (indicated textually in the same manner as the following example: stricken text) to where the green underlined text is located (indicated textually in the same manner as the following example: underlined text), in each case, as set forth in the marked copy of the Credit Agreement attached as Exhibit A hereto and made a part hereof for all purposes. For the avoidance of doubt, except as so modified by this Agreement, Schedules and Exhibits to the Credit Agreement shall remain in the form attached to the Existing Credit Agreement; except, that Agent may modify Exhibits to the Existing Credit Agreement as it may deem necessary or desirable to implement and give effect to the transactions contemplated by this Agreement.

5.      Affirmations of Existing Collateral.  Each Loan Party covenants, confirms and agrees that as security for the prompt and unconditional payment and performance of the

6

Obligations, Agent, on behalf of itself and the Lenders, has and shall continue to have, and is hereby granted a continuing lien on and security interest in the Collateral, all whether now owned or hereafter acquired, created or arising, together with all proceeds, including insurance proceeds thereof. Each Loan Party acknowledges and agrees that nothing herein contained in any way impairs Agent's or any Lender's existing rights and priority in the Collateral under the Credit Agreement and the other Existing Loan Documents.

6. Effectiveness Conditions. This Agreement shall become effective on the first date that all of the following conditions have been fully satisfied by the Borrowers in form and substance satisfactory to Agent or waived by Agent in writing (the "Agreement Effective Date"):

a. Execution and delivery of this Agreement by each party hereto;

b. After giving effect to this Agreement, no Default or Event of Default shall have occurred or be continuing (other than the Existing Events of Default);

c. The payment of all fees, expenses and other amounts due and payable on the date hereof under each of the Loan Documents, including without limitation all fees and expenses pertaining to this Agreement; and

d. Borrowers shall have executed and delivered all other agreements, instruments and documents requested by Agent to effectuate and implement the terms hereof.

7. Additional Events of Default.

a. In addition to the Events of Default set forth in the Credit Agreement and the other Loan Documents, the failure of any Borrower to comply with its representations, warranties, covenants or other undertakings under this Agreement, shall be an Event of Default under the Credit Agreement and the other Loan Documents and upon such failure, the undertakings and forbearance of Agent and the Lenders under this Agreement may at Agent's sole discretion, and without notice to any Borrower immediately terminate and Agent and the Lenders may exercise all rights and remedies available to them under the Credit Agreement, the other Loan Documents and under applicable law or in equity.

b. Any Event of Default, other than the Existing Events of Default, by the Loan Parties under any of the Credit Agreement and the other Loan Documents shall be considered an Event of Default under all of the Loan Documents and during the continuation of such Event of Default, the undertakings of Agent and the Lenders under this Agreement may at Agent's sole discretion, and without notice to any Loan Party immediately terminate and Agent and the Lenders may exercise all rights and remedies available to them under the Credit Agreement, the other Loan Documents and under applicable law or in equity.

8. Waivers.

a. Neither Agent, nor any Lender, nor any agent or attorney for Agent or any Lender, shall be liable to the Loan Parties for consequential damages arising from any breach of

7

contract, tort or other wrong relating to the establishment, administration or collection of the Obligations.

b.        No Loan Party will, directly or indirectly, do any act or fail to do any act, which would impair or affect Agent's security interest in any Collateral, nor will any Loan Party upon the occurrence and during the continuance of any Default or Event of Default under this Agreement or the other Loan Documents, contest Agent's or any Lender's right to obtain judgment against such Loan Party or to foreclose upon any Collateral pledged to Agent, nor will any Loan Party move to vacate or enjoin such judgment or foreclosure.

c.        Each Loan Party waives and renounces all rights which are waivable under Article 9 of the UCC as such rights relate to any Borrower's relationship with Agent and the Lenders, whether such rights are waivable before or after default, including, without limitation, those rights with respect to compulsory disposition of collateral (UCC §§9-610, 9-615 and 9-620), any right of redemption under UCC §9-623, and any right to notice relating to disposition of collateral under UCC §9-611.

9.        No Waiver; Acknowledgment of Rights and Remedies.

a.        Agent, on behalf of Agent and each Lender, hereby specifically reserves all of the rights and remedies available to it under the Credit Agreement, the other Loan Documents, applicable law and otherwise, as a result of the Existing Events of Default. Without limiting the scope of the preceding sentence, Agent, on behalf of Agent and each Lender, hereby specifically reserves the right, pursuant to Section 3.1 of the Credit Agreement, to increase the rate of interest on the principal of the Obligations to the Default Rate, such increase to be effective as of the day on which the Existing Events of Default or any other Default or Event of Default first occurred. Neither Agent nor any Lender waives the Existing Events of Default or any other Event of Default which may have occurred prior to the date of this letter, which may exist on the date of this Agreement, or which may hereafter occur. The specific identification of the Existing Events of Default does not constitute and shall not be deemed to constitute a waiver by Agent or any Lender of the Existing Events of Default, or any other Default or Event of Default which may now or hereafter exist under the Credit Agreement or any of the other Loan Documents, or which may hereafter occur. A Default and an Event of Default may only be waived pursuant to an agreement in writing executed by Agent. Any delay or failure by Agent or any Lender in pursuing any rights or remedies as a result of any Default or Event of Default or otherwise shall not be deemed a waiver of such Default or Event of Default or any such rights or remedies.

b.        Agent and each Lender may, in their sole discretion, continue to make loans, advances and extensions of credit, including, but not limited to, Revolving Loans, as provided for in the Credit Agreement to Borrowers from time to time, on and after the date hereof. The making of any loan, advance or Revolving Loan, or the extension of any other credit by Agent or any Lender to Borrowers, shall not constitute a waiver by Agent or any such Lender of the Existing Events of Default or any other Default or Event of Default (whether or not Agent or any Lender has knowledge thereof), or a waiver by Agent or any Lender of any of its rights, whether under the Credit Agreement, any of the other Loan Documents, applicable law or otherwise, and all of such rights, and all other rights, powers and remedies are hereby expressly reserved.

8

164393.00001/155865101v.3

c.        Nothing continued in this Agreement should be construed to limit the right of Agent or any Lender to act without any other or further notice to Loan Parties in accordance with the terms of the Credit Agreement, any of the other Loan Documents or applicable law.  The Loan Parties are not entitled to rely upon any verbal statements made or purported to have been made by or on behalf of Agent or any Lender in connection with any alleged agreement by Agent or any Lender to refrain from exercising any of the rights under the Credit Agreement, any of the other Loan Documents, or applicable law.

10.        Representations, Warranties and Reaffirmation.  Each Loan Party hereby:

a.        reaffirms all representations and warranties made to Agent under the Existing Credit Agreement and all of the Loan Documents and confirms that all such representations and warranties are true and correct in all material respects as of the date hereof (or, in the case of any such representation or warranty already qualified by materiality, such representation shall be true and correct in all respects) (except to the extent any such representations and warranties specifically relate to a specific date, in which case such representations and warranties were true and correct in all material respects on and as of such other specific date (or, in the case of any such representation or warranty already qualified by materiality, such representation shall be true and correct in all respects));

b.        reaffirms all of the covenants contained in the Existing Credit Agreement and all of the Loan Documents;

c.        represents and warrants to Agent that, other than the Existing Events of Default, no Default or Event of Default has occurred and is continuing under the Credit Agreement or any of the Loan Documents or would exist after giving effect to this Agreement;

d.        represents and warrants that such Loan Party has the requisite authority and legal right to execute, deliver and perform its obligations under this Agreement and the other documents to be executed by it in connection herewith (this Agreement and such other documents, collectively, the "Agreement Documents"), that such actions were duly authorized by all necessary limited liability company or corporate action of such Loan Party, as applicable, and that the officers executing the Agreement Documents on such Loan Party's behalf were similarly authorized and empowered, and that the Agreement Documents do not contravene any provisions of such Loan Party's certificate of incorporation or formation, operating agreement, bylaws, or other formation documents, as applicable; and

e.        represents and warrants that each Agreement Document is valid, binding and enforceable in accordance with their respective terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally.

11.        Payment of Expenses.  The Borrowers shall pay or reimburse Agent for its/their reasonable out-of-pocket costs and expenses (including Attorney Costs and any Taxes) in

9

164393.00001/155865101v.3

connection with the preparation, negotiation and execution of this Agreement in accordance with Section 16.16 of the Credit Agreement.

12. <u>Reaffirmation of Credit Agreement</u>. Except as modified by the terms hereof, all of the terms and conditions of the Credit Agreement and all of the Loan Documents (i) are hereby reaffirmed and (ii) shall continue in full force and effect as therein written.

13. <u>Miscellaneous</u>.

a. <u>Third Party Rights</u>. No rights are intended to be created hereunder for the benefit of any third party donee, creditor, or incidental beneficiary.

b. <u>Loan Document</u>. This Agreement is a "Loan Document" as defined in the Credit Agreement and all of the terms and provisions of the Credit Agreement relating to Loan Documents shall apply hereto.

c. <u>Captions</u>. The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

d. <u>Governing Law</u>. This Agreement and all matters relating hereto or arising herefrom (whether arising <u>under</u> contract law, tort law or otherwise) shall be governed by and construed in accordance with the laws of the State of Illinois.

e. <u>Severability</u>. If any part of this Agreement is contrary to, prohibited by, or deemed invalid under applicable laws, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

f. <u>Counterparts</u>. This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile or electronic transmission (including email transmission of a PDF image) shall be deemed to be an original signature hereto.

g. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and its respective successors and assigns.

h. <u>Modifications</u>. No modification hereof or any agreement referred to herein shall be binding or enforceable unless in writing and signed on behalf of the party against whom enforcement is sought.

i. <u>Release; Covenant Not to Sue</u>.

i. In consideration of the agreements of Agent and the Lenders contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Loan Party, each on behalf of

10

itself and its successors and assigns, and, to the maximum extent enforceable under applicable law, its present and former members, managers, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives (each Loan Party and all such other Persons being hereinafter referred to collectively as the "Releasing Parties" and individually as a "Releasing Party"), hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Agent, each Lender, and each of their respective successors and assigns, and their respective present and former shareholders, members, managers, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives (Agent, Lenders and all such other Persons being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from any and all demands, actions, causes of action, suits, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every kind and nature, known or unknown, suspected or unsuspected, at law or in equity, which any Releasing Party or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the date of this Agreement, for or on account of, or in relation to, or in any way in connection with this Agreement, the Credit Agreement, any of the other Loan Documents or any of the transactions hereunder or thereunder. Releasing Parties hereby represent to the Releasees that they have not assigned or transferred any interest in any Claims against any Releasee prior to the date hereof.

ii. Each Loan Party understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense to any above such Claim and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

iii. Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered will affect in any manner the final, absolute and unconditional nature of the release set forth above.

iv. Covenant Not to Sue. Each Releasing Party hereby absolutely, unconditionally and irrevocably covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by any Releasing Party pursuant to Section 9(i)(i) above. If any Releasing Party violates the foregoing covenant, each Loan Party, for itself and its successors and assigns, and, to the maximum extent enforceable under applicable law, its present and former members, managers, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives, agrees to pay, in addition to such other damages as any

11

Releasee may sustain as a result of such violation, all reasonable and documented out-of-pocket attorneys' fees and costs incurred by any Releasee as a result of such violation.

[Signature Pages Follow]

12

164393.00001/155865101v.3

IN WITNESS WHEREOF, each of the parties has signed this Agreement as of the day and year first above written.

**HOLDINGS:**

**JT LOGISTICS HOLDING COMPANY, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_____
Name: ____James R. Cord Jr._____
Title: _____President & CEO_____

**BORROWERS:**

**JT LOGISTICS HOLDING COMPANY, LLC,**
an Iowa limited liability company,

By: _James R Cord Jr_____
Name: ____James R. Cord Jr._____
Title: _____President & CEO_____

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,

By: _James R Cord Jr_____
Name: ____James R. Cord Jr._____
Title: _____President & CEO_____

**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,

By: _James R Cord Jr_____
Name: ____James R. Cord Jr._____
Title: _____President & CEO_____

**JT FREIGHT, LLC,**
an Iowa limited liability company,

By: _James R Cord Jr_____
Name: ____James R. Cord Jr._____
Title: ____President & CEO_____

**LIVIT STAFFING, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_____
Name: ____James R. Cord Jr._____
Title: ____President & CEO_____

**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_____
Name: ____James R. Cord Jr._____
Title: ____President & CEO_____

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_____
Name: ____James R. Cord Jr._____
Title: ____President & CEO_____

**JT TRANSPORTATION LEASING SOLUTIONS, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_____
Name: ____James R. Cord Jr._____
Title: ____President & CEO_____

Signature Page to Forbearance Agreement and Second Amendment to Credit and Security Agreement

**WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_
Name: _James R. Cord Jr._
Title: _President & CEO_

**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_
Name: _James R. Cord Jr._
Title: _President & CEO_

**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_
Name: _James R. Cord Jr._
Title: _President & CEO_

**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_
Name: _James R. Cord Jr._
Title: _President & CEO_

Signature Page to Forbearance Agreement and Second Amendment to Credit and Security Agreement

**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_
Name: _James R. Cord Jr._
Title: _President & CEO_

**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_
Name: _James R. Cord Jr._
Title: _President & CEO_

**700 BLAKELY, LLC,**
an Iowa limited liability company

By: _James R Cord Jr_
Name: _James R. Cord Jr._
Title: _President & CEO_

Signature Page to Forbearance Agreement and Second Amendment to Credit and Security
Agreement

**AGENT**:

**ASSOCIATED BANK, NATIONAL ASSOCIATION**

By: _____
Name: Stephen McGreevy
Title: Senior Vice President


**LENDERS**:

**ASSOCIATED BANK, NATIONAL ASSOCIATION**

By: _____
Name: Stephen McGreevy
Title: Senior Vice President


Signature Page to Forbearance Agreement and Second Amendment to Credit and Security
Agreement

EXHIBIT A

Conformed Credit Agreement

*See Attached.*

Exhibit A

*Execution Version*
Exhibit A to
~~Conformed~~Forbearance Agreement and Second Amendment to Credit and Security Agreement
~~through First Amendment~~ – Conformed Credit Agreement

**CREDIT AND SECURITY AGREEMENT**

**dated as of December 27, 2024**
**(as amended by the ~~First~~Forbearance Agreement and Second Amendment to Credit and**
**Security Agreement dated November ~~7~~24, 2025)**

**among**

**JT LOGISTICS HOLDING COMPANY, LLC,**
**as Holdings,**

**JT LOGISTICS SOLUTIONS, LLC,**
**JT TRANSPORTATION, LLC,**
**JT FREIGHT, LLC,**
**LIVIT STAFFING, LLC,**
**JT REAL ESTATE HOLDINGS, LLC,**
**JT PROPERTY SOLUTIONS, LLC,**
**JT TRANSPORTATION LEASING SOLUTIONS, LLC,**
**WAREHOUSE BUILDOUT SYSTEMS AND SOLUTIONS, LLC,**
**JT ECOMMERCE SOLUTIONS, LLC,**
**JT PACKAGING SOLUTIONS, LLC,**
**JT BINDING SOLUTIONS, LLC,**
**JT INDUSTRIAL SERVICES, LLC,**
**JT EXPEDITED SOLUTIONS, LLC,**

**and**

**700 BLAKELY, LLC,**

**as the Borrowers,**

**ASSOCIATED BANK, NATIONAL ASSOCIATION**
**(as Administrative Agent, Issuer and a Lender),**

**and**

**THE VARIOUS FINANCIAL INSTITUTIONS THAT ARE NOW OR HEREAFTER**
**BECOME A PARTY HERETO,**
**as Lenders**

**TABLE OF CONTENTS**

Page No.

**ARTICLE I DEFINITIONS** ..... **1**

1.1 Accounting Terms. ..... 1
1.2 General Terms. ..... 2
1.3 UCC Terms. ..... 35
1.4 General Construction. ..... 35
1.5 Time. ..... 36

**ARTICLE II COMMITMENTS OF THE LENDERS; BORROWING PROCEDURE** ..... **36**

2.1 Revolving Loans; Swing Loans. ..... 36
2.2 Term Loan. ..... 37
2.3 Capex Loans; HVAC Equipment Loans. ..... 38
2.4 Loan Procedures. ..... 39
2.5 Loan Disbursement. ..... 41
2.6 Maximum Advances. ..... 41
2.7 Loan Repayment; Term Loan Amortization. ..... 41
2.8 Statements. ..... 42
2.9 Letters of Credit. ..... 42
2.10 Other Letter of Credit Issues. ..... 47
2.11 Manner of Borrowing and Payment; Settlement. ..... 48
2.12 Defaulting Lender. ..... 50
2.13 Voluntary Prepayments. ..... 51
2.14 Additional Payments. ..... 51
2.15 Use of Proceeds. ..... 51
2.16 Taxes. ..... 52
2.17 Mandatory Prepayment. ..... 55
2.18 Application of Proceeds. ..... 56

**ARTICLE III INTEREST AND FEES** ..... **57**

3.1 Interest. ..... 57
3.2 Interest Payment Dates. ..... 57
3.3 Closing Fee. ..... 57
3.4 Collateral Fees. ..... 57
3.5 Non-Use Fee. ..... 58
3.6 [Reserved]. ..... 58
3.7 [Reserved]. ..... 58
3.8 Agent Fees. ..... 58
3.9 Computing Interest and Fees. ..... 58
3.10 Maximum Charges. ..... 59
3.11 Increased Costs. ..... 59
3.12 Inadequacy or Unfairness. ..... 60
3.13 Successor Rate. ..... 60

i

**ARTICLE IV COLLATERAL: GENERAL TERMS** ......................................................... **63**

4.1     Security Interest. .................................................................................. 63
4.2     Perfection. ............................................................................................ 63
4.3     Dispositions. ........................................................................................ 63
4.4     Preserving Collateral. ......................................................................... 63
4.5     Ownership. ........................................................................................... 64
4.6     Defending Agent's and Lenders' Interests. ...................................... 64
4.7     Books and Records. ............................................................................. 65
4.8     Financial Disclosure. .......................................................................... 65
4.9     Laws. .................................................................................................... 65
4.10   Inspections and Appraisals. ................................................................ 65
4.11   Insurance. ............................................................................................. 66
4.12   Paying Insurance. ................................................................................ 66
4.13   Paying Taxes. ....................................................................................... 66
4.14   Paying Leasehold Obligations. ........................................................... 67
4.15   Accounts. .............................................................................................. 67
4.16   Equipment Maintenance. ..................................................................... 69
4.17   No Liability. ......................................................................................... 69
4.18   Environmental Matters. ....................................................................... 70
4.19   Financing Statements. ......................................................................... 70
4.20   Pledged Equity Interests. .................................................................... 70
4.21   [Reserved]. ........................................................................................... 71

**ARTICLE V REPRESENTATIONS AND WARRANTIES** ............................................. **71**

5.1     Authority. ............................................................................................. 71
5.2     Formation; Qualification; and Subsidiaries. ..................................... 72
5.3     Officers; Directors; Equity Interest Holders; and Capitalization. .... 72
5.4     No Governmental Approval; No Conflict. ......................................... 72
5.5     Tax Returns. ......................................................................................... 72
5.6     Financial Information. ......................................................................... 72
5.7     Name. ................................................................................................... 73
5.8     O.S.H.A. and Environmental Compliance. ....................................... 73
5.9     Solvency; No Litigation, No Violation. .............................................. 73
5.10   Intellectual Property. ........................................................................... 73
5.11   Licenses and Permits. .......................................................................... 74
5.12   Indebtedness Default. .......................................................................... 74
5.13   No Burdensome Restrictions; No Default. ......................................... 74
5.14   No Labor Disputes. .............................................................................. 74
5.15   Margin Regulations. ............................................................................ 74
5.16   Investment Company Act. ................................................................... 74
5.17   Disclosure. ........................................................................................... 74
5.18   Hedging Agreement. ............................................................................ 74
5.19   Material Business Agreements. ........................................................... 75
5.20   Certain Laws and Regulations. ........................................................... 75
5.21   Beneficial Ownership Certificate. ...................................................... 75
5.22   Compliance with OFAC; Anti-Corruption Laws. ............................. 75

164393.00001/155883146v.1164393.00001/155883146v.3

| | | |
|---|---|---:|
| 5.23 | EEA Financial Institutions. | 75 |
| 5.24 | ERISA Compliance. | 75 |

**ARTICLE VI AFFIRMATIVE COVENANTS** .......................................................... **77**

| | | |
|---|---|---:|
| 6.1 | Conducting Business; Maintaining Existence; and Assets. | 77 |
| 6.2 | Violations. | 77 |
| 6.3 | Supplemental Instruments. | 77 |
| 6.4 | Indebtedness. | 77 |
| 6.5 | Financial Statements. | 77 |
| 6.6 | Taxes. | 77 |
| 6.7 | Deposit Accounts. | 77 |
| 6.8 | Beneficial Ownership Certificate. | 78 |
| 6.9 | [Reserved]. | 78 |
| 6.10 | Employee Benefit Plans. | 78 |
| 6.11 | [Reserved]. | 78 |
| 6.12 | Post-Closing Matters. | 78 |

**ARTICLE VII NEGATIVE COVENANTS** ................................................................ **79**

| | | |
|---|---|---:|
| 7.1 | Mergers; Consolidations; Acquisitions; and Asset Sales. | 79 |
| 7.2 | Liens. | 79 |
| 7.3 | Guarantees. | 79 |
| 7.4 | Investments. | 79 |
| 7.5 | Loans. | 79 |
| 7.6 | Capital Expenditures. | 79 |
| 7.7 | Distributions. | 80 |
| 7.8 | Indebtedness. | 80 |
| 7.9 | Business. | 80 |
| 7.10 | Affiliate Transactions. | 81 |
| 7.11 | Leases. | 81 |
| 7.12 | Subsidiaries; Partnerships; and Disqualified Stock. | 81 |
| 7.13 | Fiscal Year and Accounting Changes. | 81 |
| 7.14 | Pledging Credit. | 81 |
| 7.15 | Amending Charter Documents. | 81 |
| 7.16 | ERISA. | 81 |
| 7.17 | Prepaying Indebtedness. | 81 |
| 7.18 | Material Business Agreements. | 82 |
| 7.19 | Sanctions. | 82 |
| 7.20 | Anti-Corruption Laws. | 82 |
| 7.21 | [Reserved]. | 82 |
| 7.22 | [Reserved]. | 82 |
| 7.23 | Amending Leases. | 82 |
| 7.24 | Use of Proceeds. | 82 |
| 7.25 | Financial Covenants. | 82 |

**ARTICLE VIII CONDITIONS PRECEDENT** ............................................................. **82**

| | | |
|---|---|---:|
| 8.1 | Conditions to Initial Loans. | 82 |

164393.00001/155883146v.1164393.00001/155883146v.3

| | | | |
|---|---|---|---|
| 8.2 | Conditions to Each Loan and Advance. | | 85 |
| **ARTICLE IX** | **INFORMATION AS TO THE LOAN PARTIES** | | **86** |
| 9.1 | Disclosure. | | 86 |
| 9.2 | Borrowing Base Certificate; Schedules. | | 86 |
| 9.3 | Notice of Suits and Adverse Events. | | 86 |
| 9.4 | Material Events. | | 87 |
| 9.5 | Annual Financial Statements. | | 87 |
| 9.6 | Monthly Financial Statements. | | 87 |
| 9.7 | Additional Information. | | 87 |
| 9.8 | Projected Operating Budget and Availability Forecast. | | 88 |
| 9.9 | Electronic Reporting. | | 88 |
| 9.10 | Individual Guarantor PFS and Tax Returns. | | 88 |
| **ARTICLE X** | **EVENTS OF DEFAULT** | | **89** |
| 10.1 | Payment. | | 89 |
| 10.2 | Misrepresentation. | | 89 |
| 10.3 | Not Furnishing Information. | | 89 |
| 10.4 | Liens. | | 89 |
| 10.5 | Covenant Breaches. | | 89 |
| 10.6 | Judgments. | | 89 |
| 10.7 | Insolvency. | | 89 |
| 10.8 | Material Adverse Effect. | | 89 |
| 10.9 | Lender's Lien Priority. | | 89 |
| 10.10 | Breaches Under Material Business Agreements. | | 90 |
| 10.11 | Cross Default. | | 90 |
| 10.12 | Change of Control. | | 90 |
| 10.13 | Invalidity. | | 90 |
| 10.14 | Intellectual Property. | | 90 |
| 10.15 | Destruction of Collateral. | | 90 |
| 10.16 | Business Interruption. | | 90 |
| 10.17 | Guarantor Repudiation. | | 90 |
| 10.18 | Indictment; Forfeiture. | | 90 |
| 10.19 | Hedging Agreement. | | 91 |
| 10.20 | ERISA. | | 91 |
| 10.21 | Tenant Guaranty Default. | | 91 |
| **ARTICLE XI** | **LENDER'S RIGHTS AND REMEDIES AFTER AN EVENT OF DEFAULT** | | **91** |
| 11.1 | Rights and Remedies. | | 91 |
| 11.2 | Allocation of Payments After Event of Default. | | 92 |
| 11.3 | No Waiver. | | 94 |
| **ARTICLE XII** | **WAIVERS AND JUDICIAL PROCEEDINGS** | | **94** |
| 12.1 | Notice Waiver. | | 94 |
| 12.2 | Delay. | | 94 |

iv

| | | |
|---|---|---|
| 12.3 | Waiver of Jury Trial. | 94 |
| **ARTICLE XIII EFFECTIVE DATE AND TERMINATION** | | **94** |
| 13.1 | Term. | 94 |
| 13.2 | Termination. | 94 |
| **ARTICLE XIV LOAN PARTY REPRESENTATIVE** | | **95** |
| 14.1 | Appointment and Relationship. | 95 |
| 14.2 | Authority. | 95 |
| 14.3 | Notices. | 95 |
| 14.4 | Joint and Several Obligations. | 95 |
| 14.5 | Cross Guaranty. | 97 |
| 14.6 | Waivers. | 99 |
| **ARTICLE XV REGARDING THE AGENT** | | **99** |
| 15.1 | Waivers. | 99 |
| 15.2 | Nature of Duties. | 100 |
| 15.3 | Lack of Reliance on the Agent and Resignation. | 100 |
| 15.4 | Certain Rights of the Agent. | 101 |
| 15.5 | Reliance. | 101 |
| 15.6 | Notice of Default. | 101 |
| 15.7 | Indemnification. | 101 |
| 15.8 | The Agent in its Individual Capacity. | 102 |
| 15.9 | Delivery of Documents. | 102 |
| 15.10 | Loan Parties' Undertaking to the Agent. | 102 |
| 15.11 | No Reliance on the Agent's Customer Identification Program. | 102 |
| 15.12 | Erroneous Payments. | 102 |
| **ARTICLE XVI MISCELLANEOUS** | | **104** |
| 16.1 | Governing Law | 104 |
| 16.2 | Entire Understanding and Amendments. | 104 |
| 16.3 | Transfers and Assignments. | 106 |
| 16.4 | Payment Application. | 109 |
| 16.5 | INDEMNIFICATION BY THE BORROWERS. | 109 |
| 16.6 | Non Liability of the Lender. | 110 |
| 16.7 | FORUM SELECTION AND CONSENT TO JURISDICTION. | 111 |
| 16.8 | Notice. | 111 |
| 16.9 | Survival. | 113 |
| 16.10 | Severability. | 113 |
| 16.11 | Injunctive Relief. | 113 |
| 16.12 | Consequential Damages. | 113 |
| 16.13 | Electronic Execution; Electronic Records; Counterparts. | 113 |
| 16.14 | Construction. | 114 |
| 16.15 | Confidentiality and Sharing Information. | 114 |
| 16.16 | Costs, Expenses and Taxes. | 115 |
| 16.17 | Conflict. | 115 |
| 16.18 | No Waiver; Cumulative Rights, Enforcement. | 116 |

164393.00001/155883146v.1164393.00001/155883146v.3

vi

16.19   Keepwell. ................................................................................116
16.20   Acknowledgement and Consent to Bail-In of EEA Financial Institutions. ...........116

164393.00001/155883146v.1164393.00001/155883146v.3

**SCHEDULES AND EXHIBITS**

| | |
|---|---|
| Schedule 1 | Commitment of the Lenders |
| Schedule 1.2(a) | Owned Real Property |
| Schedule 1.2(b) | Liens |
| Schedule 4.5 | Inventory Locations |
| Schedule 4.15(c) | Loan Parties' States of Organization and Chief Executive Offices |
| Schedule 4.20 | Pledged Equity Interests |
| Schedule 5.2 | Incorporation/Organization/Foreign Qualification/Subsidiaries |
| Schedule 5.3 | Officers, Directors, Shareholders, Capitalization |
| Schedule 5.7 | Organization Name |
| Schedule 5.8(b) | Environmental |
| Schedule 5.9(b) | Litigation |
| Schedule 5.10 | Patents, Trademarks, Copyrights, and Licenses |
| Schedule 5.19 | Material Business Agreements |
| Schedule 5.24(d) | ERISA Matters |
| Schedule 6.7 | Deposit Accounts |
| Schedule 7.4 | Investments |
| Schedule 7.5 | Loans |
| Schedule 7.8 | Indebtedness |
| Schedule 7.10 | Affiliate Transactions |

| | |
|---|---|
| Exhibit 5.6 | Projections |
| Exhibit A | Form of Borrowing Base Certificate |
| Exhibit B | Form of Compliance Certificate |
| Exhibit C | Revolving Note |
| Exhibit D | Swing Loan Note |
| Exhibit E | Form of Notice of Borrowing |
| Exhibit F | Form of Notice of Conversion/Continuation |
| Exhibit G | Term Note |
| Exhibit H | Capex Note |
| Exhibit I | HVAC Equipment Loan Note |
| Exhibit J | Form of Joinder |
| Exhibit K | Form of Assignment and Assumption Agreement |

**CREDIT AND SECURITY AGREEMENT**

This Credit and Security Agreement, dated as of December 27, 2024, by and among JT LOGISTICS HOLDING COMPANY, LLC, an Iowa limited liability company ("Holdings"), JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins this Agreement as a Borrower, each a "Borrower" and collectively, the "Borrowers"), ASSOCIATED BANK, NATIONAL ASSOCIATION, a national banking association, as the Agent, a Lender, and the Issuer, and the other Lenders party hereto.

Each Lender, severally and not jointly, have agreed to make available to the Borrowers a term loan, a capex loan, an equipment loan and a revolving credit facility upon the terms and conditions set forth herein.

For good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Loan Parties, the Agent, the Lenders and the Issuer agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1    **Accounting Terms.**    Except as otherwise provided in this Agreement, all accounting and financial terms used in the Loan Documents are interpreted, all accounting determinations must be made, and all financial statements delivered in connection with the Loan Documents must be prepared in accordance with GAAP as in effect from time to time (but if GAAP (or its application) changes after the Closing Date and that change affects any provision in the Loan Documents, the Loan Documents are interpreted based on GAAP as in effect and applied immediately before the change). If the Loan Parties adopt a change in accounting principles (including any changes in GAAP) from those used in preparing the Loan Parties' financial statements delivered to the Agent before the Closing Date or that affects in any material respect (as determined by the Agent) the computation of or compliance with any of the provisions of the Loan Documents then, unless the Loan Documents have been amended to modify the provisions to take into account the change in accounting principles, all financial restrictions, provisions, and ratios must continue to be computed based on accounting principles

1

164393.00001/155883146v.1164393.00001/155883146v.3

in effect before adoption of the change. Notwithstanding anything to the contrary contained in this Section or in the definition of "Capital Lease Obligations," only those leases that would constitute capital leases based on GAAP prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842) shall be considered capital leases, and all calculations and deliverables under the Loan Documents must be made or delivered accordingly.

1.2     **General Terms.**  The following terms have the following meanings:

"4120" means 4120 E. 13th Street, LLC, an Iowa limited liability company.

"4120 Parcel A" means JT Logistics 4120 Parcel A, LLC, an Iowa limited liability company.

"Accommodation Payment" has the meaning assigned to such term in Section 14.4.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or all or substantially all of any business or division of a Person, (b) the acquisition of more than 50% of the Equity Interests of any Person, or otherwise causing any Person to become a Subsidiary or (c) a merger or consolidation or any other combination with another Person (other than a Person that is already a Subsidiary).

"Advances" means the Revolving Loans, the Letters of Credit, the Capex Loans, the HVAC Equipment Loans, and the Swing Loans.

"Affiliate" of any Person means any Person that, directly or indirectly, Controls, is Controlled by, or is under common Control with that Person. For purposes of this definition only, Control of a Person means the power, directly or indirectly, (x) to vote five percent or more of the securities having ordinary voting power to elect directors of that Person, or (y) either individually or, with respect to an officer, director or manager, with any other officer(s), director(s) or manager(s), to direct or cause the direction of the management and policies of that Person whether by contract or otherwise.

"Agent" means Associated Bank, National Association, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Aggregate Commitment" means the sum of the Aggregate Revolving Commitment and the Aggregate Term Commitment.

"Aggregate Credit Exposure" means, at any time, the aggregate Credit Exposure of all of the Lenders.

"Aggregate Revolving Commitment" means, at any time, the aggregate Revolving Commitments of all the Lenders.  The Initial Aggregate Revolving Commitment is $20,000,000 16,000,000.

2

"Aggregate Term Commitment" means, at any time, the aggregate Term Loan Commitments of all of the Lenders. The initial Term Loan Commitment is $2,530,000.

"Agreement" means this Credit and Security Agreement, as the same may be amended, modified, supplemented, renewed, extended, restated or replaced from time to time.

"Allocable Amount" has the meaning assigned to such term in Section 14.4.

"Altoona Sale Cash Equity Contribution" means that certain cash equity contribution, made on or before December 12, 2025, by one or more of the Permitted Holders to Holdings in an amount of not less than $1,000,000 in connection with the sale of the real property located at 2301 21st Street NW, Altoona, IA.

"Applicable Rate" means, for any day, the rate per annum set forth below opposite the applicable Level then in effect (based on the Average Undrawn Availability ending on the last day of the most recently completed month), it being understood that the Applicable Rate for (a) Revolving Loans and Swing Loans that are Base Rate Loans shall be the percentage set forth under the column "Revolving Loans" and "Base Rate", (b) Revolving Loans that are Term SOFR Loans shall be the percentage set forth under the column "Revolving Loans" and "Term SOFR Rate & Letter of Credit Fee", (c) that portion of the Term Loan, Capex Loans, and HVAC Equipment Loans comprised of Base Rate Loans shall be the percentage set forth under the column "Term Loan, Capex Loans & HVAC Equipment Loans" and "Base Rate", (d) that portion of the Term Loan, the Capex Loans, and the HVAC Equipment Loans comprised of Term SOFR shall be the percentage set forth under the column "Term Loan, Capex Loans & HVAC Equipment Loans" and "Term SOFR Rate & Letter of Credit Fee", (e) the Letter of Credit Fee shall be the percentage set forth under the column "Revolving Loans" and "Term SOFR Rate & Letter of Credit Fee", and (f) the Non-Use Fee shall be the percentage set forth under the column "Non-Use Fee":

| Level | Average Undrawn Availability | Term SOFR Rate & Letter of Credit Fee | | Base Rate | | Non-Use Fee |
|---|---|---|---|---|---|---|
| | | Revolving Loans | Term Loan, Capex Loans & HVAC Equipment Loans | Revolving Loans and Swing Loans | Term Loan, Capex Loans & HVAC Equipment Loans | |
| 1 | Greater than or equal to $4,000,000 | 2.00% | 2.50% | 1.00% | 1.50% | 0.25% |
| 2 | Less than $4,000,000 but greater than or equal to $2,000,000 | 2.25% | 2.75% | 1.25% | 1.75% | 0.25% |
| 3 | Less than | 2.50% | 3.00% | 1.50% | 2.00% | 0.25% |

3

164393.00001/155883146v.1164393.00001/155883146v.3

| | $2,000,000 | | | | | |
|---|---|---|---|---|---|---|

Any increase or decrease in the Applicable Rate resulting from a change in the Average Undrawn Availability shall become effective as of the first Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 9.6; provided, however, that if a Compliance Certificate is not delivered when due in accordance with such Section, then the highest rate set forth in each column of the Applicable Rate shall apply, in each case as of the first Business Day after the date on which such Compliance Certificate was required to have been delivered and in each case shall remain in effect until the first Business Day following the date on which such Compliance Certificate is delivered.  In addition, at all times while the Default Rate is in effect, the highest rate set forth in each column of the Applicable Rate shall apply.

If, as a result of any restatement of or other adjustment to the financial statements of the Borrowers or for any other reason, the Borrowers or the Agent determines that (i) the Average Undrawn Availability as calculated by the Borrowers as of any applicable date was inaccurate and (ii) a proper calculation of the Average Undrawn Availability would have resulted in higher pricing for such period, the Borrowers shall immediately and retroactively be obligated to pay to the Agent promptly on demand by the Agent (or, after the occurrence of an actual or deemed entry of an order for relief with respect to any Borrower under the Bankruptcy Code of the United States, automatically and without further action by the Agent), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period.

This paragraph shall not limit the rights of the Agent under any provision of this Agreement to payment of any Obligations hereunder at the Default Rate under Section 3.1.  The Borrowers' obligations under this paragraph shall survive the termination of the Commitments and the repayment of all other Obligations hereunder.

The initial Applicable Rate shall be set forth in Level 2 until the first Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 9.6 for the first full fiscal quarter to occur following the Closing Date to the Agent.  Any adjustment in the Applicable Rate shall be applicable to all Loans then existing or subsequently made or issued.

"Approved Electronic Communication" means each notice, demand, communication, information, document and other material transmitted, posted or otherwise made or communicated by the StuckyNet System©, email, facsimile, or any other equivalent electronic service agreed to by the Agent, whether owned, operated or hosted by the Agent, any of its Affiliates, or any other Person, that any party is obligated to, or otherwise chooses to, provide to the Agent under any Loan Document (including any financial statement, financial and other report, notice, request, certificate and other information material). Approved Electronic Communications does not, however, include any notice, demand, communication, information, document, or other material that the Agent specifically instructs a Person to deliver in physical form.

164393.00001/155883146v.1164393.00001/155883146v.3

"Archangel Collateral Pledge Agreement" means that certain Collateral Pledge , dated on or before November 25, 2025, made by Archangel Development, LLC, an Iowa limited liability company, in favor of Agent, as amended, restated, amended and restated or otherwise modified from time to time.

"Asset Disposition" means a sale, lease, license, consignment, transfer or other disposition of any asset or property of any Loan Party or Subsidiary of any Loan Party, including a disposition of any asset or property in connection with a sale-leaseback transaction or synthetic lease; including, without limitation, the following (each a "Permitted Disposition"):

(a) sales, abandonment, or other dispositions of machinery and Equipment that is substantially worn, damaged, or obsolete or no longer used or useful in the ordinary course of business and leases or subleases of Owned Real Property not useful in the conduct of the business of the Loan Parties and their Subsidiaries;

(b) the use or transfer of cash or cash equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents;

(c) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business;

(d) the sale or discount, in each case without recourse, of accounts receivable (other than Eligible Accounts) arising in the ordinary course of business, but only in connection with the compromise or collection thereof;

(e) any involuntary loss, damage or destruction of property;

(f) any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(g) the leasing or subleasing of assets of any Loan Party or its Subsidiaries in the ordinary course of business;

(h) dispositions of machinery and Equipment (other than Eligible Purchase M&E and Eligible Purchase HVAC M&E) to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, or (ii) the proceeds of such disposition are applied to the purchase price of such replacement property; provided, that to the extent the property being transferred constitutes Collateral, such replacement property shall constitute Collateral; and

(i) so long as no Event of Default has occurred and is continuing or would immediately result therefrom, transfers of assets (i) from any Loan Party or any of its Subsidiaries (other than any Borrower) to a Loan Party, and (ii) from any Subsidiary of any Loan Party that is not a Loan Party to any other Subsidiary of any Loan Party;

provided that any Permitted Disposition involving an Affiliate shall be subject to Section 7.10.

5

"Assignment and Assumption" means a document in the form of Exhibit K hereto, properly completed and otherwise in form and substance satisfactory to Agent, or any other assignment and assumption agreement entered into by a Lender that is an assignee, that is in form and substance reasonably satisfactory to the Agent.

"Associated" means Associated Bank, National Association and any successor thereto.

"Authority" has the meaning assigned to such term in Section 4.18(b).

"Authorized Officer" means a Person's president, chief executive officer, chief financial officer, or any other officer approved by the Agent in its Discretion.

"Availability Reserve" means, as of any date of determination, one or more amounts or a percent of a specified category or item as the Agent may from time to time establish and revise in its Permitted Discretion discretion to reduce the amount of Revolving Loans and Letters of Credit that would otherwise be available to Borrowers under the lending formula provided for herein, including, without duplication: (a) amounts to reflect events, conditions, contingencies or risks which, as determined by the Agent, affect the assets, business or prospects of Borrower, or the Collateral or any other property which is security for the Obligations or its value, or the enforceability, perfection or priority of the Agent's Lien in the Collateral (including the Agent's ability to collect, or enforce its rights against, the Collateral); (b) the aggregate amount of liabilities secured by Liens (other than Permitted Liens) upon Collateral that are senior to the Agent's Liens (but imposition of any such reserve shall not waive a Default or an Event of Default (if any) arising therefrom); (c) amounts to reflect Agent's judgment that any collateral report or financial information furnished by or on behalf of any Borrower or any other Loan Party to the Agent is or may have been incomplete, inaccurate or misleading in any material respect; (d) amounts to reflect any state of facts which do or would with notice or passage of time or both, constitute an Event of Default; (e) to reflect liability, contingent or otherwise, of the Agent or any Affiliate of Agent to any third party in connection with any Bank Product; (e) amounts to reflect conditions, contingencies or risks in connection with Bank Products offered by the Agent or any Affiliate of Agent to any Borrower, (f) for rent at locations leased by any Borrower and for storage, processing, and other charges of third-parties in possession of Collateral; (g) for payroll, taxes, fees, assessments, and other governmental charges with respect to the Collateral or any Borrower; (h) amounts to reflect deferred or unearned revenue; (i) the amount, if any, of dilution with respect to the Accounts as calculated by the Agent that is or is reasonably likely to be greater than two and one-half percent (2.5%); (j) the Rent, Charges and Insurance Reserve; and (k) the Bank Product Reserve.

"Average Undrawn Availability" means, as of any date of determination, Undrawn Availability at the close of business on each day in the thirty (30) consecutive day period ending immediately prior to such date, divided by 30.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the

6

European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Product" means any service or facility extended to any Loan Party by the Agent or its Affiliates including: (a) credit cards, (b) credit card processing services, (c) debit cards, (d) purchase cards, (e) automated clearing house transactions, (f) cash management, including controlled disbursement accounts or services and (g) Hedging Agreements.

"Bank Product Agreements" means those certain cash management service agreements entered into from time to time between any Loan Party and the Agent or its Affiliates in connection with any Bank Product.

"Bank Product Debt" means Indebtedness and other obligations of a Loan Party relating to Bank Products.

"Bank Product Obligations" means all obligations, liabilities, contingent reimbursement obligations, fees and expenses owing by the Loan Parties to the Agent or its Affiliates pursuant to or evidenced by the Bank Product Agreements and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all such amounts that a Loan Party is obligated to reimburse to the Agent or its Affiliates as a result of the Agent or its Affiliates purchasing participations or executing indemnities or reimbursement obligations with respect to the Bank Products provided to the Loan Parties pursuant to the Bank Product Agreements.

"Bank Product Reserve" means the aggregate amount of reserves established by Agent from time to time in its Discretion in respect of Bank Product Debt, which may be at least equal to the sum of all Bank Product Obligations, in each case, except to the extent that such Bank Product Debt has been Cash Collateralized.

"Bankruptcy Code" means Title 11 of the United States Code or any similar federal or state debtor relief laws.

"Base Rate" means for any day, a fluctuating rate of interest per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Agent as its "prime rate," and (c) the Term SOFR plus 1.00%, subject to the interest rate floors set forth therein; provided that if the Base Rate shall be less than one percent (1.00%), such rate shall be deemed one percent (1.00%) for purposes of this Agreement. The "prime rate" is a rate set by the Agent based upon various factors including the Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such prime rate announced by the Agent shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means any Loan that bears interest at or by reference to the Base Rate.

7

"Base Rate Revolving Loan" means any Revolving Loan that bears interest based on the Base Rate.

"Beneficial Owner" means, with respect to each Loan Party: (1) each individual, if any, that, directly or indirectly, owns 25% or more of that Loan Party's Equity Interests; and (2) a single individual with significant responsibility to Control, manage, or direct that Loan Party.

"Beneficial Ownership Certificate" means, for each Loan Party, a certificate acceptable to the Agent in its discretion (as amended or modified by the Agent from time to time in its discretion), certifying, among other things, the Beneficial Owner of each Loan Party.

"Benefited Lender" has the meaning set forth in Section 2.11(d).

"Borrower" and "Borrowers" have the meanings assigned to such terms in the Preamble.

"Borrowing Base" means, at any time, the sum of:

(a)      up to 90% of the Value of the Borrowers' Eligible Accounts; *plus*

(b)      during the Temporary Overadvance Period, the Temporary Overadvance Amount; *minus*

(c)      Availability Reserves.

The Agent may in its discretion reduce the advance rates, adjust Availability Reserves or any other reserves, or reduce one or more of the elements used to compute the Borrowing Base.

"Borrowing Base Certificate" means a certificate executed by the Loan Party Representative's Authorized Officer that is appropriately completed and in the form attached as Exhibit A.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Lender is located.

"Capex Availability" means (i) the aggregate amount of the Capex Commitment less (ii) the original principal amount of all Capex Loans advanced pursuant to this Agreement.

"Capex Availability Period" means the period from (i) the Closing Date until (ii) December 27, 2025.

"Capex Commitment" means the and Lender's commitment to make Capex Loans pursuant to Section 2.3(a).  The aggregate amount of the Capex Commitment is $3,000,0001,700,000.

"Capex Loan" means the Loans made under Section 2.3(a).

8

"Capex Maturity Date" means the earlier of (a) December 27, 2027 or (b) the Termination Date.

"Capex Outstandings" means, at any time, the aggregate principal amount of all outstanding Capex Loans.

"Capex Note" has the meaning assigned to such term in Section 2.3(a).

"Capital Expenditures" means any expenditure made or liability incurred that in accordance with GAAP is treated as a capital expenditure (and not as an expense item) in the year in which it was made or incurred.

"Capital Lease" means, with respect to any Person, any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or financing leases on that Person's balance sheet under GAAP, and the amount of these obligations is the capitalized amount determined in accordance with GAAP.

"Capital Lease Obligations" of any Person means that Person's obligations to pay rent or other amounts under any Capital Lease.

"Cash Collateralize" means, to pledge and deposit with or deliver to the Agent, as collateral for the Letter of Credit Exposure or such other applicable Obligations, (a) cash or deposit account balances, (b) backstop letters of credit entered into on terms, from issuers and in amounts satisfactory to the Agent, and/or (c) if the Agent shall agree, in its sole discretion, other credit support, in each case, in Dollars and pursuant to documentation in form and substance satisfactory to the Agent.

"Cash Collateral" has a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"Cash Concentration Account" means the Borrowers' commercial deposit account maintained at the Agent that is designated by the Agent as the Cash Concentration Account. The funds in this account are the Agent's sole and exclusive property, for the benefit of the Agent and the Lenders, and may only be withdrawn by the Agent.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et seq.).

"Change of Control" means any of the following: (1) the Permitted Holders do not own and Control, directly or indirectly, collectively, free and clear of all Liens, at least 51% of the outstanding voting Equity Interests of each Loan Party on a fully diluted basis; (2) Jamie Cord fails to own and Control, directly or indirectly, free and clear of all Liens, at least 50% of the outstanding voting Equity Interests of Holdings on a fully diluted basis (3) the occurrence of any event (whether in one or more transactions) that results in the Permitted Holders not having the power to designate a majority of the directors (or the individuals performing similar functions) of any Borrower; (4) any merger or consolidation of any Loan Party with another Person; (5) the sale of all or substantially all of any Loan Party's assets; or (6) any Loan Party does not own and

9

Control, free and clear of all Liens, 100% of the outstanding voting Equity Interests of any existing or future Subsidiary.

"Charges" means all of the following imposed on any Collateral or any Loan Party by any taxing or other similar Governmental Body, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund): all taxes, charges, fees, imposts, levies, or other assessments (including with respect to net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims, and charges), together with any interest and any penalties, additions to tax, or additional amounts.

"Charter Documents" means, as to any Person (other than a natural person), the charter, certificate, or articles of incorporation or organization, by-laws, regulations, general or limited partnership agreement, limited partnership certificate, formation certificate, operating agreement, and other similar organizational or governing documents.

"CIP Regulations" has the meaning assigned to such term in Section 15.11.

"Closing Date" means December 27, 2024.

"CME" means CME Group Benchmark Administration Limited.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all real and personal property in which any Loan Party has any interest of any kind, whether now existing or arising or acquired or received by the Loan Parties in the future, and wherever located, including:

(a)     All Accounts.

(b)     All Inventory.

(c)     All Equipment and Fixtures.

(d)     All General Intangibles, Payment Intangibles, and Intellectual Property.

(e)     All Investment Property and the Pledged Equity Interests.

(f)     All Deposit Accounts and any and all monies credited by or due from any financial institution or any other depository.

(g)     All Chattel Paper, Instruments, and Documents.

(h)     All of each Loan Party's right, title, and interest in and to: (1) its goods and other personal property including all merchandise returned or rejected by Account Debtors; (2) all of each Loan Party's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor (including stoppage in transit, set-off, detinue, replevin, reclamation, and

10

repurchase); (3) all additional amounts due to each Loan Party from any Account Debtors; (4) warranty claims; (5) all of each Loan Party's contract rights, rights to payment under contract rights, Instruments (including promissory notes), Documents, Chattel Paper (including electronic chattel paper), warehouse receipts, letters of credit, and money; (6) all Commercial Tort Claims; (7) all collateral securing any obligations owed to any Loan Party; (8) all Letter-of-Credit Rights; (9) all Supporting Obligations; and (10) any other goods or personal property or real property in which the Loan Parties at any time grant a Lien to the Agent or any Lender under any Loan Document or under any other agreement.

(i)      All of each Loan Party's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software, computer programs, tapes, disks, and documents relating to (a), (b), (c), (d), (e), (f), (g), or (h) of this definition.

(j)      All Proceeds and Products of (a), (b), (c), (d), (e), (f), (g), (h), and (i) of this definition in whatever form, including: cash, deposit accounts (whether comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood, business interruption, and credit insurance), negotiable instruments, and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds, and tort claim proceeds.

"Collateral Pledge Agreement" means ~~that certain~~, collectively, (a) the JMAC Collateral Pledge Agreement ~~dated as of the Closing Date made by Holdings, in favor of Agent~~, (b) the Archangel Collateral Pledge Agreement, (c) the Strawhecker Collateral Pledge Agreement, (d) the Ekis Collateral Pledge Agreement, and (e) each other Collateral Pledge Agreement executed and delivered in favor of Agent from time to time, each of which shall be in form and substance satisfactory to Agent in its sole discretion, in each case, as amended, restated, amended and restated or otherwise modified from time to time.

"Commitment" means the Revolving Commitment, the Term Loan Commitment, the Capex Commitment, and the HVAC Equipment Loan Commitment, as applicable.

"Commitment Percentage" of any Lender shall mean the percentage set forth on the Commitment Schedule, as it may be adjusted pursuant to the terms of this Agreement.

"Commitment Schedule" means the Schedule 1 attached to this Agreement, as it may be amended from time to time pursuant to the terms of this Agreement.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. Section 1 et seq.).

"Communication" means this Agreement, any Loan Document and any document, any amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to any Loan Document.

"Compliance Certificate" means a certificate of the Loan Parties signed by the Loan Party Representative's Authorized Officer appropriately completed and in substantially the form of Exhibit B.

"Computation Period" means each period of four consecutive Fiscal Quarters ending on the last day of a Fiscal Quarter.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consents" means all filings and all licenses, permits, consents, approvals, authorizations, qualifications, and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Loan Party's business.

"Control" means possessing, directly or indirectly, the power to direct or cause the direction of the management or policies of a Person (whether through the ability to exercise voting power, by contract, or otherwise). "Controlling" and "Controlled" have correlative meanings.

"Controlled Group" means all members of a controlled group of corporations, all members of a controlled group of trades or businesses (whether or not incorporated) under common control and all members of an affiliated service group that, together with any Borrower or any of their Subsidiaries, are treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"Cord Guaranty" means that certain that certain Guaranty and Suretyship Agreement, dated as of the October 24, 2025, made by Jamie Cord in favor of Agent, as amended, restated, amended and restated or otherwise modified from time to time.

"Credit Exposure" shall mean, as to any Lender at any time, such Lender's Revolving Exposure plus such Lender's Commitment Percentage of the outstanding principal balance of the Term Loan.

"Customs" has the meaning assigned to such term in Section 2.11(b).

"Customer" means and includes the account debtor with respect to any Account and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Loan Party, pursuant to which such Loan Party is to deliver any personal property or perform any services.

"Default" means an event that, with notice, the passage of time, or both, would be an Event of Default.

"Default Condition" means that either or both a Default and an Event of Default exist.

"Defaulting Lender" has the meaning set forth in Section 2.12(a) hereof.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

164393.00001/155883146v.1164393.00001/155883146v.3

"Discretion" means a determination made in good faith in the exercise of the Agent's business judgment from the perspective of a prudent, secured, asset-based Agent. The burden of establishing that the Agent did not act in its Discretion is on the Loan Parties.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable under a sinking fund obligation or otherwise, or is redeemable in whole within one year after the Termination Date.

"Dixon Sale" the sale by certain Affiliates of the Loan Parties of the real property located at 3811 Dixon Street, Des Moines, IA.

"Dixon Sale Cash Equity Contribution" means that certain cash equity contribution, made on or before January 9, 2026, by one or more of the Permitted Holders to Holdings in an amount of not less than $4,000,000 in connection with the Dixon Sale.

"Dodd-Frank Act" means the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111-203, H.R. 4173).

"Dollar" and the sign "$" means lawful money of the United States of America.

"Earnings Before Interest and Taxes" means, for any fiscal period, the sum of (1) net income (or loss) for that period (excluding extraordinary gains and gains on asset sales (other than Inventory sold in the ordinary course of business)); plus (2) all interest expense for that period; plus (3) all charges against (or minus credits to) income for federal, state, and local taxes for that period, in each case, calculated on a consolidated basis for Holdings and its Subsidiaries.

"EBITDA" means, with respect to any fiscal period, the sum of (1) Holdings' and its Subsidiaries' consolidated net income (or loss), plus (2) non-cash extraordinary losses, Interest Expense, income taxes, depreciation and amortization and increases in any change in LIFO reserves for such period, minus (3) extraordinary gains, interest income, non-operating income and income tax benefits and decreases in any change in LIFO reserves, in each case, determined on a consolidated basis for the Holdings and its Subsidiaries in accordance with GAAP.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

13

"Ekis Guaranty" means that certain that certain Guaranty and Suretyship Agreement, dated on or before November 21, 2025, made by Andre Ekis in favor of Agent, as amended, restated, amended and restated or otherwise modified from time to time.

"Ekis Collateral Pledge Agreement" means that certain Collateral Pledge , dated on or before November 25, 2025, made by Andre Ekis in favor of Agent, as amended, restated, amended and restated or otherwise modified from time to time.

"Electronic Record" and "Electronic Signature" have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

"Eligible Accounts" means, at any time, each Borrower's Accounts that the Agent determines in its sole discretion are Eligible Accounts. Without limiting the Agent's sole discretion, Eligible Accounts does not include any Account:

(a) That is not subject to a first-priority perfected Lien in the Agent's favor for the benefit of the Agent and the Lenders.

(b) That is subject to any Lien (other than a Permitted Lien that does not have priority over the Agent's Lien for the benefit of the Agent and the Lenders).

(c) (1) that is unpaid more than 90 days after the original invoice date, (2) that is unpaid more than 60 days after the original due date, or (3) that has been or should have been written off the Borrowers' books or is otherwise uncollectible.

(d) That is owing by an Account Debtor if more than 50% of all Accounts owing from that Account Debtor and its Affiliates are ineligible.

(e) That is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from that Account Debtor and its Affiliates to the Borrowers exceeds 25%, or in the case of Accounts owning by Flexe, Inc. and its Affiliate to the Borrowers, to the extent the aggregate amount of Accounts owing from Flexe, Inc. and its Affiliate to the Borrowers exceeds 50%.

(f) With respect to which any covenant, representation, or warranty in any Loan Document has been breached or is not true.

(g) That: (1) does not arise from the sale of goods or performance of services in the ordinary course of business; (2) is not evidenced by an invoice or other documentation satisfactory to the Agent in its discretion that has been sent to the Account Debtor; (3) is contingent upon a Borrower's completion of any further performance; (4) is a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery, any repurchase or return basis, or any other similar basis; or (5) is for interest, storage, or other similar charges.

14

(h)     For which the goods giving rise to the Account have not been shipped to the Account Debtor, or for which the services giving rise to the Account have not been performed by a Borrower, or if the Account was invoiced more than once.

(i)     With respect to which any payment has been returned uncollected for any reason.

(j)     That is owed by an Account Debtor that: (1) has applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator; (2) has had a material part of its property taken by any receiver, custodian, trustee, or liquidator; (3) has filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, debt adjustment, winding-up, or a voluntary or involuntary case under any state or federal bankruptcy laws; (4) has admitted in writing its inability (or is generally unable) to pay its debts as they become due; (5) is insolvent; (6) has stopped operating its business; (7) has sold a material portion of its assets; (8) requires a Borrower to support its obligations to such Account Debtor with a performance bond; (9) is the government (or any government department, agency, public corporation, or instrumentality) of any country other than the U.S. unless the Account is backed by a letter of credit acceptable to the Agent in its discretion that has been assigned to the Agent; (10) is the U.S. government (or any U.S. department, agency, public corporation, or instrumentality) unless the Federal Assignment of Claims Act of 1940 has been complied with to the Agent's satisfaction; or (11) is an Affiliate, employee, officer, director, agent, or Equity Interest holder of any Loan Party.

(k)     That is owed by an Account Debtor that (1) does not maintain its chief executive office in the United States or (2) is not organized under the law of the United States, or any state of the United States, unless, in each case, the sale is on letter of credit, guaranty, or acceptance terms, in each case satisfactory to the Agent in its discretion, or such Account is insured by credit insurance satisfactory to the Agent in its discretion with the Agent named as loss payee.

(l)     That is owed in any currency other than Dollars.

(m)     That is owed by an Account Debtor or any Affiliate of an Account Debtor that is a creditor or supplier of any Loan Party, or that is otherwise subject to a potential offset, counterclaim, dispute, deduction, discount, recoupment, reserve, defense, chargeback, credit, or allowance (but ineligibility is limited to the amount thereof).

(n)     That represents a progress billing or retainage, or relates to services for which a performance, surety or completion bond, or similar assurance has been issued.

(o)     That is evidenced by a promissory note, chattel paper, or an instrument.

(p)     That is owed by an Account Debtor located in any jurisdiction that requires filing of a "Notice of Business Activities Report" or other similar report to permit a Borrower to seek judicial enforcement in that jurisdiction of payment of that Account (unless the applicable Borrower has filed that report or is qualified to do business in that jurisdiction).

(q)     With respect to which a Borrower has made any agreement with the Account Debtor for any reduction to the Account (other than discounts and adjustments given in the ordinary course of business that are consistent with practices that existed on the Closing Date

and that have been disclosed to the Agent in writing), or any Account that was partially paid and a Borrower created a new receivable for the unpaid portion of the Account.

(r)     That does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state, or local, including the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act, and Regulation Z of the FRB.

(s)     That is for goods that have been sold under a purchase order, contract, or other agreement or understanding (written or oral) that indicates that any Person other than a Borrower has or has had an ownership interest in the goods, or that indicates any Person (other than a Borrower) as payee or remittance party.

(t)     That is otherwise not acceptable to the Agent in its Permitted Discretion for any other reason.

If an Eligible Account becomes ineligible, the Loan Party Representative must notify the Agent of that within one Business Day of the Loan Party Representative obtains knowledge of such Eligible Account becoming ineligible. In determining the amount of Eligible Accounts, the Agent may reduce the face amount of Accounts by (1) all accrued and actual discounts, claims, credits, pending credits, promotional program allowances, price adjustments, finance charges, or other allowances (including any amount that a Loan Party may be obligated to rebate to an Account Debtor under any agreement or understanding (written or oral)) and (2) the aggregate amount of all cash received with respect to Accounts but not yet applied by the Borrowers to reduce Accounts.

"Eligible Assignee" means any of the following Persons: (a) a Lender; (b) an Affiliate of a Lender; and (c) any other Person (other than a natural person) approved by (i) the Agent, and (ii) in the case of any assignment of a commitment to make Advances hereunder, the Issuer; provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include any Borrower or any of such Borrower's Affiliates or Subsidiaries and; provided, further, that, notwithstanding the foregoing, a Person shall only be an "Eligible Assignee" if the assignment to or participation of such Person shall not constitute a "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code).

"Eligible Purchased M&E" means machinery and Equipment of the Borrowers purchased after the Closing Date that is in good order, repair, running and marketable condition that at all times satisfies the criteria set forth below as determined from time to time by Agent in its Discretion.  Without limiting the generality of the immediately preceding sentence, neither machinery nor Equipment may be Eligible Purchased M&E unless it meets all the following minimum requirements:

(a)     A Borrower has good, valid, and marketable title to the machinery or Equipment, such Borrower has the right to subject it to a Lien in favor of Agent, the machinery or Equipment is subject to a first-priority perfected Lien in the Agent's favor for the benefit of the Agent and the Lenders and, except for Permitted Liens that do not have priority over the Agent's Lien for the benefit of the Agent and the Lenders, is not subject to any other Lien.

16

(b)     No representation or warranty in any Loan Document with respect to the machinery or Equipment has been breached.

(c)     The machinery or Equipment is (x) in good working order and condition (ordinary wear and tear excepted), (y) not obsolete or materially defective and (z) currently in a condition that is usable in the ordinary course of business of the Borrowers.

(d)     The machinery or Equipment does not constitute a Fixture.

(e)     The machinery or Equipment (1) is located in the United States; (2) is located at a location owned or leased by a Borrower and, with respect to any leased location, the lessor has delivered to the Agent a Waiver (or the Agent in its discretion has established a Reserve for that location) or is in any third-party warehouse or in a bailee's possession and the warehouseman or bailee has delivered to the Agent a Waiver and such other documentation as the Agent may require (or the Agent in its discretion has established a Reserve for that location); (3) does not contain or bear any Intellectual Property rights licensed to a Borrower unless the Agent is satisfied that the Agent may sell or otherwise dispose of the machinery or Equipment without (x) infringing the licensor's rights, (y) violating any contract with the licensor, or (z) incurring any liability to pay royalties; (4) complies in all material respects with all standards, laws, and regulations imposed by any Governmental Body; and (5) to the extent a Certificate of Title evidences ownership of such machinery or Equipment, the Agent's Lien shall be noted on such Certificate of Title and the Agent (or its agent) shall have possession of such Certificate of Title.

(f)     The machinery or Equipment is otherwise acceptable to the Agent in its Permitted Discretion.

"Eligible Purchased HVAC M&E" means heating, ventilation, and air conditioning machinery and Equipment of the Borrowers purchased after the Closing Date that (a) is at all times installed in the Borrowers' facility located in Altoona, Iowa, (b) is in good order, repair, running and marketable condition, and (c) is acceptable to the Agent in its Discretion.

"Environmental Complaint" has the meaning assigned to such term in Section 4.18(b).

"Environmental Laws" means all federal, state, and local environmental, land use, zoning, health, chemical use, safety, and sanitation laws, statutes, ordinances, and codes related to protecting the environment or governing the use, storage, treatment, generation, transportation, processing, handling, production, or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders, and directives issued by Governmental Bodies with respect to these matters.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust, or other equity ownership interests in a Person (and any warrants, options, or other rights entitling the holder to purchase or acquire any equity ownership interest).

"ERISA" means the Employee Retirement Income Security Act of 1974.

17

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 or Section 430 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of any Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate a Pension Plan or Multiemployer Plan, or the treatment of a plan amendment as a termination of a Pension Plan or Multiemployer Plan under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan or Multiemployer Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any ERISA Affiliate; or (i) a failure by any Borrower or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules in respect of a Pension Plan, whether or not waived, or the failure by any Borrower or any ERISA Affiliate to make any required contribution to a Multiemployer Plan.

"Erroneous Payment" has the meaning assigned to it in Section 15.12(a).

"Event of Default" has the meaning assigned to such term in Article 10.

"Excluded Hedging Obligations" means, with respect to any Guarantor, any Hedging Obligation if, and solely to the extent that, all or a portion of a Guarantor's Guaranty of, or the grant by that Guarantor of a Lien under the Loan Documents to secure, the Hedging Obligations (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission by virtue of that Guarantor's failure for any reason to constitute an "eligible contract participant" (as defined in the Commodity Exchange Act as of the date of that Guaranty or the grant of a Lien would otherwise have become effective with respect to such related Hedging Obligation). If a Hedging Obligation arises under a master agreement governing more than one swap, the exclusion applies only to the portion of the Hedging Obligation that is attributable to swaps for which the Guaranty or security interest is or becomes illegal.

"Excluded Subsidiary" means 4120 Parcel A.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient  or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the

18

laws of, or having its principal office or, in the case of a Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of a Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (i) a Lender acquires such interest in the Loan (other than pursuant to an assignment request by the Borrowers under Section 15.3) or (ii) a Lender changes its Lending Office, except in each case to the extent that, amounts with respect to such Taxes were payable either to a Lender's assignor immediately before the Lender became a party hereto or to the Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17(g), and (d) any withholding Taxes imposed pursuant to FATCA.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001.

"Expenses" means all reasonable and documented fees, costs, expenses, charges, and out-of-pocket disbursements incurred by the Agent, the Lenders and their counsel (including the allocated costs of in-house counsel) and court costs, in any way arising from or in connection with the Loan Documents, any Collateral (including costs and expenses to preserve and protect Collateral), any Obligations, or the business relationship between the Agent, the Lenders and any Loan Party, including: (1) audit fees at the per day rate provided for below; (2) all the Agent's, the Lenders and their counsels' fees and expenses (including recording fees and insurance policy fees) to prepare, examine, conduct due diligence with respect to, approve, negotiate, execute, and deliver, and close the transactions contemplated by the Loan Documents; (3) all fees and out-of-pocket disbursements incurred by the Agent (including attorneys' fees) arising from or in connection with (x) any action taken by the Agent to monitor, advise, administer, enforce, or collect any Obligations, any Loan Documents, or any other present or future documents or agreements between the Agent and any one or more of the Loan Parties, (y) the business relationship between the Agent, the Lenders and any Loan Party, and (z) background checks regarding senior management, or key investors, as the Agent determines in its discretion; (4) all out-of-pocket expenses and fees (including attorneys' fees) incurred in relation to, in connection with, in defense of, or in prosecution of any litigation (including any actions to lift the automatic stay or to otherwise in any way monitor or participate in any Insolvency Proceeding involving a Loan Party) related to the Obligations, the Loan Documents, the Collateral, or any Loan Party (including any litigation instituted by a Loan Party or any third party, any so called "Agent liability" action, any claim and delivery or other action for possession of, or foreclosure on, any of the Collateral, post judgment enforcement of any rights or remedies (including enforcing judgments and prosecuting appeals whether discretionary or as of right and whether in connection with pre judgment or post judgment matters)); (5) all costs, expenses, and fees incurred by the Agent or its agents in connection with any appraisals or environmental assessments (and the Loan Parties must fully cooperate with the appraisers and inspectors and make their property available for appraisal and inspection in connection with as many appraisals or environmental assessments as the Agent may request); and (6) all costs, expenses, and fees incurred by the Agent, the Lenders or their counsel in connection with consultants, expert witnesses, or other professionals retained by the Agent or its counsel to assist, advise, or give testimony with respect to any matter relating to the Loan Documents, the Collateral, the Obligations, the Loan Parties, or the business relationship between the Agent and any one or

19

more of the Loan Parties. The Loan Parties will receive summary invoices showing only the total amount due and the summary invoices may not contain any narrative description of the services provided (and the Agent's delivery of summary invoices does not waive any of the Agent's rights or privileges (including the attorney-client privilege)).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471 (b) (1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Bodies and implementing such Sections of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Associated on such day on such transactions as determined by the Agent.

"First Amendment" means the First Amendment to Credit and Security Agreement dated as of the First Amendment Effective Date among Agent, the Lenders party thereto, and the Loan Parties.

"First Amendment Effective Date" means November 7, 2025.

"Fiscal Quarter" means a fiscal quarter of a Fiscal Year.

"Fiscal Year" means each fiscal year of the Borrowers and their Subsidiaries, which period shall be the 12-month period ending on December 31.

"Fixed Charge Coverage Ratio" means, with respect to Holdings and its Subsidiaries for any fiscal period, the ratio of (x) EBITDA during such period minus (1) Non-Financed Capital Expenditures made (to the extent not already incurred in a prior period) or incurred during such period, (b) cash taxes paid during such period, to the extent greater than zero, and (c) Pass-Through Tax Liabilities to (ii) Fixed Charges for such period.

"Fixed Charges" means, with respect to any fiscal period and with respect to Holdings and its Subsidiaries determined on a consolidated basis in accordance with GAAP, the sum, without duplication, of (a) cash Interest Expense paid during such period (other than interest paid-in-kind, amortization of financing fees, and other non-cash Interest Expense), (b) principal payments paid in cash in respect of Indebtedness paid during such period, including cash

20

payments with respect to Capital Leases, and (c) other distributions paid in cash during such period (other than Pass-Through Tax Liabilities).

"Foreign Lender" means a Lender that is not a United States Person within the meaning of Code Section 7701(a)(30).

"FRB" means the Board of Governors of the Federal Reserve System or any successor thereto.

"FRBNY" means the Federal Reserve Bank of New York.

"GAAP" means the generally accepted accounting principles established in the United States of America by the Financial Accounting Standards Board.

"Governmental Body" means any nation or government, any state or other political subdivision of a nation or government, or any entity exercising the legislative, judicial, regulatory, or administrative functions of or pertaining to a government.

"Grinnell Sale" the sale by certain JT Real Estate of the real property located at 700 Blakely Circle, Grinnell, IA.

"Grinnell Sale Cash Equity Contribution" means that certain cash equity contribution, made on or before January 30, 2026, by certain of the Permitted Holder and/or JT Real Estate to Holdings and the other Loan Parties in an amount of not less than $4,000,000 in connection with the Grinnell Sale.

"Group" means, in some instances, Term SOFR Loans having the same Interest Period.

"Guarantor" means, (a) Holdings, and (b) each other Person that guaranties all or any Obligations.

"Guaranty" of or by any Person means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect: (1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for its payment; (2) to purchase or lease property, securities, or services to assure the owner of such Indebtedness or other obligation of the payment of that Indebtedness; (3) to maintain working capital, equity capital, or any other financial statement condition or liquidity of the Primary Obligor so as to enable the Primary Obligor to pay that Indebtedness or other obligation; or (4) as an account party in respect of any letter of credit or letter of guaranty issued to support that Indebtedness or obligation (but "Guaranty" does not include endorsements for collection or deposit in the ordinary course of business).

"Hard Costs" means, with respect to the purchase by the Borrowers of an item of Eligible Purchased M&E or Eligible Purchased HVAC M&E, the cash amount actually paid to acquire title to such item, net of all incentives, trade in allowances, discounts and rebates, and exclusive

21

of freight, delivery charges, installation costs and charges, software costs, charges and fees, warranty costs, taxes, insurance and other incidental costs or expenses and all indirect costs or expenses of any kind.

"Hazardous Discharge" has the meaning assigned to such term in Section 4.18(b).

"Hazardous Substance" means, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances, or related materials as defined in CERCLA, the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 et seq.), RCRA, or other applicable Environmental Law.

"Hazardous Wastes" means all waste materials regulated by CERCLA, RCRA, or applicable state law, and any other applicable federal and state laws relating to hazardous waste disposal.

"Hedging Agreement" means any interest rate, currency or commodity swap agreement, cap agreement or collar agreement, and any other agreement or arrangement designed to protect a Person against fluctuations in interest rates, currency exchange rates or commodity prices.

"Hedging Obligation" means, with respect to any Person, any liability of such Person under any Hedging Agreement. The amount of any Person's obligation in respect of any Hedging Obligation will be deemed to be the incremental obligation that would be reflected in the financial statements of such Person in accordance with GAAP.

"Holdings" has the meaning assigned to such terms in the Preamble.

"Holdings Collateral Pledge Agreement" means that certain Collateral Pledge Agreement, dated as of the Closing Date, made by Holdings in favor of Agent, as amended, restated, amended and restated or otherwise modified from time to time.

"Honor Date" has the meaning assigned to such term in Section 2.9(c).

"HVAC Equipment Loan Availability" means (i) the aggregate amount of the HVAC Equipment Loan Commitment less (ii) the original principal amount of all HVAC Equipment Loans advanced pursuant to this Agreement.

"HVAC Equipment Loan Availability Period" means the period from (i) the Closing Date until (ii) December 27, 2025.

"HVAC Equipment Loan Commitment" means the and Lender's commitment to make HVAC Equipment Loans pursuant to Section 2.3(b). The aggregate amount of the HVAC Equipment Loan Commitment is $2,900,0002,700,000.

"HVAC Equipment Loan" means the Loans made under Section 2.3(b).

22

"HVAC Equipment Loan Maturity Date" means the earlier of (a) December 27, 2027 or (b) the Termination Date.

"HVAC Equipment Loan Outstandings" means, at any time, the aggregate principal amount of all outstanding HVAC Equipment Loans.

"HVAC Equipment Loan Note" has the meaning assigned to such term in Section 2.3(b).

"Increased Tax Burden" means the additional federal, state, or local taxes assumed to be payable by a Pass-Through Owner of a Pass-Through Loan Party due to its status as a Pass-Through Loan Party, as evidenced and substantiated by the tax returns filed by that Pass-Through Owner (with these taxes calculated for all Pass-Through Owners at the highest federal and state marginal rates applicable to any Pass-Through Owner and taking into account losses previously allocated to each Pass-Through Owner by that Pass-Through Loan Party to the extent those losses have not previously been applied to reduce the Increased Tax Burden (but (1) capital losses and capital loss carry forwards are taken into account only to the extent they are currently usable to offset income or gain allocated by that Pass-Through Loan Party to a Pass-Through Owner and (2) that to the extent that any losses allocated by that Pass-Through Loan Party result in a payback by a Pass-Through Owner to that Pass-Through Loan Party of previous tax distributions in accordance with this Agreement then those losses are not taken into account for purposes of determining the Increased Tax Burden)).

"Indebtedness" of any Person means, as of any date: (1) that Person's obligations for borrowed money or similar obligations; (2) that Person's Capital Lease Obligations; (3) that Person's obligations that are secured by any Lien on any of its assets or property whether or not the secured obligation has been assumed by that Person; (4) except for trade accounts payable arising in the ordinary course of business that are not more than 90 days past due, that Person's obligations for the unpaid purchase price for goods, property, or services; (5) that Person's obligations to purchase goods, property, or services where payment is required regardless of whether delivery of the goods or property or the performance of the services is ever made or tendered (generally referred to as "take or pay contracts"); (6) that Person's obligations for unfunded benefit liabilities under any Plan of that Person or any ERISA Affiliate; (7) that Person's obligations for Hedging Obligations, or other similar transactions (valued in an amount equal to the highest termination payment, if any, that would be payable by that Person upon termination for any reason on the determination date); (8) that Person's obligations for outstanding reimbursement and similar obligations under letters of credit, bankers acceptances, and similar instruments; (9) the aggregate outstanding amount of all Off-Balance Sheet Liabilities (based on the aggregate outstanding amount as if the transaction were structured as a secured loan and an on balance sheet financing, whether or not shown as a liability on a consolidated balance sheet of the Person); and (10) that Person's obligations for or relating to Indebtedness of other Persons similar to the Indebtedness described in the preceding clauses (based on the maximum amount that may be payable).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

164393.00001/155883146v.1164393.00001/155883146v.3

"Insolvency Proceeding" means any proceeding by or against a Loan Party (or any Person obligated to a Loan Party) under any provision of the Bankruptcy Code or under any other bankruptcy or insolvency law (including assignments for the benefit of creditors, formal or informal moratoria, compositions, or proceedings seeking reorganization, liquidation, arrangement, or other similar relief).

"Intellectual Property" means patents, patent rights, patent applications, copyrights, works that are the subject matter of copyrights, copyright registrations, trademarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the preceding, all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the preceding, all rights to sue for past, present, and future infringement of any of the preceding, inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards, goodwill, customer and other lists, trade secret rights, copyright rights, rights in works of authorship, and contract rights relating to computer software programs.

"Interest Expense" means for any period the consolidated interest expense of Holdings and its Subsidiaries for such period (including all imputed interest on Capital Lease Obligations).

"Interest Period" means as to each Term SOFR Loan, the period commencing on the date such Term SOFR Loan is disbursed or converted to or continued as a Term SOFR Loan and ending on the date one month thereafter, as selected by the Loan Party Representative in its Notice of Borrowing or Notice of Conversion/Continuation, as applicable, or such other period that is twelve months or less requested by the Loan Party Representative and consented to by the Agent (in the case of each requested Interest Period, subject to availability); provided that:

(a)      any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless, in the case of a Term SOFR Loan, such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)      any Interest Period pertaining to a Term SOFR Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)      no Interest Period for Loans under a facility shall extend beyond the Maturity Date applicable to such facility.

"Issuer" means, with respect to any Letter of Credit, the issuer of such Letter of Credit and shall be, with respect to any Letter of Credit hereunder, Associated, and each of its successors and assigns (in each case, which may be replaced by the Agent in its sole discretion).

"JMAC Collateral Pledge Agreement" means that certain Collateral Pledge , dated on or before November 25, 2025, made by JMAC, LLC, an Iowa limited liability company, in favor of Agent, as amended, restated, amended and restated or otherwise modified from time to time.

164393.00001/155883146v.1164393.00001/155883146v.3

"Joinder" means a joinder agreement substantially in the form of Exhibit J to this Agreement.

"L/C Borrowing" has the meaning assigned to such term in Section 2.9(g).

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Obligations" means the sum (without duplication) of (a) all Unreimbursed Amounts; (b) the aggregate undrawn amount of all outstanding Letters of Credit; and (c) all fees and other amounts owing by any Borrower with respect to Letters of Credit.

"Lender" and "Lenders" means each Person listed on the Commitment Schedule, as amended from time to time, and each additional Person that becomes a party hereto pursuant to an Assignment and Assumption.

"Lender Default" has the meaning assigned to such term in Section 2.12(a).

"Lending Office" means the office or offices of the Agent as the Agent may from time to time notify the Loan Party Representative, which office may include any Affiliate of the Agent or any domestic or foreign branch of the Agent or such Affiliate.

"Letter of Credit" means any standby letter of credit issued hereunder.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form use by the Agent.

"Letter of Credit Expiration Date" means the day that is seven (7) days prior to the Maturity Date then in effect for the Revolving Commitments (or, if such day is not a Business Day, the immediately preceding Business Day).

"Letter of Credit Exposure" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Letter of Credit Fee" has the meaning assigned to such term in Section 2.9(g).

"Letter of Credit Sublimit" means an amount equal to the lesser of (a) $1,000,000 and (b) the Revolving Commitment. The Letter of Credit Sublimit is part of, and not in addition to, the Revolving Commitment.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim, encumbrance, preference, priority, or other security agreement or preferential arrangement held or asserted with respect to any asset of any kind or nature including any conditional sale or other title retention agreement, any lease

25

164393.00001/155883146v.1164393.00001/155883146v.3

having substantially the same economic effect as any of the preceding, and the filing of, or agreement to give, any financing statement under the UCC or comparable law of any jurisdiction.

"Liquidity" means, as at any date of determination, an amount equal to (a) Undrawn Availability as of such date, minus (b) all amounts owed to each Borrower's trade creditors that are outstanding sixty (60) or more days beyond the due date.

"Loan" means each Revolving Loan, each Capex Loan, each HVAC Equipment Loan, and the Term Loan; and "Loans" means all Revolving Loans, Capex Loans, HVAC Equipment Loans, and the Term Loan.

"Loan Account" has the meaning assigned to such term in Section 2.8.

"Loan Documents" means this Agreement, the Notes, the Perfection Certificate, each Borrowing Base Certificate, each Compliance Certificate, the Letters of Credit, the Beneficial Ownership Certificate, the Waivers, the Mortgages, if any, theeach Collateral Pledge Agreement, any Guaranty, any Hedging Agreement, and any and all other agreements, instruments and documents, including guaranties, pledges, powers of attorney, consents, and all other writings before, now, or later executed by any Loan Party or delivered to the Agent, the Issuer or any Lender with respect to the transactions contemplated by the Loan Documents.

"Loan Party" means each Borrower, each Guarantor and each Person that grants the Agent, for the benefit of the Lenders, a Lien on any Collateral to secure any Obligation.

"Loan Party Representative" means JT Logistics Solutions, LLC, an Iowa limited liability company.

"Material Adverse Effect" means a material adverse effect in or on: (1) the Loan Parties' aggregate financial condition, operational results, business, or prospects; (2) the Loan Parties' ability, in the aggregate, to pay or perform any Obligation in accordance with its terms; (3) the value of the Collateral, the Liens of the Agent of any Lender on the Collateral, or the priority of the Agent's or any Lender's Lien on any Collateral; (4) the validity or enforceability of any Loan Document or the Agent's rights or remedies under any Loan Document; or (5) the practical realization of the Agent's rights and remedies under the Loan Documents.

"Material Business Agreement" means any agreement that if terminated, rescinded, or breached could reasonably be expected to have a Material Adverse Effect on any Loan Party.

"Maturity Date" means the earlier of (1) the Termination Date or (2) the date on which the Revolving Commitment, the Capex Commitment, and the HVAC Equipment Loans Commitment are reduced to zero or otherwise terminated.

"Maximum Borrowing Amount" means, at any time, an amount equal to the lesser of (1) the Aggregate Revolving Commitment minus all Availability Reserves and (2) the Borrowing Base.

164393.00001/155883146v.1164393.00001/155883146v.3

"Maximum Swing Loan Amount" shall mean an amount equal to ten percent (10%) of the Aggregate Revolving Commitment.

"Mortgages" means each mortgage or other agreement that conveys or evidences a Lien on Owned Real Property that secures any Obligation.

"Mortgage Lender" means Dupaco Credit Union, in its capacity as the mortgagee of the Owned Real Property.

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or has been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including any Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Myers Guaranty" means that certain that certain Guaranty and Suretyship Agreement, dated on or before November 21, 2025, made by Jamie Myers in favor of Agent, as amended, restated, amended and restated or otherwise modified from time to time.

"Net Cash Proceeds" means:

(a)      with respect to any Asset Disposition, the aggregate cash proceeds received (including cash proceeds received pursuant to policies of insurance or by way of deferred payment of principal pursuant to a note, installment receivable or otherwise, but only as and when received) by any Loan Party pursuant to such Asset Disposition net of (i) the direct costs relating to such sale, transfer or other disposition (including sales commissions and legal, accounting and investment banking fees), (ii) taxes paid or reasonably estimated by the Borrowers to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (iii) amounts required to be applied to the repayment of any Debt secured by a Lien on the asset subject to such Asset Disposition (other than the Loans);

(b)      with respect to any issuance of Equity Interests, the aggregate cash proceeds received by any Loan Party pursuant to such issuance, net of the direct costs relating to such issuance (including sales and underwriters' commissions); and

(c)      with respect to any issuance of Debt, the aggregate cash proceeds received by any Loan Party pursuant to such issuance, net of the direct costs of such issuance (including up-front, underwriters' and placement fees).

"Non-Consenting Lender" has the meaning assigned to such term in Section 16.3(i).

"Non-Defaulting Lender" has the meaning assigned to such term in Section 2.12(b).

164393.00001/155883146v.1164393.00001/155883146v.3

"Non-Financed Capital Expenditures" means Capital Expenditures not financed by the seller of the capital asset, by a third party Agent or by means of any extension of credit by Agent other than by means of a Revolving Loan or a Swing Loan.

"Note" means one or all of the Revolving Note, the Capex Note, the HVAC Equipment Loan Note, the Term Note and the Swing Loan Note.

"Notice" is defined under Section 15.8.

"Notice of Borrowing" has the meaning given in Section 2.4.

"Notice of Continuation/Conversion" has the meaning assigned to such term in Section 2.4(f).

"Obligations" means and includes any and all loans, advances, debts, liabilities, obligations, covenants and duties (absolute, contingent, matured or unmatured) of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed or allowable in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document (including the Loan Documents), whether or not for the payment of money, (a) owing by the Loan Parties to the Lenders, the Agent, the Swing Loan Lender or the Issuer or to any other direct or indirect subsidiary or affiliate of the Lenders, the Agent, the Swing Loan Lender or the Issuer pursuant to the terms of this Agreement or the other Loan Documents, (b) owing by the Loan Parties to the Agent or any direct or indirect subsidiary or affiliate of the Agent arising (i) by reason of an equipment lease or guarantee, (ii) under any Hedging Agreement, (iii) in connection with any commercial credit cards, stored value cards, cash management or treasury administration services or in any other manner, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise), (iv) out of the Agent's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, or (v) under any other agreement between the Agent and any Loan Party, in each case, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and any amendments, extensions, renewals or increases and all costs and expenses of the Agent, the Swing Loan Lender, the Lenders and the Issuer incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses. "Obligations" shall not include, with respect to any Guarantor, Excluded Swap Obligations of such Guarantor.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of Treasury.

164393.00001/155883146v.1164393.00001/155883146v.3

"Off-Balance Sheet Liability" of a Person means: (1) any obligation under a sale and leaseback transaction that is not a Capital Lease; (2) any so-called "synthetic lease" or "tax ownership operating lease" transaction; (3) the amount of obligations outstanding under any asset securitization or similar transaction on any determination date that would be characterized as principal if that asset securitization or similar transaction were structured as a secured lending transaction rather than as a purchase; or (4) any other transaction (excluding operating leases for purposes of this clause (4)) that is the functional equivalent of or takes the place of borrowing but that is not a liability on that Person's balance sheet. The amount of any Off-Balance Sheet Liability is calculated based on the aggregate amount of obligations outstanding under the transaction on any determination date that would be characterized as principal if the transaction were structured as a secured lending transaction, whether or not shown as a liability on that Person's balance sheet, all in a manner reasonably satisfactory to the Agent.

"Original Indebtedness" has the meaning assigned to such term in Section 7.8(f).

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 16.3(g)).

"Owned Real Property" means all Real Property listed on Schedule 1.2(a).

"Parent" is defined in the defined term "Subsidiary".

"Participant" shall have the meaning set forth in Section 16.3(e).

"Pass-Through Loan Parties" means each Loan Party that is a limited liability company, a subchapter S corporation, or any other entity that is disregarded for federal and state income tax purposes while it has elected to be treated as a pass through entity for federal and state income tax purposes.

"Pass-Through Owner" is defined under the defined term "Permitted Tax Distributions".

"Pass-Through Tax Liabilities" means the amount of state and federal income tax paid or to be paid by the Pass-Through Owners on taxable income earned by a Borrower and attributable to the Pass-Through Owners as a result of a Borrower's "pass-through" tax status, assuming the highest marginal income tax rate for federal and state (for the state or states in which any owner is liable for income taxes with respect to such income) income tax purposes, after taking into account any deduction for state income taxes in calculating the federal income tax liability and

29

all other deductions, credits, deferrals and other reductions available to the Pass-Through Owners from or through such Borrower.

"Payment Office" means the office that the Agent specifies in writing to the Loan Party Representative.

"Payment Recipient" has the meaning assigned to such term in Section 15.12(a).

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan but excluding a Multiemployer Plan) that is maintained or is contributed to by any Borrower and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Perfection Certificate" means the perfection certificate or perfection certificates provided by the Borrowers to the Agent.

"Permitted Discretion" means the Agent's reasonable credit judgment (from the perspective of a secured asset-based lender) made in good faith in accordance with customary business practices for comparable asset based lending transactions.

"Permitted Dividends" means dividends and distributions that meet each of the following conditions: (1) no Default or Event of Default exists or would occur after giving pro forma effect to the dividend or distribution; (2) the Loan Parties are in pro forma compliance with the financial covenants set forth in Section 7.25 both before and after giving effect to the dividend or distribution; (3) the Borrowers shall have a Fixed Charge Coverage Ratio, as of the last day of the most recently ended fiscal quarter on a pro forma basis, of greater than 1.25 to 1.00; (4) the Borrowers shall have Undrawn Availability (without giving effect to the Temporary Overadvance Amount) of at least $3,000,000 in each case for 30 days prior to the payment of such dividend or distribution and after giving effect to the payment of such dividend or distribution; and (5) the Borrowers shall have delivered to the Agent written notice of its intention to make such dividend or distribution at least ten (10) Business Days, which notice shall be accompanied by (i) a Compliance Certificate for the monthly and / or quarterly period then ended demonstrating compliance with all financial covenants, and (ii) the proforma calculation demonstrating that no Default or Event of Default shall result after giving effect to such proposed dividend or distribution.

30

"Permitted Holders" means Jamie Cord, Troy Strawhecker, Andre Ekis, and Jamie Myers.

"Permitted Holder Cash Equity Contribution" means that certain cash equity contribution, made on or before November 21, 2025, by one or more of the Permitted Holders to Holdings in an amount of not less than $1,000,000.

"Permitted Liens" means (1) Liens in favor of the Agent, for the benefit of the Lenders; (2) Liens for taxes, assessments, or other Charges that (x) are not delinquent or (y) are being contested in good faith by appropriate proceedings that stay the enforcement of those Liens and with respect to which proper reserves have been taken by the Loan Parties in accordance with GAAP (but only if these Liens have no effect on the priority of the Agent's Liens or the value of the Collateral, and a stay of enforcement of the Lien is in effect); (3) deposits or pledges to secure obligations under worker's compensation, social security, or similar laws (excluding Liens arising under ERISA), or under unemployment insurance or general liability or product liability insurance; (4) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds, and other similar obligations arising in the ordinary course of any Loan Party's business; (5) mechanics', workers', materialmen's, warehousemen's, common carriers', landlord's or other similar Liens arising in the ordinary course of any Loan Party's business with respect to obligations that are not due or that are being contested in good faith by the applicable Loan Party; (6) Liens placed on equipment and real estate assets acquired to secure a portion of the purchase price (but only if (x) the Lien does not encumber any other of the Loan Parties' property and (y) the aggregate amount of Indebtedness secured by these Liens incurred during any fiscal year does not exceed the amount allowed by Section 7.6); (7) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants, and other similar title exceptions or Liens affecting Real Property, none of which materially impairs the use or value of that Real Property; (8) Liens on owned Real Property of the Loan Parties' in favor of Mortgage Lender (but only if the principal amount secured is not increased and no additional assets become subject to the Lien); and (9) Liens disclosed on Schedule 1.2(b) (but only if the principal amount secured is not increased and no additional assets become subject to the Lien).

"Permitted Tax Distributions" means dividends and distributions that meet each of the following conditions: (1) they are allowed under all applicable law; (2) no Event of Default or Default exists or would occur after giving pro forma effect to the dividend or distribution; (3) the Loan Parties are in pro forma compliance with the financial covenants set forth in Section 7.24 both before and after giving effect to the dividend or distribution; and (4) they are made by a Pass-Through Loan Party to its members or shareholders in an aggregate amount equal to the Increased Tax Burden of its shareholders and members (each, a "Pass-Through Owner"). Permitted Tax Distributions may be made on a quarterly basis to allow each Pass-Through Owner to pay estimated taxes during the course of the taxable year using reasonable estimates of the anticipated aggregate amount of Permitted Tax Distributions for that taxable year at the time of payment, with any excess of aggregate installments with respect to any such taxable year over the actual amount of Permitted Tax Distributions permitted for such taxable year reducing any future Permitted Tax Distributions otherwise allowed under this Agreement if less than $50,000 in the aggregate at any time, otherwise the Borrowers must cause the recipients of the excess

31

installments to return the excess to the Borrowers within 10 days of it becoming known that excess installments were made.

"Person" means any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity, or Governmental Body.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of any Borrower or any ERISA Affiliate or any such Plan to which any Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Pledged Equity Interests" has the meaning assigned to such term in Section 4.20.

"Pre-Adjustment Successor Rate" has the meaning assigned to such term in Section 3.13.

"Primary Obligor" is defined under the defined term "Guaranty".

"Prior Lender" means Old National Bank, a national banking association.

"Projections" has the meaning assigned to such term in Section 5.6(a).

"RCRA" means the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et seq.).

"Real Property" means the Loan Parties' owned and leased real property.

"Recipient" means the Lenders, the Agent, any issuer of a Letter of Credit pursuant to Section 2.9 hereunder, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Refinance Indebtedness" has the meaning assigned to such term in Section 7.8(f).

"Register" has the meaning assigned to such term in Section 15.3(c).

"Related Adjustment" means, in determining any Successor Rate, the first relevant available alternative set forth in the order below that can be determined by the Agent applicable to such Successor Rate:

(a)     the spread adjustment, or method for calculating or determining such spread adjustment, that has been selected or recommended by the Relevant Governmental Body for the relevant Pre-Adjustment Successor Rate (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto) and which adjustment or method is published on an information service as selected by the Agent from time to time in its reasonable discretion; or

(b)     the spread adjustment that would apply (or has previously been applied) to the fallback rate for a derivative transaction referencing the ISDA definitions (taking into account

32

the interest period, interest payment date or payment period for interest calculated and/or tenor thereto).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, consultants, service providers and representatives of such Person and of such Person's Affiliates.

"Release" has the meaning assigned to such term in Section 5.8(b).

"Relevant Governmental Body" means the FRB and/or the FRBNY, or a committee officially endorsed or convened by the FRB and/or the FRBNY.

"Rent, Charges and Insurance Reserve" means the aggregate of (a) a reserve for all past due rent and other amounts owing by a Loan Party to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder or other Person who possesses any Collateral or could assert a Lien on any Collateral; and (b) a reserve at least equal to three (3) months' rent and other periodic charges that could reasonably be expected to be payable to any such Person; and (c) a reserve for insurance premiums and payments due or which may become due, in each case, as determined by Agent in its sole discretion.

"Reportable Event" means a reportable event as defined in Section 4043 of ERISA and the regulations issued thereunder as to which the PBGC has not waived the notification requirement of Section 4043(a), or the failure of a Pension Plan to meet the minimum funding standards of Section 412 of the Code (without regard to whether the Pension Plan is a plan described in Section 4021(a)(2) of ERISA) or under Section 302 of ERISA.

"Required Lenders" means, any of the Lenders (other than Swing Loan Lender (in its capacity as such) or Defaulting Lenders) holding at least 66 2/3% in the aggregate, based on each Lender's Commitment Percentage, of (a) prior to the Termination Date, the Aggregate Commitment, and (b) after the Termination Date, the Aggregate Credit Exposure; provided that, as long as (y) there are only two Lenders (that are not Defaulting Lenders), Required Lenders shall mean both Lenders (that are not Defaulting Lenders) and (z) there are more than two Lenders (that are not Defaulting Lenders), Required Lenders shall mean at least two Lenders (that are not Defaulting Lenders) holding at least 66 2/3% in the aggregate, based on each Lender's Commitment Percentage.

"Revolving Commitment" means the commitment of each Lender to make Revolving Loans, participate in Swing Loans and issue Letters of Credit, as such commitment may be reduced pursuant to the terms of this Agreement. The initial amount of each Lender's Revolving Commitment is set forth on the Commitment Schedule.

"Revolving Exposure" means, at any time, the sum of (1) the outstanding principal amount of Revolving Loans and Swing Loans and (2) Letter of Credit Exposure.

"Revolving Loan" means a Loan made under Section 2.1(a).

"Revolving Note" has the meaning assigned to such term in Section 2.1(a).

33

"Sanction(s)" means any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury ("HMT") or other relevant sanctions authority.

"Scheduled Unavailability Date" has the meaning assigned to such term in Section 3.13.

"Second Amendment" means the Forbearance Agreement and Second Amendment to Credit and Security Agreement dated as of the Second Amendment Effective Date among Agent, the Lenders party thereto, and the Loan Parties.

"Second Amendment Effective Date" means November 24, 2025.

"Settlement" has the meaning assigned to such term in Section 2.11(c)(ii).

"Settlement Date" has the meaning assigned to such term in Section 2.11(c)(ii).

"Specified Blocked Accounts" means, collectively, the Deposit Accounts of the Loan Parties set forth on Schedule 6.7, other than the Specified Dupaco Accounts.

"Specified Dupaco Accounts" means, collectively, the Deposit Accounts of JT Real Estate set forth on Schedule 6.7 maintained with Dupaco Credit Union.

"SOFR Adjustment" with respect to Term SOFR means 0.11448% (11.448 basis points) for an Interest Period of one-month's duration.

"Specified Equity Contribution" has the meaning assigned to such term in Section 7.25(e).

"Specified Financial Covenants" has the meaning assigned to such term in Section 7.25(e).

"Specified Financial Covenant Defaults" has the meaning assigned to such term in Section 7.25(e).

"Specified Period" means, with respect to each specific Borrowing Base Certificate delivered to the Agent (the "Current Borrowing Base Certificate"), the period from the last date included in a Borrowing Base Certificate previously delivered to the Agent through and including the date that is two Business Days before the date of the Current Borrowing Base Certificate.

"Strawhecker Guaranty" means that certain that certain Guaranty and Suretyship Agreement, dated as of the October 27, 2025, made by Troy Strawhecker in favor of Agent, as amended, restated, amended and restated or otherwise modified from time to time.

"Strawhecker Collateral Pledge Agreement" means that certain Collateral Pledge Agreement, dated on or before November 25, 2025, made by Troy Strawhecker in favor of Agent, as amended, restated, amended and restated or otherwise modified from time to time.

34

"Subsidiary" means, with respect to any Person (the "parent") at any date, any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if the financial statements were prepared in accordance with GAAP, as well as any other Person (1) of which Equity Interests representing more than 50% of the Equity Interest or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of that date, owned, Controlled, or held, or (2) that is, as of such date, otherwise Controlled, by the parent or one or more Subsidiaries of the parent.

"Successor Rate" has the meaning assigned to such term in Section 3.13.

"Successor Rate Conforming Changes" means, with respect to any proposed Successor Rate, any conforming changes to the definition of Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definition of Business Day, timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the discretion of the Agent, to reflect the adoption and implementation of such Successor Rate and to permit the administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such Successor Rate exists, in such other manner of administration as the Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

"Swing Loan Lender" means Associated, in its capacity as lender of the Swing Loans.

"Swing Loan Note" means the promissory note described in Section 2.1(b)(i).

"Swing Loans" means the Advances made pursuant to Section 2.1(b)(i).

"Taxes" means all present or future taxes, duties, levies, imposts, deductions, assessments, charges, withholdings (including backup withholding) or other charges imposed by any Governmental Body, including any interest, penalties and additions to taxes applicable thereto.

"Temporary Overadvance Amount" means $3,700,000.(a) from October 31, 2025 through and including November 14, 2025, $3,500,00, (b) from November 15, 2025 through and including November 25, 2025, $7,500,000, (c) from November 26, 2025 through and including January 9, 2026, $6,500,000, (d) from January 12, 2026 through and including January 30, 2026, $3,500,000, and (e) from January 31, 2026 and at all times thereafter, $0.

"Temporary Overadvance Period" means the period commencing on October 31, 2025 through and including November 14, 2025January 31, 2026.

"Tenant Guaranty" means that certain Guaranty Agreement, by and among Bayer Production Supply LLC, as guarantor, JT Logistics, as warehouse, and the other parties thereto, as amended, restated, amended and restated or otherwise modified from time to time.

35

"Term Loan" means the Loan made under Section 2.2.

"Term Loan Commitment" means the commitment of each Lender to make a Term Loan on the Closing Date. After advancing the Term Loan, each reference to each Lender's Term Loan Commitment refers to the outstanding principal amount of its Term Loan.

"Term Loan Maturity Date" means the earlier of (a) December 27, 2027 or (b) the Termination Date.

"Term Note" has the meaning assigned to such term in Section 2.2.

"Term SOFR" means:

(a)     for any Interest Period with respect to a Term SOFR Loan, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the commencement of such Interest Period with a term equivalent to such Interest Period; provided that if the rate is not published prior to 11:00 a.m. on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto, in each case, *plus* the SOFR Adjustment for such Interest Period; and

(b)     for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to the Term SOFR Screen Rate with a term of one month commencing that day;

*provided* that if the Term SOFR determined in accordance with either of the foregoing provisions (a) or (b) of this definition would otherwise be less than zero, the Term SOFR shall be deemed zero for purposes of this Agreement.

"Term SOFR Loan" means a Loan that bears interest at a rate based on clause (a) of the definition of Term SOFR.

"Term SOFR Screen Rate" means the forward-looking SOFR term rate administered by CME (or any successor administrator satisfactory to the Agent) and published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Agent from time to time).

"Termination Date" means December 27, 2027.

"Threshold Amount" means $500,000.

"Total Plan Liability" means, at any time, the present value of all vested and unvested accrued benefits under all Pension Plans, determined as of the then most recent valuation date for each Pension Plan, using PBGC actuarial assumptions for single employer plan terminations.

"Toxic Substances" means any material that has been shown to have an adverse effect on human health or that is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. Section 2601 et seq., applicable state law, or any other present and future applicable

36

Federal or state laws related to toxic substances, and includes asbestos, polychlorinated biphenyls (PCBs) and lead based paints.

"UCC" means the Uniform Commercial Code as in effect from time to time in Illinois (but if the law, perfection, or the effect of perfection or non-perfection of any Lien on any Collateral is governed by the Uniform Commercial Code in effect in a different jurisdiction, "UCC" means the Uniform Commercial Code as in effect in that other jurisdiction with respect to perfection or the effect of perfection or non-perfection).

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce ("ICC") Publication No. 600 (or such later version thereof as may be in effect at the time of issuance).

"UFCA" has the meaning assigned to such term in Section 14.4(d).

"UFTA" has the meaning assigned to such term in Section 14.4(d).

"Undrawn Availability" means, as of any determination date, an amount equal to (x) the Maximum Borrowing Amount, minus (y) the sum of (1) the Revolving Exposure, plus (2) all amounts owed to each Borrower's trade creditors that are outstanding 60 or more days beyond the due date, plus (3) fees and Expenses that any Loan Party is liable for but that have not been paid or charged to the Loan Account, plus (4) all amounts owing for taxes that are past due.

"Unreimbursed Amount" has the meaning assigned to such term in Section 2.9(c).

"Unused Revolving Commitment" means, at any time, the excess of (a) the Revolving Commitment at such time over (b) the Revolving Exposure at such time.

"U.S. Borrower" means any Borrower that is a U.S. Person.

"U.S. Government Securities Business Day" means any Business Day, except any Business Day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

"Value" means for an Account, its face amount, net of any returns, rebates, discounts (calculated on the shortest terms), credits, allowances or Taxes (including sales, excise or other Taxes) that have been or could reasonably be expected to be claimed by the Account Debtor or any other Person.

"Waivers" means all landlord's waivers, warehouseman's waivers, creditor's waivers, mortgagee waivers, processing facility and bailee waivers, freight forwarder waivers and customs broker waivers that are executed and delivered in connection with this Agreement.

"Withholding Agent" means the Borrowers and the Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.3    **UCC Terms.**  Unless defined in the Loan Documents, all terms used in the Loan Documents and defined in the UCC have the meaning given in the UCC. These UCC terms include: "Account", "Account Debtor", "Certificated Security", "Chattel Paper", "Commercial Tort Claim", "Commodities Account", "Deposit Account", "Document", "Equipment", "Farm Products", "Financial Asset", "Fixture", "General Intangible", "Goods", "Instrument", "Inventory", "Investment Property", "Lease", "Lessor", "Letter-of-Credit Rights", "money", "Payment Intangibles", "Proceeds", "Product", "Record", "Secured Party", "Securities Account", "Security", "Security Entitlement", "Security Interest", and "Supporting Obligation".

1.4    **General Construction.**  When computing time periods from a specified date to a later specified date, "from" means "from and including" and "to" and "until" each mean "to but excluding". In the Loan Documents: (1) all references to laws and statutes include all regulations and Governmental Body interpretations; (2) all references to laws, statutes, and regulations include any amendments, renewals, extensions, replacements, or successor laws, statutes, or regulations; (3) any definition of or reference to any agreement, instrument, or other document means the agreement, instrument, or other document as from time to time amended, amended and restated, supplemented, modified, substituted, or replaced; (4) any reference to any Person includes that Person's successors and assigns (and if the Person is a natural person, that Person's heirs, executors, and personal representatives) and, unless expressly stated otherwise, its Subsidiaries; (5) the words "herein," "hereof," and "hereunder," and words with similar meanings, refer to this Agreement in its entirety and not any particular provision or section; (6) "discretion" when not capitalized means a determination made by the Agent in its sole and absolute discretion; (7) any reference to payment, repayment, or prepayment means payment in immediately available funds in Dollars; (8) any pronoun covers all genders; (9) wherever appropriate in the context, terms used in the Loan Documents in the singular also include the plural and vice versa; (10) any reference to any Loan Document or any other document, agreement, instrument, report, certificate, or other similar deliverable means that the Loan Document or other deliverable is satisfactory in form and substance to the Agent in its discretion; (11) the words "include," "includes," and "including" are treated as being followed by "without limitation"; (12) wherever appropriate in the context, terms used in the singular also include the plural and vice versa; (13) captions used in the Loan Documents are for convenience only and are not taken into account in interpreting the document; (14) all references to the time of day shall mean the time in Chicago, Illinois; and (15) the words "knowledge," or "know" refers, as it pertains to any Person (or in the case of any Person that is an entity, the officers and directors of such Person), the knowledge such Person, or a Person in a similar position, actually knows or would know following a reasonable inquiry in connection with the relevant subject matter. All

164393.00001/155883146v.1164393.00001/155883146v.3

financial and Borrowing Base calculations must be performed with Inventory valued on first-in, first-out basis, at the lower of cost or market value. A Default or an Event of Default exists at all times during the period beginning on the date that it occurs to the date on which it is waived in writing by the Agent or, in the case of a Default, is cured within any cure period expressly provided for in this Agreement. All covenants are given independent effect so that if a particular action or condition is not permitted by any covenant, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant does not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties in the Loan Documents are given independent effect so that if a particular representation or warranty is incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached does not affect the incorrectness or a breach of a representation or warranty.

1.5    **Time.**  Except as otherwise specified herein, any reference to a particular time means such time in Green Bay, Wisconsin.

## ARTICLE II
## COMMITMENTS OF THE LENDERS; BORROWING PROCEDURE

2.1    **Revolving Loans; Swing Loans.**

(a)    Revolving Loans. Subject to the terms and conditions in this Agreement, each Lender, severally and not jointly, will make Revolving Loans to the Borrowers in aggregate amounts outstanding at any time before the Maturity Date equal to such Lender's Commitment Percentage of the Maximum Borrowing Amount minus such Lender's Commitment Percentage of the Letter of Credit Exposure and Swing Loans. The Revolving Loans initially bear interest as Base Rate Loans (but may be converted into a Term SOFR Loan in accordance with Section 2.4(f)). If requested by a Lender, that Lender's Revolving Loans shall be evidenced by a promissory note (each, a "Revolving Note") substantially in the form attached as Exhibit C.

(b)    Swing Loans.

(i)    Availability of Swing Loans.  Subject to the terms and conditions set forth in this Agreement, and in order to minimize the transfer of funds between Revolving Lenders and Agent for administrative convenience, Agent, Revolving Lenders and Swing Loan Lender agree that in order to facilitate the administration of this Agreement, Swing Loan Lender may, at its election and option made in its sole discretion cancelable at any time for any reason whatsoever, make swing loan advances ("Swing Loans") available to Borrowers as provided for in this Section 2.1(b) at any time or from time to time after the Closing Date to, but not including, the last day of the term of this Agreement, in an aggregate principal amount up to but not in excess of the Maximum Swing Loan Amount, provided that the outstanding aggregate principal amount of Swing Loans and the Revolving Loans at any one time outstanding shall not exceed an amount equal to the Maximum Borrowing Amount less the Maximum Undrawn Amount of all outstanding Letters of Credit.  All Swing Loans shall be Base Rate Loans only.  Borrowers may borrow (at the option and election of Swing Loan Lender), repay and re-borrow (at the option and election of Swing Loan Lender) Swing Loans and Swing Loan Lender may

39

make Swing Loans as provided in this Section 2.1(b) during the period between Settlement Dates. All Swing Loans shall be evidenced by a secured promissory note (the "Swing Loan Note") substantially in the form attached as Exhibit D hereto. Swing Loan Lender's agreement to make Swing Loans under this Agreement is cancelable at any time for any reason whatsoever and the making of Swing Loans by Swing Loan Lender from time to time shall not create any duty or obligation, or establish any course of conduct, pursuant to which Swing Loan Lender shall thereafter be obligated to make Swing Loans in the future.

(ii) <u>Swing Loan Advances</u>. Upon either (i) any request by Loan Party Representative for a Revolving Loan made pursuant to Section 2.1(a) hereof or (ii) the occurrence of any deemed request by Borrowers for a Revolving Loan pursuant to the terms hereof, Swing Loan Lender may elect, in its sole discretion, to have such request or deemed request treated as a request for a Swing Loan, and may advance same day funds to Borrowers as a Swing Loan; provided that notwithstanding anything to the contrary provided for herein, Swing Loan Lender may not make Swing Loans if Swing Loan Lender has been notified by Agent or by Required Lenders that one or more of the applicable conditions set forth in Section 8.2 have not been satisfied or the Revolving Commitments have been terminated for any reason.

(iii) <u>Participations in Swing Loans</u>. Upon the making of a Swing Loan (whether before or after the occurrence of a Default or an Event of Default and regardless of whether a Settlement has been requested with respect to such Swing Loan), each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from Swing Loan Lender, without recourse or warranty, an undivided interest and participation in such Swing Loan in proportion to its Commitment Percentage. Swing Loan Lender or Agent may, at any time, require the Revolving Lenders to fund such participations by means of a Settlement as provided for in Section 2.11(c). From and after the date, if any, on which any Revolving Lender is required to fund, and funds, its participation in any Swing Loans purchased hereunder, Agent shall promptly distribute to such Revolving Lender its Commitment Percentage of all payments of principal and interest and all proceeds of Collateral received by Agent in respect of such Swing Loan; provided that no Revolving Lender shall be obligated in any event to make Revolving Loans in an amount in excess of the amount of its Revolving Commitment minus its Commitment Percentage (taking into account any reallocations under Section 2.11) of the Letter of Credit Exposure.

2.2    **Term Loan.**    Subject to the terms and conditions in this Agreement, each Lender, severally and not jointly, will make a term loan (the "Term Loan") to the Borrowers on the Closing Date equal to such Lender's Commitment Percentage of the Term Loan Commitment by transferring immediately available funds to the Loan Account or as the Loan Party Representative may otherwise instruct in writing. The Term Loan initially bears interest as a Base Rate Loan and may be converted into a Term SOFR Loan in accordance with Article 3). If requested by a Lender, that Lender's Term Loan shall be evidenced by a promissory note (each, a "Term Note") substantially in the form attached as Exhibit G.

40

2.3     **Capex Loans; HVAC Equipment Loans.**

(a)     Capex Loans.  Subject to the terms and conditions in this Agreement, during the Capex Availability Period, each Lender, severally and not jointly, will make a Capex Loan or Capex Loans to the Borrowers from time to time equal to such Lender's Commitment Percentage of the Capex Commitment, in each case in an amount not to exceed the Borrower's Capex Availability at such time, by transferring immediately available funds to the Loan Account or as the Loan Party Representative may otherwise instruct in writing; provided, that (i) the amount of any Capex Loan shall not exceed 80% of the Hard Costs of Eligible Purchased M&E purchased or to be purchased by Borrowers with the proceeds thereof, or such lesser amount as to any Capex Loan as Loan Party Representative may request in respect thereof, (ii) each Capex Loan shall be in an amount of at least $500,000 and an integral multiple of $100,000, and (iii) no more than three (3) such Capex Loans may be requested during the Capex Availability Period.  The proceeds of each Capex Loan shall be used solely for the payment of the purchase price, or to reimburse the Borrowers for the cash previously paid by the Borrowers for the purchase price, for the Eligible Purchased M&E specified in the Notice of Borrowing applicable to such Capex Loan; provided, that in the case of a purchase price paid prior to the making of a Capex Loan, such purchase price was paid no more than 12 months (or such other date as may be agreed to by Agent in its discretion) prior to the date of such Capex Loan.  No Notice of Borrowing for a Capex Loan shall include any Eligible Purchased M&E that has been included in any other Notice of Borrowing for a Capex Loan.  A single Capex Loan may be used for the purchase price of one or more items constituting Eligible Purchased M&E specified in the Notice of Borrowing required to be delivered to Agent pursuant to Section 2.4(a) below and the minimum amount of such Capex Loan applies to such Capex Loan, not to the purchase price of any individual item of Eligible Purchased M&E.  Each Capex Loan shall initially bear interest as a Base Rate Loan and may be converted into a Term SOFR Loan in accordance with Article 3). If requested by a Lender, that Lender's Capex Loans shall be evidenced by a promissory note (each, a "Capex Note") substantially in the form attached as Exhibit I.

(b)     HVAC Equipment Loans.  Subject to the terms and conditions in this Agreement, during the HVAC Equipment Loan Availability Period, each Lender, severally and not jointly, will make a HVAC Equipment Loan or HVAC Equipment Loans to the Borrowers from time to time equal to such Lender's Commitment Percentage of the HVAC Equipment Loan Commitment, in each case in an amount not to exceed the Borrower's HVAC Equipment Loan Availability at such time, by transferring immediately available funds to the Loan Account or as the Loan Party Representative may otherwise instruct in writing; provided, that (i) the amount of any HVAC Equipment Loan shall not exceed 80% of the Hard Costs of Eligible Purchased HVAC M&E purchased or to be purchased by Borrowers with the proceeds thereof, or such lesser amount as to any HVAC Equipment Loan as Loan Party Representative may request in respect thereof, (ii) each HVAC Equipment Loan shall be in an amount of at least $500,000 and an integral multiple of $100,000, and (iii) no more than three (3) such HVAC Equipment Loans may be requested during the HVAC Equipment Loan Availability Period.  The proceeds of each HVAC Equipment Loan shall be used solely for the payment of the purchase price, or to reimburse the Borrowers for the cash previously paid by the Borrowers for the purchase price, for the Eligible Equipment specified in the Notice of Borrowing applicable to such HVAC Equipment Loan; provided, that in the case of a purchase price paid prior to the making of a HVAC Equipment Loan, such purchase price was paid no more than 12 months (or such other

41

date as may be agreed to by Agent in its discretion) prior to the date of such HVAC Equipment Loan. No Notice of Borrowing for a HVAC Equipment Loan shall include any Eligible Purchased HVAC M&E that has been included in any other Notice of Borrowing for a HVAC Equipment Loan. A single HVAC Equipment Loan may be used for the purchase price of one or more items constituting Eligible Purchased HVAC M&E specified in the Notice of Borrowing required to be delivered to Agent pursuant to Section 2.4(a) below and the minimum amount of such HVAC Equipment Loan applies to such HVAC Equipment Loan, not to the purchase price of any individual item of Eligible Purchased HVAC M&E. Each HVAC Equipment Loan shall initially bear interest as a Base Rate Loan and may be converted into a Term SOFR Loan in accordance with Article 3). If requested by a Lender, that Lender's HVAC Equipment Loans shall be evidenced by a promissory note (each, a "HVAC Equipment Loan Note") substantially in the form attached as Exhibit I.

2.4 **Loan Procedures.**

(a) Borrowing Procedures. The Loan Party Representative shall give (i) written notice (delivered by hand, pdf by email communication, fax or other electronic transmission) (each such written notice, a "Notice of Borrowing") substantially in the form of Exhibit E or telephonic notice (followed immediately by a Notice of Borrowing) to the Agent of each proposed borrowing not later than 1:00 p.m. on the proposed date of such borrowing for Base Rate Loans or (ii) written notice (delivered by hand, pdf by email communication, fax or other electronic transmission) (each such written notice, a "Notice of Conversion/Continuation") substantially in the form of Exhibit F or telephonic notice (followed immediately by a Notice of Conversion/Continuation), with respect to any such conversion or continuation of Term SOFR Loans in accordance with Section 2.4(f), to the Agent of each such proposed conversion or continuation of Term SOFR Loans not later than 11:00 a.m. on the day three (3) Business Days before the date of such proposed conversion to or continuation of Term SOFR Loans). Each such notice shall be effective upon receipt by the Agent, shall be irrevocable, and shall specify the date and amount of borrowing requested. Not later than 1:00 p.m., the Agent shall pay over the funds to the Loan Party Representative on the requested borrowing date. Each borrowing shall be on a Business Day. Each borrowing shall be in an aggregate amount of at least $500,000 and an integral multiple of $100,000.

(b) Groups of Loans. With respect to Revolving Loans, Loans with Interest Periods ending on different days may be outstanding at the same time, provided that not more than three (3) different Groups of Loans shall be outstanding at any one time. With respect to Capex Loans, Loans with Interest Periods ending on different days may be outstanding at the same time, provided that not more than three (3) different Groups of Loans shall be outstanding at any one time. With respect to HVAC Equipment Loans, Loans with Interest Periods ending on different days may be outstanding at the same time, provided that not more than three (3) different Groups of Loans shall be outstanding at any one time. Notwithstanding the foregoing or any other provision of this Agreement, prior to 90 days after the Closing Date, the Interest Period for any Loan shall be one month.

(c) Certain Conditions. Notwithstanding any other provision of this Agreement, the Lenders shall not have an obligation to make any Loan if an Event of Default or Default exists. Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the

42

option of Agent or at the direction of the Required Lenders, no Term SOFR Loan shall be made available to Borrowers.

(d)     Additional Conditions for Capex Loans and HVAC Equipment Loans.  Agent shall have received, with respect to Eligible Purchased M&E and/or Eligible Purchased HVAC M&E that has been purchased prior to the date of a proposed Capex Loan or HVAC Equipment Purchase Loan, as applicable, (i) copies, or upon Agent's or any Lender's request, originals, of all agreements, documents and instruments relating to the sale of the Eligible Purchased M&E or Eligible Purchased HVAC M&E, as applicable to Borrowers, including any purchase orders, invoices, bills of sale or similar documents (provided, that, to the extent that Agent or any Lender may receive any originals, it will return such originals to Loan Party Representative after Agent or such Lender has finished its use of them), and (ii) evidence reasonably satisfactory to Agent that the Eligible Purchased M&E or Eligible Purchased HVAC M&E, as applicable, has been received and installed by Borrowers and is in good working order and operating for its intended purpose.

(e)     Term SOFR Rate Interest Period Election.  Loan Party Representative shall elect the initial Interest Period applicable to a Term SOFR Loan by its Notice of Conversion/Continuation given to the Agent pursuant to Section 2.4(f) below.  Loan Party Representative shall elect the duration of each succeeding Interest Period by giving irrevocable written notice to Agent of such duration not later than 11:00 a.m. on the day which is three (3) Business Days prior to the last day of the then current Interest Period applicable to such Term SOFR Loan.  If Agent does not receive timely notice of the Interest Period elected by Loan Party Representative, Loan Party Representative shall be deemed to have elected to convert such Term SOFR Loan to a Base Rate Loan as of the last day of the Interest Period applicable to such Term SOFR Loan subject to Section 2.4(f) below.

(f)     Conversion/Continuation of Term SOFR Loans.  Provided that no Default or Event of Default shall have occurred and be continuing, Loan Party Representative may, on the last Business Day of the then current Interest Period applicable to any outstanding Term SOFR Loan, or on any Business Day with respect to Base Rate Loans, convert any such Term SOFR Loan into a Base Rate Loan in the same aggregate principal amount, provided that any conversion of a Term SOFR Loan shall be made only on the last Business Day of the then current Interest Period applicable to such Term SOFR Loan.  If Loan Party Representative desires to convert a Term SOFR Loan or a Base Rate Loan, Loan Party Representative shall give Agent written notice by no later than 11:00 a.m. (i) on the day which is three (3) Business Days prior to the date on which such conversion is to occur with respect to a conversion from a Base Rate Loan to a Term SOFR Loan, or (ii) on the day which is one (1) Business Day prior to the date on which such conversion is to occur (which date shall be the last Business Day of the Interest Period for the applicable Term SOFR Loan) with respect to a conversion from a Term SOFR Loan to a Base Rate Loan, specifying, in each case, the date of such conversion, the Term SOFR Loan(s) or Base Rate Loan(s) to be converted and if the conversion is to a Term SOFR Loan, the duration of the first Interest Period therefor.

(g)     Indemnity.  Each Borrower shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by any

43

Borrower in the payment of the principal of or interest on any Term SOFR Loan or failure by any Borrower to complete a borrowing of, a prepayment of or conversion of or to a Term SOFR Loan after notice thereof has been given, including, but not limited to, any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its Term SOFR Loans hereunder. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or any Lender to Loan Party Representative shall be conclusive absent manifest error.

2.5 **Loan Disbursement.** All Loans will be disbursed from an office or location that the Agent designates from time to time. Revolving Loans may be borrowed, repaid, and reborrowed in accordance with the Loan Documents. None of the Term Loan, any Capex Loan, or any HVAC Equipment Loan may be reborrowed once repaid. If funded by the Lenders, the Agent will make the proceeds of each Revolving Loan requested by the Loan Party Representative available to it by crediting the Loan to a Borrower's operating account at Associated. Revolving Loans treated as being requested by a Borrower will be disbursed to the Agent and applied to the obligation or liability related to the deemed request.

2.6 **Maximum Advances.** The Borrowers may not at any time allow the Revolving Exposure to exceed the Maximum Borrowing Amount (and if it does for any reason the Borrowers must immediately and without demand pay the excess to the Agent).

2.7 **Loan Repayment; Term Loan Amortization.**

(a) The Loans are due and payable in full on the Termination Date (subject to earlier prepayment as provided in the Loan Documents).

(b) The Term Loan amortizes in equal $90,357.14 quarterly installments on the first day of each quarter, beginning on the first day of the first quarter after the Closing Date. The final payment, equal to the remaining principal balance, is payable on the Maturity Date. Payments or prepayments of the Term Loan may not be reborrowed.

(c) The Capex Loans amortize in equal quarterly installments on the first day of each quarter, beginning on the first day of the first quarter after the earlier of (x) the end of the Capex Availability Period and (y) the date upon which the Capex Loans have been advanced pursuant to Section 2.3(a) in an amount equal to the Borrower's Capex Availability, in an amount equal to, for each such payment, the Capex Outstandings as of such date multiplied by 5%. The final payment, equal to the remaining principal balance, is payable on the Maturity Date. Payments or prepayments of the Capex Loan may not be reborrowed.

(d) The HVAC Equipment Loans amortize in equal quarterly installments on the first day of each quarter, beginning on the first day of the first quarter after the earlier of (x) the end of the HVAC Equipment Loan Availability Period and (y) the date upon which the HVAC Equipment Loans have been advanced pursuant to Section 2.3(b) in an amount equal to the Borrower's HVAC Equipment Loan Availability, in an amount equal to, for each such payment, the HVAC Equipment Loan Outstandings as of such date multiplied by 2.5%. The final payment, equal to the remaining principal balance, is payable on the Maturity Date. Payments or prepayments of the HVAC Equipment Loans may not be reborrowed.

164393.00001/155883146v.1164393.00001/155883146v.3

(e)      Checks, notes, drafts, and other payment items may not be immediately collectible. Accordingly, when calculating outstanding availability, each payment and all other amounts received in the Cash Concentration Account is treated as received by the Agent (and the Agent and the Lenders will provisionally credit the Loan Account) on the Business Day immediately following the day on which the Agent receives actual possession of the payment item for deposit to the Cash Concentration Account.  In consideration for this accommodation, the Borrowers agree that in calculating interest and other charges and fees, all payments are treated as having been credited to the Loan Account on the second Business Day immediately following the Business Day on which the payments are treated as having been received by the Agent and the Lenders under this Section.  The Agent does not have to credit the Loan Account for any payment item that is not satisfactory to the Agent in its Permitted Discretion. All credits are provisional and are subject to verification and final settlement. The Agent may charge the Loan Account for any payment item that is returned unpaid or otherwise not collected. Any information and data reported to the Borrowers under any service that is received before final posting and confirmation is subject to correction. The Agent and the Lenders have no liability for the content of any preliminary service related information.

(f)      The Loan Parties must pay all payments under the Loan Documents to the Agent (without any deduction whatsoever, including any set-off, recoupment, or counterclaim), at the Payment Office, not later than 11:59 a.m., on the due date, in Dollars. The Agent may in its discretion pay any Obligations due under the Loan Documents (or other amounts any Loan Party is required to pay under the Loan Documents) by charging the Loan Account or by making Advances.

2.8    **Statements.**   The Agent will maintain a loan account in accordance with its customary procedures in the Borrowers' name (the "Loan Account") in which it will record, among other things, the date and amount of each Advance and the date and amount of each payment (but the Agent's failure to record this information does not affect the Agent's or Lenders' rights, create any liability, or release any Loan Party from any liability).

2.9    **Letters of Credit.**

(a)      The Letter of Credit Commitment.

(i)      Subject to the terms and conditions set forth herein, the Issuer agrees, (1) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit for the account of the Borrowers or any of their domestic Subsidiaries, and to amend or extend Letters of Credit previously issued by it, in accordance with Section 2.9(b), and (2) to honor drawings under the Letters of Credit; provided that after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the Revolving Exposure shall not exceed the Revolving Commitment, and (y) the Letter of Credit Exposure shall not exceed the Letter of Credit Sublimit.  Each request by the Borrowers for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrowers that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence.  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrowers' ability to obtain Letters of Credit shall be fully revolving, and

45

accordingly the Borrowers may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)     The Issuer shall have no obligation to issue any Letter of Credit if:

(A)     the expiry date of the requested Letter of Credit would occur more than twelve (12) months after the date of issuance;

(B)     the expiry date of the requested Letter of Credit would occur after the Letter of Credit Expiration Date;

(C)     any order, judgment or decree of any Governmental Body or arbitrator shall by its terms purport to enjoin or restrain the Issuer from issuing the Letter of Credit, or any law applicable to the Issuer or any request or directive (whether or not having the force of law) from any Governmental Body with jurisdiction over the Issuer shall prohibit, or request that the Issuer refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon the Issuer with respect to the Letter of Credit any restriction, reserve or capital requirement (for which the Agent, Lenders or Issuer are not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the Agent, Lenders or Issuer in good faith deem material to it;

(D)     the issuance of the Letter of Credit would violate one or more policies of the Issuer applicable to letters of credit generally;

(E)     except as otherwise agreed by the Agent, Lender and Issuer, the Letter of Credit is in an initial stated amount less than $250,000; or

(F)     the Letter of Credit is to be denominated in a currency other than Dollars.

(iii)     The Issuer shall be under no obligation to amend any Letter of Credit if (A) the Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to the Letter of Credit.

(iv)     The Issuer shall notify the Agent and the Lenders of the request by the Loan Party Representative for a Letter of Credit hereunder within a reasonable time after receiving such request.

(b)     Procedures for Issuance and Amendment of Letters of Credit.

(i)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrowers delivered to the Agent in the form of a Letter of Credit Application, appropriately completed and signed by the Borrowers and/or such Subsidiary . Such Letter of Credit Application may be sent by fax transmission, by United

164393.00001/155883146v.1164393.00001/155883146v.3

States mail, by overnight courier, by electronic transmission using the system provided by the Agent, by personal delivery or by any other means acceptable to the Agent. Such Letter of Credit Application must be received by the Agent not later than 11:00 a.m. at least two (2) Business Days (or such later date and time as the Agent may agree in a particular instance in its sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Agent: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) the purpose and nature of the requested Letter of Credit; and (H) such other matters as the Agent may require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Agent (1) the Letter of Credit to be amended; (2) the proposed date of amendment thereof (which shall be a Business Day); (3) the nature of the proposed amendment; and (4) such other matters as the Agent may require. Additionally, the Borrower shall furnish to the Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the Agent may require.

(ii)     So long as the applicable conditions contained in Section 8 are satisfied, subject hereof, the Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrowers (or the applicable Subsidiary) or enter into the applicable amendment, as the case may be, in each case in accordance with the Issuer's usual and customary business practices.

(iii)     Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the Agent will also deliver to the Borrower a true and complete copy of such Letter of Credit or amendment.

(c)     Drawings and Reimbursements; Funding of Participations. Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the Agent shall notify the Borrowers thereof. Not later than 11:00 a.m. on the date of any payment by the Lenders under a Letter of Credit (each such date, an "Honor Date"), the Borrower shall reimburse the Agent, on behalf of the Lenders, the amount of such drawing (an "L/C Borrowing"). If the Borrower fails to so reimburse the Agent by such time, the Borrowers shall be deemed to have requested a Revolving Loan that is a Base Rate Loan to be disbursed on the Honor Date in an amount equal to the amount of the unreimbursed drawing (the "Unreimbursed Amount"), without regard to the minimum and multiples specified in Section 2.4 for the principal amount of Revolving Loans. Any notice given by the Agent pursuant to this Section may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(d)     Obligations Absolute. The obligation of the Borrowers to reimburse the Agent, on behalf of the Lenders, for each drawing under each Letter of Credit and to repay each L/C

47

Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)  any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)  the existence of any claim, counterclaim, setoff, defense or other right that the Borrowers or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the Agent or any other Person, whether in connection with this Agreement or by such Letter of Credit, the transactions contemplated hereby or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)  any draft, demand, endorsement, certificate or other document presented under or in connection with such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)  waiver by the Agent of any requirement that exists for the Agent's or Lenders' protection and not the protection of the Borrowers or any waiver by the Agent which does not in fact materially prejudice the Borrowers;

(v)  honor of a demand for payment presented electronically even if such Letter of Credit requires that demand be in the form of a draft;

(vi)  any payment made by the Agent in respect of an otherwise complying item presented after the date specified as the expiration date of, or the date by which documents must be received under, such Letter of Credit if presentation after such date is authorized by the UCC, the ISP or the UCP, as applicable;

(vii)  any payment by the Agent or Lenders under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the Agent under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law; or

(viii)  any other circumstance that would constitute a defense or discharge of Borrowers' or any of their Subsidiaries' duties under applicable law.

The Borrowers shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrowers' instructions or other irregularity, the Borrowers will immediately notify the Agent. The Borrowers shall be conclusively deemed to have waived any such claim against the Agent and its correspondents unless such notice is given as aforesaid.

48

164393.00001/155883146v.1164393.00001/155883146v.3

(e)　　__Role of Bank as Issuer__.  The Borrowers agree that, in paying any drawing under a Letter of Credit, the Agent shall not have any responsibility to obtain any document (other than any sight or time draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  The Borrowers hereby assume all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrowers' pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the Agent, the Lenders any of their Related Parties nor any correspondent, participant or assignee of the Agent shall be liable or responsible for any of the matters described in this Section; provided, however, that anything in such clauses to the contrary notwithstanding, the Borrowers may have a claim against the Agent, and the Agent may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrowers which the Borrowers prove, as determined by a final nonappealable judgment of a court of competent jurisdiction, were caused by the Agent's willful misconduct or gross negligence or the Agent's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight or time draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in limitation of the foregoing, the Agent may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the Agent shall not be responsible for the validity or sufficiency of any instrument transferring, endorsing or assigning or purporting to transfer, endorse or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.  The Agent may send a Letter of Credit or conduct any communication to or from the beneficiary via the Society for Worldwide Interbank Financial Telecommunication ("__SWIFT__") message or overnight courier, or any other commercially reasonable means of communicating with a beneficiary.

(f)　　__Applicability of ISP and UCP; Limitation of Liability__.  Unless otherwise expressly agreed by the Agent and the Borrowers when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Letter of Credit.  Notwithstanding the foregoing, the Agent shall not be responsible to the Borrowers for, and the Agent's rights and remedies against the Borrowers shall not be impaired by, any action or inaction of the Agent required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the law or any order of a jurisdiction where the Agent or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Agents Association for Finance and Trade - International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

(g)　　__Letter of Credit Fees__.  The Borrowers shall pay to the Agent a Letter of Credit fee (the "__Letter of Credit Fee__") for each standby Letter of Credit equal to the Applicable Rate **for** Revolving Loans that are Term SOFR Loans times the daily amount available to be drawn under such Letter of Credit.  Letter of Credit Fees shall be (1) due and payable on the first Business Day following each fiscal quarter end, commencing with the first such date to occur after the

49

issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand and (2) computed on a quarterly basis in arrears.  If there is any change in the Applicable Rate during any quarter, the daily amount available to be drawn under each standby Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(h)     Fronting Fee and Documentary and Processing Charges.  The Borrowers shall pay directly to the Agent a fronting fee with respect to each standby Letter of Credit, at the rate per annum specified in in a fee letter with the Agent (or such other rate separately agreed between the Borrowers and the Agent, computed on the daily amount available to be drawn under such Letter of Credit on a quarterly basis in arrears.  Such fronting fee shall be due and payable on or prior to the date that is ten (10) Business Days following each fiscal quarter end, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand.  For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.2.  In addition, the Borrowers shall pay directly to the Agent the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the Agent relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(i)     Conflict with Issuer Documents.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(j)     Letters of Credit Issued for Subsidiaries.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary, the Borrowers shall be obligated to reimburse the Agent hereunder for any and all drawings under such Letter of Credit.  The Borrowers hereby acknowledge that the issuance of Letters of Credit for the account of Subsidiaries inures to the benefit of the Borrowers, and that the Borrowers' business derives substantial benefits from the businesses of such Subsidiaries.

2.10    **Other Letter of Credit Issues.**

(a)     The Borrowers indemnify and save and hold the Agent, the Lenders and their Affiliates harmless from any loss, cost, Expense, or liability (including payments made by the Agent or any of the Agent's Affiliates incurred in connection with any Letter of Credit). The Borrowers are bound by the Agent's and Lenders' regulations and good faith interpretations of any Letter of Credit, although this interpretation may be different from the Borrowers' interpretation. Furthermore, neither the Agent, the Lenders nor any of their correspondents are liable for any error, negligence, or mistakes, whether by omission or commission, in following any of any Borrower's instructions or those contained in any Letter of Credit or of any modifications, amendments, or supplements to any Letter of Credit, or in issuing or paying any Letter of Credit.

(b)     Each Loan Party appoints the Agent, or its designee, as its attorney, with full power and authority: (1) to sign and endorse its name on any warehouse or other receipts, letter of credit applications and acceptances, and bills of lading; (2) to clear Inventory through the

United States of America Customs Department ("Customs") in its name (or in the name of its designee), and to sign and deliver to Customs officials powers of attorney in its name; and (3) to complete in its name, the Agent's name, or in the name of the Agent's designee, any order, sale, or transaction, and to obtain any related documents and collect the proceeds thereof. Neither the Agent nor its attorneys are liable for any acts or omissions nor for any error of judgment or mistakes of fact or law. This power, being coupled with an interest, is irrevocable as long as any Letter of Credit is outstanding.

(c)      Immediately upon the Agent's request (x) when an Event of Default exists, or (y) if any Letter of Credit is outstanding within five Business Days of the Termination Date, the Borrowers must Cash Collateralize the Letter of Credit Exposure in an amount equal to not less than 105% of the amount of such L/C Obligations. The Borrowers irrevocably authorize the Agent, on the Borrowers' behalf and in any Borrower's name, to open that account and to make and maintain the required deposits in that account or in an account opened by the Borrowers, out of the proceeds of Accounts or other Collateral, from an Advance, or out of any other of any Loan Party's funds coming into the Agent's possession. The Agent will deposit the cash collateral (less applicable Availability Reserves) in a non-interest bearing account. The Borrowers may not withdraw amounts in this account until the Obligations are irrevocably paid and performed in full and the Loan Documents have been terminated.

(d)      Each Lender shall to the extent of the amount equal to the product of such Lender's Commitment Percentage *multiplied by* the aggregate amount of all unpaid reimbursement obligations arising from disbursements made or obligations incurred with respect to the Letters of Credit be deemed to have irrevocably purchased an undivided participation in each such unpaid reimbursement obligation. In the event that at the time a disbursement is made the unpaid balance of Advances exceeds or would exceed, with the making of such disbursement, the Maximum Borrowing Amount, and such disbursement is not reimbursed by the Borrowers within two (2) Business Days, the Agent shall promptly notify each Lender and upon the Agent's demand each Lender shall pay to the Agent such Lender's proportionate share of such unpaid disbursement together with such Lender's proportionate share of the Agent's reasonable unreimbursed costs and expenses relating to such disbursement. In the event the Issuer makes a disbursement in respect of a Letter of Credit, each Lender shall pay to such Issuer, upon such Issuer's demand, such Lender's proportionate share of such disbursement together with such Lender's proportionate share of such Issuer's reasonable unreimbursed costs and expenses relating to such disbursement. Upon receipt by the Agent of a repayment from any Borrower of any amount disbursed by the Agent for which the Agent had already been reimbursed by the Lenders, the Agent shall deliver to each Lender that Lender's pro rata share of such repayment. Each Lender's participation commitment shall continue until the last to occur of any of the following events: (i) the Issuer ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (ii) no Letter of Credit issued hereunder remains outstanding and uncancelled or (iii) all Persons (other than the applicable Borrower) have been fully reimbursed for all payments made under or relating to Letters of Credit.

2.11   **Manner of Borrowing and Payment; Settlement.**

51

(a)     Each borrowing of Revolving Loans shall be advanced according to the applicable Commitment Percentages of the Lenders.

(b)     Each payment (including each prepayment) by the Borrowers on account of the principal of and interest on the Revolving Loans, shall be applied to the Revolving Loans pro rata according to the applicable Commitment Percentages of the Lenders.  Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest and fees shall be made without set off or counterclaim and shall be made to the Agent on behalf of the Lenders to the Payment Office, in each case on or prior to 1:00 p.m. in Dollars and in immediately available funds.

(c)     (i)     Promptly after receipt by Agent of a request for a Revolving Loan pursuant to Section 2.4 and, with respect to Revolving Loans, to the extent Agent elects not to provide a Swing Loan or the making of a Swing Loan would result in the aggregate amount of all outstanding Swing Loans exceeding the maximum amount permitted in Section 2.2(a), Agent shall notify the Revolving Lenders of its receipt of such request specifying the information provided by Loan Party Representative and the apportionment among Lenders of the requested Revolving Loan, as determined by Agent in accordance with the terms hereof.  Each Lender shall remit the principal amount of each Revolving Loan to Agent such that Agent is able to, and Agent shall, to the extent the applicable Lenders have made funds available to it for such purpose and subject to Section 8.2 hereof, fund such Revolving Loan to Borrowers in immediately available funds prior to the close of business, on the applicable borrowing date; provided that if any applicable Lender fails to remit such funds to Agent in a timely manner, Agent may elect in its sole discretion to fund with its own funds the Revolving Loans of such Lender on such borrowing date, and such Lender shall be subject to the repayment obligation in Section 2.11(e).

(ii)     Agent, on behalf of Swing Loan Lender, shall demand settlement (a "Settlement") of all or any Swing Loans with Revolving Lenders on at least a weekly basis, or on any more frequent date that Agent elects or that Swing Loan Lender at its option exercisable for any reason whatsoever may request, by notifying Revolving Lenders of such requested Settlement by facsimile, telephonic or electronic transmission no later than 3:00 p.m. on the date of such requested Settlement (the "Settlement Date").  Subject to any contrary provisions of Section 2.12 hereof, each Revolving Lender shall transfer the amount of such Revolving Lender's Commitment Percentage of the outstanding principal amount (plus interest accrued thereon to the extent requested by Agent) of the applicable Swing Loan with respect to which Settlement is requested by Agent, to such account of Agent as Agent may designate not later than 5:00 p.m. on such Settlement Date if requested by Agent by 3:00 p.m., otherwise not later than 5:00 p.m. on the next Business Day.  Settlements may occur at any time notwithstanding that the conditions precedent to making Revolving Loans set forth in Section 8.2 hereof have not been satisfied or the Revolving Commitments shall have otherwise been terminated at such time.  All amounts so transferred to Agent shall be applied against the amount of outstanding Swing Loans and, when so applied shall constitute Revolving Loans of such Revolving Lenders accruing interest as Base Rate Loans.  If any such amount is not transferred to Agent by any Revolving Lender on such Settlement Date, Agent shall be entitled to recover such amount on demand from such Revolving Lender together with interest thereon as specified in Section 2.11(e).

52

(d)     If any Lender or Participant (a "Benefited Lender") shall at any time receive any payment of all or part of its Advances or other Loans, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other Lender's Advances or other Loans, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances or other Loans, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.  Each Lender so purchasing a portion of another Lender's Advances or other Loans may exercise all rights of payment (including, without limitation, rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

(e)     Unless the Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make the amount which would constitute its applicable Commitment Percentage of the Advances available to the Agent, the Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to the Agent on the next Settlement Date and, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  The Agent will promptly notify the Borrowers of its receipt of any such notice from a Lender.  If such amount is made available to the Agent on a date after such next Settlement Date, such Lender shall pay to the Agent on demand an amount equal to the product of (i) the daily average Federal Funds Effective Rate (computed on the basis of a year of 360 days) during such period as quoted by the Agent, *multiplied by* (ii) such amount, *multiplied by* (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately available to the Agent.  A certificate of the Agent submitted to any Lender with respect to any amounts owing under this subsection (e) shall be presumed correct, in the absence of manifest error.  If such amount is not in fact made available to the Agent by such Lender within three (3) Business Days after such Settlement Date, the Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to Revolving Loans hereunder, on demand from the Borrowers; provided, however, that the Agent's right to such recovery shall not prejudice or otherwise adversely affect the Borrowers' rights (if any) against such Lender.

2.12    **Defaulting Lender**.

(a)     Notwithstanding anything to the contrary contained herein, in the event any Lender (i) has refused (which refusal constitutes a breach by such Lender of its obligations under this Agreement) to make available its portion of any Advance,  (ii) notifies either the Agent or the Loan Party Representative that it does not intend to make available its portion of any Advance (if the actual refusal would constitute a breach by such Lender of its obligations under this Agreement), (iii) has notified any Borrower, or has made a public statement, to the effect that it does not intend or expect to comply with any of its funding obligations under this Agreement, or (iv) becomes, or its parent becomes, subject to a Bankruptcy Event (each, a

53

"Lender Default"), all rights and obligations hereunder of such Lender (a "Defaulting Lender") as to which a Lender Default is in effect and of the other parties hereto shall be modified to the extent of the express provisions of this Section 12 while such Lender Default remains in effect.

(b)     Advances shall be incurred pro rata from the Lenders (the "Non-Defaulting Lenders") which are not Defaulting Lenders based on their respective Commitment Percentages, and no Commitment Percentage of any Lender or any pro rata share of any Advances required to be advanced by any Lender shall be increased as a result of such Lender Default.  Amounts received in respect of principal of any type of Advances or other Loans shall be applied to reduce the applicable Advances or other Loans of each Lender pro rata based on the aggregate of the outstanding Advances or other Loans of that type of all Lenders at the time of such application; provided, that, such amount shall not be applied to any Advances or other Loans of a Defaulting Lender at any time when, and to the extent that, the aggregate amount of Advances or other Loans of any Non-Defaulting Lender exceeds such Non-Defaulting Lender's Commitment Percentage of all Advances or other Loans then outstanding.

(c)     A Defaulting Lender shall not be entitled to give instructions to the Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Loan Documents.  All amendments, waivers and other modifications of this Agreement and the Loan Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall be deemed not to be a Lender and not to have Advances outstanding.

(d)     Other than as expressly set forth in this Section 2.12, the rights and obligations of a Defaulting Lender (including the obligation to indemnify the Agent) and the other parties hereto shall remain unchanged.  Nothing in this Section 2.12 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Loan Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, the Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

A Defaulting Lender may be replaced in accordance with Section 16.3.  In the event a Defaulting Lender retroactively cures to the satisfaction of the Agent the breach which caused a Lender to become a Defaulting Lender, such Defaulting Lender shall no longer be a Defaulting Lender and shall be treated as a Lender under this Agreement

2.13    **Voluntary Prepayments.**  The Borrowers may from time to time prepay the Loans in whole or in part; provided that the Borrowers shall give the Agent notice thereof not later than 11:00 A.M., on the day of such prepayment (which shall be a Business Day), specifying the Loans to be prepaid and the date and amount of prepayment.  Any such partial prepayment shall be in an amount equal to $500,000 or a higher integral multiple of $100,000.  Any prepayment made under this Section 2.14 shall include any amount required to be paid pursuant to Section 3.8.

2.14    **Additional Payments.**  Any amounts expended by the Agent due to any Loan Party not performing or complying with its obligations under any Loan Document (including

164393.00001/155883146v.1164393.00001/155883146v.3

under Sections 2.9, 4.2, 4.4, 4.6, 4.12, 4.13, 4.15, 6.6, and 15.5) may be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations.

2.15   **Use of Proceeds.**  The Borrowers may only use the Advances and the Term Loan (1) to repay Indebtedness on the Closing Date in accordance with payoff letters received by the Agent; (2) to pay fees and Expenses relating to the transactions contemplated by the Loan Documents; and (3) for general corporate purposes and working capital needs allowed under this Agreement, including Capital Expenditures and for such other legal and proper purposes as are consistent with all applicable laws and with this Agreement. The Borrowers may only use the Capex Loans to finance the purchase of Eligible Purchased M&E from time to time, in accordance with the terms of Section 2.3(a) of this Agreement. The Borrowers may only use the HVAC Equipment Loans to finance the purchase of Eligible Purchased HVAC M&E from time to time, in accordance with the terms of Section 2.3(b) of this Agreement.

2.16   **Taxes.**

(a)   Defined Terms.  For purposes of this Section, the term "Lender" includes any Issuer of a Letter of Credit pursuant to Section 2.9 and the term "applicable law" includes FATCA.

(b)   Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrowers under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Body in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrowers shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)   Payment of Other Taxes by the Borrowers.  The Borrowers shall timely pay to the relevant Governmental Body in accordance with applicable law, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(d)   Indemnification by the Borrowers.  The Borrowers shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Body.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

55

(e)      Indemnification by the Lenders.  Each Lender shall severally indemnify the Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrowers have not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 16.3(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Body.  A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this paragraph (e).

(f)      Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrowers to a Governmental Body pursuant to this Section, the Borrowers shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(g)      Status of Lenders.

(i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Agent, at the time or times reasonably requested by the Borrowers or the Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Agent as will enable the Borrowers or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (g)(ii)(A), (ii)(B) and (ii)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

(A)      any Lender that is a U.S. Person shall deliver to the Borrowers and the Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the

56

Borrowers or the Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate in form and substance reasonably acceptable to the Agent to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrowers within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W 8BEN-E; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W 8BEN-E, a U.S. Tax Compliance Certificate in form and substance reasonably acceptable to the Agent, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate in form and substance reasonably acceptable to the Agent on behalf of each such direct and indirect partner;

57

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Agent as may be necessary for the Borrowers and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Agent in writing of its legal inability to do so.

(h)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Body with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Body) in the event that such indemnified party is required to repay such refund to such Governmental Body.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the

58

indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Survival. Each party's obligations under this Section shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

2.17    **Mandatory Prepayment**.

(a)     [Reserved].

(b)     Net Cash Proceeds of Asset Sales. Subject to Section 7.1 hereof, upon the receipt by any Loan Party of the proceeds of any sale or other disposition of any Collateral (other than Inventory in the ordinary course of business), the Borrowers shall prepay the Loans with the Net Cash Proceeds of such sale or other disposition, such prepayments to be made promptly but in no event more than one (1) Business Day following receipt of such Net Cash Proceeds, and until the date of payment, such proceeds shall be held in trust for the Lenders. The foregoing shall not be deemed to be implied consent to any such sale or other disposition otherwise prohibited by the terms and conditions hereof.

(c)     Events of Loss. If any Equipment or real property of the Borrowers which is subject to a Lien in favor of the Agent, for the benefit of the Lenders, or any other Collateral is damaged, destroyed or taken by condemnation in whole or in part, the Borrowers shall prepay the Loans with the proceeds thereof, such prepayment to be made promptly but in no event more than one (1) Business Day following receipt of such proceeds, and until the date of payment, such proceeds shall be held in trust for the Lenders.

(d)     Equity Issuances. If any Loan Party issues Equity Interests or receives a capital contribution (including, without limitation, (i) the Permitted Holder Cash Equity Contribution, (ii) the Altoona Sale Cash Equity Contribution, (iii) the Dixon Sale Cash Equity Contribution, (iv) the Grinnell Sale Cash Equity Contribution, and (v) any Specified Equity Contributions), no later than the Business Day following the date of receipt of the proceeds thereof, the Borrowers shall notify the Agent of such Loan Party's receipt of such proceeds and shall, or cause such Loan Party to, immediately prepay the Loans with the Net Cash Proceeds of such issuance of Equity Interests, and until so paid, such proceeds shall be held in trust for the Lenders. The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions of this Agreement or to any Change of Control resulting from such sale.

(e)     Revolving Commitment. If on any date (after giving effect to any other payments on such date), the Revolving Exposure exceeds the lesser of (i) the Revolving Commitment and (ii) the Borrowing Base, then, in the case of each of the foregoing, the Borrowers shall, on such day, prepay on such date the principal amount of Revolving Loans and, after all outstanding Revolving Loans have been paid in full, prepay the aggregate amount of all disbursements relating to Letters of Credit that have not been reimbursed by the Borrowers.

59

(f)    Capex Commitment.  If on any date on or prior to the last day of the Capex Availability Period (after giving effect to any other payments on such date), the Capex Outstandings exceed the Capex Commitment, then the Borrowers shall, on such day, prepay on such date the principal amount of Capex Loans in an aggregate amount at least equal to such excess.

(g)    HVAC Equipment Loan Commitment.  If on any date on or prior to the last day of the HVAC Equipment Loan Availability Period (after giving effect to any other payments on such date), the HVAC Equipment Loan Outstandings exceed the HVAC Equipment Loan Commitment, then the Borrowers shall, on such day, prepay on such date the principal amount of Capex Loans in an aggregate amount at least equal to such excess.

2.18    **Application of Proceeds.**  Each prepayment under Section 2.17(a), Section 2.17(b), Section 2.17(c) or Section 2.17(d) shall be applied, first, to prepay the principal repayment installments of the Term Loan in the inverse order of maturity until the Term Loan has been paid in full, second, to prepay the principal repayment installments of the Capex Loans in the inverse order of maturity until the Capex Loans have been paid in full, third, to prepay the principal repayment installments of the HVAC Equipment Loans in the inverse order of maturity until the Capex Loans have been paid in full, fourth, to permanently reduce the Capex Commitment until reduced to zero, fifth to permanently reduce the HVAC Equipment Loan Commitment until reduced to zero, and, sixth to permanently reduce the Revolving Commitment until reduced to zero.  If, upon giving effect to any reduction in the Revolving Commitment pursuant to the foregoing sentence, the Revolving Exposure exceed the Revolving Commitments, then the Borrowers shall repay Revolving Loans in an amount sufficient to eliminate such excess.

## ARTICLE III
## INTEREST AND FEES

3.1    **Interest.**  The unpaid principal amount of each Loan made by the Lenders shall bear interest, for the period commencing on the date of such Loan until such Loan is paid in full, (i) for Base Rate Loans, at a rate per annum equal to the sum of the Base Rate from time to time in effect plus the Applicable Rate from time to time in effect, (ii) for Term SOFR Loans, at a rate per annum equal to the sum of Term SOFR for such Loan plus the Applicable Rate from time to time in effect; provided that at any time an Event of Default exists, unless the Agent otherwise consents in writing, the interest rate applicable to each Loan and other Obligations shall be automatically increased by 2.0% (and, in the case of Obligations not bearing interest, such Obligations shall bear interest at the Base Rate plus 2.0%) (the "Default Rate"), provided further that such increase may thereafter be rescinded by the Agent in writing, notwithstanding Section 15.2.  Notwithstanding the foregoing, upon the occurrence of an Event of Default under Section 10.1 or 10.7, such increase shall occur automatically.

3.2    **Interest Payment Dates.**  Accrued interest on each Loan shall be payable in arrears (i) in respect of each Base Rate Loan, on the first day of each calendar month, upon a prepayment of such Loan and at maturity and (ii) in respect of Term SOFR Loans, on the last day of each Interest Period applicable thereto, upon a prepayment of such Loan and at maturity.

60

After maturity, and at any time an Event of Default exists, accrued interest on all Loans shall be payable on demand.

3.3 **Closing Fee.** The Borrowers must pay the Agent a $71,075.00 closing fee on the Closing Date, which shall be fully earned on the date paid.

3.4 **Collateral Fees.**

(a) Collateral Monitoring Fee. The Borrowers must pay the Agent a $12,000 per year collateral monitoring fee on the Closing Date and on the first day of the calendar month following each anniversary of the Closing Date thereafter.

(b) Collateral Evaluation Fee. Except as provided in Section 4.10, the Borrowers must pay to the Agent on the first day of the calendar month (and the Termination Date) following any month in which the Agent performed any collateral evaluation with respect to any Loan Party (including any field examination, collateral analysis, or other business analysis), a collateral evaluation fee equal to $1,000 per day for each Person performing the evaluation (plus all costs and disbursements incurred by the Agent and the Persons performing the examination or analysis). Although the Agent may conduct as many examinations as the Agent desires, if (1) no Default Condition has existed within 60 days of the date on which an examination was ordered, then the Loan Parties are only required to pay for one examinations in any 12-month period (but if the Agent conducts an examination that the Loan Parties would not be obligated to pay for and that examination reveals that a Default Condition exists or that any material Reserve is appropriate, then the cost of that examination does not count against the one-per-12-month limit). Examinations that occurred before the Closing Date also do not count against the limit in the preceding sentence.

3.5 **Non-Use Fee.**

(a) The Borrowers agree to pay to the Agent a non-use fee, for the ratable benefit of the Lenders, for the period from the Closing Date to the Termination Date, at a rate per annum equal to (a) the Applicable Rate in effect from time-to-time times (b) the Unused Revolving Commitment in effect on such day. Such non-use fee shall be payable in arrears on the first day of each calendar month and on the Termination Date for any period then ending for which such non-use fee shall not have previously been paid. The non-use fee shall be computed for the actual number of days elapsed on the basis of a year of 360 days.

(b) The Borrowers agree to pay to the Agent a non-use fee, for the ratable benefit of the Lenders, for to the last day of the Capex Availability Period, at a rate per annum equal to (a) the Non-Use Fee in effect from time-to-time times (ii) the Capex Availability in effect on such day. Such non-use fee shall be payable in arrears on the first day of each calendar month and on the last day of the Capex Availability Period for any period then ending for which such non-use fee shall not have previously been paid. The non-use fee shall be computed for the actual number of days elapsed on the basis of a year of 360 days.

(c) The Borrowers agree to pay to the Agent a non-use fee, for the ratable benefit of the Lenders, for to the last day of the HVAC Equipment Loan Availability Period, at a rate per annum equal to (a) the Non-Use Fee in effect from time-to-time times (ii) the HVAC Equipment

61

Loan Availability in effect on such day. Such non-use fee shall be payable in arrears on the first day of each calendar month and on the last day of the HVAC Equipment Loan Availability Period for any period then ending for which such non-use fee shall not have previously been paid. The non-use fee shall be computed for the actual number of days elapsed on the basis of a year of 360 days.

3.6____**[Reserved].**

3.7____**[Reserved].**

3.8____**Agent Fees.** The Loan Parties agree to pay to the Agent, for its own account, fees payable in the amounts and at the times separately agreed upon among the Loan Parties and the Agent.

3.9____**Computing Interest and Fees.** Interest shall be computed for the actual number of days elapsed on the basis of a year of 360 days. The applicable interest rate for each Base Rate Loan shall change simultaneously with each change in the Base Rate. The applicable interest rate for each Term SOFR Loan shall change simultaneously with each change in Term SOFR.

3.10____**Maximum Charges.** In no event whatsoever may interest, fees, and other charges charged under the Loan Documents exceed the highest rate allowed. If interest, fees, and other charges would exceed the highest rate allowed under law, the excess amount will instead be first applied to any unpaid principal balance owed by the Borrowers and then the Lenders will refund the remaining balance to the Borrowers. In addition, the Loan Documents will be automatically amended to provide for the highest allowed rate.

3.11____**Increased Costs.** If, after the date hereof, the adoption of, or any change in, any applicable law, rule or regulation, or any change in the interpretation or administration of any applicable law, rule or regulation by any Governmental Body or comparable agency charged with the interpretation or administration thereof, or compliance by the Lenders with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:

(a)____imposes, modifies or deems applicable any reserve (including any reserve imposed by the FRB, but excluding any reserve included in the determination of Term SOFR pursuant to Article 3, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by the Lenders; or

(b)____imposes on the Lenders any other condition affecting its Term SOFR Loans, its Notes or its obligation to make Term SOFR Loans; or

(c)____subjects any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(d)       and the result of anything described in clauses (a) and (c) above is to increase the cost to (or to impose a cost on) the Lenders (or any office of the Lenders) or such other Recipient of making, converting to, continuing or maintaining any Term SOFR, or to increase the cost to such Lender, such issuer of a Letter of Credit hereunder or such other Recipient of participating in, issuing or maintaining any such Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender (or its office), such issuer of a Letter of Credit hereunder or such other Recipient under this Agreement or under its Notes with respect thereto, then upon demand by such Lender, such issuer of a Letter of Credit hereunder or such other Recipient, as the case may be, the Borrowers shall pay directly to Agent (for the benefit of the Lenders), issuer of a Letter of Credit hereunder or other Recipient, as the case may be, such additional amount as will compensate Agent and such Lender, issuer of a Letter of Credit hereunder or other Recipient, as the case may be, for such increased cost or such reduction, so long as such amounts have accrued on or after the day that is 270 days prior to the date on which such Lender, issuer of a Letter of Credit hereunder or other Recipient, as the case may be, first made demand therefor.

If the Agent or any Lender determines that any change in, or the adoption or phase-in of, any applicable law, rule or regulation regarding capital adequacy, or any change in the interpretation or administration thereof by any Governmental Body or comparable agency charged with the interpretation or administration thereof, or the compliance by the Agent, Lender or any Person controlling the Lender with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Agent's, Lenders' or such controlling Person's capital as a consequence of the Agent's or Lenders' obligations to a level below that which the Agent, any Lender or such controlling Person could have achieved but for such change, adoption, phase-in or compliance (taking into consideration the Agent's, Lenders' or such controlling Person's policies with respect to capital adequacy) by an amount deemed by the Agent, any Lender or such controlling Person to be material, then from time to time, upon demand by the Agent or any Lender, the Borrowers shall pay to the Agent or any such Lender such additional amount as will compensate the Agent, such Lender or such controlling Person for such reduction so long as such amounts have accrued on or after the day that is 270 days prior to the date on which the Agent or such Lender first made demand therefor (except that, if the change in law giving rise to such additional costs and reductions is retroactive, then the 270 day period referred to above shall be extended to include the period of retroactive effect thereof); provided, that such additional costs shall be generally consistent with the additional costs that the Agent is applying generally to loans impacted similarly to the Advances.

### 3.12    **Inadequacy or Unfairness.**

(a)       If in connection with any request for a Term SOFR Loans or a conversion to or continuation thereof, (i) the Agent determines that adequate and reasonable means do not exist for determining Term SOFR for any requested Loan and (2) the Scheduled Unavailability Date has not occurred (in each case with respect to this clause (i), "Impacted Loans"), or (ii) the Agent determines that for any reason Term SOFR for any requested Term SOFR Loans does not adequately and fairly reflect the cost to the Agent of funding such Loan, the Agent will promptly so notify the Loan Party Representative. Thereafter, the obligation of the Agent to make or maintain Term SOFR Loans shall be suspended (to the extent of the affected Term SOFR Loans)

164393.00001/155883146v.1164393.00001/155883146v.3

until the Agent revokes such notice. Upon receipt of such notice, the Loan Party Representative may revoke any pending request for a borrowing of, conversion to or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans) or, failing that, will be deemed to have converted such request into a request for a borrowing of Base Rate Loans in the amount specified therein

(b)     Notwithstanding the foregoing, if the Agent has made the determination described in clause (a)(i) of this Section 3.12, the Agent in consultation with the Loan Party Representative, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (i) the Agent revokes the notice delivered with respect to the Impacted Loans under clause (a)(i) of this Section 3.12, (ii) the Agent notifies the Loan Party Representative that such alternative interest rate does not adequately and fairly reflect the cost to the Agent of funding the Impacted Loans, or (iii) the Agent determines that any Law has made it unlawful, or that any Governmental Body has asserted that it is unlawful, for the Agent or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Body has imposed material restrictions on the authority of the Agent to do any of the foregoing.

3.13   **Successor Rate.**

(a)      Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Agent determines (which determination shall be conclusive absent manifest error), or the Loan Party Representative notifies the Agent that the Borrowers have determined, that adequate and reasonable means do not exist for ascertaining Term SOFR, including, without limitation, because Term SOFR is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(b)     the administrator of Term SOFR or a Governmental Body having jurisdiction over the Agent or such administrator has made a public statement identifying a specific date after which Term SOFR  shall no longer be made available, or used for determining the interest rate of loans, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Agent, that will continue to provide Term SOFR after such specific date (such specific date, the "Scheduled Unavailability Date"); or

(c)     the administrator of Term SOFR or a Governmental Body having jurisdiction over such administrator has made a public statement announcing that all tenors of Term SOFR are no longer representative; or

(d)     syndicated loans currently being executed, or that include language similar to that contained in this Section 3.11, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace Term SOFR;

then, in the case of clauses (a)-(c) above, on a date and time determined by the Agent (any such date, the "Replacement Date"), which date shall be on the relevant interest payment date for interest calculated and shall occur reasonably promptly upon the occurrence of any of the events or circumstances under clauses (a), (b) or (c) above and, solely with respect to clause (ii) above,

64

164393.00001/155883146v.1164393.00001/155883146v.3

no later than the Scheduled Unavailability Date, Term SOFR will be replaced hereunder and under any Loan Document with the alternative set forth below for any payment period for interest calculated that can be determined by the Agent, in each case, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document (the "Successor Rate"; and any such rate before giving effect to the Related Adjustment, the "Pre-Adjustment Successor Rate"):  the sum of (A) the alternate benchmark rate that has been selected by the Agent as the replacement for Term SOFR for the applicable tenor giving due consideration to (y) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (z) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for Term SOFR for dollar-denominated syndicated credit facilities at such time and (B) the Related Adjustment;

and in the case of clause (d) above, the Borrowers and the Agent may amend this Agreement solely for the purpose of replacing Term SOFR under this Agreement and under any other Loan Document in accordance with the definition of "Successor Rate" and such amendment will become effective at 5:00 p.m., on the fifth Business Day after the Agent shall have notified the Loan Party Representative and the Lenders of the occurrence of the circumstances described in clause (d) above, so long as the Agent has not received, by such time, written notice of objection to such Successor Rate from Lenders comprising the Required Lenders.

The Agent will promptly (in one or more notices) notify the Loan Party Representative of (x) any occurrence of any of the events, periods or circumstances under clauses (a) through (d) above, (y) the Replacement Date and (z) the Successor Rate.

Any Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Agent, such Successor Rate shall be applied in a manner as otherwise reasonably determined by the Agent.

Notwithstanding anything else herein, if at any time any Successor Rate as so determined would otherwise be less than zero, the Successor Rate will be deemed to be zero for the purposes of this Agreement and the other Loan Documents.

In connection with the implementation of a Successor Rate, the Agent will have the right to make Successor Rate Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Successor Rate Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided that, with respect to any such amendment effected, the Agent shall post each such amendment implementing such Successor Rate Conforming Changes to the Loan Party Representative reasonably promptly after such amendment becomes effective.

If the events or circumstances of the type described in Section 3.13(a)-(d) have occurred with respect to the Successor Rate then in effect, then the successor rate thereto shall be determined in accordance with the definition of "Successor Rate."

164393.00001/155883146v.1164393.00001/155883146v.3

Notwithstanding anything to the contrary herein, (A) after any such determination by the Agent, if the Agent determines that no Successor Rate is available on or prior to the Replacement Date, (B) if the events or circumstances described in Section 3.13(d) have occurred but no Successor Rate is available, or (C) if the events or circumstances of the type described in Section 3.13(a)-(c) have occurred with respect to the Successor Rate then in effect and the Agent determines that no Successor Rate is available, then in each case, the Agent and the Borrowers may amend this Agreement solely for the purpose of replacing Term SOFR or any then current Successor Rate in accordance with this Section 3.13 at the end of any relevant interest payment date or payment period for interest calculated, as applicable, with another alternate benchmark rate giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks and, in each case, including any Related Adjustments and any other mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such benchmarks, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Agent from time to time in its reasonable discretion and may be periodically updated. For the avoidance of doubt, any such proposed rate and adjustments shall constitute a Successor Rate. Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Agent shall have posted such proposed amendment to the Loan Party Representative and the Lenders so long as the Agent has not received, by such time, written notice of objection to such Successor Rate from Lenders comprising the Required Lenders.

If, at the end of any relevant interest payment date or payment period for interest calculated, no Successor Rate has been determined in accordance with the preceding paragraphs of this Section 3.13 and the circumstances under Section 3.13(a) or (c) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Agent will promptly so notify the Loan Party Representative. Thereafter, the obligation of the Agent to make or maintain Term SOFR Loan shall be suspended, (to the extent of the affected Term SOFR Loans, interest payment dates or payment periods), until the Successor Rate has been determined in accordance with the preceding paragraphs of this Section 3.13. Upon receipt of such notice, the Loan Party Representative may revoke any pending request for a Borrowing of, conversion to or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans, interest payment dates or payment periods) or, failing that, will be deemed to have converted such request into a request for a Base Rate Loans (subject to the foregoing clause (y)) in the amount specified therein.

## ARTICLE IV
## COLLATERAL: GENERAL TERMS

4.1    **Security Interest.**    To secure the prompt payment and performance of the Obligations, each Loan Party grants to the Agent for its benefit, the benefit of the Lenders, the benefit of the Issuer, and the benefit of each of their respective Affiliates, a continuing Lien on, security interest in, pledge of, and assignment of all of its Collateral. Each Loan Party must promptly give the Agent written notice of all commercial tort claims (including the case name, court it is pending in, and a brief description of each claim) and, upon the Agent receiving such notice, that Loan Party is treated as having granted to the Agent, the Lenders and the Issuer a security interest and Lien in and to those commercial tort claims and all proceeds thereof. 4.2____

164393.00001/155883146v.1164393.00001/155883146v.3

**Perfection.** Each Loan Party must immediately take all action that the Agent requests to maintain the validity, perfection, enforceability, and priority of the Agent's Lien on the Collateral or to enable the Agent to protect, exercise, or enforce its rights under the Loan Documents and in the Collateral, including: (1) immediately discharging all Liens other than Permitted Liens; (2) obtaining any Waivers that the Agent may request in its discretion; (3) delivering to the Agent, endorsed (or accompanied by any assignments that the Agent may specify) and stamping or marking, as the Agent may specify, all Chattel Paper, Instruments, letters of credit (and advices), and Documents that are part of the Collateral; (4) entering into any other custodial arrangements satisfactory to the Agent; and (5) executing and delivering control agreements, pledges, Mortgages, notices, and assignments as requested by the Agent in its discretion. Each Loan Party authorizes the Agent to file against it one or more financing, continuation, or amendment statements. All Expenses and taxes that the Agent incurs in doing any of the preceding will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations (or, at the Agent's option, must be paid by the Borrowers to the Agent immediately on demand).

4.3 **Dispositions.** Each Loan Party must safeguard and protect all Collateral for the Agent's account and may not, except as expressly permitted by this Agreement, dispose of any Collateral (whether by sale, lease, or otherwise).

4.4 **Preserving Collateral.** Each Loan Party must cooperate fully with all of the Agent's efforts to preserve and protect the Collateral and must take any actions to preserve and protect the Collateral that the Agent may request in its Permitted Discretion. When a Default Condition exists, the Agent may from time to time in its discretion (and without any Loan Party's consent), make Revolving Loans for the Borrowers' account that the Agent in its discretion believes are necessary or desirable: (1) to preserve or protect any Collateral; (2) to enhance the likelihood of (or maximize the amount of) the repayment of the Obligations; or (3) to pay any amount chargeable to any Loan Party under the Loan Documents or applicable law. All of the Agent's Expenses referred to in this Section (including all Expenses related to bonding a custodian), will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations. Revolving Lenders shall be obligated to fund such Revolving Loans and effect a settlement with Agent therefor upon demand of Agent in accordance with their respective Commitment Percentages. To the extent any such Revolving Loans are not actually funded by the other Revolving Lenders, any such Revolving Loans funded by Agent shall be deemed to be Revolving Loans made by and owing to Agent, and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Revolving Lender with respect to such Revolving Loans.

4.5 **Ownership.** At all times with respect to all Collateral: (1) a Loan Party must be its sole owner and fully authorized and able to sell, transfer, pledge, and grant the Agent, on behalf of the Lenders, a first priority Lien in it; (2) except for Permitted Liens, the Collateral must be free and clear of all Liens; (3) each document and agreement executed by each Loan Party or delivered to the Agent in connection with the Collateral must be true and correct in all respects; (4) each Loan Party's signatures and endorsements must be genuine and properly authorized; and (5) each Loan Party's Collateral may only be located at the locations listed on Schedule 4.5 (as may be updated from time to time by Loan Party Representative upon five Business Days' prior written notice to the Agent with new locations in the United States that are acceptable to the Agent in its sole discretion) and may not be removed from those locations

67

(except (a) selling Collateral in the ordinary course of business when an Event of Default does not exist and as otherwise permitted under this Agreement, and (b) Collateral in transit from one location identified on Schedule 4.5 to another location identified on Schedule 4.5).

4.6    **Defending Agent's and Lenders' Interests.**   Until (x) the Obligations are irrevocably paid and performed in full and (y) all Commitments and the Loan Documents have been terminated in writing, the Agent's and the Lenders' interests in the Collateral continue in full force and effect. Each Loan Party must defend the Agent's and Lenders' interests in the Collateral against all Persons. When an Event of Default exists: (1) the Agent may take possession of the Collateral (and the indicia of ownership of any Collateral) in whatever physical form contained (including labels, stationery, documents, instruments, and advertising materials); (2) at the Agent's request the Loan Parties must assemble the Collateral in the best manner possible and make it available to the Agent at a place designated by the Agent; (3) each Loan Party must, and the Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers, or others receiving or holding cash, checks, Inventory, documents, or instruments in which the Agent holds a Lien to deliver them to the Agent and subject them to the Agent's order (and if they come into any Loan Party's possession it must hold them in trust for the Agent and immediately deliver them to the Agent in their original form (together with any necessary endorsement)); (4) each Loan Party grants to the Agent and its assignees an irrevocable, assignable, non-exclusive license (exercisable without royalty payments or other compensation) to use, assign, license, or sublicense any present or future Intellectual Property (including in the license or sublicense access to all media in which any of the licensed items may be recorded or stored and to all related computer programs); (5) each Loan Party grants to the Agent and its assignees an irrevocable, assignable, non-exclusive license and lease or sublease to use, assign, license, or sublicense any leased Real Property or Owned Real Property (exercisable without paying any royalty, rent, or other compensation); (6) each Loan Party authorizes the Agent to pay, purchase, contest, or compromise any Lien that in the Agent's discretion appears to conflict with the Agent's Liens (and to pay all related Expenses and to charge the Loan Account); (7) each Loan Party authorizes the Agent to hire security guards or implement other security measures; (8) each Loan Party authorizes the Agent to employ and maintain at any of each Loan Party's premises a custodian (and each Loan Party grants the custodian full authority to do all acts necessary to protect and preserve the Collateral); (9) each Loan Party authorizes the Agent to lease warehouse facilities to which all or part of the Collateral may be moved; (10) each Loan Party authorizes the Agent to use any Loan Party's owned or leased lifts, hoists, trucks, and other facilities or equipment to handle or remove Collateral; (11) each Loan Party authorizes the Agent to enter the premises where Collateral is located, to take and maintain possession of the Collateral; and (12) the Agent may at any time take any other steps that the Agent in its discretion believes are necessary or desirable to protect and preserve the Collateral. All of the Agent's Expenses incurred in accordance with the preceding (including all Expenses related to bonding a custodian), will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations.

4.7    **Books and Records.**   Each Loan Party must: (1) keep complete and accurate books and records in which entries are made of all of its dealings and transactions; (2) establish accruals on its books for all Charges; and (3) on a current basis post on its books earnings, allowances against doubtful Accounts, advances and investments, and all other proper accruals (including for premiums due on required payments, and accruals for depreciation, obsolescence,

68

or amortization). All requirements under this Section must be made in all material respects in accordance with GAAP consistently applied in the Loan Parties' current independent public accountants' opinion.

4.8 **Financial Disclosure.** Each Loan Party irrevocably authorizes and directs its accountants and auditors at any time and promptly after the Agent's request to deliver to the Agent copies of each Loan Party's financial statements, trial balances, and other accounting records of any sort in the accountant's or auditor's possession, and to disclose to the Agent any information the accountants may have concerning each Loan Party's financial status and business operations. Each Loan Party irrevocably authorizes all federal, state, and municipal authorities to furnish to the Agent copies of reports or examinations relating to each Loan Party.

4.9 **Laws.** Each Loan Party must comply with all laws, acts, rules, regulations, and orders of any Governmental Body (except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect). The Loan Parties must at all times cause all Collateral to be maintained strictly in accordance with the requirements of all insurance carriers that insure any of the Collateral so that all insurance remains in full force and effect.

4.10 **Inspections and Appraisals.** The Agent may at any time during normal business hours, examine, audit, check, inspect, and make abstracts and copies of each Loan Party's books, records, audits, correspondence, and all other materials related to the Collateral. The Agent and its agents may at any time enter upon any of each Loan Party's premises and any premises where any Collateral is located to examine, audit, inspect, or appraise the Collateral and to do the things provided in the preceding sentence. The Agent may conduct examinations, audits, inspections, and appraisals at any time the Agent elects, in each case, except as provided in the next sentence at the Loan Parties' expense in accordance with Section 3.4(b). Although the Agent may conduct as many examinations and appraisals as the Agent desires, if (1) no Default Condition has existed within 60 days of the date on which an appraisal or an examination was ordered, then the Loan Parties are only required to pay for one examination in any 12-month period and one Equipment appraisal in any 12-month period (but if the Agent conducts an examination or appraisal that the Loan Parties would not be obligated to pay for and that examination reveals that a Default Condition exists or that any material Availability Reserve is appropriate, then the cost of that examination does not count against the foregoing limits). Appraisals and examinations that occurred before the Closing Date also do not count against the limits in the preceding sentence.

4.11 **Insurance.** Each Loan Party bears the full risk of any loss with respect to the Collateral. At each Loan Party's own cost and expense, in amounts and with carriers acceptable to the Agent, each Loan Party must: (1) keep all properties and assets in which any Loan Party has an interest insured against fire, flood, sprinkler leakage, those other hazards covered by extended coverage insurance, and other hazards (and for such amounts) as the Agent may require in its discretion and maintain business interruption insurance as is customary for companies engaged in businesses similar to each Loan Party's; (2) maintain a bond in amounts that are customary for companies engaged in businesses similar to the Loan Parties insuring against larceny, embezzlement, and other criminal misappropriations; (3) maintain public and product liability insurance against claims for personal injury, death, or property damage suffered by others; (4) maintain worker's compensation or similar insurance as required by law; and (5)

furnish the Agent with (a) a status report with respect to the renewal of all insurance no later than 30 days before expiration, (b) evidence that all insurance has been renewed at least 10 days before expiration, and (c) Agent-loss-payable, additional-insured, and mortgagee endorsements, naming the Agent as an additional-insured, Agent-loss-payee, and mortgagee, and providing (A) that all insurance proceeds for loss or damage to Collateral must be payable to the Agent, (B) no insurance is affected by any act or neglect of the insured or property owner, and (C) that each policy and loss payable clause may not be cancelled, amended, or terminated without at least 30 days' prior written notice to the Agent. The Loan Parties must provide copies of all insurance policies (including the appropriate Agent-loss-payee and additional-insured endorsements) within five days after the Agent's request. Each insurance carrier is directed by the Agent and the Loan Parties to make all payments for all losses to the Agent solely in the Agent's name (and not to a Loan Party or to a Loan Party and the Agent jointly). If nonetheless any insurance losses are paid by check, draft, or other instrument payable to any Loan Party or to any Loan Party and the Agent jointly, the Agent may endorse each Loan Party's name and do such other things as the Agent may deem advisable to reduce the same to cash. The Agent has the sole authority to adjust and compromise claims under insurance coverage with respect to Collateral and business interruption insurance. All insurance loss recoveries with respect to Collateral received by the Agent may be applied to the Obligations in the order and manner determined by the Agent in its discretion (and the Agent will pay any surplus to the Loan Parties or as otherwise required by law). The Loan Parties must pay any deficiency to the Agent on demand.

4.12 **Paying Insurance.** If any Loan Party does not obtain, maintain, or renew any insurance required by the Loan Documents, the Agent may obtain and pay for it (but all premiums will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations).

4.13 **Paying Taxes.** Each Loan Party must pay, when due, all taxes, assessments, and other Charges levied or assessed against it or any of the Collateral, including real and personal property taxes, assessments, and Charges, and all franchise, income, employment, social security benefits, withholding, and sales taxes (except those being disputed in good faith, by expeditious and diligent protest, administrative or judicial appeal, or similar proceeding (but only if reserves are posted with the Agent to protect the Agent's and Lenders' Lien on the Collateral)). If any tax is or may be imposed on the Agent or any Collateral due to any transaction between the Agent and any Loan Party, or other Charges are not paid when due, or if any claim is made which, in the Agent's discretion, may possibly create a Lien on the Collateral, the Agent may without notice to the Loan Parties pay the taxes, assessments, or other Charges and each Loan Party indemnifies and holds the Agent harmless for that payment. All payments by the Agent under this Section will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations.

Each Lender shall severally indemnify the Agent for any taxes (but only to the extent that the Loan Parties have not already indemnified the Agent for such taxes and without limiting the obligation of the Loan Parties to do so) attributable to such Lender that are paid or payable by the Agent in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such taxes were correctly or legally imposed or asserted by the relevant Governmental Body. This indemnity obligation shall be paid within ten (10) days after the Agent delivers to the applicable Lender a certificate stating the amount of taxes so paid

70

or payable by Agent. Such certificate shall be conclusive of the amount so paid or payable absent manifest error.

4.14 **Paying Leasehold Obligations.** Each Loan Party must pay when due its obligations under all leases and must otherwise comply with all other material terms of its leases and keep them in full force and effect and, at the Agent's request, provide evidence of having done so to the Agent.

4.15 **Accounts.**

(a) Accounts. Each Account: (1) is a valid Account for a bona fide obligation incurred by the named Account Debtor; (2) is for the fixed amount stated in the invoice for a Borrower's absolute sale or lease and delivery of goods on stated terms, or for work, labor, or services rendered by a Borrower on the date each Account is created; and (3) is due and owing without dispute, set-off, counterclaim, reduction, or defense.

(b) Solvency. Each Account Debtor is and will be solvent and able to pay all of its Accounts in full when due.

(c) Locations. Each Loan Party's state of organization and chief executive office are located at the addresses listed on Schedule 4.15(c). Until the Loan Party Representative gives the Agent 30 days' prior written notice, all records must be kept at the executive office listed on Schedule 4.15(c).

(d) Notification. The Agent may at any time notify Account Debtors of the Agent's Lien on the Borrowers' Accounts. When an Event of Default exists, the Agent may notify Account Debtors to make payments directly to the Agent (and the Agent then has the sole right to collect Accounts).

(e) Agent's Power to Act on the Loan Parties' Behalf. The Agent may at any time receive, endorse, assign, and deliver in the Agent's or any Loan Party's name any checks, drafts, and other instruments, and each Loan Party waives notice of presentment, protest, and non-payment of any instrument so endorsed. Each Loan Party appoints the Agent and any of the Agent's designees as its attorney with power: (A) at any time to: (1) endorse each Loan Party's name on any notes, acceptances, checks, drafts, money orders, or other evidences of payment or Collateral; (2) sign each Loan Party's name on any invoice or bill of lading relating to any Accounts, drafts against Account Debtors, and assignments and verifications of Accounts; (3) send Account verifications to Account Debtors; and (4) to do all other acts and things necessary to carry out or implement the Loan Documents and the Loan Party's obligations under law; and (B) at any time when an Event of Default exists to: (1) demand payment of the Accounts; (2) enforce payment of the Accounts by legal proceedings or otherwise; (3) exercise all of the Loan Parties' rights and remedies with respect to collecting Accounts and any other Collateral; (4) settle, adjust, compromise, extend, or renew Accounts; (5) settle, adjust, or compromise any legal proceedings brought to collect Accounts; (6) prepare, file, and sign each Loan Party's name on a proof of claim in bankruptcy (or other similar document) against any Account Debtor; and (7) prepare, file, and sign each Loan Party's name on any notice of Lien, assignment, lien satisfaction, or other similar document. Each Loan Party ratifies and confirms all actions of the

71

attorney or designee (and the attorney or designee is not liable for any acts of omission or commission or for any error of judgment or mistake of fact or of law). This power of attorney is coupled with an interest and is irrevocable while any of the Obligations remain unsatisfied or unperformed. When an Event of Default or a Default exists, the Agent may change the address for delivery of mail to any Loan Party to any address that the Agent may designate and the Agent may receive, open, and dispose of all mail addressed to any Loan Party.

(f)     No Liability. Neither the Agent nor any Lender shall have any liability for any error or omission or delay of any kind occurring in the settlement, collection, or payment of any of the Accounts or any instrument received in payment of Accounts, or for any damage resulting therefrom. The Agent may accept the return of the goods represented by any of the Accounts (without notice to or consent by any Loan Party), all without discharging or in any way affecting any Loan Party's liability.

(g)     Deposit Accounts. The Borrowers must maintain with the Agent (or another bank selected by the Agent) any deposit accounts required by the Agent, including the Cash Concentration Account.

(h)     Cash Concentration Account. All collections and all other proceeds of Collateral will be deposited daily directly into the Cash Concentration Account and shall be deemed to be payments and shall be applied in accordance with Section 2.7(d). All funds in the Cash Concentration Account are the Agent's exclusive property and are subject to the Agent's sole control. The Borrowers do not have control over or any interest in the Cash Concentration Account. If any Borrower, any Affiliate or Subsidiary of a Borrower, any shareholder, officer, director, employee or agent of a Borrower or any Affiliate or Subsidiary of a Borrower, or any other Person acting for or in concert with a Loan Party shall receive any monies, checks, notes, drafts or other payments relating to or as proceeds of Accounts or other Collateral, the Borrowers and each such Person shall promptly upon receipt thereof remit the same (or cause the same to be remitted) in kind to the Cash Concentration Account.  All collections with respect to Collateral and all proceeds of Collateral received by the Loan Parties: (1) are received in trust for the Lender, for the benefit of Agent as the Lender's fiduciary; (2) may not be commingled with any of the Loan Parties' other funds or property and are held in trust for the Lender, or the benefit of Agent as the Lender's fiduciary; and (3) except as provided in the following sentence with respect to the Specified Blocked Accounts, must on the day received be deposited into the Cash Concentration Account. With respect to the Specified Blocked Accounts: (1) they may remain open for up to 90 days after the Closing Date; (2) until the Agent exercises its right to send a "Notice of Exclusive Control" to the depository bank under the deposit account control agreements with such depository bank, the balance of each of the Specified Blocked Accounts may not exceed the amount that the Borrowers reasonably and in good faith determine are necessary to pay anticipated disbursements from the Specified Blocked Accounts in the next five Business Days (any amount on any Business Day that exceeds this amount is called the "Excess Amount"); and (3) on each Business Day the Borrowers must wire transfer the Excess Amount to the Cash Concentration Account. The Borrowers acknowledge that the Agent may deliver a "Notice of Exclusive Control" under the deposit account control agreements at any time in its discretion. Agent shall apply all funds received by it from the Cash Concentration Account to the satisfaction of the Obligations in such order as Agent shall determine, subject to Borrowers' ability to re-borrow Revolving Loans in accordance with the terms hereof; provided that, in the

72

absence of any Event of Default, Agent shall apply all such funds representing collection of Accounts first to the prepayment of the principal amount of the Swing Loans, if any, and then to the Revolving Loans.

(i)     Adjustments. Without the Agent's prior written consent, no Loan Party may (1) compromise or adjust any Account (or extend the time for its payment) or (2) accept any returns of merchandise or grant any discounts, allowances, or credits (except those done in the ordinary course of the Borrowers' business and consistent with past practices that existed on the Closing Date and that have been disclosed to the Agent in writing).

(j)     Fees. Each Loan Party must pay to the Agent on demand all fees and Expenses that the Agent incurs in connection with (1) forwarding Advance proceeds and (2) establishing and maintaining the accounts required under the Loan Documents. The Agent may (without making demand) charge all fees and Expenses any Loan Party is obligated to pay under the Loan Documents to the Loan Account as a Base Rate Revolving Loan and add them to the Obligations.

4.16    **Equipment Maintenance.**   Each Loan Party must maintain its Equipment in good operating condition and repair (reasonable wear and tear excepted), in accordance with industry standards, and must make all necessary replacements and repairs so that its value and operating efficiency are maintained and preserved. No Loan Party may use or operate the Equipment in a way that violates any law, statute, ordinance, code, rule, or regulation.

4.17    **No Liability.**   Nothing herein contained shall be construed to constitute the Agent, any Lender or the Issuer as any Loan Party's agent for any purpose whatsoever, nor shall the Agent, any Lender or the Issuer be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof.  Neither the Agent, nor the Issuer nor the Lenders, whether by anything herein or in any assignment or otherwise, assume any of any Loan Party's obligations under any contract or agreement assigned to the Agent, the Issuer or the Lenders, and neither the Agent, nor the Issuer nor any Lender shall be responsible in any way for the performance by any Loan Party of any of the terms and conditions thereof.

4.18    **Environmental Matters.**

(a)     The Loan Parties must ensure that the Real Property complies with all Environmental Laws, except where the failure to comply could not reasonably be expected to have a Material Adverse Effect, and the Loan Parties must ensure that no Hazardous Substances are on any Real Property (except as permitted by applicable law or appropriate Governmental Bodies).

(b)     If any Loan Party obtains, gives, or receives notice of any Release or threat of Release of a reportable quantity of any Hazardous Substances at the Real Property (each, a "Hazardous Discharge"), or receives any notice of violation, request for information, notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, demand letter, or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any

73

Loan Party's interest in any Real Property (each, an "<u>Environmental Complaint</u>") from any Person, including any state agency responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency (each, an "<u>Authority</u>"), then the Loan Parties must promptly, but in any event within five (5) Business Days, send a written notice to the Agent detailing the facts and circumstances giving rise to the Hazardous Discharge or Environmental Complaint.

(c)      The Loan Parties must immediately send to the Agent copies of any request for information, notification of potential liability, or demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated, or used by any Loan Party to dispose of Hazardous Substances and must continue to forward copies of correspondence between any Loan Party and the Authority regarding such claims to the Agent until the claim is settled. The Loan Parties must immediately forward to the Agent copies of all documents and reports concerning a Hazardous Discharge at the Real Property that any Loan Party is required to file under any Environmental Laws. All information provided to the Agent under the Loan Documents is provided solely to protect its Lien on the Collateral and does not create any obligation on the Agent's part.

4.19    **Financing Statements.**  Except for financing statements filed with respect to Permitted Liens, no financing statement covering any of any Loan Party's assets is on file in any public office or has been authorized by any Loan Party to be filed in any public office.

4.20    **Pledged Equity Interests.**

(a)      Except as provided in the following sentence, each Loan Party grants a security interest in, Lien on, and pledges and collaterally assigns all of each Loan Party's present and future rights and title to the Equity Interests of each present and future Subsidiary of each Loan Party (including those listed on <u>Schedule 4.20</u>) (all of the preceding and all proceeds, the "<u>Pledged Equity Interests</u>").

(b)      Each Loan Party represents and warrants that (1) <u>Schedule 4.20</u> is a complete and accurate list of each Loan Party's (and its Subsidiaries') issued and outstanding Equity Interests; (2) the Loan Parties have executed appropriate transfer powers with respect to the Pledged Equity Interests and have deposited the Pledged Equity Interests and transfer powers with the Agent; (3) all Pledged Equity Interests have been duly authorized, validly issued, are fully paid and non-assessable; (4) with respect to any certificates delivered to the Agent representing any Pledged Equity Interests, either (x) they are Securities as defined in Article 8 of the UCC, or (y) if they are not Securities, then the Loan Parties must immediately inform the Agent in writing so that the Agent may take steps to perfect its Lien as a General Intangible (and no Loan Party may cause such certificates to become Securities as defined in Article 8 of the UCC without the Agent's prior written consent); (5) all Pledged Equity Interests held by a securities intermediary are subject to a control agreement establishing the Agent's control; (6) none of the Pledged Equity Interests have been issued or transferred in violation of the securities registration, securities disclosure, or similar laws of any jurisdiction; (7) except as listed on <u>Schedule 4.20</u>, there are no options, warrants, calls, or commitments whatsoever relating to the Pledged Equity Interests or that obligate the issuer of any Pledged Equity Interests to issue additional Equity Interests; and (8) no consent, approval, authorization, or other action by, and no giving of notice,

74

filing with, any Governmental Body or any other Person is required for any Loan Party's pledge of the Pledged Equity Interests under this Agreement or for the Agent's exercise of any remedies with respect to the Pledged Equity Interests (except as may be required in connection with the disposition by laws affecting the offering and sale of securities generally).

(c)       When an Event of Default exists, (1) each Loan Party authorizes the Agent to transfer the Pledged Equity Interests into the Agent's (or any nominee's) name (but the Agent is not obligated to do so); (2) the Agent may vote the Pledged Equity Interests; (3) the Agent may receive all dividends and other distributions made with respect to the Pledged Equity Interests; (4) the Agent has all the rights and remedies under the Loan Documents and those available to a secured party under the UCC and applicable law; and (5) the Agent may sell, assign, transfer, and deliver the Pledged Equity Interests at any time and from time to time. If the Agent determines that the Pledged Equity Interests are declining in value or that the Pledged Equity Interests are customarily sold in any recognized market, then the Agent does not have to give the Loan Parties prior notice before selling the Pledged Equity Interests. Otherwise, the Agent will give the Loan Party Representative at least 10 days' prior notice before selling the Pledged Equity Interests. Each Loan Party waives any advertisement requirement and (except to the extent specifically required by the preceding sentence) waives notice of any kind with respect to a sale of any of the Pledged Equity Interests.

4.21    **[Reserved].**

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants that:

5.1     **Authority.**  It has the full power, authority, and legal right to enter into the Loan Documents and to perform its obligations under the Loan Documents. Each Loan Party's execution, delivery, and performance of the Loan Documents has been approved by all necessary legal and organizational Persons. All obligations under each Loan Document it executes are legal, valid, and binding obligations enforceable against it in accordance with their terms.

5.2     **Formation; Qualification; and Subsidiaries.**  Schedule 5.2 lists: (1) each jurisdiction where each Loan Party is incorporated or organized; (2) each jurisdiction where each Loan Party is in good standing or qualified to do business; and (3) all of each Loan Party's Subsidiaries. The jurisdictions listed on Schedule 5.2 are all of the jurisdictions in which each Loan Party is required to be in good standing or qualified to do business.

5.3     **Officers; Directors; Equity Interest Holders; and Capitalization.**  Schedule 5.3 lists (1) the names and titles of each Loan Party's executive officers and directors; (2) the names of each Loan Party's Equity Interest holders and a description of their Equity Interests (including certificate numbers and the number of Equity Interests (and the percentage of total Equity Interests)); and (3) all outstanding subscriptions, options, warrants, calls, rights, and other agreements or commitments related to each Loan Party's (and its Subsidiaries') Equity Interests in any Loan Party (or any of its Subsidiaries).

75

**5.4** **No Governmental Approval; No Conflict.** The transactions contemplated by the Loan Documents (1) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Body (except for those that have been obtained); (2) do not violate any law applicable to any Loan Party or any of its Subsidiaries; (3) do not violate or create a default under any indenture, agreement, or other instrument binding on any Loan Party, any of its Subsidiaries, or any of their respective assets; (4) do not require any Loan Party to make any payment to any Person (other than the Agent); and (5) do not create any Lien on any asset of any Loan Party (except Liens created under the Loan Documents).

**5.5** **Tax Returns.** Each Loan Party has (a) filed all federal, state, and other tax returns and reports required to be filed, and (b) has paid all federal, state and other taxes, assessments, fees, and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except (a) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.6** **Financial Information.**

(a) The Loan Parties' projected income statements, cash-flow statements, balance sheets, and availability forecasts attached as Exhibit 5.6 (the "Projections") were prepared by the Loan Party Representative's Authorized Officer in good faith, are based on reasonable assumptions and estimates, and reflect the Loan Parties' judgment based on present circumstances.

(b) Each of (1) the audited consolidated and consolidating balance sheets of the Loan Parties (and, if applicable, any other Persons) as of December 31, 2023, and the related income statements, changes in stockholders' equity, and changes in cash flow and (2) the consolidated and consolidating balance sheets of the Loan Parties (and, if applicable, any other Persons) as of October 31, 2024, and the related income statements, changes in stockholders' equity, and changes in cash flow (which were prepared by an Authorized Officer of the Loan Party Representative and true copies of which were delivered to the Agent), were prepared in accordance with GAAP, consistently applied, and present fairly in all material respects the Loan Parties' financial condition at such date and the results of their operations for that period. Since December 31, 2023, there has been no change in (x) the Loan Parties' financial condition or (y) the aggregate value of the Loan Parties' machinery, Equipment, and Real Property (if any).

**5.7** **Name.** Except as stated on Schedule 5.7, during the last five years (1) no Loan Party has been known by any other name or has sold Inventory under any other name and (2) no Loan Party has been the surviving entity of a merger or consolidation or has acquired a material portion of the assets of any Person.

**5.8** **O.S.H.A. and Environmental Compliance.** Each Loan Party has complied with, and (1) its facilities, business, assets, property, and Equipment and (2) its leaseholds, comply in all material respects with the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA, and all other Environmental Laws that the failure to comply with could reasonably be expected to have a Material Adverse Effect, and no citations,

notices, or non-compliance orders have been issued to any Loan Party under any of these laws, rules, and regulations.

(a)     Each Loan Party has been issued all required federal, state, and local licenses, certificates, and permits with respect to Environmental Laws.

(b)     Except as stated on Schedule 5.8(b), (1) there are no releases, spills, discharges, leaks, or disposals (each, a "Release") of Hazardous Substances at, upon, under or within any Real Property; (2) there are no underground storage tanks or polychlorinated biphenyls on any Real Property; (3) no Real Property has ever been used as a treatment, storage, or disposal facility for Hazardous Waste; and (4) no Hazardous Substances are present on the Real Property.

5.9     **Solvency; No Litigation, No Violation.**

(a)     After giving effect to the transactions contemplated by the Loan Documents, (1) the Loan Parties are and will continue to be solvent, able to pay their debts as they mature, and have sufficient capital to carry on their business and all businesses in which they are about to engage and (2) the present fair saleable value of each Loan Party's assets is more than its liabilities (including contingent liabilities).

(b)     Except as listed on Schedule 5.9(b), (1) no Loan Party has any pending or threatened litigation, arbitration, actions, or proceedings that could reasonably be expected to have a Material Adverse Effect; (2) no Loan Party has violated any statute, regulation, or ordinance that could reasonably be expected to have a Material Adverse Effect; and (3) no Loan Party has violated any order of any court, Governmental Body, arbitration board, or tribunal that could reasonably be expected to have a Material Adverse Effect.

5.10     **Intellectual Property.**     Schedule 5.10 lists all Intellectual Property owned or utilized by any Loan Party. Except as stated on Schedule 5.10, (1) the Intellectual Property is valid; (2) has been duly registered or filed with all appropriate Governmental Bodies; (3) is all of the Intellectual Property necessary for the Loan Parties to operate their business; (4) there are no objections to or challenges to the validity of any Intellectual Property (nor is any Loan Party aware of any grounds for any challenge); (5) all Intellectual Property is either original material or property developed by a Loan Party or was lawfully acquired by the Loan Party; and (6) all Intellectual Property has been maintained to preserve its value (except where the failure to do so could not reasonably be expected to have a Material Adverse Effect).

5.11     **Licenses and Permits.**     Each Loan Party (1) has complied in all material respects with and (2) has all material licenses or permits required by any applicable federal, state, or local law, or regulation to operate its business in each jurisdiction where it conducts or plans to conduct business.

5.12     **Indebtedness Default.**     No Loan Party is in default under any Indebtedness nor does it reasonably believe that it will be in default under any Indebtedness, in each case, aggregating more than $100,000, or to the extent such default allows the holder of the Indebtedness to accelerate the Indebtedness (whether or not that right has been waived or deferred).

164393.00001/155883146v.1164393.00001/155883146v.3

5.13 **No Burdensome Restrictions; No Default.** No Loan Party: (1) is subject to any restriction (or is a party to any contract or agreement, including its Charter Documents) which compliance with or performance of could reasonably be expected to have a Material Adverse Effect; (2) has agreed (whether on the happening of a contingency or otherwise) that any of its present or future assets will be subject to a Lien that is not a Permitted Lien; and (3) is in default under any contract that could reasonably be expected to have a Material Adverse Effect.

5.14 **No Labor Disputes.** No Loan Party (1) is involved in any labor dispute (or is aware that any strikes, walkouts, or union organization exist or are threatened), (2) is a party to any labor contract that expires within six months after the Termination Date or (3) is subject to any labor or collective bargaining agreement. Hours worked by and payment made to employees of the Loan Parties are not in violation of the Fair Labor Standards Act or any other applicable law, rule or regulation dealing with such matters.

5.15 **Margin Regulations.** No Loan Party is engaged (nor will it engage) in extending credit for "purchasing" or "carrying" any "margin stock" (the quoted terms in this Section have the meanings given under Regulation U of the FRB). Furthermore, no part of the proceeds of any Advance or any Loan will be used for "purchasing" or "carrying" "margin stock" or will otherwise violate, or be inconsistent with, the provisions of Regulation T, U or X of the FRB or any other regulation of the FRB.

5.16 **Investment Company Act.** No Loan Party is an "investment company" under the Investment Company Act of 1940 (nor is it Controlled by a Person that is an "investment company").

5.17 **Disclosure.** No representation or warranty made by any Loan Party in any Loan Document or in any financial statement, report, certificate, or other document furnished to the Agent by any Loan Party is untrue or misleading in any respect or omits any fact or circumstance necessary to make any statement not misleading. Each Loan Party has disclosed to the Agent in writing each fact and circumstance that could reasonably be expected to have a Material Adverse Effect.

5.18 **Hedging Agreement.** No Loan Party is a party to (nor will it be a party to) any Hedging Agreement unless (1) it provides that termination damages are payable on a "two-way basis" without regard to fault on the part of either party and (2) it is entered into in the ordinary course of business (and not for speculative purposes).

5.19 **Material Business Agreements.** Schedule 5.19 lists all of each Loan Party's Material Business Agreements and no default or event of default exists under any of these agreements, except to the extent that such default, individually or in the aggregate, could not reasonably cause a Material Adverse Effect.

5.20 **Certain Laws and Regulations.** No Loan Party or any of its Affiliates is subject to any statute, rule, or regulation that regulates incurring any Indebtedness (including statutes or regulations related to common or interstate carriers or to selling electricity, gas, steam, water, telephone, telegraph, or other public utility services).

78

5.21    **Beneficial Ownership Certificate.**  Each Loan Party's Beneficial Ownership Certificate delivered to the Agent on the Closing Date (and as updated from time to time) is accurate, complete, and correct.

5.22    **Compliance with OFAC; Anti-Corruption Laws.**

(a)    No Loan Party, any of their respective Subsidiaries, nor, to the knowledge of the Loan Parties, any director, officer, employee, agent, affiliate or representative thereof, or any person who owns a controlling interest in or otherwise controls a Loan Party is an individual or entity that is (a) listed on the Specially Designated Nationals and Blocked Person List maintained by OFAC, the Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority, (b) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Order, (c) currently the subject or target of any Sanctions, or (d) located, organized or resident in a Designated Jurisdiction.

(b)    The Loan Parties and their Subsidiaries have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions, and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

5.23    **EEA Financial Institutions.**  No Loan Party is an EEA Financial Institution.

5.24    **ERISA Compliance.**

(a)    Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state laws.  Each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service covering, among other legally-required changes for tax-qualified retirement plans, the changes required by the Pension Protection Act of 2006, to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service.  To the best knowledge of each Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)    There are no pending or, to the best knowledge of each Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that  could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred, and neither any Borrower nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan or Multiemployer Plan; (ii) each Borrower and each ERISA Affiliate has met all applicable requirements under the

79

Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and neither any Borrower nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date; (iv) neither any Borrower nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) neither any Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA;  (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan; and (vii) neither any Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4021 or 4243 of ERISA with respect to a Multiemployer Plan; and (viii) the Unfunded Liability of all Plans does not in the aggregate exceed the Threshold Amount.

(d)	Neither any Borrower or any ERISA Affiliate maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Pension Plan or Multiemployer Plan other than (A) on the Closing Date, those listed on Schedule 5.24(d) hereto and (B) thereafter, Pension Plans and Multiemployer Plans not otherwise prohibited by this Agreement.

(e)	Each "non-qualified deferred compensation plan" (as such term is defined in Section 409A of the Code and the Treasury regulations thereunder) sponsored or maintained by any Borrower or any Subsidiary (or to which any Borrower or any Subsidiary is (or was) a party), including without limitation the individual awards under such plan, has been maintained, operated and administered with, and is in documentary compliance with, Section 409A of the Code and guidance issued thereunder (including the final Treasury Section 409A regulations) such that there is not a "plan failure" under Section 409A(a)(1) of the Code or, if there is a "plan failure", such failure could not reasonably be expected to result in liabilities to the Borrowers or any of their Subsidiaries in excess of the Threshold Amount.

5.25	**Excluded Subsidiaries**. No Excluded Subsidiary (i) has any material liabilities (other than (x) liabilities of a *de minimis* nature or (y) liabilities in connection with the Mortgage on the real property located at 4120 East 13th Street, Ames, IA), (ii) owns any material assets (other than (x) assets of a *de minimis* nature or (y) assets consisting of the real property located at 4120 East 13th Street, Ames, IA), or (iii) engages in any operations or business (other than ownership of the real property located at 4120 East 13th Street, Ames, IA).

164393.00001/155883146v.1164393.00001/155883146v.3

## ARTICLE VI
## AFFIRMATIVE COVENANTS

Until all Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened), and all Commitments and the Loan Documents have been terminated, each Loan Party must:

6.1 **Conducting Business; Maintaining Existence; and Assets.**

(a) Continuously conduct and operate its business according to good business practices.

(b) Keep its existence in full force and effect, file all reports and pay all franchise and other taxes and license fees, and do all other acts and things that are necessary or desirable to maintain its rights, licenses, leases, powers, and franchises, except to the extent that such failure, individually or in the aggregate, (i) could not cause a Material Adverse Effect, or (ii) would not result in a lien or forfeiture in the rights, licenses, leases, powers, or franchises of any Loan Party.

6.2 **Violations.** Promptly, and in any event within five (5) Business Days, notify the Agent in writing if any Loan Party or any Collateral violates or is alleged to have violated any Governmental Body's laws, statutes, regulations, or ordinances.

6.3 **Supplemental Instruments.** From time to time at the Loan Parties' expense, execute and deliver, and cause each Subsidiary to execute and deliver, or cause to be executed and delivered, to the Agent all documents, agreements, and instruments, and take or cause to be taken such further actions (including filing and recording financing statements, fixture filings, Mortgages, deeds of trust, and other documents and actions) that are required by law or that the Agent may request to carry out the terms and conditions of the Loan Documents and to ensure the perfection and priority of the Agent's Liens.

6.4 **Indebtedness.** Pay all Indebtedness when due and not otherwise default under any Indebtedness aggregating more than $100,000, or to the extent any such default allows the holder of the Indebtedness to accelerate the Indebtedness (whether or not that right has been waived or deferred).

6.5 **Financial Statements.** Cause all financial statements delivered to the Agent (a) to be prepared as required by this Agreement; b) to be complete and correct in all material respects (subject, for interim financial statements, to notes and normal year-end audit adjustments); and (c) to be prepared in reasonable detail.

6.6 **Taxes.** If any tax, assessment, or other Charge creates a Lien on any Collateral the Agent may without notice to the Loan Parties pay the tax, assessment, or other Charges. Any payments under this Section will be charged to the Loan Account as a Base Rate Revolving Loan and added to the Obligations (or, at the Agent's option, must be paid to the Agent by the Borrowers immediately on demand).

81

6.7    **Deposit Accounts.**  Except for the accounts listed on Schedule 6.7 and subject to Section 4.15(h), maintain all deposit, investment, brokerage, and other financial accounts with the Agent. Each account on Schedule 6.7 must at all times be subject to an account control agreement satisfactory to the Agent; provided, that, Borrowers may maintain the Specified Dupaco Accounts, in each case, so long as, (x) the average daily balance of the Specified Dupaco Accounts does not exceed $50,000 in the aggregate at any time and (y) at no time shall any funds representing collection of Accounts be deposited in the Specified Dupaco Accounts.  With respect to accounts maintained with the Agent, (a) normal charges shall be assessed thereon, (b) although no compensating balance is required, the Borrowers must keep monthly balances in order to merit earnings credits which will cover the Agent's service charges for demand deposit account activities, and (c) the Borrowers shall enter into agreements with Agent for standard cash management services. The Borrowers shall be responsible for all normal charges assessed thereon. The Borrowers shall not open any other bank account other than the accounts maintained with the Agent and those set forth on Schedule 6.7 without Agent's prior written consent.

6.8    **Beneficial Ownership Certificate.**  Provide to the Agent: (1) confirmation that the information in the most recent Beneficial Ownership Certificate is accurate; (2) a new Beneficial Ownership Certificate when the individual(s) identified as a Beneficial Owner have changed; and (3) any other information and documentation that the Agent may request from time to time related to the Agent's compliance with applicable laws (including the USA PATRIOT Act and other "know your customer" and anti-money laundering rules and regulations).

6.9    **[Reserved].**

6.10    **Employee Benefit Plans.**

(a)    Maintain, and cause each ERISA Affiliate to maintain, each  Plan in substantial compliance with all applicable requirements of law and regulations.

(b)    Make, and cause each ERISA Affiliate to make, on a timely basis, all required contributions to any Multiemployer Plan.

(c)    Not, and not permit any ERISA Affiliate to (i) seek a waiver of the minimum funding standards of ERISA, (ii) terminate or withdraw from any Pension Plan or Multiemployer Plan or (iii) take any other action with respect to any Pension Plan that would reasonably be expected to entitle the PBGC to terminate, impose liability in respect of, or cause a trustee to be appointed to administer, any Pension Plan, unless the actions or events described in clauses (i), (ii) and (iii) individually or in the aggregate would not have a Material Adverse Effect

6.11    **[Reserved].**

6.12    **Post-Closing Matters.**  Execute and deliver the documents, take the actions, and complete the tasks in the table below, in each case within the applicable time limit following the Closing Date specified or such later date as approved by the Agent in its sole discretion:

| Requirement | Time Limit |
|---|---|
| 1.  Delivery to the Agent of a deposit account control | 15 Business Days |

82

164393.00001/155883146v.1164393.00001/155883146v.3

| | |
|---|---|
| agreement with respect to each of the accounts set forth on Schedule 6.7 executed by the applicable depository bank, Borrowers and Agent. | |
| 2. Delivery to Agent of Waivers, in form and substance reasonably acceptable to Agent, by and among Borrowers, Agent, and the respective landlord, for each of the locations set forth on Schedule 4.15. | 30 days |

## ARTICLE VII
## NEGATIVE COVENANTS

Until all Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments and the Loan Documents have been terminated, no Loan Party may:

7.1 **Mergers; Consolidations; Acquisitions; and Asset Sales.**

(a) Merge, consolidate, or otherwise reorganize with or into any Person or acquire all or a material portion of any Person's assets or Equity Interests.

(b) Sell, pledge, lease, transfer, or otherwise dispose of any of its properties or assets (except as expressly permitted by this Agreement, including, without limitation, the "Permitted Dispositions" permitted under the definition of "Asset Disposition").

7.2 **Liens.** Except Permitted Liens, create, assign, transfer, or allow to exist any Lien on any of its property (including the Collateral).

7.3 **Guarantees.** Be liable for any other Person's obligations by assumption, endorsement, guaranty, or otherwise except for (1) endorsing checks in the ordinary course of business and (2) guaranteeing or being jointly and severally liable for a Loan Party's Obligations.

7.4 **Investments.** Purchase or acquire obligations or Equity Interests of, or any other interest in, any Person, except: (1) investments existing on the Closing Date and listed on Schedule 7.4; (2) obligations issued or guaranteed by the United States of America; (3) commercial paper with a maturity of not more than 180 days and a published rating of not less than A-1 or P-1; (4) certificates of deposit and bankers' acceptances having maturities of not more than 180 days; and (5) U.S. money market funds (x) rated AAA by Standard & Poors, Inc. or with an equivalent rating from Moody's Investors Service, Inc., or (y) that invest solely in obligations issued or guaranteed by the United States of America.

7.5 **Loans.** Except as set forth in Schedule 7.5, make advances, loans, or credit extensions to any Person (including any Affiliate), except for commercial trade credit in connection with Inventory sales in the ordinary course of its business and consistent with practices that existed on the Closing Date and that have disclosed to the Agent in writing.

164393.00001/155883146v.1164393.00001/155883146v.3

7.6     **Capital Expenditures.**  Make or incur any Capital Expenditure or commitments for Capital Expenditures (including capitalized leases), other than any Capital Expenditures financed with the proceeds of the Capex Loans or the HVAC Equipment Loans, in any fiscal year in an aggregate amount for the Loan Parties on a consolidated basis of more than $2,000,000.

7.7     **Distributions.**

(a)     Except for Permitted Dividends and Permitted Tax Distributions, pay dividends (or any distribution on account of any of its Equity Interests) or redeem, purchase, or otherwise acquire directly or indirectly any of its Equity Interests.

(b)     Enter into or issue, as applicable, any subscriptions, options, warrants, calls, rights, or other agreements or commitments of any kind relating to any Equity Interests of any Loan Party.

(c)     Pay any management, advisory, consulting, or other similar fees to any Person, other than any reasonable fees in connection with any accounting, tax, legal or similar consulting or advisory services arising in the ordinary course of business.

7.8     **Indebtedness.**  Create, incur, assume, or allow to exist any Indebtedness except:

(a)     Indebtedness existing on the Closing Date and listed on Schedule 7.8 (including any extensions, renewals, refinancings, or replacements in accordance with clause (g) below).

(b)     Indebtedness to the Agent, the Lenders and the Issuer under or pursuant to the Loan Documents;

(c)     Indebtedness to fund Capital Expenditures allowed by Section 7.6.

(d)     Indebtedness permitted under Sections 7.3 and 7.11.

(e)     Indebtedness under Hedging Agreements required under this Agreement.

(f)     Indebtedness in favor of the Mortgage Lender in connection with the mortgage on the Owned Real Property (but only if the principal amount secured is not increased).

(g)     Indebtedness that represents extensions, renewals, refinancings, or replacements ("Refinance Indebtedness") of any of the Indebtedness described in clauses (a),(c), (d) (as it pertains to Section 7.3) and (e) ("Original Indebtedness") if: (1) the Refinance Indebtedness does not increase the principal amount or interest rate of the Original Indebtedness; (2) any Liens securing that Refinance Indebtedness are not extended to any additional property; (3) no Loan Party or any Subsidiary that was not originally obligated to repay that Original Indebtedness becomes obligated for that Refinance Indebtedness; (4) the Refinance Indebtedness does not shorten the average weighted maturity of the Original Indebtedness; (5) the terms of the Refinance Indebtedness are not less favorable to the obligor than the original terms of the Original Indebtedness; and (6) if the Original Indebtedness was subordinated in right of payment to the Obligations, then the terms and conditions of the Refinance Indebtedness must include

84

subordination terms and conditions that are at least as favorable to the Agent as those that applied to the Original Indebtedness.

7.9    **Business.**    Change in any material respect the nature of the business that it is engaged in on the Closing Date and businesses reasonably related thereto.

7.10    **Affiliate Transactions.**    Directly or indirectly, purchase, acquire, or lease any property from, or sell, transfer, or lease any property to, or otherwise deal with, any Affiliate (except transactions in the ordinary course of business that existed on the Closing Date and are listed on Schedule 7.10, on an arm's length basis, and on terms no less favorable than terms that could be obtained from a Person who is not an Affiliate).

7.11    **Leases.**    Enter as lessee into any lease for real or personal property (unless capitalized and permitted under Section 7.6) if after giving effect to the lease the aggregate annual rental payments for all leased property that are not guaranteed or reimbursed by Customers of the Loan Parties would exceed $5,000,000 in any fiscal year in the aggregate for all Loan Parties.

7.12    **Subsidiaries; Partnerships; and Disqualified Stock.**

(a)    Form any Subsidiary unless (1) that Subsidiary expressly becomes a Loan Party and becomes jointly and severally liable for the Obligations; (2) the Loan Party pledges 100% of the Equity Interests of the Subsidiary to the Agent for the benefit of the Lenders; (3) such Subsidiary is joined as a Borrower hereunder and provides to the Agent a Joinder to this Agreement; (4) the Agent has received all documents (including organizational documents and legal opinions) it may require; and (5) the Subsidiary grants the Agent for the benefit of the Lenders first-priority perfected Liens in its present and future assets. If a Subsidiary becomes a Borrower, none of its assets may be included in the Borrowing Base until the Agent has conducted a field examination and makes that determination in its discretion.

(b)    Enter into any partnership, joint venture, or similar agreement.

(c)    Issue any Disqualified Stock.

7.13    **Fiscal Year and Accounting Changes.**    Change its fiscal year-end from December 31 or make any material change (1) in accounting treatment and reporting practices (except as required by GAAP) or (2) in tax reporting treatment (except as required or permitted by law).

7.14    **Pledging Credit.**    Pledge the Agent's or any Lender's credit on any purchase or for any purpose.

7.15    **Amending Charter Documents.**    Amend, modify, or waive any term or provision of its Charter Documents (except amendments, modifications, and waivers acceptable to the Agent in its discretion as confirmed in writing before the applicable amendment, modification, or waiver).

164393.00001/155883146v.1164393.00001/155883146v.3

7.16    **ERISA.**  Become part of a Controlled Group or create, maintain, or become obligated to contribute to any Plan or Multiemployer Plan.

7.17    **Prepaying Indebtedness.**  At any time, directly or indirectly (including by establishing any sinking fund for any Indebtedness) prepay any Indebtedness (other than to the Agent, the Lenders or the Issuer) or repurchase, redeem, retire, or otherwise acquire any Indebtedness.

7.18    **Material Business Agreements.**  Without the Agent's prior written consent, amend, waive, or modify in any respect the terms of any Material Business Agreement if that change would be detrimental in any material respect to the Agent or any Loan Party.

7.19    **Sanctions.**  Directly or indirectly, use the proceeds of any Loan, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity, to fund any activities of or business with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any individual or entity (including any individual or entity participating in the transaction, whether as the Agent, Lender, Issuer or otherwise) of Sanctions.

7.20    **Anti-Corruption Laws.**  Directly or indirectly use the proceeds of any Loan for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions.

7.21    ~~**[Reserved]**~~**Excluded Subsidiaries.**

(a)    Permit any Excluded Subsidiary to (i) have any material liabilities (other than (x) liabilities of a *de minimis* nature or (y) liabilities in connection with the Mortgage on the real property located at 4120 East 13th Street, Ames, IA), (ii) own any material assets (other than (x) assets of a *de minimis* nature or (y) assets consisting of the real property located at 4120 East 13th Street, Ames, IA), or (iii) engage in any operations or business (other than ownership of the real property located at 4120 East 13th Street, Ames, IA).

(b)    Permit any Excluded Subsidiary to (i) directly or indirectly receive any proceeds of any Revolving Loan and (ii) none of the assets of any Excluded Subsidiary may be included in the Borrowing Base

7.22    **[Reserved].**

7.23    **Amending Leases.**  Materially, or in any way that is adverse to Agent and the Lenders, amend, modify, or waive any term or provision of any lease of real property (except amendments, modifications, and waivers consented to in writing by the Agent in its discretion).

7.24    **Use of Proceeds.**  Use, or permit the use of, the proceeds of any Advances or any Loan for any purpose other than those permitted by Section 2.16.

7.25    **Financial Covenants.**

86

(a)    Fixed Charge Coverage Ratio.  Not permit the Fixed Charge Coverage Ratio for any Computation Period, commencing with the Computation Period ending December 31, 2024, and for each Computation Period thereafter, to be less than the applicable ratio set forth below for such Computation Period:

| Computation Period Ending | Fixed Charge Coverage Ratio |
|---|---|
| December 31, 2024 and each Computation Period thereafter | 1.10 to 1.00 |

**ARTICLE VIII**
**CONDITIONS PRECEDENT**

8.1    **Conditions to Initial Loans.**  The Agent's, Lenders' and Issuer's obligation to make Loans and Advances on the Closing Date is subject to its satisfaction of each the following conditions precedent:

(a)    Credit and Security Agreement.  This Agreement shall have been executed by the Loan Parties and the Agent and the Lender hereto.

(b)    Notes.  The Borrowers shall have executed and delivered to the Agent the Notes.

(c)    Perfection Certificate.  A Perfection Certificate completed and executed by each Loan Party.

(d)    Collateral and Security. All Collateral items required to be physically delivered to the Agent under the Loan Documents have been delivered (accompanied by any transfer instruments requested by the Agent) or arrangements satisfactory to the Agent for delivery are in place. All taxes, fees, Expenses, and other charges have been paid in full that relate to (1) the Collateral, (2) incurring the Obligations, and (3) delivering the Loan Documents.

(e)    Searches. The Agent has received accurate and complete copies of all Lien, pending suit, title, background investigation, and other searches required by the Agent.

(f)    Filings; Registrations; and Recordings. Each document required by the Loan Documents, by law (including UCC financing statements and Mortgages), or requested by the Agent to be filed, registered, or recorded to create or perfect in the Agent's favor, for the benefit of Lenders, a Lien on the Collateral has been properly filed, registered, or recorded in each jurisdiction where filing, registration, or recordation is required or requested, and all actions necessary to perfect and protect the Agent's Liens have been taken.

(g)    Organizational Proceedings. The Agent has received a copy of the resolutions of each Loan Party's Board of Directors, Shareholders, managers, or Members authorizing (1) executing, delivering, and performing the Loan Documents and (2) granting the Liens on the Collateral.

164393.00001/155883146v.1164393.00001/155883146v.3

(h)　　Resolutions; Incumbency Certificates. For each Loan Party, such Person's (a) resolutions of its board of directors (or similar governing body) approving and authorizing such Person's execution, delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby; and (b) signature and incumbency certificates of its officers executing any of the Loan Documents (it being understood that the Agent may conclusively rely on each such certificate until formally advised by a like certificate of any changes to the information set forth therein), all certified by its secretary or an assistant secretary (or similar officer) as being in full force and effect without modification.

(i)　　Charter Documents. The Agent has received complete copies of (1) each Loan Party's Charter Documents (certified by the Secretary of State or other appropriate official of that entity's jurisdiction of formation, incorporation, or organization) and (2) each Loan Party's governance documents.

(j)　　Good Standing. The Agent has received copies of good standing certificates (or other analogous certificates) for each Loan Party dated not more than 10 days before the Closing Date in each jurisdiction where each Loan Party is required to be in good standing (or other analogous status), unless the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

(k)　　Legal Opinion. The Agent has received an executed legal opinion from the Loan Parties' counsel.

(l)　　No Litigation. No litigation, investigation, or proceeding is pending or threatened against any Loan Party (or against its officers, directors, or managers), (1) in connection with the Loan Documents or (2) that could (as determined in the Agent's Discretion) have a Material Adverse Effect. No injunction, writ, or restraining order has been issued by any Governmental Body that is adverse to any Loan Party (or its business) or is inconsistent with the Loan Documents.

(m)　　Collateral Examination. The Agent has (1) completed a Collateral examination and received appraisals (both of which must be satisfactory to the Agent in its discretion), including an appraisal of the Borrowers' machinery and Equipment, and (2) reviewed all books and records in connection with the Collateral.

(n)　　Fees. The Agent and Lenders have received all fees and Expenses payable to the Agent.

(o)　　Financial Statements; Projections. The Agent has received and found satisfactory the financial statements required by Section 5.6(b) and the Projections.

(p)　　Insurance. The Agent has received evidence that each Loan Party has the insurance required by the Loan Documents and that the Agent is listed as Agent-loss-payee, additional-insured, and mortgagee (as required by the Agent).

(q)　　Collection Accounts. The Agent has received (1) other agreements establishing the Cash Concentration Account and all other required accounts; (2) evidence that Borrowers have directed all Account Debtors to make all payments to the Cash Concentration Account and

88

(3) deposit account control agreements or similar agreements with respect to the Deposit Accounts set forth on Schedule 6.7 executed by the applicable depository bank, the applicable Borrower and the Agent.

(r)　　Consents. The Agent has received all Consents and Waivers required by it.

(s)　　No Adverse Material Change. Since December 31, 2023, no event, condition, or state of facts has occurred that could reasonably be expected to have a Material Adverse Effect. No representations made or information supplied to the Agent by any Loan Party or its agents or representatives has turned out to be inaccurate or misleading in any respect.

(t)　　Contract Review and Capital Structure. The Agent is satisfied with all Material Business Agreements and the Loan Parties' legal and capital structure.

(u)　　Existing Indebtedness. The Agent has received (1) a satisfactory payoff letter for any existing Indebtedness to be paid on the Closing Date and (2) evidence that, except for Permitted Liens, there will be no Liens on any Loan Party's assets.

(v)　　Interest Rate Protection. If required by the Agent, the Borrowers have entered into Hedging Agreements acceptable to the Agent.

(w)　　Liquidity. After giving effect to the initial Loans and Advances and all other Closing Date transactions, the Borrowers' Liquidity is at least $1,500,000.

(x)　　Beneficial Ownership Certificate. The Agent has received an executed Beneficial Ownership Certificate and such other documentation and information requested in connection with applicable "know your customer" and anti-money laundering rules and regulations.

(y)　　Letter of Direction. A letter of direction containing funds flow information with respect to the proceeds of the Loans to be made on the Closing Date.

(z)　　Borrowing Base Certificate. A Borrowing Base Certificate dated as of the Closing Date.

(aa)　　Landlord Waivers. In the case of any leased real property, a collateral access agreement from the landlord of such property waiving any landlord's Lien in respect of personal property kept at the premises subject to such lease and permitting the Agent to access such leased real property.

(bb)　　Other. All corporate and other proceedings (and all documents, instruments, and other matters in connection with the transactions contemplated by the Loan Documents) must be satisfactory in form and substance to the Agent and its counsel.

8.2　　**Conditions to Each Loan and Advance.** The Agent's, Lender's and Issuer's obligation to make any Loan or Advance (including Loans and Advances on the Closing Date) is subject to the satisfaction of the following conditions precedent on the date each Advance or Loan is requested and made:

164393.00001/155883146v.1164393.00001/155883146v.3

(a)      Notice.  The Agent shall have received, as applicable, a Notice of Borrowing meeting the requirements of Section 2.4 with respect to any Borrowing (conversion to or continuation of Term SOFR Loans).

(b)      Representations and Warranties. Each representation and warranty made by each Loan Party in (or in connection with any Loan Document) is true, correct, and complete with the same effect as though made on and as of the date of the Loan or Advance (it being understood that any representation or warranty that by its terms is made as of a specified date is required to be true and correct only as of that specified date).

(c)      No Default. No Default Condition exists or would exist after giving effect to the requested Advances or Loans (but nonetheless the Agent may in its discretion continue to make Advances or Loans, and if it does so that does not (1) waive any Event of Default or Default, (2) establish a course of dealing, or (3) obligate the Agent to make any other Advances or Loans).

(d)      Maximum Advances. After giving effect to the requested Advance or Loan, (a) the aggregate Revolving Exposure does not exceed the Maximum Borrowing Amount, (b) the aggregate principal amount of all Capex Loans advanced pursuant to this Agreement does not exceed the Capex Commitment, and (c) the aggregate principal amount of all HVAC Equipment Loans advanced pursuant to this Agreement does not exceed the HVAC Equipment Loan Commitment.

(e)      Additional Conditions to Advances of HVAC Equipment Loans.  Prior to the making of the initial Advances of HVAC Equipment Loans pursuant to this Agreement, Agent shall have received a fully executed copy of the Tenant Guaranty, in form and substance satisfactory to the Agent.

Each Advance or Loan request is a representation and warranty by each Loan Party that each condition precedent to the Advance or Loan has been met on the date the Advance or Loan is requested and received.

## ARTICLE IX
## INFORMATION AS TO THE LOAN PARTIES

Until all Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments and the Loan Documents have been terminated, each Loan Party must:

9.1    **Disclosure.**  Immediately report to the Agent all matters materially affecting the value, enforceability, or collectability of any portion of the Collateral (including any Lien or claim asserted against the Collateral, any loss, damage, or destruction to any material amount of Collateral, any Loan Party's reclamation or repossession of any Collateral, the return to any Loan Party of a material amount of goods, or if any Account Debtor asserts any claims or set-offs against Accounts).

9.2    **Borrowing Base Certificate; Schedules.**  Deliver to the Agent on or before the thirtieth (30th) day of each month for the prior month (1) a detailed accounts receivable aging

including all invoices aged by invoice date (reconciled to the general ledger and the Borrowing Base Certificate); (2) a detailed accounts payable aging including all accounts payable aged by invoice date (reconciled to the general ledger); (3) a schedule or perpetual reports detailing the Loan Parties' machinery and Equipment, in form satisfactory to the Agent, by location (and including the amounts of machinery and Equipment and the value thereof that is maintained at any leased locations and premises of third parties), specifying the Hard Costs and the current book and market value thereof, with additional detail showing additions to and deletions therefrom; and (4) a Borrowing Base Certificate (that is calculated prior month and which is not binding on the Agent). Furthermore, the Loan Party Representative must deliver to the Agent at such intervals as the Agent may require: (i) assignment schedules; (ii) copies of Account Debtor invoices; (iii) evidence of shipment and delivery of goods or services; and (iv) such further schedules, documents, and information as the Agent may require (including trial balances and test verifications). The Agent may confirm and verify Accounts by any manner and through any medium it chooses. All items, reports, and information under this Section must be (x) satisfactory to the Agent in its discretion, (y) executed by the Loan Party Representative, and (z) timely delivered to the Agent.

9.3    **Notice of Suits and Adverse Events.**  Furnish the Agent with immediate notice of (1) any lapse or other termination of any Consent issued to any Loan Party by any Governmental Body or any other Person that is material to any Loan Party's operation of its business; (2) any refusal by any Governmental Body or any other Person to renew or extend any Consent; (3) copies of any periodic or special reports filed by any Loan Party with any Governmental Body or Person (but only if (x) a report indicates any material adverse change in any Loan Party's business, operations, affairs, or condition or (y) if copies are requested by the Agent); and (4) copies of any material notices and other communications from any Governmental Body that specifically relate to any Loan Party or any Collateral.

9.4    **Material Events.**  Immediately notify the Agent in writing if any of the following occur: (1) any Default Condition; (2) any default by any party under any Material Business Agreement; (3) any event, development, or circumstance that could reasonably be expected to cause any financial statement, projection (including the Projections), Borrowing Base Certificate, or other information or report furnished to the Agent to be untrue or misleading (including anything that could reasonably be expected to cause any financial statement to not present fairly in any material respect, in accordance with GAAP consistently applied, the Loan Parties' financial condition or operations on a consolidated or consolidating basis); (4) each default by any Loan Party under any Indebtedness; (5) any litigation, suit, or administrative proceeding affecting any Loan Party or the Collateral (whether or not the claim is covered by insurance); and (6) any other development that could reasonably be expected to have a Material Adverse Effect.

9.5    **Annual Financial Statements.**  Furnish the Agent within 120 days after the end of each of the Loan Parties' fiscal years, the Loan Parties' audited  financial statements on a consolidated and consolidating basis (including statements of income, stockholders' equity, and cash flow from the beginning of the current fiscal year to the end of the current fiscal year) and the balance sheet as at the end of the fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported on without qualification by an independent certified public accounting firm selected by the Loan Parties and satisfactory to the Agent in its sole discretion and setting forth in each case in comparative form

the figures from the projected annual operating budget delivered under Section 9.8 for such fiscal year. In addition, these financial statements must be accompanied by a Compliance Certificate.

9.6 **Monthly Financial Statements.** Furnish the Agent within 30 days after the end of each fiscal month, the Loan Parties' unaudited balance sheet on a consolidated and consolidating basis and the Loan Parties' unaudited statements of income, stockholders' equity, and cash flow on a consolidated and consolidating basis reflecting the results of operations from the beginning of the fiscal month to the end of the month (and for the month), prepared on a basis consistent with prior practices and complete and correct in all material respects (subject to normal and recurring year-end adjustments that individually and in the aggregate are not material) and setting forth in each case in comparative form the figures from the projected annual operating budget delivered under Section 9.8 for the current fiscal year. In addition, these financial statements must be accompanied by a Compliance Certificate.

9.7 **Additional Information.**

(a) Together with the annual financial statements to be delivered pursuant to Section 9.5 above and with the monthly financial statements to be delivered pursuant to Section 9.6 following the end of each Fiscal Quarter, deliver to the Agent of all management letters, exception reports or similar letters or reports prepared by any Loan Party or received by any Loan Party from its independent certified public accounting firm.

(b) Promptly furnish the Agent with any additional information that the Agent may request in its discretion, as well as (1) copies of all environmental audits and reviews; (2) at least 30 days' prior written notice of any Loan Party opening any new place of business, closing any existing place of business, or changing its legal name, entity type, or jurisdiction of organization, incorporation, or formation; and (3) promptly, and in any event within five (5) Business Days, upon any Loan Party's learning thereof, notice of any material labor dispute, strike, or walkout affecting any Loan Party and 90 days' prior written notice of the expiration of any labor contract binding on any Loan Party.

9.8 **Projected Operating Budget and Availability Forecast.** Furnish the Agent no later than 30 days after the beginning of each fiscal year of the Loan Parties (beginning with the first fiscal year after the Closing Date), the Loan Parties' month-by-month projected operating budget and cash flows on a consolidated and consolidating basis for the fiscal year (including for each month an income statement, a cash flow statement, and a balance sheet and availability projection). These projections must be accompanied by a certificate signed by the Loan Party Representative's Authorized Officer stating that the projections and forecasts were prepared using sound financial planning practices consistent with past budgets and financial statements and setting forth the assumptions upon which such projections are based, and that the officer has no reasonable basis to question the reasonableness of any assumptions on which the projections and forecasts were prepared.

9.9 **Electronic Reporting.** Unless otherwise agreed in writing by the Agent, all items and information required to be submitted by the Loan Parties under this Article must be delivered to the Agent by the specific method of Approved Electronic Communication designated by the Agent. All information sent by Approved Electronic Communication is treated

164393.00001/155883146v.1164393.00001/155883146v.3

as an authenticated record sent by the individual and entity whose electronic mail address is provided on the communication as "sender" or initiating party. In addition to Approved Electronic Communications, the Agent may from time to time require that items and information be provided to the Agent in physical form.

9.10 **Individual Guarantor PFS and Tax Returns.** Cause the following to be delivered to the Agent with respect to each Guarantor that is an individual:

(a) Within fifteen days of the Agent's request, a personal financial statement on the Agent's current form and current as of the date delivered, signed and dated by the applicable individual Guarantor, provided that with respect to any individual Guarantor, the Agent will not request more than one personal financial statement in any 12-month period unless a Default Condition exists. If requested by the Agent, any personal financial statement delivered under this Section must be delivered with a verification of liquidity (current brokerage or bank statements) for all cash and marketable securities listed on such personal financial statement.

(b) Copies of all federal, state and local income tax returns within 120 days of each calendar year end, or, if subject to a properly granted extension (copies of which have been provided to the Agent before the end of the 120 day period), within 5 days of being filed, but in no event later than October 15.

## ARTICLE X
## EVENTS OF DEFAULT

Each of the following events is an "Event of Default":

10.1 **Payment.** Any Loan Party does not pay any Obligation when due (whether at maturity, by acceleration, or otherwise).

10.2 **Misrepresentation.** Any representation or warranty made or treated as having been made by any Loan Party in any Loan Document, any related agreement, or in any certificate, document, or financial or other statement furnished to the Agent is misleading in any respect on the date when made or treated as having been made.

10.3 **Not Furnishing Information.** Any Loan Party does not (1) furnish financial information required under the Loan Documents when due; (2) furnish any additional information requested by the Agent within two days of when requested; or (3) permit the Agent or its agents to immediately (and without condition) inspect its books, its records, its premises, or any Collateral.

10.4 **Liens.** Any Lien (other than Permitted Liens), levy, assessment, injunction, or attachment is issued against any of any Loan Party's property other than as permitted hereunder.

10.5 **Covenant Breaches.** Any Loan Party does not perform, keep, or observe any term, provision, condition, or covenant in any Loan Document or in any other agreement with the Agent, any Lender, or the Issuer.

93

10.6    **Judgments.**  Any judgment or judgments are rendered or judgment liens are filed against any Loan Party (or any of its property) for an aggregate amount exceeding $50,000 that, within 15 days, are not to the Agent's satisfaction satisfied, stayed, discharged of record, or bonded.

10.7    **Insolvency.**  Any Loan Party: (1) becomes insolvent; (2) is unable, or admits in writing its inability, to pay its debts as they become due; (3) makes a general assignment for the benefit of creditors or to a liquidation agent; (4) files on its behalf or consents to an Insolvency Proceeding; (5) has an Insolvency Proceeding filed or instituted against it that is not dismissed within 30 days after it is filed or instituted; (6) applies to a court for the appointment of a receiver, trustee, or custodian for any of its assets; (7) has a receiver, trustee, or custodian appointed for any of its assets (with or without its consent); or (8) commences a self-liquidation of its assets. If an involuntary proceeding arises under Title 11 of the United States Code, the Lender and Issuer have no obligation to continue any financing from and after the proceeding begins.

10.8    **Material Adverse Effect.**  Any change occurs in any Loan Party's condition, affairs (financial or otherwise), or prospects that the Agent determines in its discretion has or could reasonably be expected to have a Material Adverse Effect.

10.9    **Lender's Lien Priority.**  For any reason any Lien created under any Loan Document is not a valid, perfected, first-priority Lien (other than purchase-money Liens on Equipment that are expressly allowed under this Agreement to be senior to the Lender's Liens).

10.10   **Breaches Under Material Business Agreements.**  Any default occurs under any Material Business Agreement that any Loan Party is a party to, that is not cured within any applicable cure period, and that could reasonably be expected to have a Material Adverse Effect.

10.11   **Cross Default.**  With respect to any Indebtedness with a balance of $50,000 or more (1) any Loan Party does not pay any principal or interest due after any cure period or (2) a default exists under that Indebtedness that allows the holder of the Indebtedness to accelerate the Indebtedness (whether or not that right has been waived or deferred).

10.12   **Change of Control.**  A Change of Control occurs.

10.13   **Invalidity.**  Any provision of any Loan Document is not, for any reason, at all times valid and binding on each Loan Party, or any Loan Party claims in writing that any provision of any Loan Document is not, for any reason, valid and binding on any Loan Party.

10.14   **Intellectual Property.**  Any Governmental Body: (1) revokes, terminates, suspends, or adversely modifies any of any Loan Party's Intellectual Property which (x) is material to the conduct of its business, (y) constitutes a material portion of the Collateral, or (z) which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; (2) begins proceedings to suspend, revoke, terminate, or adversely modify any of any Loan Party's Intellectual Property necessary or desirable to the conduct of its business as typically conducted and those proceedings are not dismissed or discharged within 30 days; or (3) schedules or conducts a hearing on the renewal of any Intellectual Property material to any Loan

94

Party's business and the Governmental Body issues a report recommending the termination, revocation, suspension, or material, adverse modification of any Intellectual Property.

10.15  **Destruction of Collateral.**  Any portion of the Collateral is seized or taken by a Governmental Body, or any Loan Party (or any Loan Party's title or rights) are the subject to litigation that might, as determined by the Agent in its discretion, result in material impairment or loss of the security provided by any Loan Document, or a casualty occurs as to any material asset used in the conduct of any Loan Party's business.

10.16  **Business Interruption.**  Any Loan Party's operations are interrupted at any time for more than five consecutive days.

10.17  **Guarantor Repudiation.**  (1) Any Guaranty of any of the Obligations is not in full force and effect; (2) any action is taken to discontinue or to assert that any Guaranty of any of the Obligations is not in full force and effect; (3) any Guarantor of any of the Obligations does not comply with any of the terms or provisions of its Guaranty or any other default occurs under any Guaranty; or (4) any Guarantor of any of the Obligations denies or gives the Agent notice that it does not have any further liability under any Guaranty.

10.18  **Indictment; Forfeiture.**  The indictment of, or institution of any legal process or proceeding against, any Loan Party, or any of its or their officers or directors, under any applicable law where the relief, penalties, or remedies sought or available are a felony or include the forfeiture of more than $25,000 of property of any Loan Party or the imposition of any stay or other order, the effect of which could be to restrain in any material way the conduct by any Loan Party of its business in the ordinary course.

10.19  **Hedging Agreement.**  If any event of default, termination event, or other similar event occurs under any Hedging Agreement that a Loan Party is a party to.

10.20  **ERISA.**  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Borrower or an ERISA Affiliate under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) any Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount.

10.21  **Tenant Guaranty Default.**  With respect to the Tenant Guaranty: (1) the Tenant Guaranty is not in full force and effect; (2) any action is taken to discontinue or to assert that the Tenant Guaranty is not in full force and effect; (3) any guarantor under the Tenant Guaranty does not comply with any of the terms or provisions of the Tenant Guaranty or any other default occurs under the Tenant Guaranty; or (4) any guarantor under the Tenant Guaranty denies or gives the Agent notice that it does not have any further liability under the Tenant Guaranty.

95

## ARTICLE XI
## LENDER'S RIGHTS AND REMEDIES AFTER AN EVENT OF DEFAULT

11.1 **Rights and Remedies.** When an Event of Default occurs under Section 10.7, all Obligations are immediately due and payable and the Lender's obligation to make Loans or Advances immediately terminates. When any Event of Default exists, the Agent, Lenders and Issuer have all rights and remedies provided under the Loan Documents, by law, and under all other existing and future agreements between the Agent, Lender, Issuer and any Loan Party. All rights and remedies are cumulative. Without limiting the preceding, when an Event of Default exists, the Agent may, at its election, without notice and without demand, do any one or more of the following (all of which are authorized by the Loan Parties):

(a) Declare all Obligations immediately due and payable.

(b) Declare the Commitments terminated and stop making Loans or Advances.

(c) (i) Terminate any Letter of Credit that may be terminated in accordance with its terms and/or (ii) require the Borrowers to Cash Collateralize all or any portion of the Letter of Credit Exposure in an amount equal to not less than 105% of the amount of the Letter of Credit Exposure.

(d) Terminate the Agent's, Lenders' and Issuer's future obligations to any Loan Party (which does not affect the Agent's or Lenders rights, its Liens on the Collateral, or the Obligations).

(e) Settle or adjust disputes and claims directly with Account Debtors for amounts and on terms that the Agent determines in its discretion (and the Agent will credit the Borrowers' Loan Account with only the net-cash amounts received by the Agent after deducting all Expenses).

(f) Direct the Loan Parties to hold and segregate all returned Inventory in trust for the Agent for the benefit of Lenders.

(g) Make payments and do acts that the Agent considers necessary or appropriate in its discretion to protect and preserve its Lien on the Collateral. If requested by the Agent, the Loan Parties must assemble the Collateral, deliver the Collateral to any location specified by the Agent, or allow the Agent or its agents to pick up the Collateral.

(h) Without retaining any Collateral in satisfaction of an obligation (within the meaning of Section 9-620 of the UCC), the Agent may hold or set-off and apply to the Obligations any: (1) balances and deposits of any one or more of the Loan Parties held by the Agent (including any amounts received in a blocked account); (2) Indebtedness at any time owing to or for the credit or the account of any Loan Party held by the Agent; and (3) all of each Loan Party's balances and deposits held or controlled by the Agent (including any amounts received in a blocked account).

96

(i)      Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell the Collateral. The Loan Parties' rights under all licenses and all franchise agreements may be used by the Agent without cost.

(j)      Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including any Loan Party's premises) as the Agent determines is commercially reasonable. It is not necessary that the Collateral be present at any sale. The Agent will give notice of the disposition of the Collateral as required by law. Any deficiency that exists after disposition of the Collateral as provided above must be paid immediately by the Loan Parties. Any excess will be remitted without interest by the Agent to the party or parties legally entitled to the excess.

(k)      Credit bid and purchase at any public sale.

(l)      Agent is entitled to the immediate appointment of a receiver for all or any part of the Collateral (whether the receivership is incidental to a proposed sale of the Collateral under the UCC or otherwise). Each Loan Party consents to the appointment of a receiver without notice or bond, to the fullest extent not prohibited by applicable law, and waives all notices of and defenses to the appointment of a receiver and may not oppose any application the Agent makes for the appointment of a receiver. At the Agent's option the receivership may continue until the Obligations are fully satisfied and performed.

In addition, the Agent has all rights and remedies provided by law and any rights and remedies contained in the Loan Documents. The exercise or non-exercise of any right or remedy does not preclude the exercise of any other right or remedy. All rights and remedies are cumulative.

### 11.2    **Allocation of Payments After Event of Default.**

Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the Agent or any Lender on account of the Obligations or any other amounts outstanding under any of the Loan Documents or in respect of the Collateral shall be paid over or delivered as follows:

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of the Agent in connection with enforcing the rights of the Lenders and the Issuer under this Agreement and the Loan Documents and any protective advances made by the Agent with respect to the Collateral under or pursuant to the terms of this Agreement;

SECOND, to payment of any fees owed to the Agent;

THIRD, to the payment of all accrued fees and interest due in respect of each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 16.2(b);

164393.00001/155883146v.1164393.00001/155883146v.3

FOURTH, to the payment of the outstanding principal amount of the each protective advance made pursuant to Section 4.4 and overadvance made pursuant to Section 16.2(b);

FIFTH, to the payment of all of the Obligations consisting of accrued interest on account of the Swing Loans;

SIXTH, to the payment of the outstanding principal amount of the Obligations consisting of Swing Loans;

SEVENTH, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees) of each of the Lenders and the Issuer in connection with enforcing its rights under this Agreement and the Loan Documents or otherwise with respect to the Obligations owing to such Lender or the Issuer;

EIGHTH, to the payment of all of the Obligations consisting of accrued fees and interest arising under or pursuant to this Agreement or the Loan Documents;

NINTH, to the payment of the outstanding principal amount of the Obligations constituting Advances (including the payment or cash collateralization of the outstanding amount of Letters of Credit), treasury management services and Hedging Contracts;

TENTH, to all other Obligations and other obligations which shall have become due and payable under the Loan Documents or otherwise and not repaid pursuant to clauses "FIRST" through "NINTH" above; and

ELEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (a) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (b) each of the Lenders and the Issuer shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that the then outstanding Advances held by such Lender or the Issuer bears to the aggregate then outstanding Advances) of amounts available to be applied pursuant to clauses "FIFTH" through "SEVENTH" above; and (c) to the extent that any amounts available for distribution pursuant to clause "NINTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by the Agent in a cash collateral account and applied (i) first, to reimburse the Issuer from time to time for any drawings under such Letters of Credit and (ii) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clause "TENTH" above in the manner provided in this Section 11.2.

11.3    **No Waiver.**  No delay on the Agent's part in exercising any right, power, or privilege under this Agreement or any Loan Document is a waiver, nor does any single or partial exercise of any right, power, or privilege under this Agreement or otherwise preclude the exercise of any other right, power, or privilege.

164393.00001/155883146v.1164393.00001/155883146v.3

## ARTICLE XII
## WAIVERS AND JUDICIAL PROCEEDINGS

12.1    **Notice Waiver.**  To the fullest extent not prohibited by law, each Loan Party waives all notices and demands that it would otherwise be entitled to receive (including non-payment of any of the Accounts, demand, presentment, protest, notice of acceptance, notice of Loans or Advances made, credit extended, or Collateral received or delivered).

12.2    **Delay.**  Any delay or omission by the Agent, any Lender, or the Issuer in exercising any right, remedy, or option does not waive that right (or any other right, remedy, option, or default).

12.3    **Waiver of Jury Trial.  EACH OF THE BORROWERS, THE AGENT AND LENDERS HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, ANY NOTE, ANY OTHER LOAN DOCUMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR THAT MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

## ARTICLE XIII
## EFFECTIVE DATE AND TERMINATION

13.1    **Term.**  This Agreement inures to the benefit of, and is binding on, the respective successors and permitted assigns of each Loan Party, the Agent, each Lender, the Issuer and their respective successors and assigns, is effective on the Closing Date, and continues in full force and effect until the Termination Date unless sooner terminated as provided in this Agreement.

13.2    **Termination.**  The termination of this Agreement does not affect any Loan Party's Obligations arising before the effective termination date, and the Loan Documents remain in full force and effect until all Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments have been terminated. The Liens and rights granted to the Agent for the benefit of the Lenders (including the financing statements) continue in full force and effect notwithstanding the termination of this Agreement or that the Loan Account may from time to time be in a zero or credit position, until all of the Obligations of each Loan Party have been paid or performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments have been terminated. Accordingly, each Loan Party waives any rights that it may have under the UCC or other applicable law to require that the Agent file termination statements or mortgage discharges with respect to the Collateral unless and until this Agreement has been terminated in accordance with its terms, and all Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments have been terminated. All indemnification obligations in the Loan Documents survive the termination of

99

the Loan Documents and payment and performance of the Obligations in full and the termination of the Commitments. In addition, certain provisions of the Loan Documents remain in effect even after all Obligations are irrevocably paid and performed in full and the Commitments have been terminated.

## ARTICLE XIV
## LOAN PARTY REPRESENTATIVE

14.1 **Appointment and Relationship.** The Loan Party Representative is appointed by each Loan Party as its contractual representative under each Loan Document and each Loan Party irrevocably authorizes the Loan Party Representative to act as the contractual representative with the rights and duties set forth in the Loan Documents. The Loan Party Representative agrees to act as such contractual representative. Additionally, each Loan Party appoints the Loan Party Representative as its agent to receive all Loan proceeds in its operating account and to promptly disburse the Loans to the appropriate Borrower (it being understood that Revolving Loans disbursed to any Borrower may not exceed that Borrower's Borrowing Base availability). The Agent, Lenders and their officers, directors, agents, or employees are not liable to the Loan Party Representative or any Loan Party for any action taken or omitted to be taken by the Loan Party Representative or the Loan Parties under this Article.

14.2 **Authority.** Each Loan Party authorizes the Loan Party Representative on its behalf to execute and deliver to the Agent the Loan Documents and all related agreements, certificates, documents, and instruments as are necessary or appropriate to effect the purposes of the Loan Documents (including Borrowing Base Certificates and Compliance Certificates). Each Loan Party agrees that any action taken by the Loan Party Representative (or the other Borrowers) in accordance with the terms of the Loan Documents, and the Loan Party Representative's exercise of its powers in the Loan Documents (together with such other powers as are reasonably incidental) are binding on all of the Loan Parties.

14.3 **Notices.** Each Loan Party and the Loan Party Representative must immediately notify the Agent if a Default Condition exists. Any notice of a Default Condition provided by the Agent to the Loan Party Representative is treated as notice to each Loan Party.

14.4 **Joint and Several Obligations.**

(a) Each Loan Party is jointly and severally liable for all Obligations and this joint and several liability is not affected by any extensions, renewals, waivers, or forbearances granted by the Agent on behalf of the Lenders, the Agent's or any Lender's failure to give any Loan Party notice of any borrowing or any other notice, the Agent's or any Lender's failure to pursue or preserve its rights against any Loan Party or other Person, the Agent's or any Lender's release of any Collateral, or any other defense available to a surety.

(b) Each covenant, agreement, obligation, representation, and warranty of the Loan Parties contained in the Loan Documents is the joint and several undertaking of each Loan Party. Each Loan Party acknowledges that its obligations might be construed to be, at least in part, a guarantee of the Obligations of the other Loan Parties and, in full recognition of that fact, each Loan Party consents and agrees that the Agent may, at any time and from time to time without

100

164393.00001/155883146v.1164393.00001/155883146v.3

notice or demand, whether before or after any actual or purported termination, repudiation, or revocation of this Agreement by any Loan Party, and without affecting the enforceability or continuing effectiveness of the Loan Documents as to any Loan Party or each Loan Party's joint and several liability for the Obligations: (1) supplement, restate, modify, amend, waive, increase, decrease, extend, renew, or otherwise change the Loan Documents (including time for payment (including any increase or decrease of the interest rates or advance rates in the Borrowing Base)); (2) accept partial payments; (3) release, reconvey, terminate, waive, abandon, fail to perfect, subordinate, exchange, substitute, transfer, or enforce any security or guarantees (and apply any security and direct the order or manner of sale as determined by the Agent); (4) release any Person from any liability with respect to any of the Loan Documents; (5) settle, release on terms satisfactory to the Agent or by operation of applicable law or otherwise liquidate or enforce any security or Guaranty in any manner, consent to the transfer of any security, and bid and purchase at any sale; or (6) consent to a merger, change, or any other restructuring or termination of any Loan Party's existence and correspondingly restructure the Obligations.

(c)     Each Loan Party states and acknowledges that: (1) the Loan Parties desire to utilize their borrowing potential on a consolidated basis as if they were merged into a single entity and that the Loan Documents establish credit facilities that would not otherwise be available to the Loan Parties if each Loan Party were not jointly and severally liable for the Obligations; (2) it has determined that it will benefit specifically and materially from the Loans and Advances under this Agreement; (3) it is both a condition precedent to the Agent's obligations and the desire of the Loan Parties that each Loan Party execute and deliver the Loan Documents to the Agent; and (4) the Loan Parties have requested and bargained for the structure and terms of and security for the advances under the Loan Documents. If for any reason any Loan Party's obligations under the Loan Documents (or if any Liens securing the joint and several Obligations), would, but for this Section, be unenforceable under applicable law, then the joint and several liability and each Lien is valid and enforceable to the maximum extent that would not cause the joint and several liability or Liens to be unenforceable under applicable law (and the joint and several liability and each Lien is treated as having been automatically amended accordingly at all relevant times).

(d)     To the extent that any Loan Party, under this Agreement as a joint and several obligor or a Guarantor, repays any Obligations constituting either or both Loans or other Obligations incurred directly and primarily by any other Loan Party (an "Accommodation Payment"), then the Loan Party making an Accommodation Payment is entitled to contribution and indemnification from (and to be reimbursed by) each of the other Loan Parties in an amount, for each of the other Loan Parties, equal to a fraction of the Accommodation Payment, the numerator of which is the other Loan Parties' Allocable Amount (as defined below) and the denominator of which is the sum of the Allocable Amounts of all of the Loan Parties. As of any determination date the "Allocable Amount" of each Loan Party is equal to the maximum liability for Accommodation Payments that could be asserted against that Loan Party without: (1) rendering that Loan Party "insolvent" within the meaning of Section 101(31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"); (2) leaving that Loan Party with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA; or (3) leaving that Loan Party unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the

101

UFCA. All rights and claims for contribution, indemnification, and reimbursement under this Section and applicable law are subordinate in right of payment to the prior payment in full of the Obligations and the termination of all Commitments and the Loan Documents.  The provisions of this Section, to the extent expressly inconsistent with other provisions of the Loan Documents, supersede the inconsistent provisions.

### 14.5   **Cross Guaranty.**

(a)      Notwithstanding that the Loan Parties are jointly and severally liable for all Obligations, if for any reason the Loan Parties are found in a final, non-appealable order not to be jointly and severally liable for all Obligations, then provisions of this Section apply and each Loan Party absolutely and unconditionally guarantees to the Agent, on behalf of the Lenders, and their successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration, or otherwise) and performance of all Obligations. Each Loan Party's Guaranty obligation is in addition to all other Guaranty obligations and is a payment and performance Guaranty (and not a collection Guaranty), and its obligations under this Section are absolute and unconditional, irrespective of, and not affected by:

(i)      The genuineness, validity, regularity, enforceability or any future amendment of, or change in, any other Loan Document or any other agreement, document, or instrument to which the other Loan Parties are or may become a party.

(ii)      Agent not enforcing the Loan Documents (including this Section).

(iii)      The existence, value, or condition of any Collateral, the Agent not perfecting its Lien on any Collateral, the Agent releasing any Collateral, or any Person liable for the Obligations.

(iv)      Any other action or circumstances that could be a legal or equitable defense of a surety or guarantor.

(b)      Agent does not have to proceed against any other Person (including any other Loan Party) or any Collateral before requiring payment by any one or more of the Loan Parties. The Agent may proceed, before, after, or at the same time to enforce its rights under this Section and against any Collateral.

(c)      Each Loan Party waives and agrees that it may not at any time insist on, plead, or claim, or take the benefit or advantage of any laws, claims, or doctrines related to appraisal, valuation, stay, extension, marshaling, redemption, or exemption. Each Loan Party waives with respect to its obligations and with respect to any of the Obligations: (1) all defenses with respect to diligence, presentment, demand, maturity, extension of time, change in nature or form of the Obligations, acceptance, release of security, composition, or agreement arrived at as to the amount of, or the terms of, the Obligations; (2) notice of adverse change in the other Loan Parties' financial condition; and (3) any other fact that might increase the risk to that Loan Party. Each Loan Party also waives the benefit of all provisions of law that are or might be in conflict with the terms of this Section. Each Loan Party represents, warrants, and agrees that its obligations under this Section are not and will not be subject to any set-offs, defenses, or counterclaims. Each Loan Party's obligations under this Section remain in full force and effect

102

until the Obligations have been irrevocably paid and performed in full and all Commitments and the Loan Documents have been terminated (other than contingent obligations with respect to which no claim has been asserted or threatened). Each Loan Party is in the same position as a principal debtor with respect to the Obligations and expressly waives all rights it has and may have to require that the Agent proceed against any other Loan Party or any Collateral before proceeding against, or as a condition to proceeding against, that Loan Party. The parties acknowledge that, but for the provisions of this Section (including the waivers), the Agent would not enter into the Loan Documents.

(d)     Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, until the Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and all Commitments and the Loan Documents have been terminated, each Loan Party:

(i)     Subordinates and defers all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification, set-off, or any other rights that a surety could have against a principal, a guarantor, a maker, a co-maker, an obligor, an accommodation party, a holder, a transferee, and that a Loan Party may have against any Person (including another Loan Party) in connection with or as a result of a Loan Party performing its obligations under the Loan Documents or any other agreements.

(ii)     Irrevocably subordinates and defers any "claim" (as defined in the Bankruptcy Code) against any Person (including the other Loan Parties and any surety for any of the Obligations), either directly or as an attempted set-off to any action instituted by the Agent against any Person (including the other Loan Parties).

(iii)     Acknowledges and agrees (x) that this subordination and deferral is intended to benefit the Agent and does not limit or otherwise affect that Loan Party's liability or the enforceability of this Section and (y) that the Agent and its respective successors and assigns are intended third-party beneficiaries of the waivers and agreements set forth in this Section.

(e)     If the Agent enforces its rights with respect to any Collateral (either by judicial foreclosure or by non-judicial sale or enforcement), the Agent may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights, remedies, and benefits under this Section. If, in the exercise of any of its rights and remedies, the Agent forfeits any of its rights or remedies, including its right to enter a deficiency judgment against any Loan Party or any other Person, whether because of any applicable laws relating to "election of remedies" or similar laws, the Loan Parties consent to that action by the Agent and waive any claim based on that action, even if the action by the Agent results in a full or partial loss of any subrogation or other rights that a Loan Party might otherwise have had but for the Agent's action. Any election of remedies that results in the denial or impairment of the Agent's right to seek a deficiency judgment against a Loan Party does not impair the other Loan Parties' obligation to pay the full amount of the Obligations. If the Agent bids at any foreclosure sale, trustee sale, or at any private sale, the Agent may bid all or less than the amount of the Obligations and the amount of the Agent's bid need not be paid by the Agent but will instead be credited against the Obligations. The amount of the successful bid at any such sale, whether by

103

the Agent or any other bidder, is conclusively treated as the fair market value of the Collateral (and the difference between that bid amount and the remaining balance of the Obligations is conclusively treated as the amount of the Obligations guaranteed under this Section, notwithstanding that any law, court decision, or ruling may have the effect of reducing the amount of the deficiency claim but for bidding at any sale).

(f)　　The Guaranty in this Section is a continuing Guaranty that remains in full force and effect until the Obligations are irrevocably paid and performed in full and all Commitments and the Loan Documents have been terminated.

(g)　　Each Loan Party's liability under this Section is limited to an amount not to exceed on any determination date the greater of (1) or (2):

(i)　　The net amount of all Loans to and Letters of Credit issued for the benefit of the other Loan Parties under this Agreement and then re-loaned or otherwise transferred to or directly benefiting the subject Loan Party.

(ii)　　The Loan Party's Allocable Amount, after taking into account, among other things, that Loan Party's right of contribution and indemnification from the other Loan Parties under Section 14.4.

14.6　　**Waivers.**　Each Loan Party waives (1) all rights with respect to subrogation, reimbursement, indemnity, exoneration, contribution, or any other claim that has or could have against the other Loan Parties or other Person directly or contingently liable for the Obligations, or against or with respect to the other Person's (including any Loan Party's) property (including, any property that is Collateral for the Obligations), arising in connection with the Loan Documents, until all Commitments and the Loan Documents are terminated and the Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and (2) any defense it may otherwise have to paying and performing the Obligations based on any contention that its liability under the Loan Documents is limited and not joint and several. The preceding waivers and all other waivers in the Loan Documents are a material inducement to the Agent's agreement to enter into the Loan Documents and to make Advances and other Loans.

**ARTICLE XV**
**REGARDING THE AGENT**

15.1　　**Waivers.**　Each Lender and the Issuer hereby designates Associated to act as the Agent for each such Lender and the Issuer under this Agreement and the Loan Documents.　Each Lender and the Issuer hereby irrevocably authorizes the Agent to take such action on its behalf under the provisions of this Agreement and the Loan Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and the Agent shall hold all Collateral, payments of principal and interest, fees, charges and collections (without giving effect to any collection days) received pursuant to this Agreement, for the ratable benefit of the Lenders and the Issuer.　The Agent may perform any of its duties hereunder by or through its agents or employees.　As to any matters not expressly

104

provided for by this Agreement (including without limitation, collection of the Notes) the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding; provided, however, that the Agent shall not be required to take any action which exposes the Agent to liability or which is contrary to this Agreement or the Loan Documents or applicable law unless the Agent is furnished with an indemnification reasonably satisfactory to the Agent with respect thereto.15.2    **Nature of Duties.**  The Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Loan Documents.  Neither the Agent nor any of its officers, directors, employees or agents shall be (a) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross negligence or willful misconduct, or (b) responsible in any manner for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement, or in any of the Loan Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any of the Loan Documents, as the case may be, or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Loan Documents or for any failure of any Loan Party to perform its obligations hereunder.  The Agent shall not be under any obligation to any Lender or the Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Loan Documents, or to inspect the properties, books or records of any Loan Party.  The duties of the Agent as respects the Advances to the Loan Party shall be mechanical and administrative in nature; the Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender or the Issuer; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon the Agent any obligations in respect of this Agreement except as expressly set forth herein.

15.3    **Lack of Reliance on the Agent and Resignation.**  Independently and without reliance upon the Agent, any other Lender or the Issuer, each Lender and the Issuer has made and shall continue to make (a) its own independent investigation of the financial condition and affairs of each Loan Party in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (b) its own appraisal of the creditworthiness of each Loan Party.  The Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender or the Issuer with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by any Loan Party pursuant to the terms hereof.  The Agent shall not be responsible to any Lender or the Issuer for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Loan Document, or of the financial condition of any Loan Party, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Note, the Loan Documents or the financial condition of any Loan Party, or the existence of any Event of Default or any Default.

164393.00001/155883146v.1164393.00001/155883146v.3

The Agent may resign on thirty (30) days' written notice to each of the Lenders, the Issuer and the Loan Party Representative and upon such resignation, the Required Lenders will designate prior to the end of such thirty day period a successor the Agent reasonably satisfactory to the Loan Parties (provided that no notice to or approval of the Loan Parties shall be required (i) in any case where the successor Agent is one of the Lenders or (ii) after the occurrence and during the continuance of any Event of Default).

Any such successor of the Agent shall succeed to the rights, powers and duties of the Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former the Agent's rights, powers and duties as the Agent shall be terminated, without any other or further act or deed on the part of such former the Agent. After the Agent's resignation as the Agent, the provisions of this Article 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement.

15.4    **Certain Rights of the Agent.** If the Agent shall request instructions from the Lenders and the Issuer with respect to any act or action (including failure to act) in connection with this Agreement or any Loan Document, the Agent shall be entitled to refrain from such act or taking such action unless and until the Agent shall have received instructions from the Required Lenders; and the Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, the Lenders and the Issuer shall not have any right of action whatsoever against the Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders. 15.5     **Reliance.** The Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Loan Documents and its duties hereunder, upon advice of counsel selected by it. The Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by the Agent with reasonable care.

15.6    **Notice of Default.** The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Loan Documents, unless the Agent has received notice from a Lender, the Issuer or a Loan Party referring to this Agreement or the Loan Documents, describing such Default or Event of Default. In the event that the Agent receives such a notice, the Agent shall give notice thereof to the Lenders and the Issuer. The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided, that, unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders and the Issuer.

15.7    **Indemnification.** To the extent the Agent is not reimbursed and indemnified by the Loan Parties, each Lender will reimburse and indemnify the Agent and the Issuer in proportion to its respective portion of the Loans and other Advances (or, if no Loans or other Advances are outstanding, according to its Commitment Percentage), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses

106

or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Agent or the Issuer in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Loan Document; provided that, the Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or willful misconduct.

15.8    **The Agent in its Individual Capacity.**  With respect to the obligation of the Agent to lend under this Agreement, the Loans and other Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as the Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include the Agent in its individual capacity as a Lender.  The Agent may engage in business with any Loan Party as if it were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to the Lenders.

15.9    **Delivery of Documents.**  To the extent the Agent receives financial statements required under Article 9 of this Agreement, the Agent will promptly furnish such documents and information to the Lenders and the Issuer.

15.10   **Loan Parties' Undertaking to the Agent.**  Without prejudice to their respective obligations to the Lenders and/or the Issuer under the other provisions of this Agreement, each Loan Party hereby undertakes with the Agent to pay to the Agent from time to time on demand all amounts from time to time due and payable by it for the account of the Agent, the Lenders or the Issuer or any of them pursuant to this Agreement to the extent not already paid.  Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Loan Party's obligations to make payments for the account of the Lenders and the Issuer or the relevant one or more of them pursuant to this Agreement.

15.11   **No Reliance on the Agent's Customer Identification Program.**  Each of the Lenders and the Issuer acknowledges and agrees that neither such Lender nor the Issuer, nor any of their Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Issuer's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, this Agreement, the Loan Documents or the transactions hereunder or contemplated hereby: (a) any identity verification procedures, (b) any record keeping, (c) comparisons with government lists, (d) customer notices or (e) other procedures required under the CIP Regulations or such other laws.

15.12   **Erroneous Payments.**

(a)      If the Agent notifies a Lender, Issuer, any secured party, or any other Person who has received funds on behalf of a Lender, Issuer or other secured party (any such Lender, Issuer,

secured party, or other recipient, a "Payment Recipient") that the Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Issuer or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Agent, and such Lender, Issuer or other secured party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)      Without limiting immediately preceding clause (a), each Lender, Issuer or other secured party, or any Person who has received funds on behalf of a Lender, Issuer or other secured party, hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates), or (z) that such Lender, Issuer, secured party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)      in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)      such Lender, Issuer or secured party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Agent pursuant to this Section 15.12(b).

(c)      Each Lender, Issuer or secured party hereby authorizes the Agent to set off, net and apply any and all amounts at any time owing to such Lender, Issuer or secured party under any Loan Document, or otherwise payable or distributable by the Agent to such Lender, Issuer or

164393.00001/155883146v.1164393.00001/155883146v.3

secured party from any source, against any amount due to the Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)       The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrowers or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Agent from the Borrowers or any other Loan Party for the purpose of making such Erroneous Payment.

(e)       To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to  an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(f)       Each party's obligations, agreements and waivers under this Section 15.12 shall survive the resignation or replacement of the Agent, the termination of the Aggregate Commitment and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

**ARTICLE XVI**
**MISCELLANEOUS**

16.1    **Governing Law** THIS AGREEMENT AND EACH NOTE SHALL BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

16.2    **Entire Understanding and Amendments.**

(a)       This Agreement and the other Loan Documents (including all recitals) are the entire agreement among the parties related to the subject matter of the Loan Documents. The Loan Documents supersede all prior agreements, commitments (including any commitment letters), and understandings among the parties related to the subject matter of the Loan Documents. Any promises, representations, warranties, or guarantees that may arise in the future among the parties are not effective unless they are in a writing signed by each Loan Party's and the Agent's and Lenders' respective officers. No part of the Loan Documents may be changed, modified, amended, waived, supplemented, discharged, cancelled, or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing signed by the Agent and the Loan Parties. Each Loan Party acknowledges that it has been advised by counsel in connection with the execution of the Loan Documents (or has had the opportunity to be advised) and that it is not relying on any oral representations or statements by the Agent in entering into the Loan Documents.

(b)       The Required Lenders, the Agent with the consent in writing of the Required Lenders, and the Loan Parties may, subject to the provisions of this Section 16.2, from time to

109

time enter into written supplemental agreements to this Agreement or the Loan Documents executed by the Loan Parties, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of the Lenders, the Issuer, the Agent or the Loan Parties thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, the consent of the Issuer must be obtained with respect to any amendment, waiver or consent with respect to Section 2.9 or any other provisions, the amendment or waivers of which would adversely affect the Issuer and, provided, further, that no such supplemental agreement shall:

(i)    Increase the Commitment of any Lender, without the written consent of the Agent and such Lender;

(ii)    extend the maturity of any Note or the due date for any amount payable hereunder without the written consent of the Agent and each Lender affected thereby;

(iii)    decrease the rate of interest or reduce any fee payable by the Loan Parties to the Lenders and/or the Issuer pursuant to this Agreement without the written consent of the Agent and each Lender and/or Issuer affected thereby;

(iv)    alter the definition of the term Required Lenders without the consent of the Agent and each Lender;

(v)    alter, amend or modify this Section 16.2(b)(v) without the consent of the Agent and each Lender;

(vi)    release all or substantially all of the Collateral without the consent of each Lender;

(vii)    change the rights and duties of the Agent without the consent of each Lender;

(viii)    increase the advance rates in the definition of Borrowing Base above the advance rates in effect on the Closing Date without the consent of each Lender;

(ix)    release any Loan Party from the Obligations under this Agreement, or any Loan Document without the consent of each Lender; or

(x)    alter, amend or modify Section 11.2 hereof without the consent of each Lender.

Any such supplemental agreement shall apply equally to each Lender and the Issuer and shall be binding upon the Loan Parties, the Lenders, the Issuer, the Agent and all future holders of the Obligations. In the case of any waiver, the Loan Parties, the Agent, the Lenders and the Issuer shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default

164393.00001/155883146v.1164393.00001/155883146v.3

shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

Notwithstanding (a) the existence of a Default or an Event of Default, (b) that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or (c) any other provision of this Agreement, the Agent may at its discretion and without the consent of the Lenders, voluntarily permit the outstanding Revolving Loans and the amount of Letters of Credit outstanding at any time to exceed one hundred five percent (105%) of the Borrowing Base for up to ninety (90) consecutive Business Days provided that such outstanding Advances do not exceed the Aggregate Revolving Commitment. For purposes of the preceding sentence, the discretion granted to the Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Borrowing Base was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be either "Eligible Accounts" becomes ineligible or collections of Accounts applied to reduce outstanding Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral. In the event the Agent involuntarily permits the outstanding Advances to exceed the Borrowing Base by more than five percent (5%), the Agent shall use its efforts to have the Loan Parties decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Advances made after the Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence.

(c)     If, following the Closing Date, the Agent and the Loan Party Representative shall have agreed in their sole and absolute discretion that there is an ambiguity, inconsistency, manifest error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Agent and the Loan Party Representative shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof (it being understood that the Agent has no obligation to agree to any such amendment).

16.3    **Transfers and Assignments.**

(a)     Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Loan Parties may not assign or otherwise transfer any of their rights or Obligations hereunder without the prior written consent of the Agent. No Lender may assign or otherwise transfer any of its rights or obligations hereunder except: (i) to an Eligible Assignee in accordance with the provisions of Section 16.3(b), (ii) by way of participation in accordance with the provisions of Section16.3(d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 16.3(e) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 16.3(d) and, to the extent expressly contemplated hereby, the Affiliates of each of the

111

Agent, the Lenders and the respective directors, officers, employees, agents and advisors of such Affiliates) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Transfer of Commitments.  Upon first obtaining the prior written consent of the Loan Party Representative (provided that if an Event of Default has occurred and is continuing, prior written consent of the Borrowers Representative shall not be required), any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its commitment to make Advances hereunder and the Advances at the time owing to such Lender); provided that (i) except in the case of an assignment of the entire remaining amount of the assigning Lender's commitment to make Advances hereunder and the Advances at the time owing to such Lender or in the case of an assignment to a Lender or an Affiliate of a Lender, the aggregate amount of the commitment to make Advances hereunder (which for this purpose includes Advances outstanding thereunder) or, if the applicable commitment to make Advances hereunder is not then in effect, the principal outstanding balance of the Advances of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than Five Million Dollars ($5,000,000), in the case of any assignment in respect of Advances, unless the Agent otherwise consents; (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Advances or the commitment to make Advances hereunder assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations in Advances on a non-pro rata basis; (iii) any assignment of a commitment to make Advances hereunder must be approved by the Agent unless the Person that is the proposed assignee is itself a Lender with a commitment to make Advances hereunder (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and (iv) the parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of Three Thousand Five Hundred Dollars ($3,500).  Subject to acceptance and recording thereof by the Agent pursuant to Section 16.3(d), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 16.5 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 16.3(d).

(c)     Maintenance of Register.  The Agent, acting solely for this purpose as an agent of the Loan Parties, shall maintain at its office in Cleveland, Ohio, a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the commitments to make Advances and other Loans hereunder of, and principal amounts of the Advances  and other Loans owing to, each Lender pursuant to the terms hereof

112

from time to time (the "Register"). The entries in the Register shall be conclusive, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Loan Party Representative and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Loan Party Representative or the Agent, sell participations to any Person (other than a natural person or any Loan Party or any of the Loan Party's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its commitment to make Advances hereunder and/or the Advances owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations (iii) the Loan Parties, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and (iv) the selling Lender maintains a register that reflects the name and address and principal amounts of the Advances owing to such Participant.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 16.2(b)(i) through 16.2(b)(iv) that affects such Participant.  The Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.10, 3.11, 3.12, and 16.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 16.3(a).

A Participant shall not be entitled to receive any greater payment under Section 16.5 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Loan Parties' prior written consent.

(e)    Pledge of Interests.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)    Notes.  The Loan Parties shall execute and deliver: (i) to the Agent, the transferor and the transferee, any consent or release (of all or a portion of the obligations of the transferor) to be delivered in connection with each Assignment and Assumption, (ii) if a Lender's entire interest in its commitments to make Advances hereunder has been transferred to the transferee, appropriate replacement notes against return of the Notes (each marked "replaced") held by the transferor and (iii) if only a portion of a Lender's interest in its commitments to make Advances and other Loans hereunder has been transferred, replacement notes to each of the transferor and the transferee against return of the Notes of the transferor (each marked "replaced") held by the

113

transferor; provided, that, simultaneously with the Loan Parties' delivery of new Notes pursuant to this Section 16.3(f), the transferor Lender will deliver to the Loan Party Representative any Note being replaced in whole or in part, and each such Note delivered by the transferor Lender shall be conspicuously marked "replaced" when so delivered.

(g)      Replacement of Certain Lenders.  If any Lender is a Defaulting Lender hereunder, then the Loan Party Representative may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 16.3(a)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations; provided that: (i) the Loan Party Representative shall have received the prior written consent of the Agent (not to be unreasonably withheld), and (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Advances and other Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Loan Parties (in the case of all other amounts).  No Lender shall be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Loan Party Representative to require such assignment and delegation cease to apply.

(h)      Replacement of Non-Consenting Lenders.  If, in connection with any proposed amendment, waiver or consent hereunder pursuant to Section 16.2(b) hereof: (i) requiring the consent of all Lenders, the consent of Required Lenders is obtained but the consent of all Lenders whose consent is required is not obtained or (ii) requiring the consent of Required Lenders, the consent of Lenders holding fifty-one percent (51%) or more is obtained but the consent of Required Lenders is not obtained (any Lender withholding consent as described in clause (i) and (ii) hereof being referred to as a "Non-Consenting Lender"), then, so long as the Agent is not a Non-Consenting Lender, the Agent may, at the sole expense of the Loan Parties, upon notice to such Non-Consenting Lender and the Loan Party Representative, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 16.3(a)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that such Lender shall have received payment of an amount equal to the outstanding principal of its Advances and other Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Loan Parties (in the case of all other amounts).

16.4    **Payment Application.**  The Agent has the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations in such order as the Agent determines. To the extent that any Loan Party makes a payment or the Agent, the Lenders, or the Issuer receives any payment or proceeds of the Collateral for any Loan Party's benefit that are later invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid to a trustee, debtor-in-possession, receiver, custodian, or any other Person under any bankruptcy law, common law, or equitable principal, then, to that extent, the Obligations or part of the Obligations intended to be satisfied is revived

114

and continue as if the payment or proceeds had not been received by the Agent, the Lenders, or the Issuer.

16.5 **INDEMNIFICATION BY THE BORROWERS. IN CONSIDERATION OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY THE AGENT AND EACH LENDER AND THE AGREEMENT TO EXTEND THE COMMITMENTS PROVIDED HEREUNDER, EACH BORROWER HEREBY AGREES TO INDEMNIFY, EXONERATE AND HOLD THE AGENT AND EACH LENDER, AND EACH OF THEIR OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES AND AGENTS OF THE AGENT AND LENDERS (EACH A "INDEMNIFIED PARTY") FREE AND HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, LOSSES, LIABILITIES, DAMAGES AND EXPENSES, INCLUDING ATTORNEY COSTS (COLLECTIVELY, THE "INDEMNIFIED LIABILITIES"), INCURRED BY THE AGENT OR LENDER PARTIES OR ANY OF THEM AS A RESULT OF, OR ARISING OUT OF, OR RELATING TO (A) ANY TENDER OFFER, MERGER, PURCHASE OF EQUITY INTERESTS, PURCHASE OF ASSETS OR OTHER SIMILAR TRANSACTION FINANCED OR PROPOSED TO BE FINANCED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, WITH THE PROCEEDS OF ANY OF THE LOANS, (B) THE USE, HANDLING, RELEASE, EMISSION, DISCHARGE, TRANSPORTATION, STORAGE, TREATMENT OR DISPOSAL OF ANY HAZARDOUS SUBSTANCE AT ANY PROPERTY OWNED OR LEASED BY ANY LOAN PARTY, (C) ANY VIOLATION OF ANY ENVIRONMENTAL LAW WITH RESPECT TO CONDITIONS AT ANY PROPERTY OWNED OR LEASED BY ANY LOAN PARTY OR THE OPERATIONS CONDUCTED THEREON, (D) THE INVESTIGATION, CLEANUP OR REMEDIATION OF OFFSITE LOCATIONS AT WHICH ANY LOAN PARTY OR THEIR RESPECTIVE PREDECESSORS ARE ALLEGED TO HAVE DIRECTLY OR INDIRECTLY DISPOSED OF HAZARDOUS SUBSTANCES OR (E) THE EXECUTION, DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (INCLUDING, WITHOUT LIMITATION, THE INDEMNITEE'S RELIANCE ON ANY COMMUNICATION EXECUTED USING AN ELECTRONIC SIGNATURE, OR IN THE FORM OF AN ELECTRONIC RECORD) BY ANY OF THE AGENT OR LENDER PARTIES, EXCEPT FOR ANY SUCH INDEMNIFIED LIABILITIES ARISING ON ACCOUNT OF THE APPLICABLE AGENT OR LENDER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, THE BORROWERS HEREBY AGREE TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION OF EACH OF THE INDEMNIFIED LIABILITIES THAT IS PERMISSIBLE UNDER APPLICABLE LAW. ALL OBLIGATIONS PROVIDED FOR IN THIS SECTION 16.5 SHALL SURVIVE REPAYMENT OF THE LOANS, CANCELLATION OF THE NOTES, ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF THE COLLATERAL DOCUMENTS AND TERMINATION OF THIS AGREEMENT.**

164393.00001/155883146v.1164393.00001/155883146v.3

16.6    **Non Liability of the Lender.**  The relationship between the Borrowers and each of the Lenders shall be solely that of borrowers and Lender.  Each Lender does not have any fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Loan Parties, and each of the Lenders in connection herewith or therewith is solely that of debtor and creditor. Each of the Lenders do not undertake any responsibility to any Loan Party to review or inform any Loan Party of any matter in connection with any phase of any Loan Party's business or operations.  Each Borrower agrees, on behalf of itself and each other Loan Party, that each of the Lenders do not have liability to any Loan Party (whether sounding in tort, contract or otherwise) for losses suffered by any Loan Party in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought.  **NO LENDER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF ANY INFORMATION OR OTHER MATERIALS OBTAINED THROUGH INTRALINKS OR OTHER SIMILAR INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT, NOR SHALL ANY LENDER PARTY HAVE ANY LIABILITY WITH RESPECT TO, AND EACH BORROWER ON BEHALF OF ITSELF AND EACH OTHER LOAN PARTY, HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE CLOSING DATE).**  Each Borrower acknowledges that it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party.  No joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lender and the Loan Parties.

16.7    **FORUM SELECTION AND CONSENT TO JURISDICTION.  ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS; PROVIDED THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE AGENT OR LENDERS FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION.  EACH BORROWER HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE.  EACH BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF ILLINOIS.  EACH BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY**

116

**OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.**

16.8 **Notice.** Any notice or request may be given to the Loan Party Representative (individually or on behalf of each Loan Party) or to the Agent at their addresses stated below (or at such other address as may be specified in a notice designated as a notice of change of address under this Section). Any notice, request, demand, direction, or other communication (for purposes of this Section only, a "Notice") to be given to or made on any party under any provision of the Loan Documents must be given or made in writing (which includes by means of electronic transmission (i.e., "email") or facsimile transmission). Any Notice must be delivered to the applicable parties at the addresses and numbers set forth under their respective names in this Section or in accordance with any later unrevoked Notice from any party that is given in accordance with this Section. When any Lender or the Issuer gives a Notice to the Loan Party Representative or any Loan Party, such Lender or the Issuer shall concurrently send a copy thereof to the Agent, and the Agent shall promptly notify the other Lenders and the Issuer. Any notice given to the Loan Party Representative is treated as having been given to each other Loan Party. Any Notice is effective:

(a) In the case of hand-delivery, when delivered.

(b) If given by mail, three (3) Business Days after the Notice is deposited into the U.S. mail.

(c) In the case of a facsimile transmission, when sent to the applicable party's facsimile machine number if the sending party receives a delivery confirmation from its own facsimile machine.

(d) In the case of other electronic transmission, when actually received.

(e) If given by other means (including by overnight courier), when actually received.

As of the Closing Date, the applicable parties' addresses and numbers are as follows:

(A) If to the Agent at:      Associated Bank, National Association
Corporate Banking – Asset Based Lending
525 W. Monroe Street, Suite 2300
Chicago, IL 60661
Attention: Steve McGreevy
Telephone: 312-544-4536
Email:
stephen.mcgreevy@associatedbank.com

With a copy to      Blank Rome LLP
(which is not notice):      444 W. Lake Street, Suite 1650
Chicago, Illinois 60606

117

Attention: Kenneth Ottaviano
Telephone: 312-776-2511
Email: ken.ottaviano@blankrome.com

| | | |
|---|---|---|
| (B) | If to Loan Party Representative at: | JT Logistics Solutions, LLC<br>3811 Dixon Street<br>Des Moines, Iowa 50313<br>Attention: Dave Weber<br>Telephone: 515-323-7105<br>Email: dave.weber@jtlogistics.com |
| | With a copy to (which is not notice): | BrownWinick Law Firm<br>666 Grand Avenue, Suite 2000<br>Des Moines, Iowa 50309<br>Attention: Amy Johnson<br>Telephone: 515-242-2493<br>Email: amy.johnson@brownwinick.com |

16.9 **Survival.** The Loan Parties' obligations under Sections 2.4(g), 2.11, 2.14, 3.10, 3.11, and 15.5 survive the termination of all Commitments and the Loan Documents and payment in full of the Obligations.

16.10 **Severability.** If any part of the Loan Documents is found for any reason to be unenforceable, all other parts nevertheless remain enforceable.

16.11 **Injunctive Relief.** If any Loan Party does not perform, observe, or discharge its obligations or liabilities under the Loan Documents (or threatens to fail or refuse to perform, observe, or discharge its obligations or liabilities) any remedy at law may prove to be inadequate relief to the Agent. Therefore, the Agent is entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

16.12 **Consequential Damages.** Under no circumstances is the Agent or Lenders, their Affiliates, their agents, or their attorneys liable to any Loan Party for any special, incidental, consequential, or punitive damages (including those arising from any breach of contract, tort, or other wrong relating to the Obligations, the Loan Documents, the Collateral, any Bank Product, or any agreement between the Lenders and any one or more of the Loan Parties).

16.13 **Electronic Execution; Electronic Records; Counterparts.** This Agreement, any Loan Document and any other Communication, including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures. Each of the Loan Parties and the Agent agrees that any Electronic Signature on or associated with any Communication shall be valid and binding on such Person to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of such Person enforceable against such Person in accordance with the terms thereof to the same extent as if a manually

118

executed original signature was delivered. Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Agent may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, the Agent is not under any obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by such Person pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Agent has agreed to accept such Electronic Signature, the Agent shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification and (b) upon the request of the Agent, any Electronic Signature shall be promptly followed by such manually executed counterpart. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

The Agent shall not be responsible for or have any duty to ascertain or inquire into the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with the Agent's reliance on any Electronic Signature transmitted by telecopy, emailed .pdf or any other electronic means). The Agent shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Loan Document by acting upon, any Communication (which writing may be a fax, any electronic message, Internet or intranet website posting or other distribution or signed using an Electronic Signature) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the maker thereof).

Each of the Loan Parties hereby waives (i) any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document based solely on the lack of paper original copies of this Agreement, such other Loan Document, and (ii) waives any claim against the Agent and each Related Party for any liabilities arising solely from the Agent's reliance on or use of Electronic Signatures, including any liabilities arising as a result of the failure of the Loan Parties to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

16.14  **Construction.**  Each party and its counsel have reviewed this Agreement. Accordingly, the normal rule of construction that any ambiguities are resolved against the drafting party does not apply in interpreting this Agreement, any other Loan Document, or any amendments, schedules, or exhibits to this Agreement and the other Loan Documents.

119

16.15  **Confidentiality and Sharing Information.**  The Agent agrees to use commercially reasonable efforts (equivalent to the efforts the Agent applies to maintain the confidentiality of its own confidential information) to maintain as confidential all information provided to it by any Loan Party and designated as confidential, except that the Agent may disclose such information: (a) to Persons employed or engaged by the Agent in evaluating, approving, structuring or administering the Loans and the Commitments; (b) to its Affiliates, its auditors and its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (c) to any assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this Section 15.5 (and any such assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as described in clause (a) above); (d) as required or requested by any federal or state regulatory authority or examiner, or any insurance industry association, or as reasonably believed by the Agent to be compelled by any court decree, subpoena or legal or administrative order or process; (e) as, on the advice of the Agent's counsel, is required by law; (f) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any litigation to which the Agent is a party; (g) to any nationally recognized rating agency that requires access to information about the Agent's investment portfolio in connection with ratings issued with respect to the Agent; (h) to any Affiliate of the Agent who may provide Bank Products to the Loan Parties; or (i) that ceases to be confidential through no fault of the Agent.  Notwithstanding the foregoing, each Borrower consents to the publication by the Agent of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement, and the Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.  In addition, the Agent may disclose the existence of this Agreement and information about this Agreement to other market data collectors, similar service providers to the lending industry and service providers to the Agent in connection with the administration of this Agreement, the other Loan Documents, and the Commitments.  Notwithstanding anything in this Agreement or any other Loan Document to the contrary, any information with respect to the "tax treatment" or "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby shall not be confidential, and the Agent and other parties hereto may disclose without limitation of any kind any information that is provided to the Agent with respect to the "tax treatment" or "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4); provided that to the extent any Loan Document contains information that relates to the "tax treatment" or "tax structure" and contains other information, this paragraph shall only apply to the information regarding the "tax treatment" or "tax structure."

16.16  **Costs, Expenses and Taxes.**  Each Borrower agrees to pay on demand all Expenses of the Agent (including Attorney Costs and any Taxes) in connection with the preparation, execution, syndication, delivery and administration (including perfection and protection of any collateral and the costs of Intralinks (or other similar service), if applicable) of this Agreement, the other Loan Documents and all other documents provided for herein or delivered or to be delivered hereunder or in connection herewith (including any amendment, supplement or waiver to any Loan Document), whether or not the transactions contemplated hereby or thereby shall be consummated, and all reasonable out-of-pocket costs and expenses (including Attorney Costs and any Taxes) incurred by the Agent and Lenders after an Event of

120

Default, in connection with the collection of the Obligations or the enforcement of this Agreement, the other Loan Documents or any such other documents or during any workout, restructuring or negotiations in respect thereof. In addition, each Borrower agrees to pay, and to save the Agent and Lenders harmless from all liability for, any fees of such Borrower's auditors in connection with any reasonable exercise by the Agent and Lenders of their rights pursuant to Section 4.10. All Obligations provided for in this Section 16.16 shall survive repayment of the Loans, cancellation of the Notes and termination of this Agreement.

16.17  **Conflict.**  If there is any conflict, inconsistency, or discrepancy between the provisions of this Agreement and the provisions of the other Loan Documents, the provisions giving the Agent greater rights or remedies (as determined by the Agent) govern to the maximum extent not prohibited by applicable law (it being understood that the purpose of this Agreement and any Loan Document is to add to, and not to limit, detract, or derogate from, diminish, or otherwise impair or reduce the rights granted to the Agent in this Agreement or the Loan Documents). For greater certainty, where the provisions of this Agreement and the provisions of the other Loan Documents deal with the same subject matter but are not identical, no conflict between the documents will exist or be deemed to exist unless observing or complying with the provisions of one document will cause a default under the provisions of the other document.

16.18  **No Waiver; Cumulative Rights, Enforcement.**  No failure by the Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

16.19  **Keepwell.**  Each Borrower at the time a guaranty or a grant of the security interest under the Loan Documents by any Specified Loan Party, becomes effective with respect to any Hedging Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Hedging Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under its guaranty and the other Loan Documents in respect of such Hedging Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Borrower's obligations and undertakings under this Section or any guaranty voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Borrower under this Section shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full. Each Borrower intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

16.20  **Acknowledgement and Consent to Bail-In of EEA Financial Institutions.** Solely to the extent the Lender is an EEA Financial Institution and notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding

164393.00001/155883146v.1164393.00001/155883146v.3

among any such parties, each party hereto acknowledges that any liability of the Lender arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by the Agent for the benefit of a Lender that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[Remainder of Page Intentionally Left Blank – Signature Pages Follow]

122

The Loan Parties, the Agent, and the Lenders entered into this Agreement on the Closing Date.

**HOLDINGS:**

**JT LOGISTICS HOLDING COMPANY, LLC,**
an Iowa limited liability company, as Holdings

By:_____
Name: _____
Title: _____

**BORROWERS**:

**JT LOGISTICS HOLDING COMPANY, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative

By:_____
Name: _____
Title: _____

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative

By:_____
Name: _____
Title: _____

**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,

By:_____
Name: _____
Title: _____

**JT FREIGHT, LLC,**
an Iowa limited liability company,

By:_____
Name: _____
Title: _____

**LIVIT STAFFING, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT TRANSPORTATION LEASING SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


SIGNATURE PAGE TO CREDIT AND SECURITY AGREEMENT

**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**700 BLAKELY, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

164393.00001/155883146v.1164393.00001/155883146v.3

**OTHER LOAN PARTIES**:

[_____]
a(n) _____


By:_____
Name: _____
Title: _____

164393.00001/155883146v.1164393.00001/155883146v.3

**AGENT**:

**ASSOCIATED BANK, NATIONAL ASSOCIATION**


By:_____
Name: _____
Title: _____

32875152.1
164393.00001/155883146v.1164393.00001/155883146v.3

**LENDERS:**


By:_____
Name: _____
Title: _____

SIGNATURE PAGE TO CREDIT AND SECURITY AGREEMENT

# EXHIBIT 5.6

# PROJECTIONS

See attached.

32875152.1
164393.00001/155883146v.1164393.00001/155883146v.3

A-1

## EXHIBIT A

## FORM OF BORROWING BASE CERTIFICATE

Attached.

32875152.1
164393.00001/155883146v.1164393.00001/155883146v.3

**EXHIBIT B**
**COMPLIANCE CERTIFICATE**

This Compliance Certificate (this "Certificate") is given by JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company (the "Loan Party Representative"), as required by the Credit and Security Agreement among the Loan Party Representative, the other Loan Parties, Associated Bank, National Association, as agent, and the other Lenders, dated December 27, 2024 (as amended, restated, supplemented, or modified from time to time, the "Credit Agreement"). Capitalized terms used but not defined in this Certificate have the meanings given to them in the Credit Agreement. The undersigned, an Authorized Officer of the Loan Party Representative, certifies that:

They are familiar with the Loan Documents, have made, or caused to have been made under their supervision, a detailed review of the transactions and condition of the Loan Parties during the accounting period covered by the attached financial statements.

[Attached are the Loan Parties' [audited/reviewed] financial statements on a consolidated and consolidating basis (including statements of income, stockholders' equity, and cash flow).] [Attached are the Loan Parties' unaudited financial statements on a consolidated and consolidating basis (including statements of income, and stockholders' equity, and cash flow).]

[The Loan Parties' [reviewed/audited] financial statements have been prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail.][The Loan Parties' unaudited financial statements have been prepared on a basis consistent with prior practices and are complete and correct in all material respects, subject to normal and recurring year-end adjustments that individually and in the aggregate are not material to the Loan Parties' business.] If there has been any change in GAAP or in its application since the date of the audited financial statements referred to in Section 5.6(b) of the Credit Agreement, attached to this Certificate is a description of the change(s) and the effect of the change(s) on the financial statements accompanying this Certificate.

Based on an examination sufficient to permit the undersigned to make an informed statement:

No Default Condition existed at the end of the accounting period covered by the attached financial statements and no Default Condition exists on the date of this Certificate.

[**OR**]

One or more Defaults or Events of Default exist. Attached is a statement specifying each Default and Event of Default, its nature, when it occurred, whether it is continuing, and the steps the Loan Parties are taking with respect to each Default and Event of Default.

Exhibit A contains the calculations of the financial covenants required under Sections [7.6, 7.11, and 7.24] of the Credit Agreement and a calculation of the amounts allowed under clause (6) of the definition of Permitted Liens, which calculations [are][are not] in compliance with the terms of the Credit Agreement.

A-1

A-2

[Exhibit B contains the calculations to determine the Applicable Rate.]

164393.00001/155883146v.1164393.00001/155883146v.3

This Certificate is executed and delivered on [_____ ___, 20__].

**JT LOGISTICS SOLUTIONS, LLC**, an Iowa
limited liability company


By:_____
Name: _____
Title: _____

B-3

164393.00001/155883146v.1164393.00001/155883146v.3

**EXHIBIT A TO COMPLIANCE CERTIFICATE**

See attached.

B-4

164393.00001/155883146v.1164393.00001/155883146v.3

**[EXHIBIT B TO COMPLIANCE CERTIFICATE**

See attached.]

B-5

164393.00001/155883146v.1164393.00001/155883146v.3

**EXHIBIT C**

**REVOLVING NOTE**

$[_____]                                    [_____ ___, 20__]

JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (which is defined below) as a Borrower, each a "Borrower" and collectively the "Borrowers"), jointly and severally promise to pay to the order of Associated Bank, National Association (the "Agent"), in immediately available funds, the aggregate principal amount of the Revolving Loans (as defined in the Credit Agreement), together with interest at the rates, on the dates, and on the terms in the Credit Agreement. The Borrowers must pay the unpaid principal amount of and accrued and unpaid interest on the Revolving Loans in full on the Termination Date (or such earlier date as the Revolving Loans shall be due and payable in full) and must make the mandatory repayments required to be made under the Loan Documents.

Agent will record in accordance with its usual practice the date and amount of each Revolving Loan and the date and amount of each principal payment.

This Revolving Note (this "Note") is one of the Revolving Notes issued in accordance with (and is entitled to the benefits of) the Credit and Security Agreement dated on or about the date of this Note (as amended, restated, supplemented, or modified from time to time, the "Credit Agreement"), among the Loan Parties, the Agent and the Lenders from time to time thereto. Capitalized terms used but not defined in this Note have the meanings given to them in the Credit Agreement. The Credit Agreement and the other Loan Documents govern certain of the terms and conditions of this Note, including the terms and conditions under which this Note may be prepaid or accelerated. This Note is secured by the Collateral.

[This Note amends and restates and is in substitution and exchange for the $_____ _____ Note dated _____ (the "Old Note"). This Note is not

C-1

164393.00001/155883146v.1164393.00001/155883146v.3

a novation of the Old Note and does not pay, terminate, extinguish, or discharge the undersigned's indebtedness evidenced by the Old Note. All indebtedness evidenced by the Old Note continues under and is evidenced and governed by this Note. Any reference to the Old Note in any other document (including the Loan Documents) is to be treated as a reference to this Note.]

Borrowers waive presentment, demand, protest, and notice of any kind.

[Remainder of Page Intentionally Left Blank]

C-2

164393.00001/155883146v.1164393.00001/155883146v.3

**BORROWERS**:

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**JT FREIGHT, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**LIVIT STAFFING, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

C-3

164393.00001/155883146v.1164393.00001/155883146v.3

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____

Name: _____

Title: _____


**JT TRANSPORTATION LEASING
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____

Name: _____

Title: _____


**WAREHOUSE BUILDOUT SYSTEMS &
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____

Name: _____

Title: _____


**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____

Name: _____

Title: _____


**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____

Name: _____

Title: _____


C-4

**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**700 BLAKELY, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

C-5

164393.00001/155883146v.1164393.00001/155883146v.3

**EXHIBIT D**

**SWING LOAN NOTE**

$[_____]                                                [_____ ___, 20__]

JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (which is defined below) as a Borrower, each a "Borrower" and collectively the "Borrowers"), jointly and severally promise to pay to the order of ASSOCIATED BANK, NATIONAL ASSOCIATION (the "Holder"), in immediately available funds, the aggregate principal amount of the Swing Loans (as defined in the Credit Agreement) made or extended to Borrowers by Holder, together with interest at the rates, on the dates, and on the terms in the Credit Agreement. The Borrowers must pay the unpaid principal amount of and accrued and unpaid interest on the Swing Loans made or extended to Borrowers by Holder in full on the Termination Date (or such earlier date as the Swing Loans shall be due and payable in full) and must make the mandatory repayments required to be made under the Loan Documents.

This Swing Loan Note (this "Note") is one of the Swing Loan Notes issued in accordance with (and is entitled to the benefits of) the Credit and Security Agreement dated on or about the date of this Note (as amended, restated, amended and restated, supplemented, or modified from time to time, the "Credit Agreement"), among the Loan Parties, the Agent and the Lenders from time to time thereto. Capitalized terms used but not defined in this Note have the meanings given to them in the Credit Agreement. The Credit Agreement and the other Loan Documents govern certain of the terms and conditions of this Note, including the terms and conditions under which this Note may be prepaid or accelerated. This Note is secured by the Collateral.

[This Note amends and restates and is in substitution and exchange for the $_____ _____ Note dated _____ (the "Old Note"). This Note is not a novation of the Old Note and does not pay, terminate, extinguish, or discharge the undersigned's

D-1

164393.00001/155883146v.1164393.00001/155883146v.3

indebtedness evidenced by the Old Note. All indebtedness evidenced by the Old Note continues under and is evidenced and governed by this Note. Any reference to the Old Note in any other document (including the Loan Documents) is to be treated as a reference to this Note.]

Borrowers waive presentment, demand, protest, and notice of any kind.

[Remainder of Page Intentionally Left Blank]

D-2

**BORROWERS**:

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**JT FREIGHT, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**LIVIT STAFFING, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

D-3

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT TRANSPORTATION LEASING
SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**WAREHOUSE BUILDOUT SYSTEMS &
SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

D-4

**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**700 BLAKELY, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

D-5

**EXHIBIT E**

**NOTICE OF BORROWING**

dated as of_____ , 20__

The undersigned JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("Loan Party Representative"), delivers this Notice of Borrowing to ASSOCIATED BANK, NATIONAL ASSOCIATION, as agent ("Agent"), in connection with the Credit and Security Agreement dated as of December 27, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; capitalized terms used but not defined herein shall have the meanings given such terms in the Credit Agreement), by and among Loan Party Representative, the other Loan Parties party thereto, the Lenders party thereto and Agent.

The undersigned hereby requests a Revolving Loan (the "Requested Revolving Loan").[1]

1. On [____], 20[__] (a Business Day) (the "Borrowing Date").

2. In the amount of $[_____], consisting of Base Rate Loans.

3. As of the Borrowing Date, before and after giving effect to the Requested Revolving Loan, no Default or Event of Default or will result from such proposed Revolving Loan.

> JT LOGISTICS SOLUTIONS, LLC,
> as Loan Party Representative
>
>
> By: _____
> Name:
> Title:

---

[1] Complete each of items 1-3 for each Requested Revolving Loan.

E-1

164393.00001/155883146v.1164393.00001/155883146v.3

**EXHIBIT F**

**NOTICE OF CONVERSION/CONTINUATION**

dated as of_____ , 20__

The undersigned JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("Loan Party Representative"), delivers this Notice of Conversion/Continuation to ASSOCIATED BANK, NATIONAL ASSOCIATION, as agent ("Agent"), in connection with the Credit and Security Agreement dated as of December 27, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; capitalized terms used but not defined herein shall have the meanings given such terms in the Credit Agreement), by and among Loan Party Representative, the other Loan Parties party thereto, the Lenders party thereto and Agent.

The undersigned hereby requests to.[2]

[1.  Convert $_____ in principal amount of presently outstanding Loans that are [Base Rate/Term SOFR] Loan[s] [having an Interest Period that expires on _____, 202_] to [Base Rate/Term SOFR] Loan[s] on ___, ___.  [The initial  Interest Period for such Term SOFR Loan[s] is requested to be a [one] [three] month period.].][3]

[2.  Continue as [a] Term SOFR Loan[s] $_____ in principal amount of presently outstanding Loans having an Interest Period that expires on __, 202_. The Interest Period for such Term SOFR Loan[s] commencing on ____, 202_ is requested to be a [one] [three] month period.]

The undersigned hereby certifies, in connection with any continuation of a Term SOFR Loan or any conversion of a Base Rate Loan to a Term SOFR Loan, that no Event of Default has occurred and is continuing under the Credit Agreement.

JT LOGISTICS SOLUTIONS, LLC,
as Loan Party Representative


By:  _____
Name:
Title:

---

[2] Complete each of items 1-3 for each Requested Revolving Loan.
[3] For Term SOFR Loans, this Notice of Conversion/Continuation must be provided 3 Business Days in advance of the proposed conversion/continuation date.

F-1

164393.00001/155883146v.1164393.00001/155883146v.3

**EXHIBIT G**

**TERM NOTE**

$[_____]                                              [_____ ___, 20__]

JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (which is defined below) as a Borrower, each a "Borrower" and collectively the "Borrowers"), jointly and severally promise to pay to the order of Associated Bank, National Association (the "Agent"), in immediately available funds, the aggregate principal amount of the Term Loan (as defined in the Credit Agreement), together with interest at the rates, on the dates, and on the terms in the Credit Agreement. The Borrowers must pay the unpaid principal amount of and accrued and unpaid interest on the Term Loan in full on the Termination Date (or such earlier date as the Term Loans shall be due and payable in full) and must make the mandatory repayments required to be made under the Credit Agreement.

Agent will record in accordance with its usual practice, the date and amount of the Term Loan and the date and amount of each principal payment.

This Term Note (this "Note") is the Term Note issued in accordance with (and is entitled to the benefits of) the Credit and Security Agreement dated on or about the date of this Note (as amended, restated, supplemented, or modified from time to time, the "Credit Agreement"), among the Loan Parties, the Agent and the Lenders from time to time thereto. Capitalized terms used but not defined in this Note have the meanings given to them in the Credit Agreement. The Credit Agreement and the other Loan Documents govern certain of this Note, including the terms and conditions under which this Note may be prepaid or accelerated. This Note is secured by the Collateral.

[This Note amends and restates and is in substitution and exchange for the $_____ _____ Note dated _____ (the "Old Note"). This Note is not a novation of the Old Note and does not pay, terminate, extinguish, or discharge the

G-1

164393.00001/155883146v.1164393.00001/155883146v.3

undersigned's indebtedness evidenced by the Old Note. All indebtedness evidenced by the Old Note continues under and is evidenced and governed by this Note. Any reference to the Old Note in any other document (including the Loan Documents) is to be treated as a reference to this Note.]

Borrowers waive presentment, demand, protest, and notice of any kind.

[Remainder of Page Intentionally Left Blank]

G-2

**BORROWERS**:

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative

By:_____
Name: _____
Title: _____

**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,

By:_____
Name: _____
Title: _____

**JT FREIGHT, LLC,**
an Iowa limited liability company,

By:_____
Name: _____
Title: _____

**LIVIT STAFFING, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

G-2

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION LEASING
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**WAREHOUSE BUILDOUT SYSTEMS &
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


G-3

**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____


**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____


**700 BLAKELY, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

G-4

**EXHIBIT H**

**CAPEX NOTE**

$[_____]                                          [_____ ___, 20__]

        JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (which is defined below) as a Borrower, each a "Borrower" and collectively the "Borrowers"), jointly and severally promise to pay to the order of Associated Bank, National Association (the "Agent"), in immediately available funds, the aggregate principal amount of all Capex Loans (as defined in the Credit Agreement), together with interest at the rates, on the dates, and on the terms in the Credit Agreement. The Borrowers must pay the unpaid principal amount of and accrued and unpaid interest on the Capex Loans in full on the Termination Date (or such earlier date as the Capex Loans shall be due and payable in full) and must make the mandatory repayments required to be made under the Credit Agreement.

        Agent will record in accordance with its usual practice, the date and amount of the Capex Loans and the date and amount of each principal payment.

        This Capex Note (this "Note") is one of the Capex Notes issued in accordance with (and is entitled to the benefits of) Credit and Security Agreement dated on December 27, 2024 (as amended, restated, supplemented, or modified from time to time, the "Credit Agreement"), among the Loan Parties, the Agent, and the Lenders from time to time thereto. Capitalized terms used but not defined in this Note have the meanings given to them in the Credit Agreement. The Credit Agreement and the other Loan Documents govern certain of the terms and conditions of this Note, including the terms and conditions under which this Note may be prepaid or accelerated. This Note is secured by the Collateral.

        [This Note amends and restates and is in substitution and exchange for the $_____ _____ Note dated _____ (the "Old Note"). This Note is not a novation of the Old Note and does not pay, terminate, extinguish, or discharge the undersigned's indebtedness evidenced by the Old Note. All indebtedness evidenced by the Old

164393.00001/155883146v.1164393.00001/155883146v.3

H-2

Note continues under and is evidenced and governed by this Note. Any reference to the Old Note in any other document (including the Loan Documents) is to be treated as a reference to this Note.]

Borrowers waive presentment, demand, protest, and notice of any kind.

[Remainder of Page Intentionally Left Blank]

H-2

164393.00001/155883146v.1164393.00001/155883146v.3

**BORROWERS**:

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative

By:_____
Name: _____
Title: _____

**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,

By:_____
Name: _____
Title: _____

**JT FREIGHT, LLC,**
an Iowa limited liability company,

By:_____
Name: _____
Title: _____

**LIVIT STAFFING, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company

By:_____
Name: _____
Title: _____

H-1

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION LEASING
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**WAREHOUSE BUILDOUT SYSTEMS &
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


H-2

164393.00001/155883146v.1164393.00001/155883146v.3

**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**700 BLAKELY, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

164393.00001/155883146v.1164393.00001/155883146v.3

**EXHIBIT I**

**HVAC EQUIPMENT LOAN NOTE**

$[_____]                                          [_____ ___, 20__]

JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, JT Expedited, and each other Person that joins the Credit Agreement (which is defined below) as a Borrower, each a "Borrower" and collectively the "Borrowers"), jointly and severally promise to pay to the order of Associated Bank, National Association (the "Agent"), in immediately available funds, the aggregate principal amount of all HVAC Equipment Loans (as defined in the Credit Agreement), together with interest at the rates, on the dates, and on the terms in the Credit Agreement. The Borrowers must pay the unpaid principal amount of and accrued and unpaid interest on the HVAC Equipment Loans in full on the Termination Date (or such earlier date as the HVAC Equipment Loans shall be due and payable in full) and must make the mandatory repayments required to be made under the Credit Agreement.

Agent will record in accordance with its usual practice, the date and amount of the HVAC Equipment Loans and the date and amount of each principal payment.

This HVAC Equipment Loan Note (this "Note") is one of the HVAC Equipment Loan Notes issued in accordance with (and is entitled to the benefits of) the Credit and Security Agreement dated on December 27, 2024 (as amended, restated, supplemented, or modified from time to time, the "Credit Agreement"), among the Loan Parties, the Agent, and the Lenders from time to time thereto. Capitalized terms used but not defined in this Note have the meanings given to them in the Credit Agreement. The Credit Agreement and the other Loan Documents govern certain of the terms and conditions of this Note, including the terms and conditions under which this Note may be prepaid or accelerated. This Note is secured by the Collateral.

[This Note amends and restates and is in substitution and exchange for the $_____ _____ Note dated _____ (the "Old Note"). This Note is not a novation of the Old Note and does not pay, terminate, extinguish, or discharge the undersigned's

I-1

I-2

indebtedness evidenced by the Old Note. All indebtedness evidenced by the Old Note continues under and is evidenced and governed by this Note. Any reference to the Old Note in any other document (including the Loan Documents) is to be treated as a reference to this Note.]

Borrowers waive presentment, demand, protest, and notice of any kind.

[Remainder of Page Intentionally Left Blank]

I-2

**BORROWERS**:

**JT LOGISTICS SOLUTIONS, LLC,**
an Iowa limited liability company,
as a Borrower and as Loan Party Representative


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**JT FREIGHT, LLC,**
an Iowa limited liability company,


By:_____
Name: _____
Title: _____


**LIVIT STAFFING, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT REAL ESTATE HOLDINGS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

I-3

**JT PROPERTY SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT TRANSPORTATION LEASING
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**WAREHOUSE BUILDOUT SYSTEMS &
SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT ECOMMERCE SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT PACKAGING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


I-4

**JT BINDING SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT INDUSTRIAL SERVICES, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**JT EXPEDITED SOLUTIONS, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____


**700 BLAKELY, LLC,**
an Iowa limited liability company


By:_____
Name: _____
Title: _____

I-5

**EXHIBIT J**

**FORM OF JOINDER**

This Joinder (this "Joinder") is executed and delivered as of this [___] day of [___], 20[___] by [_____] (the "New Borrower") in favor of Associated Bank, National Association ("Associated"), as Agent under and as defined in the Credit Agreement referred to below.

Reference is hereby made to that certain Credit and Security Agreement dated as of December 27, 2024 (as the same may be amended, restated, amended and restated, extended, supplemented, or otherwise modified from time to time, the "Credit Agreement") among JT LOGISTICS HOLDING COMPANY, LLC, an Iowa limited liability company ("Holdings"), JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company ("JT Logistics"), JT TRANSPORTATION, LLC, an Iowa limited liability company ("JT Transportation"), JT FREIGHT, LLC, an Iowa limited liability company ("JT Freight"), LIVIT STAFFING, LLC, an Iowa limited liability company ("LIVIT Staffing"), JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company ("JT Real Estate"), JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company ("JT Property"), JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company ("JT Leasing"), WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability company ("JT Warehouse"), JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company ("JT eCommerce"), JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company ("JT Packaging"), JT BINDING SOLUTIONS, LLC, an Iowa limited liability company ("JT Binding"), JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company ("JT Industrial"), JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company ("JT Expedited"), and 700 BLAKELY, LLC, an Iowa limited liability company ("700 Blakely"; and together with JT Logistics, JT Transportation, JT Freight, LIVIT Staffing, JT Real Estate, JT Property, JT Leasing, JT Warehouse, JT eCommerce, JT Packaging, JT Binding, JT Industrial, and JT Expedited, collectively, the "Existing Borrowers" and each individually an "Existing Borrower"), the Agent and the Lenders from time to time thereto.

Under the terms of the Credit Agreement, New Borrower is required, and does agree, to expressly join the Credit Agreement as a Borrower, and hereby agrees that it shall be deemed a party to the Credit Agreement as if it were originally signatory thereto. New Borrower hereby agrees to be bound by, and a maker and obligor of, all representations, warranties, indemnities, undertakings, covenants, limitations, waivers, exclusions, acknowledgements and agreements under the Credit Agreement relating to, pertaining to, or binding upon, a Borrower or made or agreed to by a Borrower to or for the benefit of the Agent on behalf of the Lenders.

Without limiting the foregoing, New Borrower, as security for the payment and performance in full of the Obligations, does hereby grant, assign, and pledge to Agent, on behalf of the Lenders, a security interest in and Lien on all personal property of New Borrower including all property of the type described in the Credit Agreement as "Collateral" (subject in all respects to the exclusions set forth in the definition of "Collateral"). The information on the attached Schedules hereto is hereby added to the applicable Schedules to the Credit Agreement.

J-1

J-2

This Joinder is a supplement to, and not a novation of, the Credit Agreement, which remains in full force and effect, and the provisions of which are incorporated herein by reference.

[Signature Pages Follow]

J-2

IN WITNESS WHEREOF, New Borrower has executed and delivered this Joinder as part of the Credit Agreement as of the date and year first set forth above.

NEW BORROWER:                                    [_____]


                                                 By:  _____
                                                 Name:
                                                 Title:


ACCEPTED AND AGREED:
ASSOCIATED BANK, NATIONAL ASSOCIATION,
as Agent


By:_____
Name:
Title:

J-3

164393.00001/155883146v.1164393.00001/155883146v.3

**EXHIBIT K**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Assignment") is dated as of the Effective Date set forth below and is entered into by and between _____ (the "Assignor") and _____ (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by Agent as contemplated below, (i) all of the Assignor's rights and obligations as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including Guarantees), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or in any way based on or related to any of the foregoing, including, but not limited to contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity, related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

1.   Assignor:        _____.

     [Assignor [is] [is not] a Defaulting Lender]

2.   Assignee:        _____, [which is an Eligible Assignee].

3.   Borrowers:    JT LOGISTICS SOLUTIONS, LLC, an Iowa limited liability company; JT TRANSPORTATION, LLC, an Iowa limited liability company; JT FREIGHT, LLC, an Iowa limited liability company; LIVIT STAFFING, LLC, an Iowa limited liability company; JT REAL ESTATE HOLDINGS, LLC, an Iowa limited liability company; JT PROPERTY SOLUTIONS, LLC, an Iowa limited liability company; JT TRANSPORTATION LEASING SOLUTIONS, LLC, an Iowa limited liability company; WAREHOUSE BUILDOUT SYSTEMS & SOLUTIONS, LLC, an Iowa limited liability

J-1

164393.00001/155883146v.1164393.00001/155883146v.3

company; JT ECOMMERCE SOLUTIONS, LLC, a Iowa limited liability company; JT PACKAGING SOLUTIONS, LLC, an Iowa limited liability company; JT BINDING SOLUTIONS, LLC, an Iowa limited liability company; JT INDUSTRIAL SERVICES, LLC, an Iowa limited liability company; JT EXPEDITED SOLUTIONS, LLC, an Iowa limited liability company; and 700 BLAKELY, LLC, an Iowa limited liability company.

4.      Agent: Associated Bank, National Association, as the administrative agent and collateral agent under the Credit Agreement.

5.      Credit Agreement:    The Credit and Security Agreement, dated as of December 27, 2024, by and among Borrowers, the Lenders parties thereto, and Agent, as amended.

6.      Assigned Interest in Commercial Loan:

| Aggregate Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned |
|---|---|
| $_____ | $_____ |

7.      Assigned Interest in Residential Loan:

| Aggregate Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned |
|---|---|
| $_____ | $_____ |

Effective Date: _____, 20__ **[TO BE INSERTED BY AGENT UPON RECEIPT BY AGENT]**

J-2

164393.00001/155883146v.1164393.00001/155883146v.3

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR:

_____

By: _____
      Name: _____
      Title:_____

ASSIGNEE:

_____

By: _____
      Name: _____
      Title:_____

**[Consented to and]** Accepted:

ASSOCIATED BANK, NATIONAL ASSOCIATION, as Agent

By: _____
Name:_____
Title:_____

**[Consented to and]** Accepted:

JT LOGISTICS SOLUTIONS, LLC, as Loan Party Representative

By: _____
Name:_____
Title:_____

J-3

J-4

ANNEX 1

**STANDARD TERMS AND CONDITIONS FOR**
**ASSIGNMENT AND ASSUMPTION**

(A)     Representations and Warranties.

(a)     1.1     Assignor.  Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the relevant Assigned Interest, (ii) such Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby, and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of any Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by any Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

(b)     1.2     Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under the Credit Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of such Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the relevant Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire such Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 9.5 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase such Assigned Interest, (vi) it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase such Assigned Interest, and (vii) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Agent, any other assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

164393.00001/155883146v.1164393.00001/155883146v.3

(B)     <u>Payments</u>.  From and after the Effective Date, the Agent shall make all payments in respect of each Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignee whether such amounts have accrued prior to, on or after the Effective Date.  The Assignor and the Assignee shall make all appropriate adjustments in payments by the Agent for periods prior to the Effective Date or with respect to the making of this assignment directly between themselves.

(C)     <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by facsimile or other electronic transmission (*e.g.*, .pdf) shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of Illinois.

164393.00001/155883146v.1164393.00001/155883146v.3

**SCHEDULE 1**
**COMMITMENTS OF THE LENDERS**

| LENDERS | COMMITMENT PERCENTAGE | REVOLVING COMMITMENT AMOUNT | TERM LOAN COMMITMENT AMOUNT | CAPEX LOAN COMMITMENT AMOUNT | HVAC EQUIPMENT LOAN COMMITMENT AMOUNT | AGGREGATE COMMITMENT |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
| TOTAL |  |  |  |  |  |  |

SCHEDULES

See attached.

164393.00001/155883146v.1164393.00001/155883146v.3